IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
MC ALLEN DIVISION

UNITED STATES OF AMERICA )
)
)
VS. )
)
)        Violation No. ST34 W0889336
MICHAEL TODD CLEVELAND, )   MAGISTRATE ACTION NO. M-06-4806-1
)
)
)

DEFENDANT'S APPEAL BRIEF FROM THE UNITED STATES MAGISTRATE
COURT TO THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS

Milo Lone-Eagle Colton and Marisa Y. Salazar (Civil Rights Legal Defense and
Educational Fund, Inc.), for Defendant – Appellee.

I.      SUMMARY OF FACTS

According to Father Stephen Huffstetter[1]

> (American Indians) believe good dreams and nightmares float in the air
> and a special willow frame strung with sinew can screen out nightmares and let
> only good dreams pass through the center hole.
> They call the ornament a "dreamcatcher" and put one in every tipi and on
> the cradle board of every baby.  Unfortunately, there aren't many good dreams
> left for (American Indians).
> Once, their nation was proud and strong. Now, they are the poorest of
> America's poor.  The 2000 U.S. census. . .reports Buffalo County,[2] home of the
> Crow Creek Reservation, is the poorest county in all of the United States. . .In
> fact, of the top 10 poorest counties,. . . six (are) homes to Indian reservations.

On an early Saturday afternoon on March 11, 2006, American Indians took

another hit as a nightmare gripped and diminished the American Indian community of

South Texas.  It was on this date that United States Fish and Wildlife Service

---

[1] Fr. Stephen Huffstetter, SCJ, Director of St. Joseph Indian School, Chamberlain, SD, 57326, *Letter to Mr. Colton*, Received 2-13-07.

[2] South Dakota

**DEFENDANTS' EXHIBIT 3**

(USFWS) Special Agent Alejandro Rodriguez (the agent), acting without probable cause and without a search warrant, raided an American Indian religious service,[3] frightening and upsetting American Indian women and children and humiliating respected American Indian elders. His raid targeted the Nde Daa[4] Way South Powwow[5] held at the Palm View Community Center in McAllen, Texas. He came to seize sacred feathers used by powwow participants in the observance of their traditional native religion.

In less than an hour[6], the agent seized more than fifty feathers from Lipan Apache Holy Man Robert Soto, his brother-in-law Michael Russell of Creek Indian ancestry, and Cherokee Artist Michael Todd Cleveland.

Although all the confiscated feathers are said to be from species listed on the Migratory Bird Treaty Act (MBTA), they are exempt for American Indian use in religious observances according to federal court precedent and administrative laws of the Executive Branch of the Federal Government. The agent's raid on this religious ceremony violated the Indian participants' rights, including participating Indian Michael Todd Cleveland's rights, to the free exercise of religion under the Religious Freedom Restoration Act (RFRA) and the First amendment of the U.S. Constitution. Gonzalez v. O Centro Espirita Beneficiente Uniao Do Vegetal (UDV), et al., 126 S.Ct. 1211 (2006). Commercial vendors that sell objects necessary for religious ceremonies are also exempt from the MBTA.

---

[3] U.S. Government stipulated the powwow was a religious ceremony in Final Pretrial – CVB Bench Trial Motions Hearing Transcript, at page 9, Lines 4 and 5.
[4] Nde Daa is Apache for "The People Springtime Gathering."
[5] U.S. Government stipulated at pre-trial hearing that an American Indian Powwow is a religious service. *See* Final Pretrial-CVB Bench Trial Motions Hearing Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of Texas, McAllen Division, at page 9, Lines 4 and 5.
[6] *See* Bench Trial Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of Texas, McAllen Division, at page 40, Lines 20-25.

**DEFENDANTS' EXHIBIT 3**

On November 2, 2006, a one-day bench trial was held in The United States District Court for the Southern District of Texas, McAllen Division, U.S. Magistrate Judge Dorina Ramos presiding.  At the conclusion of the trial, Magistrate Judge Ramos found the Defendant in violation of the Migratory Bird Treaty Act, but Judge Ramos reduced the Defendant Michael Todd Cleveland's fine to $200.  On November 11, 2006, Defendant Michael Todd Cleveland filed a Notice of Appeal.

**ISSUE ONE: Did the agent's actions violate the fourth amendment by raiding this American Indian religious service without probable cause and without a search warrant?**

The agent **lacked probable cause** under the Fourth Amendment to the U.S. Constitution to conduct a search and seizure of feathers without a warrant at the McAllen Powwow, held on March 11, 2006. Under the federal search and seizure exclusionary rule, any evidence obtained via an illegal search or an illegal seizure, must be excluded as evidence. *Boyd v. United States*, 116 U.S. 616 (1886), *Weeks v. United States,* 232 U.S. 383 (1914), and *Silverthorne Lumber v. United States,* 251 U.S. 385 (1920).

According to the <u>first</u> of two Reports of Investigation prepared by the agent, dated 04/20/2006, Report #: 2006201750R001, Case Title "OPERATION POWWOW", SUBJECTS OF THE REPORT: MICHAEL CLEVELAND, MICHAEL V. RUSSELL, AND ROBERT SOTO, the agent stated:

> In the Fall of 2005, (he) received a call from a Service refuge employee, who is a Native American, to report that he had been to an area pow-wow and had observed a male subject wearing a bustle made of golden eagle feathers. According to the refuge employee, he knew the individual was not a Native American. The refuge employee did not know the subject's name, but he

**DEFENDANTS' EXHIBIT 3**

promised to call (the agent) back if he received other information in regard to the subject's identity.[7]

The agent did not divulge the identity of his tipster, nor did he indicate how he verified that his tipster was indeed a Native American. Nor did the agent indicate which specific powwow of the many powwows[8] held in the area of south Texas his tipster had observed the male wearing the Golden Eagle bustle. At any of the many area powwows, it is common for male traditional dancers to wear eagle feather bustles and eagle feather roach head dresses. Further, the agent did not indicate whether the tipster ever called him back concerning the identity of the male "not a Native American."

Months after the tip, on March 8, 2006, the agent noticed a picture in a local newspaper (The Town Crier, Vol. 42., No. 10) announcing an upcoming powwow on March 11, 2006, in McAllen, Texas. In a picture of The South Texas Indian Dancers that is remarkable for its lack of clarity and detail, the agent indicates that he "observed at least two subjects wearing what appeared to be immature golden eagle feathers."[9] Although, under the Fourth Amendment, the agent was required to submit his tipster's information to a detached and neutral magistrate for a proper determination on the issuance of a search warrant to be executed at the powwow, he did not do this. In *Johnson v. United States,* 333 U.S. 10 (1948), the court stated that inferences leading to the issuance of a search warrant must be drawn by a neutral and detached magistrate, not by the officer engaged in the often competitive enterprise of

---

[7] Report of Investigation (First Report), dated April 20, 2006, Report #: 2006201750R001, Case Title "OPERATION POWWOW", page 2.
[8] In south Texas, there are many powwows held throughout the year, including powwows in McAllen, Laredo, Falfurrias, San Antonio (at Crossroads Mall, St. Mary's University, Fort Sam Houston, the Witte Museum, the Botanical Gardens, etc.), Fredericksburg, and Canyon Lake, to list a few.
[9] Ibid.

