**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MC ALLEN DIVISION**

| | | |
|---|---|---|
| **Mc Allen Grace Brethren Church, Native American New Life Center, Chief of Chiefs Christian Church (formerly known as San Antonio Indian Fellowship); South Texas Indian Dancers, Association; Linda Cleveland,** Individually; **Michael Todd Cleveland,** Individually; **Edith Clark,** Individually and as council member of Native American New Life Center; **William Clark,** Individually, and as member of Native American  New Life Center; **Kathryn Dodd,** Individually and as member of Native American New Life Center and South Texas Indian Dancers Association; **Carrie Felps,** Individually; **Homer  Hinojosa, III,** Individually and as member of Mc Allen Grace Brethren Church, Chief of Chiefs Christian Church (formerly known as San Antonio Indian Fellowship), and South Texas Indian Dancers Association; **Nancy Hollingworth,** as member of Native American New Life Center; **Lucian Oden,** as member of Chief of Chiefs Christian Church (formerly known as San Antonio Indian  Fellowship); **Michael V. Russell,** Individually and as a member of Mc Allen Grace Brethren Church and South Texas Indian Dancers Association; **Veronica Russell,** Individually and as a member of Grace Brethren Church and South Texas Dancers Association  **Xavier Sanchez,** as member of Chief of Chiefs Christian Church (formerly known as San Antonio Indian Fellowship); and **Pastor Robert Soto,**  Individually, and on behalf of Mc Allen Grace Brethren Church, Native American New Life Center, Chief of Chiefs Christian Church (formerly known as San Antonio Indian Fellowship); and South Texas Indian Dancers Association, | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **CIVIL NO. 7:07-CV-060** |
| **Plaintiffs,** | § | |
| **V.** | § | |
| | § | |
| U.S. Secretary of Dept. of Interior, Ken Salazar, | § | |

1

Defendant.                          §

## AMENDED PLAINTIFFS' ORIGINAL COMPLAINT
## FOR DECLARATORY RELIEF

This is a suit by American Indian organizations and their members seeking (1) a declaratory judgment that Defendant's interpretation of the statutory and regulatory scheme of the Migratory Bird Treaty Act (MBTA), 16 U.S.C. 703, and the Bald and Golden Eagle Protection Act (BGEPA), 16 U.S.C 668 is unlawful and unconstitutional as applied to Plaintiffs in that it burdens their religious use of feathers and bird parts of protected species of birds and resulted in Defendant acting beyond his legal authority in carrying out searches and seizures of Plaintiffs' property; (2) an order declaring that American Indians as defined under 62 FR 58782, but not enrolled in federally recognized tribes are exempted from the MBTA and BGEPA as to possession, transport, export or import at any time or in any manner of feathers and bird parts of protected species of birds used for religious purposes, observances, and worship; (3) an order enjoining Defendant from applying the MBTA and BGEPA against Plaintiffs for their religious use of feathers and bird parts of protected species of birds; and (4) an order compelling the return and protection of property seized by a federal officer at Ndc Daa Way South Powwow held at the Palm View Community Center in Mc Allen, Texas, on March 11, 2006.

### PARTIES

1.          Plaintiff, Mc Allen Grace Brethren Church is an incorporated 501 (c)(3) religious organization.  It is incorporated under the laws of Texas and

2

headquartered in Mc Allen, Texas.  Mc Allen Grace Brethren Church brings this action on its own behalf and on behalf of all its members.

2.      Plaintiff, Native American New Life Center is an unincorporated religious subsidiary under Mc Allen Grace Brethren Church.  It brings this action on its own behalf and on behalf of all its members.

3.      Plaintiff, Chief of Chiefs Christian Church (formerly known as the San Antonio Indian Fellowship) is an unincorporated religious subsidiary under Mc Allen Grace Brethren Church.  It brings this action on its own behalf and on behalf of all its members.

4.      Plaintiff, South Texas Indian Dancers Association is an unincorporated religious subsidiary under Mc Allen Grace Brethren Church.  It brings this action on its own behalf and on behalf of all its members.

5.      Plaintiff, Robert Soto is an American Indian according to 62 FR 58782.  He is Pastor and a practicing member of the Mc Allen Grace Brethren Church, the Native American New Life Center, and Chief of Chiefs Christian Church (formerly known as the San Antonio Indian Fellowship).  He resides in the Southern District of Texas.  He brings this action on his own behalf and as the duly authorized officer of Mc Allen Grace Brethren Church, the Native American New Life Center, the San Antonio Indian Fellowship, and the South Texas Indian Dancers Association.

6.      Plaintiff, Carrie Felps is an American Indian according to 62 FR 58782.  She resides in the Southern District of Texas.  She brings this action on her own behalf.

3

7.      Plaintiff, Linda Cleveland is an American Indian according to 62 FR 58782. She resides in the Southern District of Texas. She brings this action on her own behalf.

8.      Plaintiff, Michael Todd Cleveland is an American Indian according to 62 FR 58782. He resides in the Southern District of Texas. He brings this action on his own behalf.

9.      Plaintiff, Michael V. Russell is an American Indian according to 62 FR 58782. He is a practicing member and council member of Mc Allen Grace Brethren Church and the South Texas Indian Dancers Association. He resides in the Southern District of Texas. He brings this action on his own behalf.

10.      Plaintiff, Veronica Russell is an American Indian according to 62 FR 58782. She is a practicing member and council member of Mc Allen Grace Brethren Church and the South Texas Indian Dancers Association. She resides in the Southern District of Texas. She brings this action on her own behalf.

11.      Plaintiff, Edith Clark is an American Indian according to 62 FR 58782. She is a practicing member and advisor of the Native American New Life Center. She resides in the Southern District of Texas. She brings this action on her own.

12.      Plaintiff, William Clark is an American Indian according to 62 FR 58782. He is a practicing member and advisor of the Native American New Life Center. He resides in the Southern District of Texas. He brings this action on his own behalf.

13.      Plaintiff, Kathryn Dodd is an American Indian according to 62 FR 58782. She is a practicing member of the Native American New Life Center and the

4

South Texas Indian Dancers Association.  She resides in the Southern District of Texas.
She brings this action on her own behalf.

14.     Plaintiff, Homer Hinojosa, III is an American Indian according to 62
FR 58782.  He is a practicing member of the Mc Allen Grace Brethren Church, Chief of
Chiefs Christian Church (formerly known as the San Antonio Indian Fellowship), and the
South Texas Indian Dancers Association.  He resides in the Southern District of Texas.
He brings this action on his own behalf.

15.     Plaintiff, Nancy Hollingworth is an American Indian according to 62
FR 58782.  She is a practicing member and advisor of the Native American New Life
Center.  She resides in the Southern District of Texas.  She brings this action on her own
behalf.

16.     Plaintiff, Xavier Sanchez is an American Indian according to 62 FR
58782.  He is a practicing member, council member, and co-founder of Chief of Chiefs
Christian Church (formerly known as the San Antonio Indian Fellowship).  He resides in
the Western District of Texas.  He brings this action on his own behalf.

17.     Plaintiff, Lucian Oden is an American Indian according to 62 FR
58782.  He is a practicing member, council member, and co-founder of Chief of Chiefs
Christian Church (formerly known as the San Antonio Indian Fellowship).  He resides in
the Western District of Texas.  He brings this action on his own behalf.

18.     Defendant Ken Salazar is the Secretary of the United States
Department of the Interior.  He is sued in his official capacity only, in which he is
responsible for enforcing and administering the MBTA and the BGEPA.   Pursuant to 28

U.S.C. §1391(e), he may be served by certified mail at Main Interior, 1849 C Street, N.W., Room 3238, Washington, D.C. 20240-0001.

## JURISDICTION

19.     This Court has jurisdiction under 28 U.S.C. § 1331 because the action arises under the laws and Constitution of the United States.  Plaintiffs seek a determination under the standards of the Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb-2000bb(4) and the First, Fourth, Fifth and Fourteenth Amendments to the U.S. Constitution of the lawfulness and constitutionality of Defendants' interpretation of the MBTA and the BGEPA and its implementing regulations as applied to Plaintiffs. This Court is authorized to grant declaratory relief by the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.  The Court is authorized to grant preliminary and permanent injunctive relief under Fed. R. Civ. P. 65.

## VENUE

20     Venue is proper in this court under 28 U.S.C. § 1391(e) because: (a) all Defendants are officers and employees of the United states and its agencies and were at all relevant times acting in their official capacities and under color of their legal authority; (b) at least one Defendant officially resides in this district; (c) the cause of action arose in this district; and (d) all but two Plaintiffs reside in this district and no real property is at issue.

## FACTUAL ASSERTIONS

21. The American Indian traditional religion practiced by the Plaintiffs in this action is protected by both the First Amendment to the United States Constitution and the RFRA 20 U.S.C. §§ 2000bb and 2000 bb(4).

