**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**MC ALLEN DIVISION**

| | |
|---|---|
| **Mc Allen Grace Brethren Church, Native** § <br> **American New Life Center, San Antonio** § <br> **Indian Fellowship; South Texas Indian Dancers** § <br> **Association; Linda Cleveland,** Individually**;** § <br> **Michael Cleveland,** Individually**; Michael Russell,** § <br> Individually**; Veronica Russell,** Individually**; Edith** § <br> **Clark,** Individually and as council member of § <br> Native American New Life Center**; William Clark,** § <br> Individually, and as member of Native American § <br> New Life Center**; Carrie Felps,** Individually**;** § <br> **Homer Hinojosa, III,** Individually and as § <br> member of  Mc Allen Grace Brethren Church, § <br> San Antonio Indian Fellowship, and South Texas § <br> Indian  Dancers Association**; Nancy Hollingworth,** § <br> as member of Native American New Life Center**;** § <br> **Lucian Oden,** as member of San Antonio Indian § <br> Fellowship**; Xavier Sanchez,** as member of San § <br> Antonio Indian Fellowship**; and Pastor Robert** § <br> **Soto,** Individually, and on behalf of Mc Allen § <br> Grace Brethren Church, Native American New § <br> Life Center, San Antonio Indian Fellowship**,** § <br> and South Texas Indian Dancers Association**,** § <br> § <br> **Plaintiffs,** § <br> **V.** § <br> § <br> **Secretary of the U.S. Dept. of Interior, Ken** § <br> **Salazar, in his official capacity,** § <br> § <br> **Defendants.** § | **CIVIL NO.  7:07-CV-060** <br> **AMENDED COMPLAINT** |

<u>**PLAINTIFFS' FIRST AMMENDED COMPLAINT**</u>

This is a suit by American Indian organizations and their members seeking **(1)** a

judgment finding that Defendants' interpretation of the statutory and regulatory scheme

of the Migratory Bird Treaty Act (MBTA), 16 U.S.C. 703, and the Bald and Golden

Eagle Protection Act (BGEPA), 16 U.S.C 668 is unlawful in violation of the Religious

Freedom of Restoration Act and unconstitutional in violation of the First Amendment's

1

Free Exercise Clause as applied to Plaintiffs in that it burdens their religious use of feathers and bird parts of protected bird species and resulted in Defendants acting beyond their legal authority in disrupting Plaintiff's religious ceremony and seizing   Plaintiffs' property.   (1A) A finding that Government's interest in protecting the eagle population is not compelling because it is no longer endangered; (1B) A finding that Government's interest in preserving American Indian culture and religion for federally recognized Indians is not compelling because it results in a prohibition of protected bird species' parts to the majority of American Indians.  **(2)** A finding that American Indians as defined under 62 FR 58782,a definition not restricted to Indians enrolled in federally recognized tribes, are exempted from the MBTA and BGEPA as to possession, transport, export or import at any time or in any manner of feathers and bird parts of protected species of birds used for religious purposes, observances, and worship because it is to be used "to monitor civil rights enforcement and program implementation."; ; and (3)   not( an order compelling a moratorium on the the search and seizure of feathers and bird parts during powwows and the return and protection of property seized by a federal officer at Nde Daa Way South Powwow held at the Palm View Community Center in Mc Allen, Texas, on March 11, 2006.

<u>PARTIES</u>

1.            Plaintiff, Mc Allen Grace Brethren Church is an incorporated 501 (c)(3) religious organization.  It is incorporated under the laws of Texas and headquartered in Mc Allen, Texas.  Mc Allen Grace Brethren Church brings this action on its own behalf and on behalf of all its members.

2.	Plaintiff, Native American New Life Center is an unincorporated religious subsidiary under Mc Allen Grace Brethren Church.  It brings this action on its own behalf and on behalf of all its members.

3.	The San Antonio Indian Fellowship is an unincorporated religious subsidiary under Mc Allen Grace Brethren Church.  It brings this action on its own behalf and on behalf of all its members.

4.	Plaintiff, South Texas Indian Dancers Association is an unincorporated religious subsidiary under Mc Allen Grace Brethren Church.  It brings this action on its own behalf and on behalf of all its members.

5.	Plaintiff, Robert Soto is an American Indian according to 62 FR 58782.  He is Pastor and a practicing member of the Mc Allen Grace Brethren Church, the Native American New Life Center, and the San Antonio Indian Fellowship.  He resides in the Southern District of Texas.  He brings this action on his own behalf and as the duly authorized officer of Mc Allen Grace Brethren Church, the Native American New Life Center, the San Antonio Indian Fellowship, and the South Texas Indian Dancers Association.

6.	Plaintiff, Carrie Felps is an American Indian according to 62 FR 58782.  She resides in the Southern District of Texas.  She brings this action on her own behalf.

7.	Plaintiff, Linda Cleveland is an American Indian according to 62 FR 58782.  She resides in the Southern District of Texas.  She brings this action on her own behalf.

8.      Plaintiff, Michael Cleveland is an American Indian according to 62 FR 58782.  He resides in the Southern District of Texas.  He brings this action on his own behalf.

9.      Plaintiff, Michael Russell is an American Indian according to 62 FR 58782.  He is a practicing member and council member of Mc Allen Grace Brethren Church and the South Texas Indian Dancers Association.  He resides in the Southern District of Texas.  He brings this action on his own behalf.

10.      Plaintiff, Veronica Russell is an American Indian according to 62 FR 58782.  She is a practicing member and council member of Mc Allen Grace Brethren Church and the South Texas Indian Dancers Association.  She resides in the Southern District of Texas.  She brings this action on her own behalf.

11.      Plaintiff, Edith Clark is an American Indian according to 62 FR 58782.  She is a practicing member and advisor of the Native American New Life Center.  She resides in the Southern District of Texas.  She brings this action on her own.

12.      Plaintiff, William Clark is an American Indian according to 62 FR 58782.  He is a practicing member and advisor of the Native American New Life Center.  He resides in the Southern District of Texas.  He brings this action on his own behalf.

13.      Plaintiff, Homer Hinojosa, III is an American Indian according to 62 FR 58782.  He is a practicing member of the Mc Allen Grace Brethren Church, the San Antonio Indian Fellowship, and the South Texas Indian Dancers Association.  He resides in the Southern District of Texas.  He brings this action on his own behalf.

14.      Plaintiff, Nancy Hollingworth is an American Indian according to 62 FR 58782.  She is a practicing member and advisor of the Native American New Life

Center.  She resides in the Southern District of Texas.  She brings this action on her own behalf.

15.       Plaintiff, Xavier Sanchez is an American Indian according to 62 FR 58782.  He is a practicing member, council member, and co-founder of the San Antonio Indian Fellowship.  He resides in the Western District of Texas.  He brings this action on his own behalf.

16.       Plaintiff, Lucian Oden is an American Indian according to 62 FR 58782.  He is a practicing member, council member, and co-founder of the San Antonio Indian Fellowship.  He resides in the Western District of Texas.  He brings this action on his own behalf.

17.       Defendant  Ken Salazar is the Secretary of the United States Department of the Interior.  He is sued in his official capacity only, in which he is responsible for enforcing and administering the MBTA and the BGEPA.   Pursuant to 28 U.S.C. §1391(e), he may be served by electronic filing in federal court.

## JURISDICTION

18.       This Court has jurisdiction under 28 U.S.C. § 1331 because the action arises under the laws and Constitution of the United States.  Plaintiffs seek a determination under the standards of the Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb-2000bb(4) and the First,  Fifth and Fourteenth Amendments to the U.S. Constitution of the lawfulness and constitutionality of Defendants' interpretation of the MBTA and the BGEPA and its implementing regulations as applied to Plaintiffs. This Court is authorized to grant declaratory relief by the Declaratory Judgment Act, 28

U.S.C. §§ 2201, 2202.  The Court is authorized to grant preliminary and permanent injunctive relief under Fed. R. Civ. P. 65.

## VENUE

19.     Venue is proper in this court under 28 U.S.C. § 1391(e) because: (a) all Defendants are officers and employees of the United states and its agencies and were at all relevant times acting in their official capacities and under color of their legal authority; (b) at least one Defendant officially resides in this district; (c) the cause of action arose in this district; and (d) all but two Plaintiffs reside in this district and no real property is at issue.

## FACTUAL ASSERTIONS

20.     The American Indian traditional religion practiced by the Plaintiffs in this action is protected by both the First Amendment to the United States Constitution and the RFRA 20 U.S.C. §§ 2000bb and 2000 bb(4).

21.     Each of the individual Plaintiffs and all of the members of the Grace Brethren Church, Native American New Life Center, San Antonio Indian Fellowship, and South Texas Indian Dancers Association are sincere practitioners of their American Indian traditional religion, and in particular, are sincere adherents to the basic tenets of the American Indian religious use of feathers and bird parts of protected species of birds as necessary and essential to their worship.

22.     The Plaintiffs use sacred feathers and bird parts to pray and to worship during religious ceremonies, celebrations, services and events, as did their American Indian ancestors following religious practices existing from time immemorial.

23.     The Plaintiffs believe that feathers and bird parts worn, held, and attached to sacred objects are essential and necessary to communicate with, invoke, and give thanks to the Creator and the spirits of their ancestors during religious ceremonies, celebrations, services, and events.