**DEFENDANTS' EXHIBIT 3**

ferreting out crime. The agent decided to draw his own inferences and decided to conduct an illegal search and seizure at the powwow before he attended the sacred event. According to *Katz v. United States,* 389 U.S. 347 (1967), the Fourth Amendment protects people, not places. The court in *Katz* stated that the prohibition against unreasonable searches and seizures is not limited to homes, offices, buildings, or other enclosed places. It applies even in public places where a person has a "reasonable and justifiable expectation of privacy." Therefore, participants of the powwow had a reasonable and justifiable expectation of privacy in their possessions and in the sacred ceremony they attended. However, the agent reported:

> On March 11, 2006, . . ., in a covert capacity, (he) attended the pow-wow . . . As the agent walked into the hallway of the center he immediately recognized a subject from the newspaper photo with a bustle made of large white and brown feathers standing at the entrance to the pavilion. The agent approached the subject (later identified as Michael v. RUSSELL by his state-issued driver's license) and commented to him that he (the agent) liked the costume he (RUSSELL) was wearing. RUSSELL thanked the agent for the compliment and proceeded to explain what it was made of. The agent then asked RUSSELL what a small beaded-leather pouch that he was wearing around his neck was for. RUSSELL stated it was a small medicine bag and it was used by Native Americans to keep medicinal items. The agent then asked R2USSELL about the bustle he was wearing on his back. RUSSELL said it was made of eagle feathers and it was given to him by an Apache. The agent asked RUSSELL if he was a Native American and RUSSELL stated 'No'. [10] The (agent) asked RUSSELL if he (the agent) could touch the feathers and RUSSELL stated 'No' and turned away from (the agent). [11]

---

[10] Mr. Russell is in fact of Creek Indian ancestry, and he claims American Indian identification pursuant to Federal Law 62 FR 58782-01. Like many Indians, he resents the term "Native American" as applicable to the First People in the America's prior to the arrival of the Europeans. Federal Law supports his position. According to Federal Law 62 FR 58782-01, as described in *Federal Register* Notice, dated October 30, 1997, entitled "Revisions to the Standards for the Classification of Federal Data on Race and Ethnicity," at Supplementary Information, Section D, OMB's Decisions, Subsection (8), OMB accepts the following recommendation concerning changing the term "American Indian" to "Native American," it states:

"The term American Indian should not be changed to Native American."

[11] Among many Indians, it is considered a tremendous breech of ethics to touch the feathers worn by an Indian without the wearer's permission. Many believe that the touching of the feathers by another could diminish the "medicine" or spiritual powers of the feathers.

**DEFENDANTS' EXHIBIT 3**

At this point the agent showed RUSSELL his credentials and identified himself as a federal agent with the United States Fish and Wildlife Service (USFWS). The agent asked RUSSELL to follow him to an isolated area of the large hallway outside the pavilion where the pow-wow was being held.[12]

Once there (in the hallway[13]), the agent asked RUSSELL to remove the bustle from his back so the agent could inspect the feathers. RUSSELL was also wearing four more feathers on his costume that appeared to be eagle feathers and the agent asked him to remove these as well.[14] The agent identified all the feathers as immature golden eagle (Aquila chryaetos).[15]

At this point, Rev. Soto approached the agent and asked him what the problem was. The agent told Rev. Soto that he was investigating the illegal possession of feathers by those attending the powwow.

Rev. Soto informed the agent that he was interrupting an American Indian religious service, and that he should leave the powwow. The agent said he did not have to leave, whereupon Rev. Soto asked to see the agent's credentials. The agent refused to show them to him. Rev. Soto persisted and asked again to see the agent's credentials and again the agent refused to produce them. After four requests by Rev. Soto for the agent to produce his credentials, the agent finally showed them to him.

Rev. Soto then identified himself, and informed the agent that the bustle worn by Mr. Russell belonged to Rev. Soto, an enrolled member of the Lipan Apache Band of Texas.

According to the agent's report:

---

[12] Report of Investigation (First Report), dated April 20, 2006, Report #: 2006201750R001, Case Title "OPERATION POWWOW", page 2-3.

[13] The entire community center area where participants were present is included in the religious ceremony called a powwow. The fourth amendment protects people, not places. The "hallway" area later referenced is a very large room with chairs through which participants must pass as they come from the dressing room where they have already begun their religious experience. Many participants perform sacred ceremonies such as a "smudge" to bless themselves and their feathers in this "hallway" area.

[14] Ibid.

[15] The agent's ability to identify the feathers is suspect. If questioned at trial, Mr. Russell would not have supported the agent's identification of all the feathers as immature golden eagle feathers.

6                                                      **DEFENDANTS' EXHIBIT 3**

At this point the agent asked RUSSELL where he had gotten the feathers and RUSSELL stated that his brother-in-law, Robert SOTO, had lent him the feathers . . . The agent asked RUSSELL for identification and RUSSELL stated that his wallet was in the dressing room. The agent told RUSSELL to go get it.

While (the agent) was waiting for RUSSELL he recognized the second subject, who was talking to a female at an information table, as one of the two persons with what appeared to be eagle feathers in the newspaper photo. The agent (claimed that he) called the subject and the agent identified himself with his credentials as a federal agent with the USFWS. The subject, later identified as Robert SOTO, asked to see the agent's credentials . . . The agent asked SOTO to remove two large white and brown feathers that SOTO was wearing on top of his head. SOTO removed them and handed them to the agent[16]. The agent also identified these two feathers as immature golden eagle. At this point the agent asked SOTO if he was a Native American and SOTO answered 'Yes.' The agent asked SOTO if he was 'carded' and SOTO again answered 'Yes' and that his card was in his wallet in the dressing room. SOTO was told to go and get the card.

While the agent was talking to SOTO, RUSSELL returned from the dressing room with his Texas driver license. After SOTO left to retrieve his identification, the agent wrote down RUSSELL's personal information and advised RUSSELL he was going to seize the feathers and the agent would be contacting RUSSELL in the next few days to advise him of what was going to happen.

SOTO returned from the dressing room and handed the agent a plastic credit-card sized identification . . . The card, issued by the Lipan Apache Band of Texas, Inc., had SOTO's picture on it along with a membership number and name and address. The agent wrote down all the information and advised SOTO that he (the agent) would not be seizing the feathers from him but would be investigating the matter further . . .

After the agent finished the contact with RUSSELL and SOTO he returned to pavilion where the pow-wow was being held. The agent observed several people seated in stands watching people from the audience participate in a cake-walk while several males banged on large drums. The agent observed several vendors selling jewelry, arts, and crafts.[17]

The agent claimed that he noticed an American Indian artist whom the agent

mis-identified as:

---

[16] In an "Administrative Page" attached to Report of Investigation, dated August 2, 2006, Report #: 2006201750R003, Case Title "OPERATION POWWOW", SUBJECTS OF THE REPORT: SOTO, Robert, RUSSELL, Michael, and CLEVELAND, p. 1, it was noted that the agent's Office of Law Enforcement Supervisors in San Antonio "would not oppose returning the two eagle feathers abandoned by Soto."

[17] Report of Investigation (First Report), dated April 20, 2006, Report #: 2006201750R001, Case Title "OPERATION POWWOW", pages 2-3.

**DEFENDANTS' EXHIBIT 3**

One vendor, Michael Cleveland, had several dream-catchers for sale containing various feathers, some of which appeared to be songbird and waterfowl (which species the agent was unwilling or unable to identify in his report or in the transmission paperwork of the feathers to the USFWS Forensics Laboratory as protected by the Migratory Bird Treaty Act or any other Act).[18]

According to Commander Edith Clark, a Cherokee Indian,[19] who had custody and control of the booth that was decorated by Linda Cleveland, the vendor of record, with her son Michael Cleveland's dreamcatchers, Commander Clark was the only person at the booth when the agent first approached it and made assertions that the feathers adorning the dreamcatchers could be illegal.

At trial, the agent admitted that someone other than Michael Cleveland or his mother Linda Cleveland was at the booth when he first approached it. He described her (Commander Edith Clark) as a "white Caucasian lady probably in her early 60s manning the booth."[20] When he asked Commander Edith Clark about the dreamcatchers and the feathers adorning them, Commander Clark told him he needed to visit with Linda Cleveland, the vendor of record, who was on break at the time.

After the passage of several minutes, Linda Cleveland appeared at the booth with her son Michael Cleveland.

Without asking or establishing whether Linda Cleveland or Michael Cleveland were American Indians, the agent commenced his interrogation of Michael Cleveland about the feathers adorning the dreamcatchers at Linda Cleveland's booth.

---

[18] Ibid., p. 3.

[19] See Bench Trial Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of Texas, McAllen Division, at page 96, Lines 4-8.

[20] See Bench Trial Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of Texas, McAllen Division, at page 23, Lines 16-17.

**DEFENDANTS' EXHIBIT 3**

At trial and in pre-trial motions, the American Indian status of Linda Cleveland and her son was not contested by the Government when Linda Cleveland testified that she was a Cherokee Indian who identified as such on the 2000 US decennial census and the biological mother of Michael Cleveland. Mrs. Cleveland also testified that she was the vendor of record at the powwow and that her son's dreamcatchers were not for sale and were hung at her booth for decoration it and to give it ambience.[21]

At this point, Rev. Soto and Anita Anaya, a fellow Tribal Council Member and Secretary to the Lipan Apache Tribe of Texas, approached the agent. She and Rev. Soto told the agent that he was disrupting an American Indian religious service in violation of the American Indians' freedom of religion and he needed to cease and desist his harassing and molesting of American Indian powwow participants and leave the powwow.