6

22. Each of the individual Plaintiffs and all of the members of the Grace Brethren Church, Native American New Life Center, Chief of Chiefs Christian Church (formerly known as San Antonio Indian Fellowship), and South Texas Indian Dancers Association are sincere practitioners of their American Indian traditional religion, and in particular, are sincere adherents to the basic tenets of the American Indian religious use of feathers and bird parts of protected species of birds as necessary and essential to their worship.

23. The Plaintiffs use sacred feathers and bird parts to pray and to worship during religious ceremonies, celebrations, services and events, as did their American Indian ancestors following religious practices existing from time immemorial.

24. The Plaintiffs believe that feathers and bird parts worn, held, and attached to sacred objects are essential and necessary to communicate with, invoke, and give thanks to the Creator and the spirits of their ancestors during religious ceremonies, celebrations, services, and events.

25. Plaintiffs wear, hold, and attach sacred feathers to implements during religious ceremonies, celebrations, services and events, including but not limited to smudging and cleansing ceremonies, wedding ceremonies, naming ceremonies, sweat lodge ceremonies, solstice ceremonies, healing ceremonies, rites of passage ceremonies, honoring ceremonies, blessings, funerals, memorial services, holy feasts, vision quests, sacred dances and powwows.

26. Plaintiffs consider each feather and bird part of all birds sacred and a gift from the Creator.

27. Plaintiffs do not seek to harm or kill protected species of birds in order to obtain feathers and bird parts for religious purposes. They merely want to access feathers

7

of protected species of birds that are shed through a natural process called "molting," or to access feathers of protected species of birds that have died naturally from causes such as old age or disease, that have died by electrocution, poisoning road kill, or poaching by non-Indians.

28. Because feathers and bird parts are essential to Plaintiffs' American Indian religious ceremonies, a prohibition against using feathers and bird parts would completely prevent Plaintiffs from freely practicing their American Indian traditional religion.

29. Defendant's interpretation of the statutory and regulatory scheme of the MBTA, 16 U.S.C. 703, and the BGEPA, 16 U.S.C 668, disregards the definition of "American Indian" as defined under 62 FR 58782 and subsequently incorporated in the Code of Federal Regulations (CFR) relating to the executive departments and agencies of the Federal Government that applies both to American Indians enrolled in federally recognized tribes, as well as American Indians not enrolled in federally recognized tribes.

30. By disregarding 62 FR 58782, Defendant defines a majority of American Indians, including Plaintiffs, out of existence for purposes of practicing their traditional native religion as American Indians because they are not enrolled in federally recognized tribes, thereby depriving Plaintiffs of American Indian exemptions to MBTA and BGEPA—exemptions enjoyed by American Indians who are enrolled in federally recognized tribes.

31. Defendant's interpretation of the statutory and regulatory scheme of the MBTA, 16 U.S.C. 703, and the BGEPA, 16 U.S.C 668 is unlawful and unconstitutional as applied to Plaintiffs in that it burdens their religious use of feathers and bird parts of

protected species of birds and resulted in Defendant acting beyond his legal authority in carrying out searches and seizures of Plaintiffs' property.

32. On an early Saturday afternoon on March 11, 2006, United States Fish and Wildlife Service (USFWS) Special Agent Alejandro Rodriguez (the agent), acting without probable cause and without a search warrant, raided an American Indian religious service,[1] frightening and upsetting American Indian women and children and humiliating respected American Indian elders. His raid targeted the Nde Daa[2] Way South Powwow[3] held at the Palm View Community Center in Mc Allen, Texas. He came to seize sacred feathers used by powwow participants in the observance of their traditional native religion.

In less than an hour[4], the agent seized more than fifty feathers from Lipan Apache Holy Man Robert Soto, his brother-in-law Michael Russell of Creek Indian ancestry, and Cherokee Artist Michael Todd Cleveland.

Although all the confiscated feathers are said to be from species listed on the MBTA and the BGEPA, they are exempt for American Indian use in religious observances according to federal court precedent and administrative laws of the Executive Branch of the Federal Government. The agent's raid on this religious ceremony violated the American Indian participants' rights to the free exercise of religion under the Religious Freedom Restoration Act (RFRA) and the First Amendment of the

---

[1] U.S. Government stipulated the powwow was a religious ceremony in Final Pretrial – CVB Bench Trial Motions Hearing Transcript, at page 9, Lines 4 and 5.
[2] Nde Daa is Apache for "The People." The Way South Powwow held in March is the Lipan Apache's annual Springtime Gathering.
[3] U.S. Government stipulated at a pre-trial hearing that an American Indian Powwow is a religious service. *See* Final Pretrial-CVB Bench Trial Motions Hearing Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of Texas, Mc Allen Division, at page 9, Lines 4 and 5.
[4] *See* Bench Trial Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of Texas, Mc Allen Division, at page 40, Lines 20-25.

U.S. Constitution. <u>Gonzalez v. O Centro Espirita Beneficiente Uniao Do Vegetal (UDV),</u>
<u>et al.</u>, 126 S.Ct. 1211 (2006).

 Plaintiffs also assert that commercial vendors that provide objects to American

Indians that are necessary for religious observances, practice and ceremonies are also

exempt from the MBTA and BGEPA.

 On November 2, 2006, a one-day bench trial was held in The United States

District Court for the Southern District of Texas, Mc Allen Division, U.S. Magistrate

Judge Dorina Ramos presiding.  At the conclusion of the trial, Magistrate Judge Ramos

found the Plaintiff Michael Todd Cleveland in violation of the Migratory Bird Treaty

Act, but Judge Ramos reduced the Plaintiff Michael Todd Cleveland's fine to $200.  On

November 11, 2006, Plaintiff Michael Todd Cleveland filed a Notice of Appeal.

 The agent **lacked probable cause** under the Fourth Amendment to the U.S.

Constitution to conduct a search and seizure of feathers without a warrant at the Mc Allen

Powwow, held on March 11, 2006. Under the federal search and seizure exclusionary

rule, any evidence obtained via an illegal search or an illegal seizure, must be excluded as

evidence. *Boyd v. United States*, 116 U.S. 616 (1886), *Weeks v. United States*, 232 U.S.

383 (1914), and *Silverthorne Lumber v. United States*, 251 U.S. 385 (1920).

 According to the <u>first</u> of two Reports of Investigation prepared by the agent, dated

04/20/2006, Report #: 2006201750R001, Case Title "OPERATION POWWOW",

SUBJECTS OF THE REPORT: MICHAEL CLEVELAND, MICHAEL V. RUSSELL,

AND ROBERT SOTO, the agent stated:

> In the Fall of 2005, (he) received a call from a Service refuge employee, who is a
> Native American, to report that he had been to an area pow-wow and had
> observed a male subject wearing a bustle made of golden eagle feathers.
> According to the refuge employee, he knew the individual was not a Native

American. The refuge employee did not know the subject's name, but he promised to call (the agent) back if he received other information in regard to the subject's identity.[5]

The agent did not divulge the identity of his tipster, nor did he indicate how he verified that his tipster was indeed a Native American. Nor did the agent indicate which specific powwow of the many powwows[6] held in the area of south Texas his tipster had observed the male wearing the Golden Eagle bustle. At any of the many area powwows, it is common for male traditional dancers to wear eagle feather bustles and eagle feather roach head dresses. Further, the agent did not indicate whether the tipster ever called him back concerning the identity of the male "not a Native American."

Months after the tip, on March 8, 2006, the agent noticed a picture in a local newspaper (The Town Crier, Vol. 42., No. 10) announcing an upcoming powwow on March 11, 2006, in Mc Allen, Texas. In a picture of The South Texas Indian Dancers that is remarkable for its lack of clarity and detail, the agent indicates that he "observed at least two subjects wearing what appeared to be immature golden eagle feathers."[7] Although, under the Fourth Amendment, the agent was required to submit his tipster's information to a detached and neutral magistrate for a proper determination on the issuance of a search warrant to be executed at the powwow, he did not do this. In *Johnson v. United States,* 333 U.S. 10 (1948), the court stated that inferences leading to the issuance of a search warrant must be drawn by a neutral and detached magistrate, not by the officer engaged in the often competitive enterprise of ferreting out crime. The

---

[5] Report of Investigation (First Report), dated April 20, 2006, Report #: 2006201750R001, Case Title "OPERATION POWWOW", page 2.
[6] In south Texas, there are many powwows held throughout the year, including powwows in Mc Allen, Laredo, Falfurrias, San Antonio (at Crossroads Mall, St. Mary's University, Fort Sam Houston, the Witte Museum, the Botanical Gardens, etc.), Fredericksburg, and Canyon Lake, to list a few.
[7] Ibid.