24.     Plaintiffs wear, hold, and attach sacred feathers to implements during religious ceremonies, celebrations, services and events, including but not limited to smudging and cleansing ceremonies, wedding ceremonies, naming ceremonies, sweat lodge ceremonies, solstice ceremonies, healing ceremonies, rites of passage ceremonies, honoring ceremonies, blessings, funerals, memorial services, holy feasts, vision quests, sacred dances and powwows.

25.     Plaintiffs consider each feather and bird part of all birds sacred and a gift from the Creator.

26.     Plaintiffs do not seek to harm or kill birds in order to obtain feathers and bird parts for religious purposes.

27.     Because feathers and bird parts are essential to Plaintiffs' American Indian religious ceremonies, a prohibition against using feathers and bird parts would completely prevent Plaintiffs from freely practicing their American Indian traditional religion.

28.     Defendants' interpretation of the statutory and regulatory scheme of the MBTA, 16 U.S.C. 703, and the BGEPA, 16 U.S.C 668, disregards the definition of "American Indian" as defined under 62 FR 58782 to be used "to monitor civil rights enforcement and program implementation." and which was subsequently incorporated in the Code of Federal Regulations (CFR) relating to the executive departments and

agencies of the Federal Government that applies both to American Indians <u>enrolled</u> in federally recognized tribes, as well as American Indians <u>not enrolled</u> in federally recognized tribes.

29.    By disregarding 62 FR 58782, Defendants define a majority of American Indians, including Plaintiffs, out of existence for purposes of practicing their traditional native religion as American Indians because they are not enrolled in federally recognized tribes, thereby depriving Plaintiffs of American Indian exemptions to MBTA and BGEPA—exemptions enjoyed by American Indians who are enrolled in federally recognized tribes.

30.    Defendants' interpretation of the statutory and regulatory scheme of the MBTA, 16 U.S.C. 703, and the BGEPA, 16 U.S.C 668 is unlawful and unconstitutional as applied to Plaintiffs in that it burdens their religious use of feathers and bird parts of protected species of birds and resulted in Defendants acting beyond their legal authority in carrying out searches and seizures of Plaintiffs' property.

## STATEMENT OF FACTS

31.    On an early Saturday afternoon on March 11, 2006, United States Fish and Wildlife Service (USFWS) Special Agent Alejandro Rodriguez (the agent), acting without probable cause and without a search warrant, raided an American Indian religious service,[1] frightening and upsetting American Indian women and children and humiliating respected American Indian elders.  His raid targeted the Nde Daa[2] Way South

---

[1] U.S. Government stipulated the powwow was a religious ceremony in Final Pretrial – CVB Bench Trial Motions Hearing Transcript, at page 9, Lines 4 and 5.
[2] Nde Daa is Apache for "The People Springtime Gathering."

Powwow[3] held at the Palm View Community Center in Mc Allen, Texas.  He came to seize sacred feathers used by powwow participants in the observance of their traditional native religion.

In less than an hour[4], the agent seized more than fifty feathers from Lipan Apache Holy Man Robert Soto, his brother-in-law Michael Russell of Creek Indian ancestry, and Cherokee Artist Michael Todd Cleveland.

Although all the confiscated feathers are said to be from species listed on the MBTA, they are exempt for American Indian use in religious observances according to federal court precedent and administrative laws of the Executive Branch of the Federal Government. The agent's raid on this religious ceremony violated the American Indian participants' rights to the free exercise of religion under the Religious Freedom Restoration Act (RFRA) and the First Amendment of the U.S. Constitution.  Gonzalez v. O Centro Espirita Beneficiente Uniao Do Vegetal (UDV), et al., 126 S.Ct. 1211 (2006).

On November 2, 2006, a one-day bench trial was held in The United States District Court for the Southern District of Texas, Mc Allen Division, U.S. Magistrate Judge Dorina Ramos presiding.  At the conclusion of the trial, Magistrate Judge Ramos found the Plaintiff Michael Todd Cleveland in violation of the Migratory Bird Treaty Act, but Judge Ramos reduced the Plaintiff Michael Todd Cleveland's fine to $200.  On November 11, 2006, Plaintiff Michael Todd Cleveland filed an  appeal.  After appellate oral arguments in May of 2007, on June 24, 2011, Honorable Randy Crane ruled that Mr.

---

[3] U.S. Government stipulated at pre-trial hearing that an American Indian Powwow is a religious service. *See* Final Pretrial-CVB Bench Trial Motions Hearing Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of Texas, Mc Allen Division, at page 9, Lines 4 and 5.
[4] *See* Bench Trial Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of Texas, Mc Allen Division, at page 40, Lines 20-25.

Cleveland was guilty of the unlawful possession of feathers for the purpose of sale in violation of the MBTA, 16 U.S.C. § 703, et seq.

According to the <u>first</u> of two Reports of Investigation prepared by the agent, dated 04/20/2006, Report #: 2006201750R001, Case Title "OPERATION POWWOW", SUBJECTS OF THE REPORT: MICHAEL CLEVELAND, MICHAEL V. RUSSELL, AND ROBERT SOTO, the agent stated:

> In the Fall of 2005, (he) received a call from a Service refuge employee, who is a Native American, to report that he had been to an area pow-wow and had observed a male subject wearing a bustle made of golden eagle feathers. According to the refuge employee, he knew the individual was not a Native American. The refuge employee did not know the subject's name, but he promised to call (the agent) back if he received other information in regard to the subject's identity.[5]

The agent did not divulge the identity of his tipster, nor did he indicate how he verified that his tipster was indeed a Native American.  Nor did the agent indicate which specific powwow of the many powwows[6] held in the area of south Texas his tipster had observed the male wearing the Golden Eagle bustle.  At any of the many area powwows, it is common for male traditional dancers to wear eagle feather bustles and eagle feather roach head dresses.  Further, the agent did not indicate whether the tipster ever called him back concerning the identity of the male "not a Native American."

Months after the tip, on March 8, 2006, the agent noticed a picture in a local 2newspaper (The Town Crier, Vol. 42., No. 10) announcing an upcoming powwow on March 11, 2006, in Mc Allen, Texas.  In a picture of The South Texas Indian Dancers that is remarkable for its lack of clarity and detail, the agent indicates that he "observed at

---

[5] Report of Investigation (First Report), dated April 20, 2006, Report #: 2006201750R001, Case Title "OPERATION POWWOW", page 2.

[6] In south Texas, there are many powwows held throughout the year, including powwows in Mc Allen, Laredo, Falfurrias, San Antonio (at Crossroads Mall, St. Mary's University, Fort Sam Houston, the Witte Museum, the Botanical Gardens, etc.), Fredericksburg, and Canyon Lake, to list a few.

least two subjects wearing what appeared to be immature golden eagle feathers."[7]  The

agent reported:

> On March 11, 2006, . . ., in a covert capacity, (he) attended the pow-wow . . .  As
> the agent walked into the hallway of the center he immediately recognized a
> subject from the newspaper photo with a bustle made of large white and brown
> feathers standing at the entrance to the pavilion. The agent approached the subject
> (later identified as Michael v. RUSSELL by his state-issued driver's license) and
> commented to him that he (the agent) liked the costume he (RUSSELL) was
> wearing. RUSSELL thanked the agent for the compliment and proceeded to
> explain what it was made of.  The agent then asked RUSSELL what a small
> beaded-leather pouch that he was wearing around his neck was for. RUSSELL
> stated it was a small medicine bag and it was used by Native Americans to keep
> medicinal items.  The agent then asked R2USSELL about the bustle he was
> wearing on his back.  RUSSELL said it was made of eagle feathers and it was
> given to him by an Apache.  The agent asked RUSSELL if he was a Native
> American and RUSSELL stated 'No'. [8]  The (agent) asked RUSSELL if he (the
> agent) could touch the feathers and RUSSELL stated 'No' and turned away from
> (the agent).[9]

> At this point the agent showed RUSSELL his credentials and identified himself as
> a federal agent with the United States Fish and Wildlife Service (USFWS).  The
> agent asked RUSSELL to follow him to an isolated area of the large hallway
> outside the pavilion where the pow-wow was being held.[10]

> Once there (in the hallway[11]), the agent asked RUSSELL to remove the bustle
> from his back so the agent could inspect the feathers.  RUSSELL was also

---

[7] Ibid.

[8] Mr. Russell is in fact of Creek Indian ancestry, and he claims American Indian identification pursuant to Federal Law 62 FR 58782. Like many Indians, he resents the term "Native American" as applicable to the First People in the America's prior to the arrival of the Europeans.  Federal Law supports his position. According to Federal Law 62 FR 58782, as described in *Federal Register* Notice, dated October 30, 1997, entitled "Revisions to the Standards for the Classification of Federal Data on Race and Ethnicity," at Supplementary Information, Section D, OMB's Decisions, Subsection (8), OMB accepts the following recommendation concerning changing the term "American Indian" to "Native American," it states:

> "The term American Indian should not be changed to Native American."

[9] Among many Indians, it is considered a tremendous breech of ethics to touch the feathers worn by an Indian without the wearer's permission.  Many believe that the touching of the feathers by another could diminish the "medicine" or spiritual powers of the feathers.

[10] Report of Investigation (First Report), dated April 20, 2006, Report #: 2006201750R001, Case Title "OPERATION POWWOW", page 2-3.