According to the agent's Report of Investigation:

While the agent was discussing the possession of these feathers with CLEVELAND, SOTO and Anita Anaya came over to speak to the agent. Anaya claimed she was the secretary of the Lipan Apache and asked the agent what he was doing there. The agent advised Anaya that he was conducting a federal investigation into the illegal possession of protected migratory bird parts.

Anaya asked the agent if she could ask him to leave. The agent advised Anaya again that he was conducting a federal investigation and since the location was a public place and open to the public he was lawfully there. Furthermore, the agent reminded Anaya that the pow-wow had been advertised in the local paper[22] and was open to the public. The agent gave Anaya a business card and told her to call him if she had any further questions. Anaya kept insisting that (the agent) leave the premises, and the agent advised her that if she kept interfering with a federal investigation she could be arrested. At this point Anaya decided to leave.[23]

---

[21]*See* Bench Trial Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of Texas, McAllen Division, at page 103, Lines 10-11.

[22] As are hundreds of religious services of the many Christian denominations throughout Texas.

[23] Report of Investigation (First Report), dated April 20, 2006, Report #: 2006201750R001, Case Title "OPERATION POWWOW", at page 4.

**DEFENDANTS' EXHIBIT 3**

After the interrogations were finished, the agent decided that the feathers should be tested to determine whether they were illegal or not. In front of witnesses at the booth, the agent then seized <u>four</u> feathers from one of Mr. Cleveland's dreamcatchers, explaining that the feathers would be sent to the USFWS lab for testing to determine the feathers' birds or origin. Even in the context of a nonsearch, merely observing a contraband object does not give law enforcement the authority to seize it. The seizable nature of an object must also be "plain." If the law enforcement official must conduct a search to determine whether it is contraband or otherwise seizable, the object is not in "plain view." *Arizona v. Hicks,* 480 U.S. 321, (1987). If the agent had to send the feathers to the USFWS lab and wait for a determination on their status before issuing a citation, then the "seizable nature" of the feathers was not "plain" when he seized them, and in fact the USFWS lab determined that two of the seized feathers were not identifiable[24].

At trial, Commander Edith Clark stated that she saw the agent seize <u>three</u> feathers;[25] Robert Soto saw the agent seize <u>one</u> feather;[26] and Linda Cleveland saw the agent seize <u>four</u> feathers.[27]

The <u>four</u> feathers that Mr. Cleveland claimed were seized by the agent included: two pheasant feathers, about two inches in diameter, and somewhat round in shape; one farm turkey feather, darkish brown in color with golden or tarnish stripes at the

---

[24] *See* Bench Trial Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of Texas, McAllen Division, at page 66, Lines 19-25.

[25] *See* Bench Trial Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of Texas, McAllen Division, at page 99, Line 23.

[26] *See* Bench Trial Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of Texas, McAllen Division, at page 87, Lines 18.

[27] *See* Bench Trial Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of Texas, McAllen Division, at page 106, Line 8.

**DEFENDANTS' EXHIBIT 3**

tip and about three inches long; and one duck feather, all white in color and fluffy looking, about 2 to 2 and ½ inches long.[28]

According to the agent's Report of Investigation, the number of feathers that he seized was double what Mr. Cleveland claimed was seized. The agent's Report of Investigation stated:

> The agent continued visiting with CLEVELAND and seized eight loose feathers that were attached to the dream-catchers.[29]

According to the Morphology Examination Report and the trial testimony of Pepper Trail, Senior Forensic Scientist for the National Fish and Wildlife Forensics Laboratory, of the eight feathers (alleged to have been taken from suspect Michael Cleveland and submitted by the agent for examination), one was White-winged Dove (Zenaida asiatica), one was White-tipped Dove (Leptoptila verreauxi), two were Black-bellied Whistling Duck (Dendrocygna), two were Canada Goose (Branta Canadensis), and two were unidentified waterfowl (Anatidae).[30] Pepper Trail also made the incredible assertion at trial that his method of examining feathers with the naked eye for purposes of identification was 100 percent accurate,[31] perfect beyond even the known limitations of DNA analysis.

---

[28] Defendant's Motion to Suppress.

[29] Report of Investigation (First Report), dated April 20, 2006, Report #: 2006201750R001, Case Title "OPERATION POWWOW", page 4.

[30] *See* Bench Trial Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of Texas, McAllen Division, at page 58, Lines 9-13.

[31] *See* Bench Trial Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of Texas, McAllen Division, at page 64, lines 22-25, at page 65, Lines 1-25, and at page 66, Lines 1-23 where Pepper Trail testifies that his Morphology analysis, with all the obvious limitations of naked eye analysis, is 100 percent accurate, even when compared to DNA analysis which has never been described by the science of microbiology as 100 percent accurate:

> Q    Okay. If I were to ask you which is more reliable, morphology-based analysis or DNA analysis, what would be your answer?
>
> A    My answer is they're both completely reliable when they're applied appropriately.
>
> Q    Okay. But you wouldn't give me a number in terms of reliability?

**DEFENDANTS' EXHIBIT 3**

The agent's report goes on to state:

CLEVELAND claimed he had found the feathers on daily nature walks he takes around his residence. He was advised that the sale of protected species, and their parts, was illegal and the agent would contact him later . . .[32]

The agent contacted SOTO after verifying that the Lipan Apache was not a federally recognized tribe, to set-up a meeting at the agent's office to discuss the possession by SOTO of the two golden eagle feathers. SOTO and the agent agreed to meet on March 16, 2006, at 10:30 A.M.[33]

| | |
|---|---|
| A | **I believe that my identifications are a hundred percent reliable based on morphology** (Bold print provided), and if I am not able to make a completely reliable identification to species, I back to the group that I can make a hundred percent accurate identification, as in the case of the waterfowl in this instance. |
| Q | Okay. And you did indicate there were two feathers you could not identify. |
| A | To species, correct. |
| Q | Okay. To species. |
| A | No; I couldn't identify them to species, so two feathers probably from the same species, but I was only able to get them to the group of waterfowl. |
| Q | And they're listed as – |
| A | They're – |
| Q | They're unidentified – |
| A | Right. |
| Q | -- waterfowl |
| A | Right. |
| Q | Okay. By "unidentified," they're not subject to the Migratory Bird Treaty Act under your analysis. |
| A | Correct. |
| Q | Okay. With DNA analysis would it have been possible to – |
| A | It could have been attempted, as I explained, if the tissue – if there had been tissue present on those feathers, which would have had to have been determined by the analysts in question, it might have been possible to identify the species. |
| Q | Okay. Have you heard of PCR testing? |
| A | Yes. |
| Q | RFLP testing? |
| A | Uh-huh. |
| Q | What is PCR testing? |
| A | PCR stands for polymerase chain reaction, and it's a technique whereby small bits of DNA are – they call it "amplified." They're broken by enzymes into mall bits and them recombined sort of in a soup of nucleotides so that so that long chains are built up. |
| Q | Okay. |
| A | It's a way of producing a large amount of DNA from a small sample. |
| Q | Have you seen any figures concerning reliability of polymerase chain reaction? |
| A | I couldn't give you a specific figure, but I know that it's a standard technique. It's considered highly reliable. |
| Q | Would it be 99.53 percent? |

[32] Report of Investigation (First Report), dated April 20, 2006, Report #: 2006201750R001, Case Title "OPERATION POWWOW", page 4.
[33] Ibid.

**DEFENDANTS' EXHIBIT 3**

Based on their confrontation with the agent, Rev. Robert Soto and his brother-in-law Michael Russell feared they were facing a possible fine of up to $500 for each feather confiscated by the agent, as well as jail time, so they contacted local Mc Allen attorney Arturo Cisneros concerning their predicament.