agent decided to draw his own inferences and decided to conduct an illegal search and seizure at the powwow before he attended the sacred event.  According to *Katz v. United States*, 389 U.S. 347 (1967), the Fourth Amendment protects people, not places.  The court in *Katz* stated that the prohibition against unreasonable searches and seizures is not limited to homes, offices, buildings, or other enclosed places.  It applies even in public places where a person has a "reasonable and justifiable expectation of privacy." Therefore, participants of the powwow had a reasonable and justifiable expectation of privacy in their possessions and in the sacred ceremony they attended.  However, the agent reported:

> On March 11, 2006, . . ., in a covert capacity, (he) attended the pow-wow . . .  As the agent walked into the hallway of the center he immediately recognized a subject from the newspaper photo with a bustle made of large white and brown feathers standing at the entrance to the pavilion. The agent approached the subject (later identified as Michael v. RUSSELL by his state-issued driver's license) and commented to him that he (the agent) liked the costume he (RUSSELL) was wearing. RUSSELL thanked the agent for the compliment and proceeded to explain what it was made of.  The agent then asked RUSSELL what a small beaded-leather pouch that he was wearing around his neck was for. RUSSELL stated it was a small medicine bag and it was used by Native Americans to keep medicinal items.  The agent then asked RUSSELL about the bustle he was wearing on his back.  RUSSELL said it was made of eagle feathers and it was given to him by an Apache.  The agent asked RUSSELL if he was a Native American and RUSSELL stated 'No'.[8]  The (agent) asked RUSSELL if he (the agent) could touch the feathers and RUSSELL stated 'No' and turned away from (the agent).[9]

---

[8] Mr. Russell is in fact of Creek Indian ancestry, and he claims American Indian identification pursuant to Federal Law 62 FR 58782. Like many Indians, he resents the term "Native American" as applicable to the First People in the America's prior to the arrival of the Europeans.  Federal Law supports his position. According to Federal Law 62 FR 58782, as described in *Federal Register* Notice, dated October 30, 1997, entitled "Revisions to the Standards for the Classification of Federal Data on Race and Ethnicity," at Supplementary Information, Section D, OMB's Decisions, Subsection (8), OMB accepts the following recommendation concerning changing the term "American Indian" to "Native American," it states:

"The term American Indian should not be changed to Native American."

[9] Among many Indians, it is considered a tremendous breech of ethics to touch the feathers worn by an Indian without the wearer's permission.  Many believe that the touching of the feathers by another could diminish the "medicine" or spiritual powers of the feathers.

At this point the agent showed RUSSELL his credentials and identified himself as a federal agent with the United States Fish and Wildlife Service (USFWS).  The agent asked RUSSELL to follow him to an isolated area of the large hallway outside the pavilion where the pow-wow was being held.[10]

Once there (in the hallway[11]), the agent asked RUSSELL to remove the bustle from his back so the agent could inspect the feathers.  RUSSELL was also wearing four more feathers on his costume that appeared to be eagle feathers and the agent asked him to remove these as well.[12]  The agent identified all the feathers as immature golden eagle (Aquila chryaetos).[13]

At this point, Rev. Soto approached the agent and asked him what the problem was.  The agent told Rev. Soto that he was investigating the illegal possession of feathers by those attending the powwow.

Rev. Soto informed the agent that he was interrupting an American Indian religious service, and that he should leave the powwow.  The agent said he did not have to leave, whereupon Rev. Soto asked to see the agent's credentials.  The agent refused to show them to him.  Rev. Soto persisted and asked again to see the agent's credentials and again the agent refused to produce them. After four requests by Rev. Soto for the agent to produce his credentials, the agent finally showed them to him.

Rev. Soto then identified himself, and informed the agent that the bustle worn by Mr. Russell belonged to Rev. Soto, an enrolled member of the Lipan Apache Band of Texas.

According to the agent's report:

---

[10] Report of Investigation (First Report), dated April 20, 2006, Report #: 2006201750R001, Case Title "OPERATION POWWOW", page 2-3.

[11] The entire community center area where participants were present is included in the religious ceremony called a powwow. The fourth amendment protects people, not places. The "hallway" area later referenced is a very large room with chairs through which participants must pass as they come from the dressing room where they have already begun their religious experience.  Many participants perform sacred ceremonies such as a "smudge" to bless themselves and their feathers in this "hallway" area.

[12] Ibid.

[13] The agent's ability to identify the feathers is suspect. If questioned at trial, Mr. Russell would not have supported the agent's identification of all the feathers as immature golden eagle feathers.

At this point the agent asked RUSSELL where he had gotten the feathers and RUSSELL stated that his brother-in-law, Robert SOTO, had lent him the feathers . . . The agent asked RUSSELL for identification and RUSSELL stated that his wallet was in the dressing room. The agent told RUSSELL to go get it.

While (the agent) was waiting for RUSSELL he recognized the second subject, who was talking to a female at an information table, as one of the two persons with what appeared to be eagle feathers in the newspaper photo. The agent (claimed that he) called the subject and the agent identified himself with his credentials as a federal agent with the USFWS. The subject, later identified as Robert SOTO, asked to see the agent's credentials . . . The agent asked SOTO to remove two large white and brown feathers that SOTO was wearing on top of his head. SOTO removed them and handed them to the agent[14]. The agent also identified these two feathers as immature golden eagle. At this point the agent asked SOTO if he was a Native American and SOTO answered 'Yes.' The agent asked SOTO if he was 'carded' and SOTO again answered 'Yes' and that his card was in his wallet in the dressing room. SOTO was told to go and get the card.

While the agent was talking to SOTO, RUSSELL returned from the dressing room with his Texas driver license. After SOTO left to retrieve his identification, the agent wrote down RUSSELL's personal information and advised RUSSELL he was going to seize the feathers and the agent would be contacting RUSSELL in the next few days to advise him of what was going to happen.

SOTO returned from the dressing room and handed the agent a plastic credit-card sized identification . . . The card, issued by the Lipan Apache Band of Texas, Inc., had SOTO's picture on it along with a membership number and name and address. The agent wrote down all the information and advised SOTO that he (the agent) would not be seizing the feathers from him but would be investigating the matter further . . .

After the agent finished the contact with RUSSELL and SOTO he returned to pavilion where the pow-wow was being held. The agent observed several people seated in stands watching people from the audience participate in a cake-walk while several males banged on large drums. The agent observed several vendors selling jewelry, arts, and crafts.[15]

The agent claimed that he noticed an American Indian artist whom the agent

mis-identified as:

---

[14] In an "Administrative Page" attached to Report of Investigation, dated August 2, 2006, Report #: 2006201750R003, Case Title "OPERATION POWWOW", SUBJECTS OF THE REPORT: SOTO, Robert, RUSSELL, Michael, and CLEVELAND, p. 1, it was noted that the agent's Office of Law Enforcement Supervisors in San Antonio "would not oppose returning the two eagle feathers abandoned by Soto."

[15] Report of Investigation (First Report), dated April 20, 2006, Report #: 2006201750R001, Case Title "OPERATION POWWOW", pages 2-3.

One vendor, Michael Cleveland, had several dream-catchers for sale containing various feathers, some of which appeared to be songbird and waterfowl (which species the agent was unwilling or unable to identify in his report or in the transmission paperwork of the feathers to the USFWS Forensics Laboratory as protected by the Migratory Bird Treaty Act or any other Act).[16]

According to Commander Edith Clark, a Cherokee Indian,[17] who had custody and control of the booth that was decorated by Linda Cleveland, the vendor of record, with her son Michael Cleveland's dreamcatchers, Commander Clark was the only person at the booth when the agent first approached it and made assertions that the feathers adorning the dreamcatchers could be illegal.

At the one-day bench trial before U.S. Magistrate Judge Dorina Ramos, the agent admitted that someone other than Michael Cleveland or his mother Linda Cleveland was at the booth when he first approached it.  He described her (Commander Edith Clark) as a "white Caucasian lady probably in her early 60s manning the booth."[18] When he asked Commander Edith Clark about the dreamcatchers and the feathers adorning them, Commander Clark told him he needed to visit with Linda Cleveland, the vendor of record, who was on break at the time.

After the passage of several minutes, Linda Cleveland appeared at the booth with her son Michael Cleveland.

Without asking or establishing whether Linda Cleveland or Michael Cleveland were American Indians, the agent commenced his interrogation of Michael Cleveland about the feathers adorning the dreamcatchers at Linda Cleveland's booth.

---

[16] Ibid., p. 3.
[17] *See* Bench Trial Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of Texas, Mc Allen Division, at page 96, Lines 4-8.
[18] *See* Bench Trial Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of Texas, Mc Allen Division, at page 23, Lines 16-17.