[11] The entire community center area where participants were present is included in the religious ceremony called a powwow. The fourth amendment protects people, not places.  The "hallway" area later referenced is a very large room with chairs through which participants must pass as they come from the dressing room where they have already begun their religious experience.  Many participants perform sacred ceremonies such as a "smudge" to bless themselves and their feathers in this "hallway" area.

wearing four more feathers on his costume that appeared to be eagle feathers and the agent asked him to remove these as well.[12]  The agent identified all the feathers as immature golden eagle (Aquila chryaetos).[13]

At this point, Rev. Soto approached the agent and asked him what the problem was.  The agent told Rev. Soto that he was investigating the illegal possession of feathers by those attending the powwow.

Rev. Soto informed the agent that he was interrupting an American Indian religious service, and that he should leave the powwow.  The agent said he did not have to leave, whereupon Rev. Soto asked to see the agent's credentials.  The agent refused to show them to him.  Rev. Soto persisted and asked again to see the agent's credentials and again the agent refused to produce them. After four requests by Rev. Soto for the agent to produce his credentials, the agent finally showed them to him.

Rev. Soto then identified himself, and informed the agent that the bustle worn by Mr. Russell belonged to Rev. Soto, an enrolled member of the Lipan Apache Band of Texas.

According to the agent's report:

At this point the agent asked RUSSELL where he had gotten the feathers and RUSSELL stated that his brother-in-law, Robert SOTO, had lent him the feathers . . . The agent asked RUSSELL for identification and RUSSELL stated that his wallet was in the dressing room. The agent told RUSSELL to go get it.

While (the agent) was waiting for RUSSELL he recognized the second subject, who was talking to a female at an information table, as one of the two persons with what appeared to be eagle feathers in the newspaper photo.  The agent (claimed that he) called the subject and the agent identified himself with his credentials as a federal agent with the USFWS. The subject, later identified as Robert SOTO, asked to see the agent's credentials . . . The agent asked SOTO to remove two large white and brown feathers that SOTO was wearing on top of his

---

[12] Ibid.
[13] The agent's ability to identify the feathers is suspect. If questioned at trial, Mr. Russell would not have supported the agent's identification of all the feathers as immature golden eagle feathers.

head.  SOTO removed them and handed them to the agent[14].  The agent also identified these two feathers as immature golden eagle.  At this point the agent asked SOTO if he was a Native American and SOTO answered 'Yes.' The agent asked SOTO if he was 'carded' and SOTO again answered 'Yes' and that his card was in his wallet in the dressing room.  SOTO was told to go and get the card.

While the agent was talking to SOTO, RUSSELL returned from the dressing room with his Texas driver license.  After SOTO left to retrieve his identification, the agent wrote down RUSSELL's personal information and advised RUSSELL he was going to seize the feathers and the agent would be contacting RUSSELL in the next few days to advise him of what was going to happen.

SOTO returned from the dressing room and handed the agent a plastic credit-card sized identification . . . The card, issued by the Lipan Apache Band of Texas, Inc., had SOTO's picture on it along with a membership number and name and address.  The agent wrote down all the information and advised SOTO that he (the agent) would not be seizing the feathers from him but would be investigating the matter further . . .

After the agent finished the contact with RUSSELL and SOTO he returned to pavilion where the pow-wow was being held.  The agent observed several people seated in stands watching people from the audience participate in a cake-walk while several males banged on large drums. The agent observed several vendors selling jewelry, arts, and crafts.[15]

The agent claimed that he noticed an American Indian artist whom the agent

mis-identified as:

One vendor, Michael Cleveland, had several dream-catchers for sale containing various feathers, some of which appeared to be songbird and waterfowl (which species the agent was unwilling or unable to identify in his report or in the transmission paperwork of the feathers to the USFWS Forensics Laboratory as protected by the Migratory Bird Treaty Act or any other Act).[16]

---

[14] In an "Administrative Page" attached to Report of Investigation, dated August 2, 2006, Report #: 2006201750R003, Case Title "OPERATION POWWOW", SUBJECTS OF THE REPORT: SOTO, Robert, RUSSELL, Michael, and CLEVELAND, p. 1, it was noted that the agent's Office of Law Enforcement Supervisors in San Antonio "would not oppose returning the two eagle feathers abandoned by Soto."

[15] Report of Investigation (First Report), dated April 20, 2006, Report #: 2006201750R001, Case Title "OPERATION POWWOW", pages 2-3.

[16] Ibid., p. 3.

According to Commander Edith Clark, a Cherokee Indian,[17] who had custody and control of the booth that was decorated by Linda Cleveland, the vendor of record, with her son Michael Cleveland's dreamcatchers, Commander Clark was the only person at the booth when the agent first approached it and made assertions that the feathers adorning the dreamcatchers could be illegal.

At the one-day bench trial before U.S. Magistrate Judge Dorina Ramos, the agent admitted that someone other than Michael Cleveland or his mother Linda Cleveland was at the booth when he first approached it. He described her (Commander Edith Clark) as a "white Caucasian lady probably in her early 60s manning the booth."[18] When he asked Commander Edith Clark about the dreamcatchers and the feathers adorning them, Commander Clark told him he needed to visit with Linda Cleveland, the vendor of record, who was on break at the time.

After the passage of several minutes, Linda Cleveland appeared at the booth with her son Michael Cleveland.

Without asking or establishing whether Linda Cleveland or Michael Cleveland were American Indians, the agent commenced his interrogation of Michael Cleveland about the feathers adorning the dreamcatchers at Linda Cleveland's booth.

At trial and in pre-trial motions, the American Indian status of Linda Cleveland and her son was not contested by the Government when Linda Cleveland testified that she was a Cherokee Indian who identified as such on the 2000 US decennial census and the biological mother of Michael Cleveland. Mrs. Cleveland also testified that

---

[17] *See* Bench Trial Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of Texas, Mc Allen Division, at page 96, Lines 4-8.
[18] *See* Bench Trial Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of Texas, Mc Allen Division, at page 23, Lines 16-17.

she was the vendor of record at the powwow and that her son's dreamcatchers were not for sale and were hung at her booth for decoration it and to give it ambience.[19]

At this point, Rev. Soto and Anita Anaya, a fellow Tribal Council Member and Secretary to the Lipan Apache Tribe of Texas, approached the agent.  She and Rev. Soto told the agent that he was disrupting an American Indian religious service in violation of the American Indians' freedom of religion and he needed to cease and desist his harassing and molesting of American Indian powwow participants and leave the powwow.

According to the agent's Report of Investigation:

While the agent was discussing the possession of these feathers with CLEVELAND, SOTO and Anita Anaya came over to speak to the agent. Anaya claimed she was the secretary of the Lipan Apache and asked the agent what he was doing there. The agent advised Anaya that he was conducting a federal investigation into the illegal possession of protected migratory bird parts.

Anaya asked the agent if she could ask him to leave. The agent advised Anaya again that he was conducting a federal investigation and since the location was a public place and open to the public he was lawfully there. Furthermore, the agent reminded Anaya that the pow-wow had been advertised in the local paper[20] and was open to the public.  The agent gave Anaya a business card and told her to call him if she had any further questions.  Anaya kept insisting that (the agent) leave the premises, and the agent advised her that if she kept interfering with a federal investigation she could be arrested. At this point Anaya decided to leave.[21]

In front of witnesses at the booth, the agent then seized <u>four</u> feathers from one of Mr. Cleveland's dreamcatchers, explaining that the feathers would be sent to the USFWS lab for testing to determine the feathers' birds or origin.

---

[19]*See* Bench Trial Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of Texas, Mc Allen Division, at page 103, Lines 10-11.
[20] As are hundreds of religious services of the many Christian denominations throughout Texas.
[21] Report of Investigation (First Report), dated April 20, 2006, Report #: 2006201750R001, Case Title "OPERATION POWWOW", at page 4.

At trial, Commander Edith Clark stated that she saw the agent seize <u>three</u> feathers;[23] Robert Soto saw the agent seize <u>one</u> feather;[24] and Linda Cleveland saw the agent seize <u>four</u> feathers.[25]

The <u>four</u> feathers that Mr. Cleveland claimed were seized by the agent included: two pheasant feathers, about two inches in diameter, and somewhat round in shape; one farm turkey feather, darkish brown in color with golden or tarnish stripes at the tip and about three inches long; and one duck feather, all white in color and fluffy looking, about 2 to 2 and ½ inches long.[26]

According to the agent's Report of Investigation, the number of feathers that he seized was double what Mr. Cleveland recalls as seized. The agent's Report of Investigation stated:

> The agent continued visiting with CLEVELAND and seized eight loose feathers that were attached to the dream-catchers.[27]

According to the Morphology Examination Report and the trial testimony of Pepper Trail, Senior Forensic Scientist for the National Fish and Wildlife Forensics Laboratory, of the eight feathers (alleged to have been taken from suspect Michael Cleveland and submitted by the agent for examination), <u>one</u> was White-winged Dove (Zenaida asiatica), <u>one</u> was White-tipped Dove (Leptoptila verreauxi), <u>two</u> were Black-bellied Whistling Duck (Dendrocygna), <u>two</u> were Canada Goose (Branta Canadensis),

---

[23] *See* Bench Trial Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of Texas, Mc Allen Division, at page 99, Line 23.
[24] *See* Bench Trial Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of Texas, Mc Allen Division, at page 87, Lines 18.
[25] *See* Bench Trial Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of Texas, Mc Allen Division, at page 106, Line 8.
[26] Defendant's Motion to Suppress.
[27] Report of Investigation (First Report), dated April 20, 2006, Report #: 2006201750R001, Case Title "OPERATION POWWOW", page 4.

and <u>two</u> were unidentified waterfowl (Anatidae).[28]  Pepper Trail also made the incredible

assertion at trial that his method of examining feathers with the naked eye for purposes of

identification was 100 percent accurate,[29] perfect beyond even the known limitations of

DNA analysis.