> On March 15, 2006, Mr. Arturo Cisneros contacted the agent regarding SOTO's case. Mr. Cisneros wanted to know how SOTO and RUSSELL could take care of this matter. The agent told Mr. Cisneros if RUSSELL forfeited $500 to the government (in response to the issuance of a violation notice), and both of them agreed to sign an abandonment form for the eagle feathers, the investigation would be concluded. Mr. Cisneros stated he was going to contact SOTO and would get back to the agent.
>
> Mr. Cisneros notified the agent on March 20, 2006, that RUSSELL and SOTO had agreed . . . to the government's proposal. It was agreed that all the parties would meet on March 23, 2006, at Cisneros' law office. Mr. Cisneros asked the agent if he (the agent) could bring the feathers seized from RUSSELL at the pow -wow so they could be 'blessed' before being abandoned to the government. The agent agreed.
>
> On March 23, 2006, the agent met with Mr. Cisneros, RUSSELL, and SOTO at Cisneros' law office.  Also present were approximately 18 members of the Lipan Apache tribe.[34]

Before the arrival of the Indians, the agent strategically placed a file folder, a notebook with a yellow legal pad, a blue envelope, and a video tape boldly labeled in large black ink "3-11-06" (the date of the powwow when feathers were seized) on the desk in the room where the feathers were to be surrendered.  At the pre-trial hearing of Defendant's Motion to Compel, the agent conceded that the video tape contained no evidence of the feathers seized by the agent from Rev. Soto, Mr. Russell, and Mr.

---

[34] Report of Investigation, dated April 20, 2006, Report #: 2006201750R001, Case Title "OPERATION POWWOW", page 4.

**DEFENDANTS' EXHIBIT 3**

Cleveland. In fact, the tape was blank,[35] leaving a reasonable person to infer that the tape was merely a prop to compel surrender of the feathers.

After the Indians arrived, they held a somber Surrender Ceremony with several Indians breaking down and weeping. Rev. Soto prayed to the Creator to watch over the feathers and protect their medicine. Then he smudged the feathers and bid them farewell.

According to the agent's report

> They held a sage burning and chanting ceremony to 'bless' the feathers in Cisneros' conference room. RUSSELL was issued a violation notice . . . for $500 . . . and both RUSSELL and SOTO signed abandonment forms for the feathers.[36]

According to Rev. Soto, the agent then made a chilling remark. The agent said, "This matter is not over yet. I have a list of all the powwows in Texas, and I will be at those powwows taking away feathers."

According to a <u>second</u> considerably abbreviated Report of Investigation with substantive omissions that were contained in the first report, dated August 2, 2006, Report #: 2006201750R003, Case Title "OPERATION POWWOW", SUBJECTS OF THE REPORT: SOTO, Robert, RUSSELL, Michael, and CLEVELAND, Michael, the agent re-wrote his Report of Investigation focusing primarily on Defendant Michael Cleveland, stating

> In May of 2006 the agent contacted CLEVELAND by phone to let him know that the feathers (confiscated from Cleveland's dream catchers) had been positively identified belonging to several migratory species that by law could not be sold

---

[35] *See* Final Pretrial-CVB Bench Trial Motions Hearing Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of Texas, McAllen Division, at page 24, Line 25, at page 25, Lines 1-25, at page 26, Lines 1-17. Pre-trial Hearing on Defendant's Motion to Compel, November 1, 2006.
[36] Ibid.

**DEFENDANTS' EXHIBIT 3**

without a permit.[37] CLEVELAND stated that he was only selling the dream catchers and not the feathers and therefore not in violation of any law . . .

Later that day the agent drove to CLEVELAND's residence . . . He met with CLEVELAND and issued a violation notice . . . for $500.[38]

**ISSUE TWO: Whether an American Indian as defined under federal law is entitled to the free exercise of religion under the Religious Freedom Restoration Act (RFRA) and the First Amendment, including the use of sacred feathers of protected species of birds listed on the Migratory Bird Treaty Act pursuant to American Indian religious beliefs?**

The trial court erred in accepting the "Government's position that Mr. Cleveland does not belong to a federally recognized tribe, therefore, does not garner the same protections that are offered under this government-to-government agreement and the issues brought forth in the Morton Policy,"[39] specifically the free exercise of his American Indian religion, under RFRA and the First Amendment to the U.S. Constitution, which includes the use of feathers of protected species of birds listed on the Migratory Bird Treaty Act and Golden and Bald Eagle Protection Act.

The government stipulated that a powwow is a religious ceremony. Inherent in this is the government's stipulation that a powwow is a sincere exercise of an Indian's

---

[37] At trial, Jeff Haskins, Chief of the Migratory Bird Office for the U.S. Fish and Wildlife Service, Region 2, Southwest Region, Albuquerque, New Mexico which includes Texas, testified as to the *futility* of an American Indian not a member of a federally recognized tribe attempting to obtain a permit to possess feathers of species listed on the Migratory Bird Treaty Act. *See* Bench Trial Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of Texas, McAllen Division, at page 11, Lines 11-23, and at page 16, Lines 1-5, where Haskins testifies

I asked my permit staff to review all the permits that have been issued for Indian religious use of non eagles. And we have issued, I believe, 182 permits. I don't believe that any of those permits were issued to non-enrolled tribal members.

[38] Report of Investigation, dated August 2, 2006, Report #: 2006201750R003, Case Title "OPERATION POWWOW", SUBJECTS OF THE REPORT: SOTO, Robert, RUSSELL, Michael, and CLEVELAND, p. 2.

[39] *See* Bench Trial Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of Texas, McAllen Division, at page 114, Lines 20-25.

15                    **DEFENDANTS' EXHIBIT 3**

religion. The facts of the agent's raid on the powwow demonstrate how all persons, including Michael Todd Cleveland[40], present at this powwow were substantially burdened in the free exercise of their religion when it was raided. Under RFRA, the government's stipulations combined with the facts shifts the burden to the government to prove it had a compelling interest in criminalizing Michael Todd Cleveland's religious use of bird feathers. The U.S. Supreme Court in Gonzalez v. O Centro Espirita Beneficiente Uniao Do Vegetal (UDV), et al., 126 U.S. 1211 (2006), noted in their ruling to allow a religious use exemption to the Controlled Substances Act that "…Congress had a reason for enacting RFRA, too. Congress recognized that 'laws 'neutral' toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise,' and legislated 'the compelling interest test' as the means for the courts to 'strike sensible balances between religious liberty and competing prior governmental interests.' (court citing to 42 U.S.C. §§2000bb(a)(2), (5)).

A strict liability argument by the government is not a specified compelling interest that addresses the first amendment violations involved. A wildlife preservation argument by the government as a compelling interest is irrelevant since American Indians like Michael Todd Cleveland only use feathers procured by means other than the purposeful destruction of birds. It is important to understand that American Indians do not wish to harm or kill protected species of birds listed on the Migratory Bird Treaty Act or Bald and Golden Eagle Protection Acts. They are merely seeking, in the first instance,

---

[40] Michael Todd Cleveland attends powwows as a participant in the traditions of his native religion. He prays during each powwow and also participates by handing down the religious lessons and tradition of the dreamcatcher to others. It was an Indian spiritual leader who had a vision of the very first dreamcatcher as he prayed on a mountain.

**DEFENDANTS' EXHIBIT 3**

the "living feathers" of the protected species of birds that are shed naturally through a process called molting. As Benjamin Ikenson noted in a recent *American Indian Report*:

(F)or tribes. . . it is important to use feathers from live eagles for certain ceremonies.[41]

American Indians also seek other feathers of protected species of birds that die from natural causes, as well as those killed by accident, such as electrocution from power lines, accidental poisoning, or road kill, pursuant to the Morton Policy for other sacred ceremonies and purposes.

The Government's argument that only American Indians enrolled in federally recognized tribes can use feathers of protected species of birds listed on the Migratory Bird Treaty Act in the free exercise of their American Indian religion constitutes legal religious genocide against a substantial majority of the American Indian population residing in the United States by simply defining most American Indians out of existence.

According to the 2000 U.S Census, only forty percent (40%) of American Indians are enrolled in federally-recognized tribes. According to expert testimony *In the Matter of Joseluis Saenz v. Department of Interior*,[42] a case very similar to the Defendant's case,[43] less than twenty percent (20%) of people who identify as having an American Indian ancestry are enrolled in federally recognized tribes.

---

[41] *See* Benjamin Ikenson, "Caretakers of the Sacred: Iowa opens the first tribal eagle rehabilitation center," *American Indian Report,* February 2007, at p. 22.