At trial and in pre-trial motions, the American Indian status of Linda Cleveland and her son was not contested by the Government when Linda Cleveland testified that she was a Cherokee Indian who identified as such on the 2000 US decennial census and the biological mother of Michael Cleveland.  Mrs. Cleveland also testified that she was the vendor of record at the powwow and that her son's dreamcatchers were not for sale and were hung at her booth for decoration and to give it ambience.[19]

At this point, Rev. Soto and Anita Anaya, a fellow Tribal Council Member and Secretary to the Lipan Apache Tribe of Texas, approached the agent.  She and Rev. Soto told the agent that he was disrupting an American Indian religious service in violation of the American Indians' freedom of religion and he needed to cease and desist his harassing and molesting of American Indian powwow participants and leave the powwow.

According to the agent's Report of Investigation:

While the agent was discussing the possession of these feathers with CLEVELAND, SOTO and Anita Anaya came over to speak to the agent. Anaya claimed she was the secretary of the Lipan Apache and asked the agent what he was doing there. The agent advised Anaya that he was conducting a federal investigation into the illegal possession of protected migratory bird parts.

Anaya asked the agent if she could ask him to leave. The agent advised Anaya again that he was conducting a federal investigation and since the location was a public place and open to the public he was lawfully there. Furthermore, the agent reminded Anaya that the pow-wow had been advertised in the local paper[20] and was open to the public.  The agent gave Anaya a business card and told her to call him if she had any further questions.  Anaya kept insisting that (the agent) leave the premises, and the agent advised her that if she kept interfering with a federal investigation she could be arrested. At this point Anaya decided to leave.[21]

---

[19]*See* Bench Trial Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of Texas, Mc Allen Division, at page 103, Lines 10-11.
[20] As are hundreds of religious services of the many Christian denominations throughout Texas.
[21] Report of Investigation (First Report), dated April 20, 2006, Report #: 2006201750R001, Case Title "OPERATION POWWOW", at page 4.

After the interrogations were finished, the agent decided that the feathers should be tested to determine whether they were illegal or not. In front of witnesses at the booth, the agent then seized <u>four</u> feathers from one of Mr. Cleveland's dreamcatchers, explaining that the feathers would be sent to the USFWS lab for testing to determine the feathers' birds or origin. Even in the context of a nonsearch, merely observing a contraband object does not give law enforcement the authority to seize it. The seizable nature of an object must also be "plain." If the law enforcement official must conduct a search to determine whether it is contraband or otherwise seizable, the object is not in "plain view." *Arizona v. Hicks,* 480 U.S. 321, (1987). If the agent had to send the feathers to the USFWS lab and wait for a determination on their status before issuing a citation, then the "seizable nature" of the feathers was not "plain" when he seized them, and in fact the USFWS lab determined that two of the seized feathers were not identifiable[22].

At trial, Commander Edith Clark stated that she saw the agent seize <u>three</u> feathers;[23] Robert Soto saw the agent seize <u>one</u> feather;[24] and Linda Cleveland saw the agent seize <u>four</u> feathers.[25]

The <u>four</u> feathers that Mr. Cleveland claimed were seized by the agent included: two pheasant feathers, about two inches in diameter, and somewhat round in shape; one farm turkey feather, darkish brown in color with golden or tarnish stripes at the tip and

---

[22] *See* Bench Trial Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of Texas, Mc Allen Division, at page 66, Lines 19-25.
[23] *See* Bench Trial Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of Texas, Mc Allen Division, at page 99, Line 23.
[24] *See* Bench Trial Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of Texas, Mc Allen Division, at page 87, Lines 18.
[25] *See* Bench Trial Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of Texas, Mc Allen Division, at page 106, Line 8.

about three inches long; and one duck feather, all white in color and fluffy looking, about 2 to 2 and ½ inches long.[26]

According to the agent's Report of Investigation, the number of feathers that he seized was double what Mr. Cleveland claimed was seized. The agent's Report of Investigation stated:

> The agent continued visiting with CLEVELAND and seized eight loose feathers that were attached to the dream-catchers.[27]

According to the Morphology Examination Report and the trial testimony of Pepper Trail, Senior Forensic Scientist for the National Fish and Wildlife Forensics Laboratory, of the eight feathers (alleged to have been taken from suspect Michael Cleveland and submitted by the agent for examination), one was White-winged Dove (Zenaida asiatica), one was White-tipped Dove (Leptoptila verreauxi), two were Black-bellied Whistling Duck (Dendrocygna), two were Canada Goose (Branta Canadensis), and two were unidentified waterfowl (Anatidae).[28] Pepper Trail also made the incredible assertion at trial that his method of examining feathers with the naked eye for purposes of identification was 100 percent accurate,[29] perfect beyond even the known limitations of DNA analysis.

---

[26] Defendant's Motion to Suppress.

[27] Report of Investigation (First Report), dated April 20, 2006, Report #: 2006201750R001, Case Title "OPERATION POWWOW", page 4.

[28] *See* Bench Trial Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of Texas, Mc Allen Division, at page 58, Lines 9-13.

[29] *See* Bench Trial Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of Texas, Mc Allen Division, at page 64, lines 22-25, at page 65, Lines 1-25, and at page 66, Lines 1-23 where Pepper Trail testifies that his Morphology analysis, with all the obvious limitations of naked eye analysis, is 100 percent accurate, even when compared to DNA analysis which has never been described by the science of microbiology as 100 percent accurate:

    Q      Okay. If I were to ask you which is more reliable, morphology-based analysis or DNA analysis, what would be your answer?

    A      My answer is they're both completely reliable when they're applied appropriately.

    Q      Okay. But you wouldn't give me a number in terms of reliability?

The agent's report goes on to state:

CLEVELAND claimed he had found the feathers on daily nature walks he takes around his residence.  He was advised that the sale of protected species, and their parts, was illegal and the agent would contact him later . . .[30]

The agent contacted SOTO after verifying that the Lipan Apache was not a federally recognized tribe, to set-up a meeting at the agent's office to discuss the possession by SOTO of the two golden eagle feathers. SOTO and the agent agreed to meet on March 16, 2006, at 10:30 A.M.[31]

---

| | |
|---|---|
| A | **I believe that my identifications are a hundred percent reliable based on morphology** (Bold print provided), and if I am not able to make a completely reliable identification to species, I back to the group that I can make a hundred percent accurate identification, as in the case of the waterfowl in this instance. |
| Q | Okay. And you did indicate there were two feathers you could not identify. |
| A | To species, correct. |
| Q | Okay.  To species. |
| A | No; I couldn't identify them to species, so two feathers probably from the same species, but I was only able to get them to the group of waterfowl. |
| Q | And they're listed as – |
| A | They're – |
| Q | They're unidentified – |
| A | Right. |
| Q | – waterfowl |
| A | Right. |
| Q | Okay. By "unidentified," they're not subject to the Migratory Bird Treaty Act under your analysis. |
| A | Correct. |
| Q | Okay. With DNA analysis would it have been possible to – |
| A | It could have been attempted, as I explained, if the tissue – if there had been tissue present on those feathers, which would have had to have been determined by the analysts in question, it might have been possible to identify the species. |
| Q | Okay. Have you heard of PCR testing? |
| A | Yes. |
| Q | RFLP testing? |
| A | Uh-huh. |
| Q | What is PCR testing? |
| A | PCR stands for polymerase chain reaction, and it's a technique whereby small bits of DNA are – they call it "amplified."  They're broken by enzymes into mall bits and them recombined sort of in a soup of nucleotides so that so that long chains are built up. |
| Q | Okay. |
| A | It's a way of producing a large amount of DNA from a small sample. |
| Q | Have you seen any figures concerning reliability of polymerase chain reaction? |
| A | I couldn't give you a specific figure, but I know that it's a standard technique.  It's considered highly reliable. |
| Q | Would it be 99.53 percent? |

[30] Report of Investigation (First Report), dated April 20, 2006, Report #: 2006201750R001, Case Title "OPERATION POWWOW", page 4.
[31] Ibid.

Based on their confrontation with the agent, Rev. Robert Soto and his brother-in-law Michael Russell feared they were facing a possible fine of up to $500 for each feather confiscated by the agent, as well as jail time, so they contacted local Mc Allen attorney Arturo Cisneros concerning their predicament.

On March 15, 2006, Mr. Arturo Cisneros contacted the agent regarding SOTO's case. Mr. Cisneros wanted to know how SOTO and RUSSELL could take care of this matter. The agent told Mr. Cisneros if RUSSELL forfeited $500 to the government (in response to the issuance of a violation notice), and both of them agreed to sign an abandonment form for the eagle feathers, the investigation would be concluded. Mr. Cisneros stated he was going to contact SOTO and would get back to the agent.

Mr. Cisneros notified the agent on March 20, 2006, that RUSSELL and SOTO had agreed . . . to the government's proposal. It was agreed that all the parties would meet on March 23, 2006, at Cisneros' law office. Mr. Cisneros asked the agent if he (the agent) could bring the feathers seized from RUSSELL at the pow -wow so they could be 'blessed' before being abandoned to the government. The agent agreed.