---

[28] *See* Bench Trial Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of Texas, Mc Allen Division, at page 58, Lines 9-13.

[29] *See* Bench Trial Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of Texas, Mc Allen Division, at page 64, lines 22-25, at page 65, Lines 1-25, and at page 66, Lines 1-23 where Pepper Trail testifies that his Morphology analysis, with all the obvious limitations of naked eye analysis, is 100 percent accurate, even when compared to DNA analysis which has never been described by the science of microbiology as 100 percent accurate:

| Q | Okay. If I were to ask you which is more reliable, morphology-based analysis or DNA analysis, what would be your answer? |
|---|---|
| A | My answer is they're both completely reliable when they're applied appropriately. |
| Q | Okay.  But you wouldn't give me a number in terms of reliability? |
| A | **I believe that my identifications are a hundred percent reliable based on morphology** (Bold print provided), and if I am not able to make a completely reliable identification to species, I back to the group that I can make a hundred percent accurate identification, as in the case of the waterfowl in this instance. |
| Q | Okay. And you did indicate there were two feathers you could not identify. |
| A | To species, correct. |
| Q | Okay.  To species. |
| A | No; I couldn't identify them to species, so two feathers probably from the same species, but I was only able to get them to the group of waterfowl. |
| Q | And they're listed as – |
| A | They're – |
| Q | They're unidentified – |
| A | Right. |
| Q | -- waterfowl |
| A | Right. |
| Q | Okay. By "unidentified," they're not subject to the Migratory Bird Treaty Act under your analysis. |
| A | Correct. |
| Q | Okay. With DNA analysis would it have been possible to – |
| A | It could have been attempted, as I explained, if the tissue – if there had been tissue present on those feathers, which would have had to have been determined by the analysts in question, it might have been possible to identify the species. |
| Q | Okay. Have you heard of PCR testing? |
| A | Yes. |
| Q | RFLP testing? |
| A | Uh-huh. |
| Q | What is PCR testing? |
| A | PCR stands for polymerase chain reaction, and it's a technique whereby small bits of DNA are – they call it "amplified."  They're broken by enzymes into mall bits and them recombined sort of in a soup of nucleotides so that so that long chains are built up. |
| Q | Okay. |
| A | It's a way of producing a large amount of DNA from a small sample. |
| Q | Have you seen any figures concerning reliability of polymerase chain reaction? |

The agent's report goes on to state:

CLEVELAND claimed he had found the feathers on daily nature walks he takes around his residence.  He was advised that the sale of protected species, and their parts, was illegal and the agent would contact him later . . .[30]

The agent contacted SOTO after verifying that the Lipan Apache was not a federally recognized tribe, to set-up a meeting at the agent's office to discuss the possession by SOTO of the two golden eagle feathers. SOTO and the agent agreed to meet on March 16, 2006, at 10:30 A.M.[31]

Based on their confrontation with the agent, Rev. Robert Soto and his brother-in-law Michael Russell feared they were facing a possible fine of up to $500 for each feather confiscated by the agent, as well as jail time, so they contacted local Mc Allen attorney Arturo Cisneros concerning their predicament.

On March 15, 2006, Mr. Arturo Cisneros contacted the agent regarding SOTO's case. Mr. Cisneros wanted to know how SOTO and RUSSELL could take care of this matter. The agent told Mr. Cisneros if RUSSELL forfeited $500 to the government (in response to the issuance of a violation notice), and both of them agreed to sign an abandonment form for the eagle feathers, the investigation would be concluded. Mr. Cisneros stated he was going to contact SOTO and would get back to the agent.

Mr. Cisneros notified the agent on March 20, 2006, that RUSSELL and SOTO had agreed . . . to the government's proposal. It was agreed that all the parties would meet on March 23, 2006, at Cisneros' law office.  Mr. Cisneros asked the agent if he (the agent) could bring the feathers seized from RUSSELL at the pow -wow so they could be 'blessed' before being abandoned to the government. The agent agreed.

On March 23, 2006, the agent met with Mr. Cisneros, RUSSELL, and SOTO at Cisneros' law office.  Also present were approximately 18 members of the Lipan Apache tribe.[32]

---

A  I couldn't give you a specific figure, but I know that it's a standard technique.  It's considered highly reliable.

Q  Would it be 99.53 percent?

[30] Report of Investigation (First Report), dated April 20, 2006, Report #: 2006201750R001, Case Title "OPERATION POWWOW", page 4.

[31] Ibid.

[32] Report of Investigation, dated April 20, 2006, Report #: 2006201750R001, Case Title "OPERATION POWWOW", page 4.

Before the arrival of the Indians, the agent strategically placed a file folder, a notebook with a yellow legal pad, a blue envelope, and a video tape boldly labeled in large black ink "3-11-06" (the date of the powwow when feathers were seized) on the desk in the room where the feathers were to be surrendered.  At the pre-trial hearing of Defendant's Motion to Compel, the agent conceded that the video tape contained no evidence of the feathers seized by the agent from Rev. Soto, Mr. Russell, and Mr. Cleveland.  In fact, the tape was blank,[33] leaving a reasonable person to infer that the tape was merely a prop to compel surrender of the feathers.

After the Indians arrived, they held a somber Surrender Ceremony with several Indians breaking down and weeping.  Rev. Soto prayed to the Creator to watch over the feathers and protect their medicine.  Then he smudged the feathers and bid them farewell.

According to the agent's report

> They held a sage burning and chanting ceremony to 'bless' the feathers in Cisneros' conference room. RUSSELL was issued a violation notice . . . for $500 . . . and both RUSSELL and SOTO signed abandonment forms for the feathers.[34]

According to Rev. Soto, the agent then made a chilling remark. The agent said, "This matter is not over yet.  I have a list of all the powwows in Texas, and I will be at those powwows taking away feathers."

According to a second considerably abbreviated Report of Investigation with substantive omissions that were contained in the first report, dated August 2, 2006, Report #: 2006201750R003, Case Title "OPERATION POWWOW",  SUBJECTS OF THE REPORT: SOTO, Robert, RUSSELL, Michael, and CLEVELAND, Michael, the

---

[33]*See* Final Pretrial-CVB Bench Trial Motions Hearing Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of Texas, Mc Allen Division, at page 24, Line 25, at page 25, Lines 1-25, at page 26, Lines 1-17. Pre-trial Hearing on Defendant's Motion to Compel, November 1, 2006.
[34] Ibid.

agent re-wrote his Report of Investigation focusing primarily on Defendant Michael

Cleveland, stating

> In May of 2006 the agent contacted CLEVELAND by phone to let him know that the feathers (confiscated from Cleveland's dream catchers) had been positively identified belonging to several migratory species that by law could not be sold without a permit.[35] CLEVELAND stated that he was only selling the dream catchers and not the feathers and therefore not in violation of any law . . .
>
> Later that day the agent drove to CLEVELAND's residence . . . He met with CLEVELAND and issued a violation notice . . . for $500.[36]

Plaintiffs Soto and Russell submitted a Petition for Remission on May 9, 2006 to the U.S.

Fish and Wildlife Service; their Petition for Remission was timely and was accepted via

letter on June 8, 2006 by Kevin R. Adams, Chief of the Office of Law Enforcement for

Fish and Wildlife Service, U.S. Department of Interior, in the Washington, D.C. Office.

On May 9, 2006, Plaintiffs' Petition for Remission was supplemented without request.

Plaintiffs' Petition for Remission was denied on February 23, 2007 by Martin Steinmetz

of USFWS.  Plaintiffs Soto and Russell then submitted an appeal called a Supplemental

Petition for Remission on March 2, 2007.  Plaintiffs filed this civil action in March of

2007 based on violations of RFRA and their First, Fifth, and Fourteenth Amendment

rights perpetrated in the raid of their March 11, 2006 powwow and the continuing

violations of being denied their freedom to practice their religion with any bird parts.

---

[35] At trial, Jeff Haskins, Chief of the Migratory Bird Office for the U.S. Fish and Wildlife Service, Region 2, Southwest Region, Albuquerque, New Mexico which includes Texas, testified as to the *futility* of an American Indian not a member of a federally recognized tribe attempting to obtain a permit to possess feathers of species listed on the Migratory Bird Treaty Act. *See* Bench Trial Transcript, Case No: 7:06-MJ-4806, Criminal, U.S. District Court, Southern District of Texas, Mc Allen Division, at page 11, Lines 11-23, and at page 16, Lines 1-5, where Haskins testifies

> I asked my permit staff to review all the permits that have been issued for Indian religious use of non eagles. And we have issued, I believe, 182 permits. I don't believe that any of those permits were issued to non-enrolled tribal members.