[42] In the Matter of JOSELUIS SAENZ v. DEPARTMENT OF INTERIOR, U.S. 10th Circuit Court of Appeals, No. 00-2166  at Footnote 9: According to testimony at the motion hearing, there are approximately 1.7 million members of federally recognized Indian tribes. There are 8.7 million Americans who identify themselves as having Native American ancestry. Aplt. Br. At 34 (citing 60 Fed. Reg. 44,674,44,679 (1995) (census data).

[43] Joseluis Saenz was an American Indian who was not enrolled in a federally recognized tribe. His feathers that belonged to species of eagles listed on the Migratory Bird Treaty Act and the Bald and Golden Eagle Act were confiscated by federal agents. The U.S. 10th Circuit Court ordered his feathers be restored to him and that his attorneys be paid for their services in representing him.

**DEFENDANTS' EXHIBIT 3**

The Defendant Michael Todd Cleveland is an American Indian as defined by federal law 62 FR 58782-01. This assertion was never challenged by the Government in pre-trial motions or at trial.[44]

Under Federal Law 62 FR 58782-01 as described in *Federal Register* Notice, dated October 30, 1997, entitled "Revisions to the Standards for the Classification of Federal Data on Race and Ethnicity," the definition of American Indian is: "A person having origins in any of the original peoples of North and South America (including Central America), and who maintains tribal affiliation or community attachment."[45]

This definition of American Indian was mandated to "be used by the Bureau of the Census in the 2000 decennial census. Other Federal programs (were directed to) adopt the (definition) as soon as possible, but not later than January 1, 2003, for use in household surveys, administrative forms and records, and other data collections."[46]

In *Federal Register* Notice, dated October 30, 1997, at Supplementary Information, Section B, Comprehensive Review Process, it states:

1. The racial and ethnic categories set forth in the standards should not be interpreted as being primarily biological or genetic in reference. Race and ethnicity may be thought of in terms of social and cultural characteristics as well as ancestry.
2. Respect for individual dignity should guide the processes and methods for collecting data on race and ethnicity; ideally, respondent self-identification should be facilitated to the greatest extent possible, recognizing that some data collection systems observer identification is more practical.

In *Federal Register* Notice, dated October 30, 1997, at Supplementary Information, Section B, Comprehensive Review Process, it further states:

---

[44] *See* Bench Trial Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of Texas, McAllen Division, at page 102, Lines 19-25, and p. 103, Line 1. Linda Cleveland testifies that she is a Cherokee Indian and that Michael Cleveland is her biological son.
[45] http://www.whitehouse.gov/omb/fedreg/ombdir1.5html. *Federal Register* Notice, October 30, 1997, "Revisions to the Standards for the Classification of Federal Data on Race and Ethnicity," Executive Office of President, Office of Management and Budget (OMB), Office of Information and Regulatory Affairs.
[46] Ibid. Effective Date.

**DEFENDANTS' EXHIBIT 3**

"The principle objective of the review has been to enhance the accuracy of the demographic information collected by the Federal Government." **"The second element (is) to monitor civil rights enforcement and program implementation."** (Bold print provided)

In *Federal Register* Notice, dated October 30, 1997, at Supplementary

Information, Section D, OMB's Decisions, Subsection (8), OMB accepts the following

recommendation concerning changing the term "American Indian" to "Native

American," it states:

"The term American Indian should not be changed to Native American."

In *Federal Register* Notice, dated October 30, 1997, at Supplementary

Information, Section D, OMB's Decisions, Subsection (12), at which OMB accepts the

following recommendations concerning the classification of Central and South American

Indians who hail from homelands outside the exterior boundaries of the United States that

make it physically impossible for them to obtain recognition as enrolled members of U.S.

federally recognized tribes, it states:

Central and South American Indians should be classified as American Indian. The definition of the "American Indian or Alaska Native" category should be modified to include the original peoples of Central and South America. In addition, OMB has decided to make the definition for the American Indian or Alaska Native category more consistent with the definitions of other categories.

In Defendant's Motion to Suppress, Defendant argued for an expanded definition

of American Indian beyond the slim minority of American Indians enrolled in federally

recognized tribes as follows:

Mr. Cleveland, as an American Indian, asserts his right to "possess, carry, use, wear, give, loan, or exchange among other Indians, without compensation, all federally protected birds, as well as their parts or feathers." (*See Attached:* "MORTON ISSUES POLICY STATEMENT ON INDIAN USE OF BIRD FEATHERS, Department of the Interior, News Release, dated February 5, 1975).

**DEFENDANTS' EXHIBIT 3**

According to several of our witnesses who attended the McAllen Powwow and observed the confiscation of feathers by Agent Rodriguez, Special Agent Rodriguez told powwow participants that they were not American Indian unless they could show that they possessed a card issued by the U.S. Bureau of Indian Affairs stating they were American Indians enrolled in federally recognized tribes. Nowhere in the Morton Policy Statement, above, nor in the Bald and Gold Eagle Protection Acts does it define "American Indian" in the very narrow terms asserted by Special Agent Rodriguez.

Federal Law is inconsistent in its recognition and definition of American Indians. Under one federal law,[47] Mr. Cleveland is recognized and counted as an American Indian, whereas, under another federal law (the law invoked by Special Agent Rodriguez), he is denied such recognition.

**The U.S. Decennial Census Definition of American Indian.** In the first instance, the law governing the U.S. Decennial Census has recognized and counted Mr. Cleveland's biological mother as an American Indian in the 2000 U.S. Census, along with millions of other American Indians who are not enrolled members of federally recognized tribes. The definition of "American Indian" used by the U.S. Census for this period was derived through *self-declaration*. It has evolved and been used in the U.S. Census enumerations since 1960. This *self-declaration* definition treats American Indians for the purposes of the Census the same as other minorities, such as African-Americans, Asians, and Hispanics. According to the 2000 Census,

> The term "American Indian and Alaska Native" refers to people having origins in any of the original peoples of North and South America (including Central America), and who maintain tribal affiliation or community attachment. It includes people who reported "American Indian and Alaska Native" or wrote in their principal or enrolled tribe.[48]

Moreover, *a person could choose more than one race on the 2000 U.S. Census*. As a consequence of this provision, the Texas American Indian population grew from 65,877 in the 1990 U.S. Census to 215,599 in the 2000 U.S. Census, an increase of 330 percent.[49] At the same time, the United States American Indian population more than doubled from 1,959,234 in the 1990 U.S. Census to 4,119,301 in the 2000 U.S. Census.[50]

---

[47] 62 FR 58782-01.

[48] *The American Indian and Alaska Native Population: 2000*, U.S. Census Bureau, February 2002, p. 2.

[49] It should also be noted the according to Rev. Robert Soto's testimony at trial, "there's approximately 6,000 Native Americans living in the McAllen Metroplex." *See* Trial Transcript at page 88, Lines 19 and 20.

[50] In Texas, 118,362 persons indicated that they were "American Indian and Alaska Native alone" and 97,237 persons indicated that they were "Native American and Alaskan Native in combination" with other races.

**DEFENDANTS' EXHIBIT 3**

Nearly 60 percent[51] of those recognized and enumerated as American Indians in the 2000 U.S. Census were *not* enrolled in federally recognized tribes. They were from tribes that have been terminated by the federal government or not granted recognition by the federal government. Others were children, grandchildren, and great-grandchildren of enrolled tribal members, who did not meet the sufficient blood quantum or were the progeny of parents that did not meet the appropriate gender requirements for their children's admission into their respective tribes, whereas others made up a large number of the lost generation of American Indians adopted out during the 1940s-1970s, when extreme poverty in Indian Country combined with high-handed government practices allowed the federal government to remove Indian children from their biological parents and give them to non-Indians to raise as their own. And still, there were other American Indians from Canada and Central and South America who now reside in the United States who can never establish a legal claim as a member of a federally recognized tribe because their ancestral homeland is outside the United States. Their only option to be recognized and counted as an American Indian by the federal government was through the U.S. Census.