On March 23, 2006, the agent met with Mr. Cisneros, RUSSELL, and SOTO at Cisneros' law office. Also present were approximately 18 members of the Lipan Apache tribe.[32]

Before the arrival of the Indians, the agent strategically placed a file folder, a notebook with a yellow legal pad, a blue envelope, and a video tape boldly labeled in large black ink "3-11-06" (the date of the powwow when feathers were seized) on the desk in the room where the feathers were to be surrendered.  At the pre-trial hearing of Defendant's Motion to Compel, the agent conceded that the video tape contained no evidence of the feathers seized by the agent from Rev. Soto, Mr. Russell, and Mr.

---

[32] Report of Investigation, dated April 20, 2006, Report #: 2006201750R001, Case Title "OPERATION POWWOW", page 4.

Cleveland.  In fact, the tape was blank,[33] leaving a reasonable person to infer that the tape was merely a prop to compel surrender of the feathers.

After the Indians arrived, they held a somber Surrender Ceremony with several Indians breaking down and weeping.  Rev. Soto prayed to the Creator to watch over the feathers and protect their medicine.  Then he smudged the feathers and bid them farewell.

According to the agent's report

> They held a sage burning and chanting ceremony to 'bless' the feathers in Cisneros' conference room. RUSSELL was issued a violation notice . . . for $500 . . . and both RUSSELL and SOTO signed abandonment forms for the feathers.[34]

According to Rev. Soto, the agent then made a chilling remark. The agent said, "This matter is not over yet.  I have a list of all the powwows in Texas, and I will be at those powwows taking away feathers."

According to a second considerably abbreviated Report of Investigation with substantive omissions that were contained in the first report, dated August 2, 2006, Report #: 2006201750R003, Case Title "OPERATION POWWOW",  SUBJECTS OF THE REPORT: SOTO, Robert, RUSSELL, Michael, and CLEVELAND, Michael, the agent re-wrote his Report of Investigation focusing primarily on Defendant Michael Cleveland, stating

> In May of 2006 the agent contacted CLEVELAND by phone to let him know that the feathers (confiscated from Cleveland's dream catchers) had been positively identified belonging to several migratory species that by law could not be sold without a permit.[35] CLEVELAND stated that he was only selling the dream catchers and not the feathers and therefore not in violation of any law . . .

---

[33] *See* Final Pretrial-CVB Bench Trial Motions Hearing Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of Texas, Mc Allen Division, at page 24, Line 25, at page 25, Lines 1-25, at page 26, Lines 1-17. Pre-trial Hearing on Defendant's Motion to Compel, November 1, 2006.
[34] Ibid.
[35] At trial, Jeff Haskins, Chief of the Migratory Bird Office for the U.S. Fish and Wildlife Service, Region 2, Southwest Region, Albuquerque, New Mexico which includes Texas, testified as to the *futility* of an American Indian not a member of a federally recognized tribe attempting to obtain a permit to possess feathers of species listed on the Migratory Bird Treaty Act. *See* Bench Trial Transcript, Case No: 7:06-MJ-

Later that day the agent drove to CLEVELAND's residence . . . He met with CLEVELAND and issued a violation notice . . . for $500.[36]

## COUNT ONE

### Violation of the Religious Freedom Restoration Act

35.     Congress passed the Religious Freedom Restoration Act (RFRA) in 1993 to prevent the government from burdening the free exercise of religion unless it had a compelling governmental interest in doing so and it accomplished its goal by the least restrictive means.

36.     The Defendant considers the religious use of bird feathers and parts of protected species of birds by Plaintiffs, who are American Indians as defined under 62 FR  58782 not enrolled in federally recognized tribes, to be a criminal act barred by the Migratory Bird Treaty Act (MBTA), 16 U.S.C. 703, and  the Bald and Golden Eagle Protection Act (BGEPA), 16 U.S.C. 688, and regulations adopted pursuant to the Acts.

37.     Defendant's interpretation of MBTA and BGEPA substantially burdens Plaintiffs' exercise of their religion.

38.     Defendant's criminalization of Plaintiffs' religious use of feathers and bird parts of species listed on the MBTA and BGEPA serves no compelling governmental interest.

---

4806, Criminal, U.S. District Court, Southern District of Texas, Mc Allen Division, at page 11, Lines 11-23, and at page 16, Lines 1-5, where Haskins testifies

> I asked my permit staff to review all the permits that have been issued for Indian religious use of non eagles. And we have issued, I believe, 182 permits. I don't believe that any of those permits were issued to non-enrolled tribal members.

[36] Report of Investigation, dated August 2, 2006, Report #: 2006201750R003, Case Title "OPERATION POWWOW", SUBJECTS OF THE REPORT: SOTO, Robert, RUSSELL, Michael, and CLEVELAND, p. 2.

39.    Even assuming the Defendant's interpretation of the MBTA and BGEPA did serve a compelling governmental interest, a complete ban on the cultural and religious use of feathers and bird parts of species listed on the MBTA and BGEPA by American Indians as defined under 62 FR 58782 and not enrolled in federally recognized tribes is not the least restrictive means of furthering any such interest.

Moreover, on February 13, 2009, in the case of *United States v. Wilgus* (Case No.: 2:99-CR-00047; Assoc. Case No. 2-99-CR-00166; and Assoc. Case No.: 2:00-CR-00029), U.S. District Judge Benson for the District of Utah found that the federal government had violated the Religious Freedom Restoration Act (RFRA) of 1993, 42 U.S.C. Sec. 2000bb *et seq.* when it failed to prove that its current permit requirement for possession of eagle feathers was either necessary or the least restrictive means for the government's stated compelling interests (1) to protect eagles and (2) to protect American Indian religions. (at page 8).

As to the government's need to protect eagles with its burdensome permit process, Judge Benson noted that bald eagle populations had grown in recent years. The recovery in eagle populations was

> so pronounced that on June 28, 2007, then Secretary of the Interior Dirk Kempthorne announced the removal of the bald eagle from the list of threatened species protected under the Endangered Species Act, 16 U.SC. Sec. 1531 *et seq.* The Secretary described the bald eagle's recovery in glowing terms: "After nearly disappearing from most of the United States decades ago, the bald eagle is now flourishing across the nation and no longer needs the protection of the Endangered Species Act." June 28, 2007 United States Fish and Wildlife Service News Release. (at page 23).

Judge Benson further noted that "loss of habitat" posed a much greater threat to eagle populations than practitioners of American Indian religions. (at pages 39 and 43).

23

As to the government's claim that extending access to eagle feathers beyond those Indians enrolled in federally-recognized tribes could harm American Indian cultures, the judge found the government's evidence to be irrelevant and not credible. (at page 44).  Id.

40.     For these reasons, Defendant has violated the statutory rights of Plaintiffs who are members of Mc Allen Grace Brethren Church, the Native American New Life Center, Chief of Chiefs Christian Church (formerly known as San Antonio Indian Fellowship), and South Texas Indian Dancers Association embodied in RFRA, 42 U.S.C. § 2000bb-1(a)(1999).

## COUNT TWO

### Violation of First Amendment of U.S. Constitution

41.     Framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment to the Constitution.  The Free Exercise Clause of the First Amendment provides that Congress shall make no law "prohibiting the free exercise" of religion.

42.     In Employment Division, Dept. of Human Resources of Oregon v. Smith, 494 U.S. 872 (1990),  the U.S. Supreme Court held that a law imposing a substantial burden on religion need not be justified by a compelling governmental interest if it is neutral and of general applicability.  However, if that law is either not neutral or is not one of general applicability, it must be justified by a compelling governmental interest that is narrowly tailored to advance that interest.

43.     "Revisions to the Standards for Classification of Federal Data on Race and Ethnicity," 62 FR 58782 (October 30, 1997), Executive Office of President, Office of Management and Budget (OMB), Office of Information and Regulatory Affairs, defines

American Indian as: "A person having origins in any of the original peoples of North and South America, and who maintains tribal affiliation or community attachment."

44.    The principle objective of the "Revisions to the Standards for Classification of Federal Data on Race and Ethnicity," 62 FR 58782, is "to enhance the accuracy of the demographic information collected by the Federal Government," for the decennial census, in household surveys, on administrative forms (e.g., school registration and mortgage lending applications), and in medical and other research.

45.    A second objective of the "Revisions to the Standards for Classification of Federal Data on Race and Ethnicity," 62 FR 58782,   and is **"to monitor civil rights enforcement and program implementation."** (Bold print provided).

46.    "Revisions to the Standards for Classification of Federal Data on Race and Ethnicity," 62 FR 58782, indicate: "The term American Indian should not be changed to Native American."

47.    "Revisions to the Standards for Classification of Federal Data on Race and Ethnicity," 62 FR 58782, provide that (1) "Central and South American Indians should be classified as American Indian," (2) "The definitions of the 'American Indian or Alaska Native' category should be modified to include the original peoples of Central and South America," and (3) "In addition, OMB has decided to make the definition for the American Indian or Alaska Native category more consistent with the definitions of other categories."