[36] Report of Investigation, dated August 2, 2006, Report #: 2006201750R003, Case Title "OPERATION POWWOW", SUBJECTS OF THE REPORT: SOTO, Robert, RUSSELL, Michael, and CLEVELAND, p. 2.

Plaintiff s Soto and Russell's Supplemental Petition for Remission was then denied in December of 2011.

**QUESTION ONE:** *Whether the Government's regulation prohibiting the use of feathers and parts of parts of birds listed on the Migratory Bird Treaty Act (MBTA) or Bald and Golden Eagle Protection Act (BGEPA) for religious purposes by American Indians not enrolled in federally recognized tribes violates the First Amendment's Free Exercise Clause of U.S. Constitution and the Religious Freedom Restoration Act (RFRA)?(Counts One and Two)*

## COUNT ONE

### Violation of the Religious Freedom Restoration Act

32.    Congress passed the Religious Freedom Restoration Act (RFRA) in 1993 to prevent the government from burdening the free exercise of religion unless it had a compelling governmental interest in doing so and it accomplished its goal by the least restrictive means.

33.    The authority for the government's regulation used to seize Plaintiffs' feathers is based on the Migratory Bird Treaty Act (MBTA), 16 U.S.C. 703, and the Bald and Golden Eagle Protection Act (BGEPA), 16 U.S.C. 688, and regulations adopted pursuant to the Acts; these acts provide an exception "to permit the taking, possession and transportation of (eagle feathers and parts) . . .for the religious purposes of Indian tribes."  Nowhere in the statute does it limit the exception to only <u>federally-recognized</u> Indian tribes.  Plaintiffs are American Indians as defined under 62 FR  58782 who are not enrolled in federally recognized tribes.

34.    Defendants' interpretation of MBTA and BGEPA substantially burdens Plaintiffs' exercise of their religion.  According to the 10th Circuit Court of Appeals: "Not until 1981, eighteen years after the regulation was first enacted, was the requirement that an applicant be a member of a federally-recognized Indian tribe clearly articulated. In

1981, after a member of an Indian tribe that was not federally recognized requested a permit for eagle feathers, the Deputy Solicitor of the Interior issued a memorandum which stated that only federally-recognized Indian tribes constituted "Indian tribes" under the BGEPA. Id. at 3-4; Aplt. App. at 189.  It was only in 1999 that the regulatory language was changed to clearly reflect the requirement that an applicant must be a member of a federally- recognized Indian tribe. See 50 C.F.R. § 22.22 (1999)."  In the Matter of Joseluis Saenz, v. Dept. of Interior, No. 00-2166 (10th Circuit).

35.    According to the 2000 U.S. Census, 4,119,301 American Indians were counted. In 1999, the "Indian Labor Force Report," Office of Tribal Affairs, Bureau of Indian Affairs, U.S. Department of Interior, counted 1,698,483 Indians enrolled in federally recognized tribes.  Thus, if all Indians enrolled in federally-recognized tribes were counted on the 2000 census (which was highly unlikely), nearly two-thirds of all Indians counted were not enrolled in federally-recognized tribes and thus not eligible for feathers under the government's regulation.

36.    In yet another estimate of the American Indian population in the United States referred to in a 2000 10th Circuit Court of Appeals opinion, the Court noted that in 1995 there were 8.7 million "Americans who identify themselves as having Native American Ancestry."  Under this count, more than three-fourths of all Indians were not enrolled in federally recognized tribes and thus not eligible for feathers under the government's regulation.  *In the Matter of Joseluis Saenz*, v. *Dept. of Interior*, No. 00-2166 (10th Circuit) at Footnote 9.

37.    In an effort to appear to be supportive of the Indian Tribe exception in the Eagle Act, the government has made a token effort to collect eagle bodies, feathers, and

bird parts for American Indian rituals through the creation of a National Eagle Repository at the Rocky Mountain Arsenal National Wildlife Refuge in Denver, Colorado.[37]  It also has experimented with a repository for non-eagle species of listed on the MBTA.

38.   By any reasonable measure, the National Eagle Repository is an abject failure. According to the Division of Migratory Bird Management, only 1.1 percent of all the members of federally-recognized tribes have eagle permits.[38]  This means that **more than ninety-eight percent** of Indians the government claims it is protecting with its regulations (i.e., members of federally-recognized tribes) have not received eagle permits from the government.

39.   Even more revealing, in *U.S. v. Cleveland* (2006)[39], Jeff Haskins, Chief of the Migratory Bird Office for the U.S. Fish and Wildlife Service, indicated that his office had issued only 182 permits only to Indians enrolled in federally-recognized tribes for non-eagle feathers of birds listed on the MBTA. This means that **more than ninety-nine percent** of Indians the government claims it is protecting with its regulations (i.e., members of federally-recognized tribes) have not received permits from the government for non-eagle feathers or parts of birds listed on the MBTA.

40.   Congress has explicitly declared a policy "to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian, . . . including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites." The Indian Religious Freedom Act, 42 U.S.C. § 1996.

---

[37] Draper, Electa, "Eagle bodies, parts for Indian rites are collected, sent from Colo. Morgue," *The Denver Post,* Posted: 09/01/2001, p. 1. http://www.denverpost.com/ci_13242945. Accessed: 2-27-2012.
[38] Stokes, DaShanne, "Eagle feathers and the imperialist conquest of state-recognized tribes," *Indian Country Today*, p. 5, 8-13-08.
[39] *U.S. v. Cleveland*, Violation No ST34 W0889336, Magistrate Action No. M-06-4806, at Footnote 33.

Clearly, this policy has not been implemented in good faith by the government when it comes to American Indian possession and use of feathers of protected species of birds. A more reasonable conclusion is the government's regulations are designed to deny American Indians access to feathers of birds listed on the MBTA and BGEPA.

41.     Defendants' criminalization of Plaintiffs' religious use of feathers and bird parts of species listed on the MBTA and BGEPA serves **no compelling governmental interest**. Plaintiffs contend that government's regulation prohibiting the use of feathers and bird parts of birds listed on the MBTA and BGEPA for Plaintiffs' religious purposes contradicts the government's so-called "compelling interest" in preserving American Indian culture for those enrolled in federally-recognized tribes. How can American Indian culture and religion be preserved when the government denies that culture and religion to most American Indians? Plaintiffs embrace the U.S. District Court's and 10th Circuit Court's position in the *Joseluis Saenz Case* as a more reasonable approach. In the *Saenz* Case, the courts held that the government cannot "give religious preference to one group of Native Americans over another."[40]

**QUESTION 1(A)**: *Whether Government's interest in protecting Eagle populations is compelling?*

42. The government asserts a compelling interest for its regulation on two grounds: One: protecting eagles, and Two: protecting federally-recognized tribes' culture.[41] Also, the government asserts "in furtherance of a compelling governmental interest" its policy "is the least restrictive means of furthering that compelling governmental interest." Bald eagle populations have made significant recoveries since protections were established

---

[40] *In the Matter of Joseluis Saenz vs. Department of Interior*, U.S. 10th Circuit Court of Appeals, No. 00-2166, Appeal from the U.S. District Court in New Mexico, D.C. No. 99-21-M.
[41] Spaulding, Janet, U.S. Department of Interior Letter, dated March 8, 2011.

under the BGEPA. In 2001, it was noted that "the current nesting population of Bald Eagles has increased by more than a factor of ten since 1963."[42]  Moreover, in 2007, the government removed the Bald Eagle in the lower 48 states from the List of Endangered and Threatened Wildlife.  More recently, on March 9, 2012, the U.S. Fish and Wildlife Service issued a permit allowing the Northern Arapaho Tribe of Wyoming to kill bald eagles for religious purposes.[43] Plaintiffs consider the preservation of protected species of birds as paramount.  From the beginning, Plaintiffs have taken the position that they have no desire to harm or kill any birds listed on either the MBTA or BGEPA, nor are they seeking permission to do so.  It is not necessary. It is estimated that there are 80,000-110,000 Bald Eagles in the wild[44] and another 30,000 Golden Eagles in the United States alone.[45]  Each eagle has in excess of 7,000 feathers it sheds each year through a natural process called "molting".  This means there are literally millions of eagle feathers shed annually by live birds. Further, many millions more feathers of birds listed on the MBTA shed their feathers annually through "molting."

**QUESTION 1(B)**: *Whether the Government's interest in preserving American Indian culture and religion for American Indians enrolled in federally-recognized tribes is contradicted by its regulation prohibiting the use of feathers and parts of birds listed on the Migratory Bird Treaty Act (MBTA) or Bald and Golden Eagle Protection Act (BGEPA) for religious purposes by a majority of American Indians?*

---

[42] Appellee Joseluis Saez/s En Banc Rehearing Brief, U.S. Court of Appeals for the Tenth Circuit, page 3.
[43] *San Antonio Express-News*, "Feds allow tribe to kill two eagles," March 14, 2012, P. A3.
[44] Alaska's Bald Eagles: Eagles are as common as pigeons in Southeast Alaska, http://alaskatrekker.com/eagles.htm. Accessed 2-24-2012.
[45] McNeel, Jack, Coeur d'Alene Elders View Golden Eagle Release, October 14, 2011, p. 3. http://indiancountrytodaymediannetwork.com/2011/10/14/coeur-dallIllene-elders-view-eagle-release-58412#ixzzinJZvbyNS. Accessed: 2-24-12.