**A Definition of American Indian as Enrolled in a Federally-Recognized Tribe.** Under this definition, the federal government (and Special Agent Rodriguez) asserts that one is an American Indian entitled to worship with "federally protected feathers" only if one is enrolled in a federally-recognized tribe and if that person has applied for a permit to possess and use the feathers.[52] Senior United States Judge of the District Court for the District of New Mexico, the Honorable Judge Mechem in a case similar to Mr. Cleveland's case, *In the Matter of Joseluis Saenz vs. The Department of Interior*,[53] stated that the government's (i.e. USFWS) "draconian" use of federal recognition to determine who could worship with eagle fathers conflicted with reality. Moreover, the wordings of the laws-The Migratory Bird Treaty Act and Bald and Golden Eagle Protection Act-made no mention of federal recognition. Instead, the laws simply say, "Indian tribes." He also wrote that the government's use of federal recognition in issuing permits to own eagle feathers was little more than a bureaucratic shortcut. "In the end, (it) appears the present system was designed to

---

[51] *According to* "Indian Labor Force Report," Office of Tribal Affairs, Bureau of Indian Affairs, U.S. Department of Interior, 1999, there were 1,698,483 Indians enrolled in federally recognized tribes.
[52] The number of federally recognized tribes has never been static. In 1987, Russell Thornton noted *American Indian Holocaust and Survival: A Population History Since 1492*, University of Okahoma Press, 1987, at p. 190, that there were at that time "some 300 federally recognized tribes in the United States." Today, there are approximately 570 federally recognized tribes in the United States. Currently, there are more than 200 American Indian tribes that have petitioned the federal government seeking federal recognition. More than 20 of those tribes already have state recognition. *See* Johnson, Troy, "U.S. Federally Non-Recognized Indian Tribes—Index by State,":
http://www.kstrom.net/isk/maps/tribesnonrec.html, accessed 6-12-03.
[53] In the Matter of Joseluis Saenz vs. Department of Interior, U.S. 10th Circuit Court of Appeals, No. 00-2166, Appeal from the U.S District Court in New Mexico, D.C. No. 99-21-M.

**DEFENDANTS' EXHIBIT 3**

minimize the work Congress has handed to the agency . . . Administrative expediency, however, does not constitute a compelling government interest."[54]

The "federal recognition" definition of American Indian is not only the narrowest definition of "American Indian."[55]  It is also the most arbitrary and capricious of the definitions of American Indian.

To illustrate, one year a person of full-blood Indian ancestry might be enrolled in a federally recognized tribe.  The next year that tribe may no longer have federal recognition, making that full-blood Indian a non-Indian in the federal government's eyes.  Later on, federal recognition could be reinstated.  This happened time and again in the 1950s and 1960s, when the federal government terminated nearly 100 tribes.  During the 1970s and 1980s, after prolonged campaigns in the courts and the U.S. Congress by members of the terminated tribes, the federal government decided to reinstate federal recognition of many, but not all, of those previously terminated tribes.

To be an enrolled member of a federally-recognized tribe often requires a validated genealogy to an ancestor on a specified tribal roll established by the federal government, as well as a blood-quantum requirement of "Indian-ness."  In addition, a vote by the tribal government may be required in which the tribal government agrees to accept the individual into its tribe.[56]

When it comes to the blood quantum requirement, the many tribes have a wide range of degree of tribal blood required for enrollment in the tribe.  One tribe may have a requirement as high as one-half degree of tribal blood born to an enrolled member of the tribe, as with the Duckwater Shoshone Tribe, whereas another tribe may have a requirement so low as to be any amount of Indian blood, no matter how small, with a pedigree to an ancestor on a federal roll, as with the Cherokee Nation of Oklahoma, or it may be a quantum anywhere between the extremes (such as one-quarter, one-eighth, one-sixteenth, and so on).

Historically, tribes have been known to shift blood-quantum requirements to disenroll segments of their respective populations for political purposes.  In 2003 at the Isleta Pueblo, tribal leaders decided to raise the blood quantum for tribal enrollment and impose a rigid one-half blood quantum requirement for membership.  They informed tribal members already enrolled in the tribe who did

---

[54] *Ibid. Also see* Struckman, Robert, "War on feathers: fruitless drug raid becomes federal holy war," Boulder Weekly, 2002, p. 5; http://www.greatdreams.com/apache-indian-rights-2001.htm; accessed 3/20/06.
[55] In addition to the two federal definitions of American Indians discussed herein, there are 69 North American Tribal Entities which are recognized by individual states but not by the U.S. *See* http://en.wikipedia.org/wiki/List_of_State_Recognized_Tribal_Entities, accessed 6-29-06.
[56] The Chief Administrative Officer of the Winnebago Tribe of Nebraska from 1992 to 1993, Dr. Milo Colton, witnessed tribal council votes to not admit those who met all the requirements for enrollment, but had been adopted out to non-Indians.  One of the arguments to reject their application came from an elder on the council who said, "If their parents didn't want them, then we don't want them either."

22                                        **DEFENDANTS' EXHIBIT 3**

not meet the new one-half blood quantum requirement that they would be disenrolled.[57]  In 2004 at the Redding Rancheria, the tribal council went ahead and disenrolled one-quarter of its membership.  In both the Isleta Pueblo and Redding Rancheria cases disenrollment of tribal members was pushed because of disputes related to the distribution of casino profits.[58]

Then there are those cases in which an applicant for tribal membership that met all the requirements of membership in terms of blood quantum and ancestry as traced to the appropriate roll was not permitted membership in the tribe for a very different political reason, although the reason was oftentimes tied to the scarcity of resources available for those already enrolled members.

For example, in the case of *Santa Clara Pueblo v. Martinez*,[59] the United States Supreme Court upheld the ordinance of a tribe that denied membership to the children of female tribal members who married outside the tribe.  In this case Julia Martinez was a full-blood member of the Santa Clara Pueblo, and she resided on the Santa Clara Reservation in Northern New Mexico.  She married a full-blood Navajo Indian with whom she had several children.[60]  Even though she was a full-blood Indian and member of the tribe, and even though her children grew up on her reservation and were living there at the time of the lawsuit, the Court upheld the tribe's right to deny her children membership because their father was not Santa Claran.

Finally, there are American Indians who decline to participate in the enrollment process to become a member of a federally recognized tribe because of a belief that the Creator makes American Indians, not the federal government.  As American Indian activist Leonard Peltier commented:

> This is not our way.  We never determined who our people were through numbers and lists.  Those are the rules of our colonizers, imposed for the benefit of our colonizers at our expense.  They are meant to divide and weaken us.  I will not comply with them.[61]

**ISSUE THREE: Whether American Indians not enrolled in federally recognized**

**tribes can be required to engage in the futile act of seeking permits for feathers**

---

[57] "Isleta Pueblo enforcing blood quantum requirement," *Winnebago Indian News*, December 27, 2003, p. 1.

[58] "Dave Anderson finally sworn in as head of BIA," *Winnebago Indian News*, February 7, 2004, p. 1.

[59] Santa Clara Pueblo v. Martinez, 436 U.S. 49 (1978).

[60] *See* Robert N. Clinton, Nell Jessup Newton, and Monroe E. Price, *American Indian Law: Cases and Materials*, Third Edition, Michie Company, Publishers, 1991, p. 85. According to custom, Santa Clara Indians were patrilineal, whereas the Navajos were matrilineal.

[61] Statement by Leonard Peltier to Paulette D'Auteuil Robideou at Leavenworth Federal Prison, June 1991. *See also* Ward Churchill, *Indians Are Us? Culture and Genocide in Native North America*, Common Courage Press, 1994, p. 106.

**DEFENDANTS' EXHIBIT 3**

**listed on the Migratory Bird Treaty Act for religious purposes, when such permits**
**are never issued and impossible to obtain?**

The trial court erred in granting the Government's Response to Defendant
Michael Cleveland's Motion to Suppress based on the argument that "Defendant does not
have standing to challenge the regulations implementing MBTA. Under those
regulations, Defendant could have applied for a permit to possess migratory bird parts but
did not do so."[62]

At trial, the Government's expert witness indicated that there was not record of
any American Indian not enrolled in a federally recognized tribe ever being issued a
permit for feathers of birds of protected species listed on the Migratory Bird Treaty Act.[63]
Again, it is instructive to note that Senior United States Judge of the District Court for the
District of New Mexico, the Honorable Judge Mechem in a case similar to Mr.
Cleveland's case, *In the Matter of Joseluis Saenz vs. The Department of Interior*,[64] stated
that the government's (i.e. USFWS) "draconian" use of federal recognition to determine
who could worship with eagle fathers conflicted with reality. Moreover, the wordings of
the laws, "The Migratory Bird Treaty Act" and "Bald and Golden Eagle Protection Act,"
made no mention of federal recognition. Instead, the laws simply say, "Indian tribes."
He also wrote that the government's use of federal recognition in issuing permits to own
eagle feathers was little more than a bureaucratic shortcut. "In the end, (it) appears the
present system was designed to minimize the work Congress has handed to the agency . .