48.    According to the 2000 Census, sixty percent  (60%) of American Indians as defined under 62 FR 58782 were not enrolled in federally recognized tribes.

49.     According to expert testimony in a Tenth Circuit Court of Appeals case involving an American Indian not enrolled in a federally recognized tribe who had his eagle feathers seized, eighty percent (80%) of American Indians as defined under 62 FR 58782 were not enrolled in federally recognized tribes, *In the Matter of Joseluis Saenz v. Department of Interior*, U.S. 10th Circuit Court of Appeals, No. 00-2166, at Footnote 9.

50.     The statutory and regulatory scheme of the MBTA and BGEPA is not neutral because it favors a minority of American Indians defined under 62 FR 58782, who are enrolled in federally recognized tribes, above a majority of American Indians also defined under 62 FR 58782 but not enrolled in federally recognized tribes, including Plaintiffs.

51.     Likewise, the statutory and regulatory scheme of the MBTA and BGEPA is not a law of general applicability because it provides immunity to a minority of American Indians defined under 62 FR 58782 who are enrolled in federally recognized tribes from the penalties of the MBTA and BGEPA, but does not provide immunity to a majority of American Indians as defined under 62 FR 58782 who are not enrolled in federally recognized tribes, including Plaintiffs who are similarly situated.

52.     The MBTA and BGEPA also provide for more than twenty (20) other exemptions for scientific institutions, public museums and zoological gardens for education and exhibition, farmers and livestock owners permitted to kill eagles that they can prove are damaging their livestock, and other purposes unrelated to the central religious issue raised here.  It is therefore in no sense a law of general applicability.

53.     Defendant has no compelling governmental interest in applying the MBTA and BGEPA to criminalize Plaintiffs' religious use of birds and their parts.

54.     Even if it were assumed that Defendant had a compelling governmental interest in restricting the use of birds and their parts through the MBTA and BGEPA, such an interest could be furthered without prohibiting the Plaintiffs' religious use of the birds and their parts.  Thus, any such governmental interest could be furthered through less restrictive means.

55.     Enrollment in a federally recognized tribe is a <u>political designation</u> that depends on <u>political criteria</u> that abridges Plaintiffs' Free Exercise of Religion under the First Amendment . <u>See Santa Clara Pueblo v. Martinez</u>, 436 U.S. 49.

56.     For these reasons, Defendant has violated the First Amendment rights of Plaintiffs.

**COUNT THREE**

**Violation of Equal Protection Clause of the U.S. Constitution**

57.     Plaintiffs defined as American Indians under 62 FR 58782 who are not enrolled in federally recognized tribes are similarly situated to American Indians defined under 62 FR 58782 who are enrolled in federally recognized tribes as to their religious use of feathers and birds parts of species listed on the MBTA and BGEPA.  Nevertheless, Defendants have refused to accord the same deference to Plaintiffs.

58.     Consequently, the Defendant's decision to allow American Indians enrolled in federally recognized tribes to use protective species of birds for religious purposes, while denying the same protection to American Indian Plaintiffs, violates the Equal Protection rights of Plaintiffs guaranteed by the Fifth and Fourteenth Amendments to the U.S. Constitution.

## COUNT FOUR

### Improper Application of MBTA AND BGEPA

59.     Implicit in Defendant's actions complained of herein is Defendant's assumption that Plaintiffs defined as American Indians under 62 FR 58782 who are not enrolled in federally recognized tribes are not exempted from criminal action when they use feathers and parts of protected species of birds for religious purposes, whereas American Indians under 62 FR 58782 who are enrolled in federally recognized tribes are exempted from criminal action when they use feathers and parts of protected species of birds for religious purposes.

60.     The Defendant's draconian use of federal recognition to determine which American Indians can worship with feathers and parts of protected species of birds conflicts with reality in that the wordings of the MBTA and BGEPA make no mention of federal recognition, but simply say "Indian Tribes" are exempted from provisions of the act.

61.     On February 5, 1975, U. S. Secretary of the Interior Rogers C. B. Morton issued a statement (Morton Policy) concerning Indian cultural and religious use of migratory bird feathers and parts, holding that "American Indians may possess, carry, use, wear, give, loan, or exchange among other Indians, without compensation, all federally protected birds, as well as their parts or feathers," establishing federal policy exempting all American Indians, including Plaintiffs, from MBTA and BGEPA.

62.     In the Matter of Joseluis Saenz v. Department of Interior, U.S. District Court Judge Mechem noted that it was not until after the Saenz Case was filed in 1996 that the Department of Interior's own internal regulations were drafted to exclude in its

definition of "Indian Tribes" American Indians not enrolled in federally recognized tribes, before Judge Mechem ordered that the U.S. Department of Fish and Wildlife return to Saenz, an American Indian not enrolled in a federally recognized tribe, all his religious items, including feathers of federally protected birds. See In the Matter of Joseluis Saenz v. Department of Interior, U.S. 10th Circuit Court of Appeals, No. 00-2166, Appeal from the United States District Court of New Mexico, D.C. No. 99-21-M.

63.    In the end, the government's use of federal recognition in issuing permits to American Indians to own protected species of birds and their parts is little more than a bureaucratic short-cut designed to minimize the work Congress has handed to the agency, resulting in an administrative expediency that does not constitute a compelling government interest.

## COUNT FIVE

### Violation of Fourth Amendment

64.    There was no fair probability that contraband evidence of a crime would be found at March 11, 2006, Mc Allen Powwow, because American Indian Plaintiffs defined under 62 FR 58782 were in lawful possession feathers of protected species of birds listed on the MBTA and BGEPA.

65.    Defendant had no probable cause to raid March 11, 2006, Mc Allen Powwow or to seize feathers and other items at these premises.

66.    Because Defendant searched and seized the feathers and other items without probable cause, such search and seizure violated American Indian Plaintiffs' Fourth Amendment right to be free from unlawful search and seizure.

## COUNT SIX

### Violation of Fifth Amendment

67.     Defendant has seized feathers and other items described above from Plaintiffs to assert ownership and control over the property.

68.     Defendants provided Plaintiffs no notice of hearing before seizing these items.

69.     No extraordinary circumstances justified the failure to provide Plaintiffs pre-deprivation notice and hearing.

70.     The seizure of feathers and other items deprived Plaintiffs of their rights of ownership and possession of religious objects used in their observance of their traditional American Indian religion, in particular, and constituted a violation of the Plaintiffs' rights under the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

## COUNT SEVEN

### Administrative Procedure Act

71.     Defendant's conduct set forth above constitutes agency action that is: (a) arbitrary and capricious, an abuse of discretion and otherwise not in accordance with the law; (b) contrary to Plaintiffs' constitutional and statutory rights; (c) in excess of statutory jurisdiction and authority; and (d) without observance of procedures required by law.  Such action should be set aside and declaratory and injunctive relief provided under the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

## COUNT EIGHT

### Violation of International Law

72.     The MBTA, really a series of agreements with Canada, Great Britain, Mexico and former Soviet Union signed between 1916 and 1976, permits indigenous people not enrolled in nationally recognized tribes with their respective national governments to possess feathers and bird parts of protected species of birds for religious purposes.

73.     Indigenous people, including members of the South Texas Indian Dancers Association, travel between and among nations that are signatories to the MBTA, bringing with them their regalia and religious objects adorned with feathers and bird parts of protected species, so that they can practice their traditional native religion and faith while in other countries as guests of their respective native populations.

74.     The doctrine of comity, as established under international law and recognized in the United States, encourages deference to foreign legal and political judgments to foster international cooperation and encourage reciprocity between the United States and other countries.  See Spatola v. United States, 925 F.2d 615, 618 (2d Cir. 1991).

75.     Federal agencies regularly invoke the doctrine of comity as a guide for decisions that touch on foreign interests.

76.     Where "fairly possible," a United States statute should be construed so as not to conflict with international law or an international agreement of the United States. See Restatement (Third) of Foreign Relations Law, Sec. 114.

77.     The United States is a signatory to the United Nations International Covenant on Civil and Political Rights (ICCPR), which insures the freedom of everyone to "have or to adopt a religion of his choice, and freedom, either individually or in the community of others and in public or private, to manifest his religion or belief in worship, observance, practice, and teaching." ICCPR, 138 Cong. Rec. S4781-84 (1992).

78.     The United States has also endorsed the Universal Declaration of Human Rights, which protects the rights of individuals not only to believe as they wish, but also to "manifest" that belief through practice, including "ceremonial acts" and "participation in rituals." See U.N. Human Rts. Comm., General Comment no. 22, p. 4 (1993).