Under the current government regulation, American Indians cannot pick up a single feather shed by birds listed on the MBTA and BGEPA from off the ground without a government permit—a permit the government denies to the vast majority of our Indian people.  Because of the regulation and the burdensome permit requirements, millions of feathers of protected species of birds that could be used in American Indian religious practices remain uncollected and on the ground each year subject to destruction by humans, the elements of Nature, and other sources.

As an example, if an American Indian (like Plaintiff and Cherokee Indian artist Michael Cleveland) decides to clear his lawn of feathers shed by white-tipped doves (like those he had on his dream-catchers at the powwow or any other species listed on the MBTA or BGEPA) as an act of respect for the bird before mowing his lawn, he is in violation of the government's regulations and subject to prosecution the moment he picks up a feather.[46]  However, if he runs his lawn mower over the feathers cutting them to pieces, he is in compliance with the regulations. A regulatory system that operates this way is anathema to most American Indian beliefs.  Moreover, eagle populations and other species of birds listed on the MBTA in zoos and aviaries regularly shed feathers, as well.  Too often, their feathers are put in the trash or burned by the establishments that house these birds.

Also, there are many eagles and protected species of birds that die from natural causes, such as old age or illness.  Others are victims of road kill, pollution, electrocution, wind farms, illegal poaching by non-Indians, and many other causes whose feathers and body parts could be used for American Indian religious practices and ceremonies. Most

---

[46] Strict liability attaches under the government's regulation.

of these birds are never recovered by the government or any other agency for a wide range of reasons—mostly because it is illegal, impractical, and costly.

Because of (1) the Bald and Golden Eagle population recovery, (2) the government's removal of the Bald Eagle from the List of Endangered Wildlife, (3) the vitality of today's eagle populations, (4) the government's recent permitting of the killing of bald eagles by the members of the Northern Arapaho Tribe of Wyoming, and (5) the government's ineffectual ability to provide permitted feathers and eagle body parts to any American Indian, the government has no compelling interest in denying Plaintiffs or other American Indians feathers and body parts of birds listed on the MBTA and BGEPA for religious purposes to any American Indian.

Plaintiffs challenge the government's regulation as "the least restrictive means of furthering" the government's asserted "compelling interest." Plaintiffs propose even lesser restrictive measures than the government's regulation. These measures would mean greater supplies of feathers for our Indian people and more effective management of our bird populations. These measures include: _First, let American Indians collect and gather feathers shed by living birds without government harassment and intervention._ Under this proposal, birds listed on the MBTA and BGEPA are not harmed, killed or threatened in any way. _Second, let American Indians themselves serve as stewards of their sacred bird populations, along with the government, by developing their own aviaries._ Today, the "Zuni Tribe has a federal permit to keep live eagles, most of which come from raptor rehabilitation projects."[47]  This practice should be expanded, encouraged and supported by the government for other tribes and Indian communities, as

---

[47] _San Antonio Express-News_, "Tribe: Bald eagle permit a victory for tradition." March 18, 2012, P. A12.

well. Because of the veneration Indians have for their winged brothers and sisters, they would serve as ideal guardians of these species listed on the MBTA and BGEPA.

43.     Even assuming the Defendants' interpretation of the MBTA and BGEPA did serve a compelling governmental interest, a complete ban on the cultural and religious use of feathers and bird parts of species listed on the MBTA and BGEPA by American Indians as defined under 62 FR 58782 not enrolled in federally recognized tribes is not the **least restrictive means** of furthering any such interest.   The government's regulation has evolved to the point that a small minority of American Indians (specifically, those enrolled in federally-recognized tribes) has the right to the free exercise of an American Indian religion which uses feathers and parts of birds listed on the MBTA or BGEPA as essential and central to the practice of their American Indian religion.

44.     For these reasons, Defendants have violated the  RFRA rights of Plaintiffs who are members of Mc Allen Grace Brethren Church, the Native American New Life Center, San Antonio Indian Fellowship, and South Texas Indian Dancers Association embodied in RFRA, 42 U.S.C. § 2000bb-1(a)(1999).

## COUNT TWO

### Violation of First Amendment of U.S. Constitution

45.     Assertions and arguments made in paragraphs 33 through 44 above are herein incorporated by reference due to relevance as part of  Count Two.  Framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment to the Constitution.  The Free Exercise Clause of the

First Amendment provides that Congress shall make no law "prohibiting the free exercise" of religion.

46. In <u>Employment Division, Dept. of Human Resources of Oregon v. Smith,</u> 494 U.S. 872 (1990), the U.S. Supreme Court held that a law imposing a substantial burden on religion need not be justified by a compelling governmental interest if it is neutral and of general applicability. However, if that law is either not neutral or is not one of general applicability, it must be justified by a compelling governmental interest that is narrowly tailored to advance that interest.

47. "Revisions to the Standards for Classification of Federal Data on Race and Ethnicity," 62 FR 58782 (October 30, 1997), Executive Office of President, Office of Management and Budget (OMB), Office of Information and Regulatory Affairs, defines American Indian as: "A person having origins in any of the original peoples of North and South America, and who maintains tribal affiliation or community attachment."

48. The principle objective of the "Revisions to the Standards for Classification of Federal Data on Race and Ethnicity," 62 FR 58782, is "to enhance the accuracy of the demographic information collected by the Federal Government," for the decennial census, in household surveys, on administrative forms (e.g., school registration and mortgage lending applications), and in medical and other research.

49. A second objective of the "Revisions to the Standards for Classification of Federal Data on Race and Ethnicity," 62 FR 58782, and is **"to monitor civil rights enforcement and program implementation."** (Bold print provided).

50.     "Revisions to the Standards for Classification of Federal Data on Race and Ethnicity," 62 FR 58782, indicate: "The term American Indian should not be changed to Native American."

51.     "Revisions to the Standards for Classification of Federal Data on Race and Ethnicity," 62 FR 58782, provide that (1) "Central and South American Indians should be classified as American Indian," (2) "The definitions of the 'American Indian or Alaska Native' category should be modified to include the original peoples of Central and South America," and (3) "In addition, OMB has decided to make the definition for the American Indian or Alaska Native category more consistent with the definitions of other categories."

52.     According to the 2000 Census, sixty percent  (60%) of American Indians as defined under 62 FR 58782 were not enrolled in federally recognized tribes.

53.     According to expert testimony in a Tenth Circuit Court of Appeals case involving an American Indian not enrolled in a federally recognized tribe who had his eagle feathers seized, eighty percent (80%) of American Indians as defined under 62 FR 58782 were not enrolled in federally recognized tribes, *In the Matter of Joseluis Saenz v. Department of Interior*, U.S. 10th Circuit Court of Appeals, No. 00-2166, at Footnote 9.

54.     The statutory and regulatory scheme of the MBTA and BGEPA is not neutral because it favors a minority of American Indians defined under 62 FR 58782 who are enrolled in federally recognized tribes above a majority of American Indians also defined under 62 FR 58782 but not enrolled in federally recognized tribes, including Plaintiffs.

55.     Likewise, the statutory and regulatory scheme of the MBTA and BGEPA is not a law of general applicability because it provides immunity to a minority of American Indians defined under 62 FR 58782 who are enrolled in federally recognized tribes from the penalties of the MBTA and BGEPA, but does not provide immunity to a majority of American Indians as defined under 62 FR 58782 who are not enrolled in federally recognized tribes, including Plaintiffs who are similarly situated.

56.     The MBTA and BGEPA also provide for more than twenty (20) other exemptions for scientific institutions, public museums and zoological gardens for education and exhibition, farmers and livestock owners permitted to kill eagles that they can prove are damaging their livestock, and other purposes unrelated to the central religious issue raised here.  It is therefore in no sense a law of general applicability.

**QUESTION TWO**: *What federal definition of American Indian shall be applied to an American Indian that uses feathers and parts of birds listed on the Migratory Bird Treaty Act or Bald and Golden Eagle Protection Act as essential and central to the practice of the American Indian religion?*

A. *An American Indian is defined as a member of any federally or State recognized tribe, or an individual certified as an Indian artisan by an Indian tribe.*

This definition is used in the enforcement of a truth-in-advertising law that prohibits misrepresentation in marketing of Indian arts and crafts products within the United States.  The law is enforced by the Department of Interior. *See* Indian Arts and Crafts Act of 1990 (P.L. 101-644).

B. *An American Indian is defined as" any individual who. . .irrespective of whether he or she lives on or near a reservation, is a member of a tribe, band, or other organized group of Indians, including those tribes, bands or groups terminated since 1940 (i.e., no longer federally-recognized) and those recognized now or in the future by the State in which they reside, or who is a descendent, in the first or second degree, of any such member,. . ."*

This definition is used for American Indians eligible for scholarship and grant programs. *See* Indian Health Care Improvement Act (IHCIA), U.S.C. Sec. 1603(c).

C. *An American Indian "shall. . .include all other persons of one-half or more Indian blood" irrespective of their membership in a federally recognized tribe.*

This definition is used for those Indians eligible for tuition loans for vocational and trade schools. *See* Indian Reorganization Act of 1934 (IRA), 25 U.S.C. Sec. 476, 479, and 471. Also *see In the Matter of Joseluis Saenz*, v. *Dept. of Interior*, No. 00-2166 (10th Circuit).