---

[62] Government's Response to Defendant Michael Cleveland's Motion to Suppress, p. 7 of 12.
[63] *See* Bench Trial Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of
Texas, McAllen Division, at page 15, Lines 23-25, and at page 16, Lines 1-16.
[64] In the Matter of Joseluis Saenz vs. Department of Interior, U.S. 10th Circuit Court of Appeals, No. 00-
2166, Appeal from the U.S District Court in New Mexico, D.C. No. 99-21-M.

**DEFENDANTS' EXHIBIT 3**

. Administrative expediency, however, does not constitute a compelling government interest."[65]

**ISSUE FOUR: Whether the trial court erred in granting the Government's Motion in Limine to "exclude evidence. . .regarding eagle feathers" because Defendant "is not charged with any violation of the Bald and Golden Eagle Protection Act"?[66]**

Defendant asserts that the trial court erred in granting Government's Motion in Limine based on the Government's argument to "exclude evidence. . .regarding eagle feathers" because Defendant "is not charged with any violation of the Bald and Golden Eagle Protection Act"[67] and that the agent just happened to be at the powwow "(a)fter finishing an unrelated investigation" involving confiscation of feathers from Rev. Soto and Mr. Russell[68] at the same powwow attended by Defendant, when he chanced upon the booth of Linda Cleveland containing the dreamcatchers of Cherokee artist Michael Todd Cleveland(Defendant). The Government's argument is absurd and dishonest.  It is merely a dodge on the part of the Government to avoid the key issues of (1) whether the agent could, in the first place, conduct a raid of an American Indian religious service **without probable cause**  and **without a warrant** (2) whether the agent could be questioned about submitting two substantially different Reports of Investigation concerning the "Operation Pow Wow" raid, and (3) whether Defendant could effectively

---

[65] *Ibid.  Also see* Struckman, Robert, "War on feathers: fruitless drug raid becomes federal holy war," Boulder Weekly, 2002, p. 5; http://www.greatdreams.com/apache-indian-rights-2001.htm; accessed 3/20/06.

[66] Government's Motion in Limine.

[67] Government's Motion in Limine.

[68] Government's Response to Defendant Michael Todd Cleveland's Motion to Suppress., at page 2.

**DEFENDANTS' EXHIBIT 3**

impeach the agent's credibility without addressing obvious and glaring inconsistencies[69]

and omissions in the two substantially different Reports of Investigation.

What the Government failed to mention in its Motion in Limine was (1) both Rev.

Robert Soto and Michael Russell had eagle feathers confiscated by the agent that were

netted in the same less-than-an-hour raid, entitled "Operation Powwow," as did the

Defendant, (2) Rev. Robert Soto, Michael Russell and Defendant Michael Cleveland

were all charged with the same statutory violation of the Migratory Bird Treaty Act,[70]

with Soto and Russell additionally charged with violation of the Bald and Golden Eagle

Protection Act,[71] (3) that Golden and Bald Eagles are listed on the Migratory Bird Treaty

Act along with other the species of birds whose feathers were allegedly confiscated by

---

[69] *See* Bench Trial Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of Texas, McAllen Division, at page 42, Lines 7-25, and at page 43, Lines 1-9 counsel for Defendant brought to attention to the agent and the court that the agent's actions were arbitrary and capricious in issue citations to American Indians at the McAllen Powwow on March 11, 2006. In the first instance, when the agent seized feathers from Michael Russell, he ignored Mr. Russell's statement that the feathers belonged to his brother-in-law Rev. Soto. He also ignored Rev. Soto's statement that the feathers belonged to Rev. Soto. Moreover, the agent, in fact, issued Mr. Russell a citation with a $500 fine. He also issued Rev. Soto a citation with no fine. In the second instance, when the agent came upon the booth in the custody and control of Commander Edith Clark, he responded to her statement that the feathers in the booth belonged to someone else, by refusing to issue her a citation or fine. According to the agent's testimony at trial:

> Q    So if someone says, "These are not my feathers," then you move to the person who says, "These are my feathers"?
> A    That's right.
> Q    And that is protocol? That's the way –
> A    That's the way I conduct my investigations, yes.
> Q    Well, you confiscated more than two sets of feathers; did you not, on that day?
> A    I confiscated more than those eight feathers, yes, sir.
> Q    In one of those confiscations, did the party in control and custody of the feathers indicate those feathers were not his?
>     MR. SCHAMMEL: Objection, your Honor. At this point, I believe we're getting a little far afield as to the issue of this trial.
>     THE COURT: Okay. Explain to me why you want to bring that up.
>     MR. COLTON: Your Honor, Rule 41, we're essentially invoking that to indicate that the procedures the agent employed were arbitrary and capricious. They were not consistent throughout and that he treated our client differently than he has treated other people, including the people at the powwow that day.
>     THE COURT: What is it that you anticipate bringing out?
>     MR. COLTON: That in one instance the person who has control and custody of the prescribed feathers is released from his investigation whereas in the previous instance, the person is, in fact, issued a citation.

[70] 16 USC 703.

[71] 16 USC 668.

    **DEFENDANTS' EXHIBIT 3**

the agent from Defendant Cleveland, and (4) the feathers of *all* birds (including eagle

feathers, as well as the feathers seized from Defendant Cleveland) are relevant to "Native

American practices, social ceremonies or other activities," because

> Within Native American culture, birds (of all species, not just eagles) are
> considered to be messengers to the spirits in the sky – a link to 'The Creator.' The
> feather denotes a oneness with the Creator's gift of nature. The feather,
> universally symbolic to Native Americans, is considered to possess the power and
> the spirit of the bird from which it came."[72]

The Government's efforts to cut off evidence relating to the agent's seizure of

eagle feathers from Rev. Soto and Mr. Russell violates **res gestae.** Under **res gestae,**

showing a tiny part of an event cannot tell the whole story. The entire contents of two

Reports of Investigation prepared by Special Agent Rodriguez concerning "Operation

Powwow," listing Defendant Cleveland as the primary suspect in the Report of

Investigation dated April 20, 2006, and a tertiary suspect in the Report of Investigation

dated August 2, 2006, which were provided to Defense by Prosecution prior to trial,

should have been admissible for cross-examination of Special Agent Rodriguez and

direct examination of witnesses from the powwow who had encounters with the agent

and who had their feathers seized by the agent minutes immediately before the seizure of

Defendant Cleveland's feathers. According to Black's Law Dictionary, **res gestae** refers

to: "The whole of the transaction under investigation and every part of it . . . "(It) relates

to statements which because of their intimate relation to facts become a part of those facts

---

[72] See Robert Gentner, *Birds, Feathers and their meaning to the Native American,* 1997. Also see Footnote
34, below. It should also be noted that American Indians have a more expansive definition of the term
"eagle." Indians refer to many species of birds as "eagles"; thus, eagle feathers may come from the Golden
Eagles, Bald Eaglse, Giving Eagles (Turkeys), Night Eagles (owls), Red Eagle or Spotted Eagle (Red-tailed
Hawk and other hawks), and the Mexican Eagles (Caracara Falcon). See Robert Gentner, *Birds, Feathers
and their meaning to the Native American,* 1997.

**DEFENDANTS' EXHIBIT 3**

and are therefore admitted as such." Industrial Commission of Colorado v. Fotis, 112

Colo. 423, 149 P.2d 657, 659.

**ISSUE FIVE: Whether vendors at powwows are engaged in "purely commercial"**

**activities?**

The trial court erred in granting Government's Motion in Limine based on the

argument that:

> Defendant is not charged for violations related to any participation in any
> Native American dancing activities, whether social, ceremonial, or religious. He
> is not charged for violations related to his participation in powwow ceremonies.
> Defendant is charged for violations related to his activities as a commercial
> vendor. . .Where activity at issue is of a commercial nature, defenses may not be
> based on the free exercise of religion. . .a defendant may not claim First
> Amendment or RFRA protection for the taking and possession of a protected bird
> when he subsequently sells it for pure commercial gain.