79.     Finally, the United States Congress has passed the International Religious Freedom Act (IRFA), Pub. L. No. 105-292, 112 Stat. 2788 (1998), codified at 22 U.S.C. §§ 6401-6481.  IRFA establishes as United States policy the promotion of freedom of religion and cooperation with foreign governments "that affirm and protect religious freedom, in order to develop multilateral . . . intitiatives to . . . promote religious freedom abroad."

80.     These laws make clear that it is not only "fairly possible" for the United States to defer to other nations permitting the religious use of feathers and bird parts of protected species of birds by its indigenous people, but that domestic and international 2law, in fact, require such deference.

81.     Under these circumstances, Defendants' interpretation of MBTA forbidding the religious use of birds and bird parts of protected species by Plaintiffs in the United States clearly violates the doctrine of comity, treaties which the United States has endorsed, and domestic law.

32

## COUNT NINE

### Declaratory Judgment

82.     Defendant's interpretation of MBTA and BGEPA as considering it a crime for American Indians defined under 62 FR 58782 not enrolled in federally recognized tribes to possess, carry, use, wear, give, loan, or exchange feathers and bird parts of all federally protected species among other American Indians without compensation for religious purposes, as explained in the above counts, creates an actual controversy with the meaning of 28 U.S.C. § 2201(a).

83.     For these reason, Plaintiffs are entitled to a declaratory judgment that all the above described actions were and are unlawful and to such additional declaratory relief as described in Plaintiffs' Prayer for Relief.

### PRAYER FOR RELIEF

For the reasons set forth above, Plaintiffs seek the following relief:

1.     A judgment declaring the Defendant's interpretation of the MBTA and the BGEPA as barring Plaintiffs' religious use of feathers and bird parts of protected species of birds violates RFRA, 42 U.S.C. §§ 2000bb-2000bb(4), the First and Fourth Amendments to the U.S. Constitution, the Equal Protection Clause of the Fifth and Fourteenth Amendments to the U.S. Constitution and international law.

2.     A judgment declaring that the MBTA and the BGEPA does not apply to American Indians as defined under 62 FR 58782, whether enrolled in federally recognized tribes or not, and that all American Indians as defined under 62 FR 58782 may possess, carry, use, wear, give, loan, or exchange among other American Indians, without compensation, all federally protected birds, as well as their parts or feathers.

33

3.      A judgment declaring that the federal agent who raided the Mc Allen Powwow and seized the feathers of Rev. Robert Soto, Michael V. Russell, and Michael Todd Cleveland on or about March 11, 2006, at the premises at the Palm View Library and Community Center, located at 1401 Jordan Street, in Mc Allen, Texas acted beyond the bounds of his legal authority because as American Indians as defined under 62 FR 58782 Rev. Robert Soto, Michael V. Russell, and Michael Todd Cleveland were entitled to the feathers seized for religious reasons and purposes.

4.      A judgment declaring that the federal agent who raided the Mc Allen Powwow and seized the feathers of Rev. Robert Soto, Michael V. Russell, and Michael Todd Cleveland on or about March 11, 2006, at the premises at the Palm View Library and Community Center, located at 1401 Jordan Street, in Mc Allen, Texas acted beyond the bounds of his legal authority in violation of RFRA and the Administrative Procedure Act as well as the constitutional rights of Plaintiffs under the First, Fourth, Fifth, and Fourteenth Amendments.

5.      An order enjoining Defendant from enforcing the MBTA and BGEPA against any Plaintiff anywhere within the jurisdiction of the federal courts of the United States.

6.      An order compelling Defendant to return to Plaintiffs Robert Soto, Michael Russell, and Michael Todd Cleveland all feathers and things seized on or about March 11, 2006 from the premises at the Palm View Library and Community Center, located at 1401 Jordan Street, in Mc Allen, Texas or surrendered on or about March 23 at the Law Office of Attorney Art Cisneros in Mc Allen, Texas.

34

7.      An order compelling Defendant to protect the feathers seized on or about March 11, 2006 from the premises at the Palm View Library and Community Center, located at 1401 Jordan Street, in Mc Allen, Texas, and prohibiting Defendant from removing, destroying, or harming the feathers in any way.

8.      Attorneys' fees and costs pursuant to the Equal Access of Justice Act, 5 U.S.C. § 504.

9.      Such other and further relief as warranted.

10.     Specific Declaratory Judgment and Order sought is as follows:

## DECLARATORY JUDGMENT AND ORDER FOR RELIEF

The complaint of McAllen Grace Brethren Church, et al. v. U.S. Secretary of Interior, Ken Salazar for declaratory relief, having been presented to this Court on the _____ day of _____, 2009, and upon interrogation of the plaintiffs and the examination of Plaintiffs' Original Complaint for Declaratory Relief, the Court declares, adjudges and decrees:

11.     All persons identified and counted as American Indians on the U.S. Census and for other purposes pursuant to federal law (62 FR 58782) have the right to worship as American Indians, including the minority of American Indians enrolled in federally-recognized tribes (41% of the total 2000 U.S. Census count of American Indians[37]) and the majority of American Indians *not* enrolled in federally recognized tribes (59% of the total 2000 U.S. Census count of American Indians).

---

[37] *According to* "Indian Labor Force Report," Office of Tribal Affairs, Bureau of Indian Affairs, U.S. Department of Interior, 1999, there were 1,693,483 Indians enrolled in federally recognized tribes (or 41 % of those counted as American Indians on the 2000 U.S. Census, which counted 4,119,301 American Indians)

12.      All persons identified and counted as American Indians on the U.S. Census and for other purposes pursuant to federal law (62 FR 58782) have the right to worship as American Indians using feathers and parts of birds listed in the Migratory Bird Treaty Act (MBTA), 16 U.S.C. 703 and the Bald and Golden Eagle Protection Act (BGEPA), 16 U.S.C. 668.[38]

13.      Defendant erred when he arbitrarily and capriciously determined that only enrolled members of federally recognized tribes are entitled to worship as American Indians using feathers and parts of birds listed on the MBTA or BGEPA.

14.      The Defendant's interpretation of the MBTA and the BGEPA barring Plaintiffs' religious use of feathers and bird parts of protected species of birds violates the Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb-2000bb(4), the First and Fourth Amendments to the U.S. Constitution, the Equal Protection Clause of the Fifth and Fourteenth Amendments to the U.S. Constitution and international law.

15.      The MBTA and the BGEPA do not apply to American Indians as defined by 62 FR 58782. All American Indians as defined by 62 FR 58782 may possess, carry, use, wear, give, loan, or exchange among other American Indians, without compensation, all federally protected birds, as well as their parts or feathers in conformance with their native religious beliefs.

16.      The federal agent who raided the Mc Allen Powwow and seized the feathers of Rev. Robert Soto, Michael V. Russell, and Michael Todd Cleveland on or

---

[38] The government has never challenged the right of Indians to worship their Creator using feathers of protected species of birds. However, the government has attempted to block that right to worship for a majority of Indians by construing the Indian Tribe exception to the MBTA and BGEPA to only tribes recognized by the federal government. It is important to note that the plaintiffs do not seek to harm or kill any birds listed on the MBTA or BGEPA. They merely seek access to feathers of birds that are shed in a natural process called "molting," or access to feathers of birds that have died from natural causes (such as old age and illness), or birds that have died due to electrocution, poisoning, unlawful hunting, or roadkill.

about March 11, 2006, at the premises of the Palm View Library and Community Center, located at 1401 Jordan Street, in Mc Allen, Texas acted beyond the bounds of his legal authority, because as American Indians as defined under 62 FR 58782, Rev. Robert Soto, Michael V. Russell, and Michael Todd Cleveland were entitled to possess, for religious reasons and purposes, the feathers seized from them.

17.    The federal agent who raided the Mc Allen Powwow and seized the feathers of Rev. Robert Soto, Michael V. Russell, and Michael Todd Cleveland on or about March 11, 2006, at the premises of the Palm View Library and Community Center, located at 1401 Jordan Street, in Mc Allen, Texas acted beyond the bounds of his legal authority in violation of the RFRA, the Administrative Procedure Act and the constitutional rights of Plaintiffs under the First, Fourth, Fifth, and Fourteenth Amendments.

**The Court orders:**

18.    Defendant is enjoined from enforcing the MBTA and the BGEPA against any Plaintiff anywhere within the jurisdiction of the federal courts of the United States.

19.    Defendant is compelled to return to Plaintiffs Rev. Robert Soto, Michael V. Russell all feathers, and Michael Todd Cleveland objects seized from them on or about March 11, 2006 from the premises at the Palm View Library and Community Center, located at 1401 Jordan Street, in Mc Allen, Texas or surrendered on or about March 23, 2006 at the Law Office of Attorney Art Cisneros in Mc Allen, Texas, including administrative fines.