D. *An American Indian is defined **only** as a member of a federally-recognized tribe.*

This definition is used  by the Department of Interior for implementing The Eagle Act, 16. U.S.C. Sec. 668(a), originally passed in 1940 and amended in 1962 (with an exception for feathers and bird parts for "religious purposes of Indian tribes").

Defendants have no compelling governmental interest in applying the MBTA and BGEPA to criminalize Plaintiffs' religious use of birds and their parts.

58.     Even if it were assumed that Defendants had a compelling governmental interest in restricting the use of birds and their parts through the MBTA and BGEPA, such an interest could be furthered without prohibiting the Plaintiffs' religious use of the birds and their parts.  Thus, any such governmental interest could be furthered through less restrictive means.

59.     Enrollment in a federally recognized tribe is a political designation that depends on political criteria that abridges Plaintiffs' Free Exercise of Religion under the First Amendment . See Santa Clara Pueblo v. Martinez, 436 U.S. 49.

60.     Plaintiffs assert that, when it comes to the free exercise of religion, the broadest definition of American Indian shall be used.  Thus, **62 FR 58782 whose** principle objective is to "enhance the accuracy of the **demographic information** collected by the Federal Government," and the second element is **"to monitor the civil**

**rights enforcement and program implementation"** should be used for determining plaintiffs' rights to feathers seized in this case. For these reasons, Defendants have violated the First Amendment rights of Plaintiffs.

## COUNT THREE

### Violation of Equal Protection Clause of the U.S. Constitution

61. Plaintiffs defined as American Indians under 62 FR 58782 who are not enrolled in federally recognized tribes are similarly situated to American Indians defined under 62 FR 58782 who are enrolled in federally recognized tribes as to their religious use of feathers and birds parts of species listed on the MBTA and BGEPA. Nevertheless, Defendants have refused to accord the same deference to Plaintiffs.

62. Consequently, the Defendants' decision to allow American Indians enrolled in federally recognized tribes to use protective species of birds for religious purposes, while denying the same protection to American Indian Plaintiffs, violates the Equal Protection rights of Plaintiffs guaranteed by the Fifth and Fourteenth Amendments to the U.S. Constitution.

## COUNT FOUR

### Improper Application of MBTA AND BGEPA

63. Implicit in Defendants' actions complained of herein is Defendants' assumption that Plaintiffs defined as American Indians under 62 FR 58782 who are not enrolled in federally recognized tribes are not exempted from criminal action when they use feathers and parts of protected species of birds for religious purposes, whereas American Indians under 62 FR 58782 who are enrolled in federally recognized tribes are

exempted from criminal action when they use feathers and parts of protected species of birds for religious purposes.

64.     The Defendants' draconian use of federal recognition to determine which American Indians can worship with feathers and parts of protected species of birds conflicts with reality in that the wordings of the MBTA and BGEPA make no mention of federal recognition, but simply say "Indian Tribes" are exempted from provisions of the act.

65.     On February 5, 1975, U. S. Secretary of the Interior Rogers C. B. Morton issued a statement (Morton Policy) concerning Indian cultural and religious use of migratory bird feathers and parts, holding that "American Indians may possess, carry, use, wear, give, loan, or exchange among other Indians, without compensation, all federally protected birds, as well as their parts or feathers," establishing federal policy exempting all American Indians, including Plaintiffs, from MBTA and BGEPA.

66.     In the Matter of Joseluis Saenz v. Department of Interior, U.S. District Court Judge Mechem noted that it was not until after the Saenz Case was filed in 1996 that the Department of Interior's own internal regulations were drafted to exclude in its definition of "Indian Tribes" American Indians not enrolled in federally recognized tribes, before Judge Mechem ordered that the U.S. Department of Fish and Wildlife return to Saenz, an American Indian not enrolled in a federally recognized tribe, all his religious items, including feathers of federally protected birds. See In the Matter of Joseluis Saenz v. Department of Interior, U.S. 10th Circuit Court of Appeals, No. 00-2166, Appeal from the United States District Court of New Mexico, D.C. No. 99-21-M.

67.     In the end, the government's use of federal recognition in issuing permits to American Indians to own protected species of birds and their parts is little more than a bureaucratic short-cut designed to minimize the work Congress has handed to the agency, resulting in an administrative expediency that does not constitute a compelling government interest.

## COUNT FIVE

### Violation of Fifth Amendment

71.     Defendants have seized feathers and other items described above from Plaintiffs to assert ownership and control over the property.

72.     Defendants provided Plaintiffs no notice of hearing before seizing these items.

73.     No extraordinary circumstances justified the failure to provide Plaintiffs pre-deprivation notice and hearing.2

74.     The seizure of feathers and other items deprived Plaintiffs of their rights of ownership and possession of religious objects used in their observance of their traditional American Indian religion, in particular, and constituted a violation of the Plaintiffs' rights under the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

## COUNT SIX

### Administrative Procedure Act

75.     Defendants conduct set forth above constitutes agency action that is: (a) arbitrary and capricious, an abuse of discretion and otherwise not in accordance with the law; (b) contrary to Plaintiffs' constitutional and statutory rights; (c) in excess of statutory jurisdiction and authority; and (d) without observance of procedures required by

law.  Such action should be set aside and declaratory and injunctive relief provided under the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

## COUNT SEVEN

### Violation of International Law

76.     The MBTA, really a series of agreements with Canada, Great Britain, Mexico and former Soviet Union signed between 1916 and 1976, permits indigenous people not enrolled in nationally recognized tribes with their respective national governments to possess feathers and bird parts of protected species of birds for religious purposes.

77.     Indigenous people, including members of the South Texas Indian Dancers Association, travel between and among nations that are signatories to the MBTA, bringing with them their regalia and religious objects adorned with feathers and bird parts of protected species, so that they can practice their traditional native religion and faith while in other countries as guests of their respective native populations.

78.     The doctrine of comity, as established under international law and recognized in the United States, encourages deference to foreign legal and political judgments to foster international cooperation and encourage reciprocity between the United States and other countries.  See Spatola v. United States, 925 F.2d 615, 618 (2d Cir. 1991).

79.     Federal agencies regularly invoke the doctrine of comity as a guide for decisions that touch on foreign interests.

80.     Where "fairly possible," a United States statute should be construed so as not to conflict with international law or an international agreement of the United States. See Restatement (Third) of Foreign Relations Law, Sec. 114.

81.     The United States is a signatory to the United Nations International Covenant on Civil and Political Rights (ICCPR), which insures the freedom of everyone to "have or to adopt a religion of his choice, and freedom, either individually or in the community of others and in public or private, to manifest his religion or belief in worship, observance, practice, and teaching." ICCPR, 138 Cong. Rec. S4781-84 (1992).

82.     The United States has also endorsed the Universal Declaration of Human Rights, which protects the rights of individuals not only to believe as they wish, but also to "manifest" that belief through practice, including  "ceremonial acts" and "participation in rituals."  See U.N. Human Rts. Comm., General Comment no. 22, p. 4 (1993).

83.     Finally, the United States Congress has passed the International Religious Freedom Act (IRFA), Pub. L. No. 105-292, 112 Stat. 2788 (1998), codified at 22 U.S.C. §§ 6401-6481.  IRFA establishes as United States policy the promotion of freedom of religion and cooperation with foreign governments "that affirm and protect religious freedom, in order to develop multilateral . . . intitiatives to . . . promote religious freedom abroad."

84.     These laws make clear that it is not only "fairly possible" for the United States to defer to other nations permitting the religious use of feathers and bird parts of protected species of birds by its indigenous people, but that domestic and international law, in fact, require such deference.

85.     Under these circumstances, Defendants' interpretation of MBTA forbidding the religious use of birds and bird parts of protected species by Plaintiffs in the United States clearly violates the doctrine of comity, treaties which the United States has endorsed, and domestic law.

## CONCLUSION

The history of discrimination against American Indian religion and culture in the United States is long and sad. In 1883, the Department of Interior's Commissioner of Indian Affairs Hiram Price declared that "the old heathenish dances" associated with American Indian powwows and other religious practices were "a great hindrance to the civilization of the Indians." Thereupon, he promulgated a *Code of Indian Offenses*, declaring all dances and feasts associated with Indian powwows and other religious ceremonies "Indian offenses." The *Code* specifically targeted American Indian religious leaders, ruling

The usual practices of so-called "medicine-men" shall be considered "Indian offenses". . ., and whenever it shall be proven. . .that the influence or practice of a so-called "medicine-man" operates as a hindrance to the civilization of a tribe. . .to prevent the Indians from abandoning their heathenish rites and customs, he shall be adjudged guilty of an Indian offense. . .(and) confined in. . .prison. . .until such time as he shall produce evidence. . .that he will forever abandon all practices styled Indian offenses. . .