At trial, testimony from Linda Cleveland, mother of the Defendant, indicated that

she was the vendor of record at the powwow, not her son. The Defendant's dream

catchers were hanging at her booth as decorations to provide ambience. Moreover, the

dream catchers were never offered for sale and none were sold during the course of the

powwow.[73] Furthermore, the agent indicated in one of his Reports of Investigation that

the Defendant "stated that he was only selling the dream catchers and not the feathers."[74]

In his trial testimony, the agent testified that:

> When I initially called him and told him who I was, he asked me what I wanted. I
> told him I was fixing to send him a violation notice for the sale of migratory bird
> parts and/or feathers. At that point, he made a statement that he was not selling
> the feathers, the he was actually just selling the dream catchers and the feathers
> were just being attached and being given.[75]

---

[73] See Bench Trial Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of
Texas, McAllen Division, at page 103, Lines 15-25, p. 104, Lines 1-25, and p. 105, Lines 1-11.
[74] Report of Investigation, dated August 2, 2006.
[75] See Bench Trial Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of
Texas, McAllen Division, at page 35, Lines 7-10.

**DEFENDANTS' EXHIBIT 3**

It is a common practice among American Indians to "give" or "gift" feathers to others who are members of the American Indian community. Within the Indian culture, it is considered bad manners, a breach of ethics, to sell sacred feathers.

As to whether the vending activities at powwows are "purely commercial"[76] in nature, only a non-Indian would argue that they are. Vendors at powwows are themselves American Indians, and they participate at powwows by providing other American Indians with unique native objects that are essential to their native religious observances and that facilitate their worshipping of their Creator.

Lipan Apache Holy Man Robert Soto testified at trial:[77]

Q       Okay. Reverend Soto, is part of your activities as a pastor and a holy man, does the powwow relate to that in any way?

A       As far as being a sacred event?

Q       Yes.

A.      Yes. We consider the powwow or any kind of native gathering a sacred event.

Q.      Okay. Are the vendors part of the powwow?

A       The vendors are part of the powwow, yes, in many ways because vendors are a lot of times our suppliers of things.

Q       Such as?

A       Uh?

Q       Such as?

---

[76] *See* Government's Motion in Limine where Government asserts "a defendant prosecuted under BGEPA for purely commercial rather than religious activities may not assert a claim that the free exercise of religion has been infringed by the Act, but where purchases were allegedly made for religious purposes, a free exercise claim may be raised." *See* page 2, bottom 2 lines, and page 3, top 3 lines of Government's Motion in Limine.

[77]*See* Bench Trial Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of Texas, McAllen Division, at page 79, Lines 24-25, p. 80, Lines 1-25, p. 81, Lines 1-14.

**DEFENDANTS' EXHIBIT 3**

A      Well, we can't go to the Ace Hardware store to buy our beads and our leather and supplies.  And we don't - - we can't go the HEB or a Wal-Mart and buy our sage and sweet grass

And since I don't support the tobacco industry, but we get our tobacco a lot from the vendors who get it directly from the fields as part of -- for some of our ceremonies or some of our other sacred events, objects like, you know, dream catchers and things like that that are used in a more holy way than the tourists do.  And so a lot of these vendors are our suppliers.

Q      So regalia that's worn at powwows, vendors in fact are involved in the sale of ribbon shirts?

A      Ribbon shirts yea –

Q      Women's dresses?

A      Women's dress, videos, tapes, music. I mean all that kind of stuff is stuff that we need that we can't find it anywhere besides the vendors.

Q      Various headdresses?

A      Yes.

Q      War shields?

A      Yes.

Q      Dance Sticks?

A      Yes.

Q      Moccasins?

A      Yes.

**DEFENDANTS' EXHIBIT 3**

On Redirect Examination, Rev. Soto testified further[78]

Q       Reverend Soto, can vendors refuse to sell certain items that might be available at
their booth?

A       If they wanted to they can refuse to sell anything.

Q       Including feathers?

A       Right.

Q       So your testimony is that vendors are an integral part of the powwow?

A       They're a big part of our powwow for several reasons.  But I think they also go
along with the educational aspect of our nativeness, because people are allowed to take
something from that powwow that denotes the fact that we're native.

        Just this week I had a call from a lady who purchased a dream catcher for her son
at our powwow and how her son was just totally flabbergasted over this little purchase
and wanted to meet the person that made it.  Of course, I don't know where he got it
from.

        But vendors are a big part of our gathering.  You know we do consider it sacred.
It's a sacred ceremony.  And the vendors play a big part in that aspect too.  Because they
are our suppliers.

        A good example of that is walking up there to the vicinity of San Juan, a shrine,
you know where parishioners can purchase their candles in the facility to pray to the
Saints or whatever they pray for.  Not only that but in the store they sell other things like
rosaries and other articles that they consider sacred.  And along with that they sell
postcards for the tourists, people that come by to take a little souvenir of the facility.

---

[78] *See* Bench Trial Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of
Texas, McAllen Division, at page 90, Lines 6-25, at p. 91, Lines 1-13.

31                          **DEFENDANTS' EXHIBIT 3**

And so in many ways, you know, the vendors just play the same role, practically.

Q       Do vendors on occasion have the artists themselves there to demonstrate their art?

A       Sometimes.  Most of the vendors that I know were there, for example, I know have done a lot of their art work.

### PRAYER

DEFENDANT MICHAEL TODD CLEVELAND REPECTFULLY PRAYS THAT:

Wherefore it is found that the search of the powwow on March 11, 2006 was an illegal search and an illegal seizure, Defendant Michael Todd Cleveland requests that the court find that the resulting evidence should have been excluded from his trial;

Wherefore it is found that the rights of the participants' at the powwow on March 11, 2006, including participant Michael Todd Cleveland's, right to the free exercise of religion were violated under the first amendment of the U.S. Constitution and RFRA, Defendant Michael Todd Cleveland requests a finding that as an American Indian as defined under federal law, he is entitled to the free exercise of religion under RFRA and the first amendment, including the use of sacred feathers of protected species of birds listed on the Migratory Bird Treaty Act pursuant to his American Indian religious beliefs; and Defendant Michael Todd Cleveland requests an order establishing a permanent injunction against federal law enforcement agents raiding powwows; and the return of **all** religious items seized at the March 11, 2006 Mc Allen, Texas powwow;

A finding that American Indians not enrolled in federally recognized tribes cannot be required to engage in the futile act of seeking permits for feathers listed on the

**DEFENDANTS' EXHIBIT 3**

Migratory Bird Treaty Act for religious purposes, when such permits are never issued and impossible to obtain.

Wherefore the court finds that the trial court erred in granting the Government's Motion in Limine to "exclude evidence. . .regarding eagle feathers" because Defendant "is not charged with any violation of the Bald and Golden Eagle Protection Act," Defendant Michael Todd Cleveland requests that his conviction be reversed and that the court order all religious items seized on March 11, 2006 to be returned.

A finding that vendors at powwows are not engaged in "purely commercial" activities, and are therefore also exempt from the MBTA provisions.

### CERTIFICATE OF SERVICE

The undersigned certifies that on this the 1st day of March 2007, a true and correct copy of the foregoing appeal was sent by electronic mail to Ms. Elinor Colburn and Steven Schammel, attorneys for the Government.

Respectfully submitted,

BY: _____

Dr. Milo Lone-Eagle Colton
Civil Rights Legal Defense & Edu. Fund, Inc.
Regional Counsel
Nebraska Bar No: 19693
519 Culebra Road
San Antonio, Texas 78201
Telephone: 210-334-5209
Fax: 210-736-1367

_____

Marisa Y. Salazar
Regional Counsel
Civil Rights Legal Defense & Edu. Fund, Inc.
New Mexico Bar No: 25887
519 Culebra Road
San Antonio, Texas 78201
Telephone: 210-334-5209
Fax: 210-736-1367

ATTORNEYS IN CHARGE FOR
DEFENDANT, Michael Todd Cleveland

**DEFENDANTS' EXHIBIT 3**