20.    Defendant is compelled to protect the feathers seized on or about March 11, 2006 from the premises at the Palm View Library and Community Center, located at

37

1401 Jordan Street, in Mc Allen, Texas.  Defendant is prohibited from removing,

destroying, or harming the feathers seized in any way until the feathers and objects are

returned to Plaintiffs Robert Soto, Michael V. Russell, and Michael Todd Cleveland.

   21. Defendant is ordered to pay Attorneys' fees and costs pursuant to the

Equal Access of Justice Act, 5 U.S.C. § 504.

   22. Such other and further relief as warranted.

       Respectfully submitted,

DATED: March 5, 2009  BY: /s/Marisa Y. Salazar
         Marisa Y. Salazar, Regional Counsel
         New Mexico Bar No: 25887
         Dr. Milo Lone-Eagle Colton, Regional Counsel
         Nebraska Bar No: 19693
         Civil Rights Legal Defense & Edu. Fund, Inc.
         129 Whitney Way
         Cibolo, Texas 78108
         Telephone: 210-334-5209
         ATTORNEYS IN CHARGE FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

   This is to certify that service of a true and correct copy of the foregoing pleading will be automatically accomplished through the notice of electronic filing, on this 5th day of March, 2009, to the following parties:

Ken Salazar, Secretary of the United States Department of the Interior, at Main Interior, 1849 C Street, N.W., Room 3238, Washington, D.C. 20240-0001.

Alberto Gonzalez, Attorney General of the United States, at the United States Department of Justice, 950 Pennsylvania Avenue, N.W., Washington, D.C. 20530-0001.

H. Dale Hall is the Director, United States Fish and Wildlife Service (USFWS), at Main Interior, 1849 C Street, N.W., Room 3238, Washington, D.C. 20240-001.

Kevin R. Adams, Chief of the Office of Law Enforcement for United States Fish and Wildlife Service (USFWS), at Main Interior, 1849 C Street, N.W., Room 3020, MS 3238 MIB, Washington, D.C. 20240-0001.

Richard McDonald, Special Agent in Charge of the Office of Law Enforcement for Region Two of the United States Fish and Wildlife Service (USFWS), at Post Office Box 329, Albuquerque, New Mexico 87103.

Benjamin Tuggle, Acting Director for Region Two of the United States Fish and Wildlife Service (USFWS), at 500 Gold Avenue, Albuquerque, New Mexico 87102.

Donald J. DeGabrielle, Jr., United States Attorney for the Southern District of Texas, at Post Office Box 61129, Houston, Texas 77208.

Gary Young, Resident Special Agent in Charge for the USFWS Office of Criminal Investigations in Mc Allen, Texas, at 1874 Grandstand Drive, San Antonio, Texas 78238-4507.

Martin Steinmetz, Office of the Field Solicitor, at U.S. Solicitor's Office, 7906 E. 33d Street, Suite 100, Tulsa, OK 74145

Respectfully submitted,

BY:    /s/ Marisa Y. Salazar
Marisa Y. Salazar, Regional Counsel
New Mexico Bar No: 25887
Dr. Milo Lone-Eagle Colton, Regional Counsel
Nebraska Bar No: 19693
Civil Rights Legal Defense & Edu. Fund, Inc.
129 Whitney Way
Cibolo, Texas 78108
Telephone: 210-334-5209
ATTORNEYS IN CHARGE FOR PLAINTIFFS

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**MC ALLEN DIVISION**

| | |
|---|---|
| Mc Allen Grace Brethren Church, Native American New Life Center, Chief of Chiefs Christian Church (formerly known as San Antonio Indian Fellowship); et. al. | §<br>§<br>§<br>§<br>§ CIVIL NO. 7:07-CV-060 |
| **Plaintiffs,** | §<br>§<br>§ |
| **v.** | §<br>§ |
| U.S. Secretary of Dept. of Interior, Ken Salazar, | §<br>§ |
| **Defendant.** | § |

## DECLARATORY JUDGMENT AND ORDER FOR RELIEF

The complaint of McAllen Grace Brethren Church, et al. v. U.S. Secretary of Interior, Ken Salazar for declaratory relief, having been presented to this Court on the _____ day of _____, 2009, and upon interrogation of the plaintiffs and the examination of Plaintiffs' Original Complaint for Declaratory Relief, the Court declares, adjudges and decrees:

All persons identified and counted as American Indians on the U.S. Census and for other purposes pursuant to federal law (62 FR 58782) have the right to worship as American Indians, including the minority of American Indians enrolled in federally-recognized tribes (41% of the total 2000 U.S. Census count of American Indians[1]) and the majority of American Indians *not* enrolled in federally recognized tribes (59% of the total 2000 U.S. Census count of American Indians).

---

[1] *According to* "Indian Labor Force Report," Office of Tribal Affairs, Bureau of Indian Affairs, U.S. Department of Interior, 1999, there were 1,693,483 Indians enrolled in federally recognized tribes (or 41 % of those counted as American Indians on the 2000 U.S. Census, which counted 4,119,301 American Indians)

All persons identified and counted as American Indians on the U.S. Census and for other purposes pursuant to federal law (62 FR 58782) have the right to worship as American Indians using feathers and parts of birds listed in the Migratory Bird Treaty Act (MBTA), 16 U.S.C. 703 and the Bald and Golden Eagle Protection Act (BGEPA), 16 U.S.C. 668.[2]

Defendant erred when he arbitrarily and capriciously determined that only enrolled members of federally recognized tribes are entitled to worship as American Indians using feathers and parts of birds listed on the MBTA or BGEPA.

The Defendant's interpretation of the MBTA and the BGEPA barring Plaintiffs' religious use of feathers and bird parts of protected species of birds violates the Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb-2000bb(4), the First and Fourth Amendments to the U.S. Constitution, the Equal Protection Clause of the Fifth and Fourteenth Amendments to the U.S. Constitution and international law.

The MBTA and the BGEPA do not apply to American Indians as defined by 62 FR 58782. All American Indians as defined by 62 FR 58782 may possess, carry, use, wear, give, loan, or exchange among other American Indians, without compensation, all federally protected birds, as well as their parts or feathers in conformance with their native religious beliefs.

The federal agent who raided the Mc Allen Powwow and seized the feathers of Rev. Robert Soto, Michael V. Russell, and Michael Todd Cleveland on or about March 11,

---

[2] The government has never challenged the right of Indians to worship their Creator using feathers of protected species of birds. However, the government has attempted to block that right to worship for a majority of Indians by construing the Indian Tribe exception to the MBTA and BGEPA to only tribes recognized by the federal government. It is important to note that the plaintiffs do not seek to harm or kill any birds listed on the MBTA or BGEPA. They merely seek access to feathers of birds that are shed in a natural process called "molting," or access to feathers of birds that have died from natural causes (such as old age and illness), or birds that have died due to electrocution, poisoning, unlawful hunting, or roadkill.

2

2006, at the premises of the Palm View Library and Community Center, located at 1401 Jordan Street, in Mc Allen, Texas acted beyond the bounds of his legal authority, because as American Indians as defined under 62 FR 58782, Rev. Robert Soto, Michael V. Russell, and Michael Todd Cleveland were entitled to possess, for religious reasons and purposes, the feathers seized from them.

The federal agent who raided the Mc Allen Powwow and seized the feathers of Rev. Robert Soto, Michael V. Russell, and Michael Todd Cleveland on or about March 11, 2006, at the premises of the Palm View Library and Community Center, located at 1401 Jordan Street, in Mc Allen, Texas acted beyond the bounds of his legal authority in violation of the RFRA, the Administrative Procedure Act and the constitutional rights of Plaintiffs under the First, Fourth, Fifth, and Fourteenth Amendments.

**The Court orders:**

1.      Defendant is enjoined from enforcing the MBTA and the BGEPA against any Plaintiff anywhere within the jurisdiction of the federal courts of the United States.

2.      Defendant is compelled to return to Plaintiffs Rev. Robert Soto, Michael V. Russell all feathers, and Michael Todd Cleveland objects seized from them on or about March 11, 2006 from the premises at the Palm View Library and Community Center, located at 1401 Jordan Street, in Mc Allen, Texas or surrendered on or about March 23, 2006 at the Law Office of Attorney Art Cisneros in Mc Allen, Texas, including administrative fines.

3.      Defendant is compelled to protect the feathers seized on or about March 11, 2006 from the premises at the Palm View Library and Community Center, located at 1401 Jordan Street, in Mc Allen, Texas.  Defendant is prohibited from removing,

3

destroying, or harming the feathers seized in any way until the feathers and objects are returned to Plaintiffs Robert Soto, Michael V. Russell, and Michael Todd Cleveland.

4.    Defendant is ordered to pay Attorneys' fees and costs pursuant to the Equal Access of Justice Act, 5 U.S.C. § 504.

It is so ordered.

DATED this _____ day of _____.


_____
Ricardo H. Hinojosa
United States District Judge

4