In 1887, the federal government attempted to "civilize" American Indians largely through the education of their children. In 1892, Captain Richard Pratt, the founder of the first Indian boarding school in Carlisle, Pennsylvania stated the objective of educating

Indian children was to make certain "*that all the Indian there is in the race should be dead. Kill the Indian in him and save the man.*"[48]

---

[48] In the *Saenz Case*, the 10th Circuit Court wrote:

> For approximately sixty years (1871-1928), the federal government conducted an official policy of "assimilation" towards Native Americans, which resulted in a "systematic attempt to eradicate Indian heritage and tribalism." Felix S. Cohen, <u>Handbook of Federal Indian Law</u> 127-143 (1982 ed.). The 1950s saw an official policy of "termination," in which the federal government sought to end the "trust relationship" between the federal government and Indian tribes, and Congress voted to "terminate" numerous tribes. <u>Id.</u> at 152-75. An "important practical effect of termination was to remove the sovereignty of terminated tribes. Although the termination acts did not expressly extinguish the governmental authority of such tribes, most were not able to exercise their governmental powers after the loss of their land base." <u>Id.</u> at 175.

> Overall, "[f]ederal policy toward the recognition of Indian tribes has been by no means consistent with `real' ethnological principles: Congress has frequently consolidated previously distinct groups into a single tribe for recognition purposes, or has divided an individual tribe into two or more groups, recognizing each in turn as a `different' Indian `nation.' Congress has also occasionally `terminated' tribes' federal recognition, in some cases only to `restore' it thereafter . . . ." Christopher A. Ford, "Executive Prerogatives in Federal Indian Jurisprudence: The Constitutional Law of Tribal Recognition," 73 Denv. U. L. Rev. 141, 156 (1995) (citations omitted), <u>quoted in</u> Aplt. App. at 207 (district court opinion). Mr. Saenz's tribe, the Chiricahua Indians, was once a federally-recognized tribe with its own reservation. That status was revoked, however, when the federal government dissolved the Chiricahua reservation in 1886 after the outbreak of warfare between the Apache and the United States. Aplee. App. at 66-69 (Executive Orders creating and dissolving Chiricahua reservation). It has largely been the federal government's policies toward the Indian tribes over the years that have determined which tribes have survived and which tribes have not. On the one hand, historical government policy toward the Chiricahua tribe may have made it impossible for that tribe to obtain federal recognition today, while on the other hand, the government now wants to use that same lack of recognition to infringe on Mr. Saenz's religious freedom. We refuse to base Mr. Saenz's free exercise rights on such tenuous ground.

> Congress has explicitly declared a policy "to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian, . . . including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites." The Indian Religious Freedom Act, 42 U.S.C. § 1996. Against this background, we do not believe that Mr. Saenz's free exercise rights should be conditioned on his "political" status-whether or not he is a member of a federally-recognized tribe.

> Finally, the government alleges that allowing Mr. Saenz and others like him to obtain eagle permits will result in a permit system that is administratively unfeasible. As explained, the government has offered no proof that the number of permit applicants would substantially increase in the absence of the challenged restriction, and we cannot ignore the fact that the government operated the permit system for eighteen years without requiring an applicant to be a member of a federally-recognized tribe. <u>See</u> <u>supra</u>, note 2. The government operates programs for Native Americans under the IRA and IHCIA that do not require participants to be members of federally-recognized tribes. Presumably, the government has found a way to allocate the limited resources in those programs (scholarship funds and grants) among the programs' applicants. The government will have to do the same here. As the district court stated, "[t]he federal government may find it difficult, time-consuming or bothersome to identify authentic Indian tribes ethnologically rather

Since that time, Indian people have struggled to save their culture.  Today, many of our Indian elders remember a time when we held our powwows and other religious ceremonies in secret, all the while fearing the wrath of the federal government.  In 1989, Plaintiff Robert Soto and his family held the first open powwow in south Texas.  In 2006, the fist of the federal government came down hard on our Indian community. Plaintiffs and American Indians throughout Texas pray the court renders a summary judgment, keeping in mind that recent cases and law have begun to open the door for our Indian people to practice their religions beliefs without the repressive measures of the government.

*In the Matter of Joseluis Saenz v. Department of Interior*, U.S. 10th Circuit Court of Appeals, No. 00-2166, Appeal from the U.S. District Court in New Mexico, D.C. No. 99-21-M, both the Court of Appeals and the District Court held an American Indian (Joseluis Saenz) who did not meet the requirements for enrollment in a federally-recognized tribe should be permitted to possess and use eagle feathers in American Indian religious ceremonies (such as powwows). Although Joseluis Saenz asserted he was an American Indian, he could not meet the requirements for enrollment in a federally recognized tribe. We wholeheartedly embrace the District Court's and Circuit Court's

---

than simply politically, but the present test will never provide for the individual free exercise of religion precisely because of cases like the present one and because whether or not a particular tribe has been formally recognized for political purposes bears no relationship whatsoever to whether or not an individual practitioner is of Indian heritage by birth, sincerely holds and practices traditional Indian religious beliefs, is dependent on eagle feathers for the expression of those beliefs, and is substantially burdened when prohibited from possessing eagle parts." Aplt. App. at 218.

position in the *Saenz Case* that held that the government cannot "give religious preference to one group of Native Americans over another."[49]

Under the Religious Freedom Restoration Act (RFRA), laws have evolved in states, like Texas, where the majority of American Indians not enrolled in federally-recognized tribes have a right to practice their American Indian religion, such as the Native American Church whose members can ingest sacramental peyote because it is essential and central to the Church's religious observances and ceremonies,. Also, the U.S. Supreme Court ruled in favor of worshipers in a similar matter concerning the Uniao do Vegital religion permitting their ingesting of Hoasca tea as an essential and central element of their religion. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006).

## PRAYER FOR RELIEF

For the reasons set forth above, Plaintiffs seek the following relief:

1.    A judgment declaring the Defendants' interpretation of the MBTA and the BGEPA as barring Plaintiffs' religious use of feathers and bird parts of protected species of birds violates RFRA, 42 U.S.C. §§ 2000bb-2000bb(4), the First Amendment to the U.S. Constitution, the Equal Protection Clause of the Fifth and Fourteenth Amendments to the U.S. Constitution and international law.

2.    A judgment declaring that the MBTA and the BGEPA does not apply to American Indians as defined under 62 FR 58782, whether enrolled in federally

---

[49] The *Saenz Case* is distinguished from *U.S. v. Wilgus* and *U.S. v. Hardman*, 297 F.3d 1116 (10th Cir. 2002) which involved non-Indians who had been prosecuted under the BGEPA for possession of eagle feathers without a BGEPA permit. Mr. Saenz self-identified as an American Indian, even though he could not meet the requirements for enrollment in a federally-recognized tribe.  Wilgus and Hardman both identified as non-Indians practicing an American Indian religion that used eagle feathers as part of its worship and practices.

recognized tribes or not, and that all American Indians as defined under 62 FR 58782 may possess, carry, use, wear, give, loan, or exchange among other American Indians, without compensation, all federally protected birds, as well as their parts or feathers.

3.      A judgment declaring that the federal agent who raided the Mc Allen Powwow and seized the feathers of Rev. Robert Soto, Michael V. Russell, and Michael Todd Cleveland on or about March 11, 2006, at the premises at the Palm View Library and Community Center, located at 1401 Jordan Street, in Mc Allen, Texas acted beyond the bounds of his legal authority because as American Indians as defined under 62 FR 58782 Rev. Robert Soto, Michael V. Russell, and Michael Todd Cleveland were entitled to the feathers seized for religious reasons and purposes.

4.      A judgment declaring that the federal agent who raided the Mc Allen Powwow and seized the feathers of Rev. Robert Soto, Michael V. Russell, and Michael Todd Cleveland on or about March 11, 2006, at the premises at the Palm View Library and Community Center, located at 1401 Jordan Street, in Mc Allen, Texas acted beyond the bounds of his legal authority in violation of RFRA and the Administrative Procedure Act as well as the constitutional rights of Plaintiffs under the First, Fifth and Fourteenth Amendments.

5.      An order compelling Defendants to return to Plaintiffs Soto and Russell all feathers and items  seized on or about March 11, 2006 from the premises at the Palm View Library and Community Center, located at 1401 Jordan Street, in Mc Allen, Texas or surrendered on or about March 23 at the Law Office of Attorney Art Cisneros in Mc Allen, Texas.

6.      Such other and further relief as warranted.

Respectfully submitted,

BY:  _/s/ Milo Lone-Eagle Colton _____
Dr. Milo Lone-Eagle Colton, Regional Counsel
Nebraska Bar No: 19693
Civil Rights Legal Defense & Edu. Fund, Inc.


/s/ Marisa Y. Salazar_____
Marisa Y. Salazar, Regional Counsel
ATTORNEY IN CHARGE FOR PLAINTIFFS
New Mexico Bar No: 25887
Civil Rights Legal Defense & Edu. Fund, Inc.
519 Culebra Road
San Antonio, Texas 78201
Telephone: 210-334-5209
Fax: 210-492-1601

## CERTIFICATE OF SERVICE

This is to certify that on March 27, 2012, the attached Plaintiff's First Amended Complaint was filed electronically. Notice of the filing will be sent to all parties by operation of the Court's electronic filing system, including the Counsel listed below. Parties may access this filing through the Court's system.

Jimmy Rodriguez
Assistant U.S. Attorney
Southern District of Texas
919 Milam, Suite 1500
P.O. Box 61129
Houston, TX 77208
**Attorney for Defendant**                      _/s/Marisa Y. Salazar_____
                                               Attorney for Plaintiffs