**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**MC ALLEN DIVISION**

| | | |
|---|---|---|
| **Mc Allen Grace Brethren Church,  Native** | § | |
| **American New Life Center,  San Antonio** | § | |
| **Indian Fellowship;  South Texas Indian Dancers** | § | |
| **Association; Linda Cleveland,** Individually**;** | § | |
| **Michael Cleveland,** Individually**;  Michael Russell,** | § | |
| Individually**;  Veronica Russell,** Individually**;  Edith** | § | |
| **Clark,** Individually and as council member of | § | |
| Native American New Life Center**; William Clark,** | § | |
| Individually,  and as member of Native American | § | |
| New Life Center**; Carrie Felps**, Individually**;** | § | |
| **Homer Hinojosa, III,** Individually and as | § | **CIVIL NO.  7:07-CV-060** |
| member of Mc Allen Grace Brethren Church, | § | **MOTION FOR** |
| San Antonio Indian Fellowship,  and South Texas | § | **SUMMARY JUDGMENT** |
| Indian Dancers Association**; Nancy Hollingworth,** | § | |
| as member of Native American New Life Center**;** | § | |
| **Lucian Oden,** as member of San Antonio Indian | § | |
| Fellowship**;  Xavier Sanchez,** as member of San | § | |
| Antonio Indian Fellowship**; and Pastor Robert** | § | |
| **Soto,** Individually,  and on behalf of Mc Allen | § | |
| Grace Brethren Church, Native American New | § | |
| Life Center, San Antonio Indian Fellowship**,** | § | |
| and South Texas Indian Dancers Association**,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| **V.** | § | |
| | § | |
| **Secretary of the U.S. Dept. of Interior,  Ken** | § | |
| **Salazar,  in his official capacity,** | § | |
| | § | |
| **Defendants.** | § | |

**PLAINTIFFS'  MOTION FOR SUMMARY JUDGMENT**

    **COMES NOW,** Plaintiffs  Mc Allen Grace Brethren, et. al., who move for

summary judgment on all of the claims in their First Amended Complaint  pursuant to

Fed. R. Civ. P. 56. Plaintiffs'  counsel discussed the grounds for this motion and the relief

requested with counsel for the Defendant in March 2012. Defendant's  counsel opposes

the relief requested herein, but agreed to the cross-filing of motions for summary judgment.  In support of a judgment in their favor, Plaintiffs state the following:

## 1.     BACKGROUND

On March 11, 2006, United States Fish and Wildlife Service Agent Alejandro entered a powwow held at the Palm View Community Center in McAllen, Texas.  A powwow is an American Indian religious service and cultural event. The powwow was sponsored by members of the Lipan Apache Tribe of Texas, a state-recognized tribe, formally recognized by the Texas State Senate and the Texas House of Representatives. (*See* Senate Resolution 438 and House of Representative Resolution 812 attached).

Using a Department of Interior regulation that bans all American Indians not enrolled in federally-recognized tribes from using feathers or parts of birds listed on the Migratory Bird Treaty Act (MBTA) and Bald and Golden Eagle Protection Act (BGEPA) for their religious ceremonies, the Agent seized feathers from American Indians participating in the powwow. (50 CFR 21.11.)

The feathers seized are considered by American Indians sacred objects used in American Indian religious practices to communicate with the Creator.

Specifically, the Agent seized two golden eagle feathers that were worn in a ceremonial roach headdress by Reverend Robert Soto, tribal member and Vice Chairman of the Lipan Apache Tribe of Texas. Next, the Agent seized a ceremonial bustle with 42 sacred golden eagle feathers and two additional roach feathers belonging to Rev. Soto and worn by Rev. Soto's brother-in-law Muskogee Creek Indian Michael Russell, who was participating as a Traditional Dancer at the powwow. The Agent also seized two Helushka (Warrior) eagle feathers belonging to Mr. Russell.

At a vendor's table, 6-8 assorted non-eagle feathers attached to dream-catchers belonging to Cherokee Indian artist Michael Cleveland were confiscated by the Agent. The feathers on the dream-catchers were picked up off the ground during Mr. Cleveland's morning walks in the weeks before the powwow. Dream-catchers are religious implements which carry religious significance for American Indians similar to Christian crosses and Bibles, the Jewish Torah, and the Muslim Koran.

The Agent issued citations to Rev. Robert Soto and Michael Russell for the offense of "Possessing eagle feathers without a permit," 50 CFR 21.11. Mr. Russell was assessed a fine for $500, which he paid. Rev. Soto was not assessed any fine.

Agent Rodriguez issued a citation to Michael Cleveland for violation of the MBTA, carrying a fine of $500.

A trial was held in a criminal case of *United States v. Cleveland*, M-06-4806 (S.D. of Texas, McAllen Division) in Magistrate Court. Another hearing was held in U.S. District where U.S. District Judge Randy Crane decided the feathers were for sale on Mr. Cleveland's dream-catchers, which was a purely commercial activity. Thus, the dream-catcher feathers were not covered by an exception for the possession of feathers of protected species of birds listed on the MBTA for the religious purposes of Indian tribes. *See* 16 U.S.C. Sec. 668 (a).

Mr. Cleveland paid a fine of $250 and court costs.

THERE IS NO GENUINE DISPUTE AS TO ANY MATERIAL FACT AND THE MOVANT IS ENTITLED TO JUDGMENT AS A MATTER OF LAW

In a United States Department of Interior Letter (Attached as Exhibit A), by Janet Spaulding, Esq., dated December 8, 2011, RE: Supplemental Petition of Remission of

one bustle of golden eagle feathers and 6 loose golden eagle feathers seized from Robert Soto and Michael Russell on or about March 11, 2006, Attorney Spaulding stated the following:

1. In *United States v. Cleveland*, "the parties had stipulated that the powwow was a religious service." (at page 2)

2. "I will accept that Mr. Soto and Mr. Russell were exercising their religious beliefs in the use of the golden eagle feathers they wore during the powwow." (at page 3)

3. "It is undisputed that Michael Russell, Mr. Soto's brother-in-law, wore the golden eagle bustle and possession of four single golden eagle feathers owned by Rev. Soto with Rev. Soto's permission." (at page 3)

4. "It is undisputed that Mr. Soto allowed a person who is not a member of a federally recognized Indian tribe to take possession of his bustle made from golden eagle feathers as well as four loose golden eagle feathers." (at page 3)

5. "I find that although Rev. Soto is a sincere religious practitioner of Native American religion, the federal government's compelling interest in limiting the right to legally possess eagle feathers for religious purposes to members of federally recognized tribes prevents any mitigation of the seizure of the golden eagle feathers involved in this matter." (at page 9)

## 2.    QUESTIONS PRESENTED

QUESTION ONE: *Whether the Government's regulation prohibiting the use of feathers and parts of parts of birds listed on the Migratory Bird Treaty Act (MBTA) or Bald and Golden Eagle Protection Act (BGEPA) for religious purposes by American Indians not*

*enrolled in federally recognized tribes violates the First Amendment's Free Exercise*

*Clause of U.S. Constitution and the Religious Freedom Restoration Act (RFRA)?*

QUESTION TWO: *Whether the Government's interest in protecting Eagle populations is Compelling?*

QUESTION THREE: *Whether the Government's interest in preserving American Indian culture and religion for American Indians enrolled in federally-recognized tribes is contradicted by its regulation prohibiting the use of feathers and parts of birds listed on the Migratory Bird Treaty Act (MBTA) or Bald and Golden Eagle Protection Act (BGEPA) for religious purposes by a majority of American Indians?*

QUESTION FOUR: *What federal definition of American Indian shall be applied to an American Indian that uses feathers and parts of birds listed on the Migratory Bird Treaty Act or Bald and Golden Eagle Protection Act as essential and central to the practice of the American Indian religion?*

### 3.    DISCUSSION: QUESTIONS ONE, TWO, THREE AND FOUR

QUESTION ONE: *Whether the Government's regulation prohibiting the use of feathers and parts of birds listed on the Migratory Bird Treaty Act (MBTA) or Bald and Golden Eagle Protection Act (BGEPA) for religious purposes by American Indians not enrolled in federally recognized tribes violates the First Amendment's Free Exercise Clause of U.S. Constitution and the Religious Freedom Restoration Act (RFRA)?*

The authority for the government's regulation used to seize Plaintiffs' feathers is based on the Eagle Act[1] which provides an exception "to permit the taking, possession and transportation of (eagle feathers and parts) . . .for the religious purposes of Indian tribes." Nowhere in the statute does it limit the exception to only <u>federally-recognized</u> Indian tribes.

According to the 10th Circuit Court of Appeals: "Not until 1981, eighteen years after the regulation was first enacted, was the requirement that an applicant be a member of a federally-recognized Indian tribe clearly articulated. In 1981, after a member of an Indian tribe that was not federally recognized requested a permit for eagle feathers, the Deputy Solicitor of the Interior issued a memorandum which stated that only federally-recognized Indian tribes constituted "Indian tribes" under the BGEPA. <u>Id.</u> at 3-4; Aplt. App. at 189. It was only in 1999 that the regulatory language was changed to clearly reflect the requirement that an applicant must be a member of a federally- recognized Indian tribe. *See* 50 C.F.R. § 22.22 (1999)." *In the Matter of Joseluis Saenz*, v. *Dept. of Interior*, No. 00-2166 (10th Circuit).

The government's regulation has evolved to the point that a small minority of American Indians (specifically, those enrolled in federally-recognized tribes) has the right to the free exercise of an American Indian religion which uses feathers and parts of birds listed on the MBTA or BGEPA as essential and central to the practice of their American Indian religion.

According to the 2000 U.S. Census, 4,119,301 American Indians were counted. In 1999, the "Indian Labor Force Report," Office of Tribal Affairs, Bureau of Indian

---

[1] 16 U.S.C. Sec. 668(a), originally passed in 1940, see Act of June 8, 1940, ch. 278, 54 Stat. 250-251, the Eagle Act as amended in 1962, adding both protection of golden eagles and the exception at issue in this case for possession for the religious purposes of Indian tribes.

Affairs, U.S. Department of Interior, counted 1,698,483 Indians enrolled in federally recognized tribes. Thus, if all Indians enrolled in federally-recognized tribes were counted on the 2000 census (which was highly unlikely), nearly two-thirds of all Indians counted were not enrolled in federally-recognized tribes and thus not eligible for feathers under the government's regulation.

In yet another estimate of the American Indian population in the United States referred to in a 2000 10th Circuit Court of Appeals opinion, the Court noted that in 1995 there were 8.7 million "Americans who identify themselves as having Native American Ancestry." Under this count, more than three-fourths of all Indians were not enrolled in federally recognized tribes and thus not eligible for feathers under the government's regulation. *In the Matter of Joseluis Saenz*, v. *Dept. of Interior*, No. 00-2166 (10th Circuit) at Footnote 9.

In an effort to appear to be supportive of the Indian Tribe exception in the Eagle Act, the government has made a token effort to collect eagle bodies, feathers, and bird parts for American Indian rituals through the creation of a National Eagle Repository at the Rocky Mountain Arsenal National Wildlife Refuge in Denver, Colorado.[2] It also has experimented with a repository for non-eagle species of listed on the MBTA.

By any reasonable measure, the National Eagle Repository is an abject failure. According to the Division of Migratory Bird Management, only 1.1 percent of all the members of federally-recognized tribes have eagle permits.[3] This means that **more than ninety-eight percent** of Indians the government claims it is protecting with its

---

[2] Draper, Electa, "Eagle bodies, parts for Indian rites are collected, sent from Colo. Morgue," *The Denver Post,* Posted: 09/01/2001, p. 1. http://www.denverpost.com/ci_13242945. Accessed: 2-27-2012.
[3] Stokes, DaShanne, "Eagle feathers and the imperialist conquest of state-recognized tribes," *Indian Country Today*, p. 5, 8-13-08.

regulations (i.e., members of federally-recognized tribes) have not received eagle permits from the government.

Even more revealing, in *U.S. v. Cleveland* (2006)[4], Jeff Haskins, Chief of the Migratory Bird Office for the U.S. Fish and Wildlife Service, indicated that his office had issued only 182 permits only to Indians enrolled in federally-recognized tribes for non-eagle feathers of birds listed on the MBTA. This means that **more than ninety-nine percent** of Indians the government claims it is protecting with its regulations (i.e., members of federally-recognized tribes) have not received permits from the government for non-eagle feathers or parts of birds listed on the MBTA.

Congress has explicitly declared a policy "to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian, . . . including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites." The Indian Religious Freedom Act, 42 U.S.C. § 1996. Clearly, this policy has not been implemented in good faith by the government when it comes to American Indian possession and use of feathers of protected species of birds. A more reasonable conclusion is the government's regulations are designed to deny American Indians access to feathers of birds listed on the MBTA and BGEPA.

QUESTION TWO: *Whether Government's interest in protecting Eagle populations is compelling?*

The government asserts a compelling interest for its regulation on two grounds: (1) protecting eagles, and (2) protecting federally-recognized tribes' culture.[5] Also, the

---

[4] *U.S. v. Cleveland*, Violation No ST34 W0889336, Magistrate Action No. M-06-4806, at Footnote 33.
[5] Spaulding, Janet, U.S. Department of Interior Letter, dated March 8, 2011.

government asserts "in furtherance of a compelling governmental interest" its policy "is the least restrictive means of furthering that compelling governmental interest."

Bald eagle populations have made significant recoveries since protections were established under the BGEPA. In 2001, it was noted that "the current nesting population of Bald Eagles has increased by more than a factor of ten since 1963."[6] Moreover, in 2007, the government removed the Bald Eagle in the lower 48 states from the List of Endangered and Threatened Wildlife.

More recently, on March 9, 2012, the U.S. Fish and Wildlife Service issued a permit allowing the Northern Arapaho Tribe of Wyoming to kill bald eagles for religious purposes.[7]

Plaintiffs consider the preservation of protected species of birds as paramount. From the beginning, Plaintiffs have taken the position that they have no desire to harm or kill any birds listed on either the MBTA or BGEPA, nor are they seeking permission to do so. It is not necessary. It is estimated that there are 80,000-110,000 Bald Eagles in the wild[8] and another 30,000 Golden Eagles in the United States alone.[9] Each eagle has in excess of 7,000 feathers it sheds each year through a natural process called "molting". This means there are literally millions of eagle feathers shed annually by live birds. Further, many millions more feathers of birds listed on the MBTA shed their feathers annually through "molting."

[6] Appellee Joseluis Saez/s En Banc Rehearing Brief, U.S. Court of Appeals for the Tenth Circuit, page 3.
[7] *San Antonio Express-News*, "Feds allow tribe to kill two eagles," March 14, 2012, P. A3.
[8] Alaska's Bald Eagles: Eagles are as common as pigeons in Southeast Alaska, http://alaskatrekker.com/eagles.htm. Accessed 2-24-2012.
[9] McNeel, Jack, Coeur d'Alene Elders View Golden Eagle Release, October 14, 2011, p. 3. http://indiancountrytodaymediannetwork.com/2011/10/14/coeur-dalllllene-elders-view-eagle-release-58412#ixzzinJZvbyNS.   Accessed: 2-24-12.

Under the current government regulation, American Indians cannot pick up a single feather shed by birds listed on the MBTA and BGEPA from off the ground without a government permit—a permit the government denies to the vast majority of our Indian people. Because of the regulation and the burdensome permit requirements, millions of feathers of protected species of birds that could be used in American Indian religious practices remain uncollected and on the ground each year subject to destruction by humans, the elements of Nature, and other sources.

As an example, if an American Indian (like Plaintiff and Cherokee Indian artist Michael Cleveland) decides to clear his lawn of feathers shed by white-tipped doves (like those he had on his dream-catchers at the powwow or any other species listed on the MBTA or BGEPA) as an act of respect for the bird before mowing his lawn, he is in violation of the government's regulations and subject to prosecution the moment he picks up a feather.[10] However, if he runs his lawn mower over the feathers cutting them to pieces, he is in compliance with the regulations. A regulatory system that operates this way is anathema to most American Indian beliefs.

Moreover, eagle populations and other species of birds listed on the MBTA in zoos and aviaries regularly shed feathers, as well. Too often, their feathers are put in the trash or burned by the establishments that house these birds.

Also, there are many eagles and protected species of birds that die from natural causes, such as old age or illness. Others are victims of road kill, pollution, electrocution, wind farms, illegal poaching by non-Indians, and many other causes whose feathers and body parts could be used for American Indian religious practices and ceremonies. Most

---

[10] Strict liability attaches under the government's regulation.

of these birds are never recovered by the government or any other agency for a wide range of reasons—mostly because it is illegal, impractical, and costly.

Because of (1) the Bald and Golden Eagle population recovery, (2) the government's removal of the Bald Eagle from the List of Endangered Wildlife, (3) the vitality of today's eagle populations, (4) the government's recent permitting of the killing of bald eagles by the members of the Northern Arapaho Tribe of Wyoming, and (5) the government's ineffectual ability to provide permitted feathers and eagle body parts to any American Indian, the government has no compelling interest in denying Plaintiffs or other American Indians feathers and body parts of birds listed on the MBTA and BGEPA for religious purposes to any American Indian.

Plaintiffs challenge the government's regulation as "the least restrictive means of furthering" the government's asserted "compelling interest." Plaintiffs propose even lesser restrictive measures than the government's regulation. These measures would mean greater supplies of feathers for our Indian people and more effective management of our bird populations. These measures include:

> *First, let American Indians collect and gather feathers shed by living birds without government harassment and intervention.* Under this proposal, birds listed on the MBTA and BGEPA are not harmed, killed or threatened in any way.
> *Second, let American Indians themselves serve as stewards of their sacred bird populations, along with the government, by developing their own aviaries.* Today, the "Zuni Tribe has a federal permit to keep live eagles, most of which come from raptor rehabilitation projects."[11]  This practice should be expanded, encouraged and supported by the government for other tribes and Indian

---

[11] *San Antonio Express-News*, "Tribe: Bald eagle permit a victory for tradition." March 18, 2012, P. A12.

communities, as well. Because of the veneration Indians have for their winged brothers and sisters, they would serve as ideal guardians of these species listed on the MBTA and BGEPA.

QUESTION THREE: *Whether the Government's asserted compelling interest in preserving American Indian culture and religion for federally-recognized Indians is contradicted by its regulation prohibiting the use of parts of birds listed on the Migratory Bird Treaty Act (MBTA) or Bald and Golden Eagle Protection Act (BGEPA) for religious purposes by a majority of American Indians?*

Plaintiffs contend that government's regulation prohibiting the use of feathers and bird parts of birds listed on the MBTA and BGEPA for Plaintiffs' religious purposes contradicts the government's so-called "compelling interest" in preserving American Indian culture for those enrolled in federally-recognized tribes. How can American Indian culture and religion be preserved when the government denies that culture and religion to most American Indians?

We embrace the U.S. District Court's and 10th Circuit Court's position in the *Joseluis Saenz Case* as a more reasonable approach. In the *Saenz* Case, the courts held that the government cannot "give religious preference to one group of Native Americans over another."[12]

QUESTION FOUR: *What federal definition of American Indian shall be applied to an American Indian that uses feathers and parts of birds listed on the Migratory Bird Treaty Act or Bald and Golden Eagle Protection Act as essential and central to the practice of the American Indian religion?*

---

[12] *In the Matter of Joseluis Saenz vs. Department of Interior*, U.S. 10th Circuit Court of Appeals, No. 00-2166, Appeal from the U.S. District Court in New Mexico, D.C. No. 99-21-M.

The federal government has used and continues to use several different definitions for American Indian. All but one includes American Indians <u>not</u> enrolled in federally-recognized tribes. The following five definitions are submitted for review:

1.   <u>An American Indian is defined as "A person having origins in any of the original peoples of North and South America (including Central America), and who maintains tribal affiliation or community attachment.</u>[13]

This definition of American Indian was mandated to "be used by the Bureau of the Census in the 2000 decennial census. Other Federal programs (were directed to) adopt the (definition) as soon as possible, but not later than January 1, 2003, for use in household surveys, administrative forms and records, and other data collections."[14]

In *Federal Register* Notice, dated October 30, 1997, at Supplementary Information, Section B, Comprehensive Review Process, it states:

A.  The racial and ethnic categories set forth in the standards should not be interpreted as being primarily biological or genetic in reference. Race and ethnicity may be thought of in terms of social and cultural characteristics as well as ancestry.

B.  Respect for individual dignity should guide the processes and methods for collecting data on race and ethnicity; ideally, respondent self-identification should be facilitated to the greatest

[13] http://www.whitehouse.gov/omb/fedreg/ombdir15.html. *Federal Register* Notice, October 30, 1997, "Revisions to the Standards for the Classification of Federal Data on Race and Ethnicity," Executive Office of President, Office of Management and Budget (OMB), Office of Information and Regulatory Affairs.
[14] Ibid. Effective Date.

extent possible, recognizing that some data collection systems observer identification is more practical.

In *Federal Register* Notice, dated October 30, 1997, at Supplementary Information, Section B, Comprehensive Review Process, it further states:

"The **principle objective** of the review has been to **enhance the accuracy of the demographic information** collected by the Federal Government."

"The **second element (is) to monitor civil rights enforcement and program implementation**." (Bold print supplied)

In *Federal Register* Notice, dated October 30, 1997, at Supplementary Information, Section D, OMB's Decisions, Subsection (8), OMB accepts the following recommendation concerning changing the term "American Indian" to "Native American," it states:

**"The term American Indian should not be changed to Native American."**
(Bold print supplied)

In *Federal Register* Notice, dated October 30, 1997, at Supplementary Information, Section D, OMB's Decisions, Subsection (12), OMB accepts the following recommendations concerning the classification of Central and South American Indians, it states:

**Central and South American Indians should be classified as American Indian.** (Bold print supplied)  The definition of the "American Indian or Alaska Native" category should be modified to include the original peoples of Central and South America.  In addition, OMB has decided to make the definition for the

American Indian or Alaska Native category more consistent with the definitions of other categories.

2. _An American Indian is defined as a member of any federally or State recognized tribe, or an individual certified as an Indian artisan by an Indian tribe._

   This definition is used in the enforcement of a truth-in-advertising law that prohibits misrepresentation in marketing of Indian arts and crafts products within the United States. The law is enforced by the Department of Interior. *See* Indian Arts and Crafts Act of 1990 (P.L. 101-644).

3. _An American Indian is defined as" any individual who. . .irrespective of whether he or she lives on or near a reservation, is a member of a tribe, band, or other organized group of Indians, including those tribes, bands or groups terminated since 1940 (i.e., no longer federally-recognized) and those recognized now or in the future by the State in which they reside, or who is a descendent, in the first or second degree, of any such member,. . ."_

   This definition is used for American Indians eligible for scholarship and grant programs. *See* Indian Health Care Improvement Act (IHCIA), U.S.C. Sec. 1603(c).

4. _An American Indian "shall. . .include all other persons of one-half or more Indian blood" irrespective of their membership in a federally recognized tribe._

   This definition is used for those Indians eligible for tuition loans for vocational and trade schools. *See* Indian Reorganization Act of 1934 (IRA), 25 U.S.C. Sec. 476, 479, and 471. Also *see In the Matter of Joseluis Saenz,* v. *Dept. of Interior*, No. 00-2166 (10th Circuit).

5. *An American Indian is defined **only** as a member of a federally-recognized tribe*.

This definition is used by the Department of Interior for implementing The Eagle Act, 16. U.S.C. Sec. 668(a), originally passed in 1940 and amended in 1962 (with an exception for feathers and bird parts for "religious purposes of Indian tribes").

Plaintiffs assert that, when it comes to the free exercise of religion, the broadest definition of American Indian shall be used. Thus, **Definition 1** whose principle objective is to "enhance the accuracy of the **demographic information** collected by the Federal Government," and the second element is **"to monitor the civil rights enforcement and program implementation"** should be used for determining plaintiffs' rights to feathers seized in this case.

## 5.     CONCLUSION

The history of discrimination against American Indian religion and culture in the United States is long and sad.

In 1883, the Department of Interior's Commissioner of Indian Affairs Hiram Price declared that "the old heathenish dances" associated with American Indian powwows and other religious practices were "a great hindrance to the civilization of the Indians." Thereupon, he promulgated a *Code of Indian Offenses*, declaring all dances and feasts associated with Indian powwows and other religious ceremonies "Indian offenses." The *Code* specifically targeted American Indian religious leaders, ruling

"The usual practices of so-called "medicine-men" shall be considered "Indian offenses". . ., and whenever it shall be proven. . .that the influence or practice of a so-called "medicine-man" operates as a hindrance to the civilization of a tribe. . .to prevent the Indians from abandoning their heathenish rites and customs, he

shall be adjudged guilty of an Indian offense. . .(and) confined in. . .prison. . .until

such time as he shall produce evidence. . .that he will forever abandon all

practices styled Indian offenses. . ."

In 1887, the federal government attempted to "civilize" American Indians largely

through the education of their children. In 1892, Captain Richard Pratt, the founder of the

first Indian boarding school in Carlisle, Pennsylvania stated the objective of educating

Indian children was to make certain *"that all the Indian there is in the race should be*

*dead. Kill the Indian in him and save the man."[15]*

---

[15] In the *Saenz Case*, the 10th Circuit Court wrote:

> For approximately sixty years (1871-1928), the federal government conducted an official policy of
> "assimilation" towards Native Americans, which resulted in a "systematic attempt to eradicate
> Indian heritage and tribalism." Felix S. Cohen, Handbook of Federal Indian Law 127-143 (1982
> ed.). The 1950s saw an official policy of "termination," in which the federal government sought to
> end the "trust relationship" between the federal government and Indian tribes, and Congress voted
> to "terminate" numerous tribes. Id. at 152-75. An "important practical effect of termination was to
> remove the sovereignty of terminated tribes. Although the termination acts did not expressly
> extinguish the governmental authority of such tribes, most were not able to exercise their
> governmental powers after the loss of their land base." Id. at 175.

> Overall, "[f]ederal policy toward the recognition of Indian tribes has been by no means consistent
> with `real' ethnological principles: Congress has frequently consolidated previously distinct groups
> into a single tribe for recognition purposes, or has divided an individual tribe into two or more
> groups, recognizing each in turn as a `different' Indian `nation.' Congress has also occasionally
> `terminated' tribes' federal recognition, in some cases only to `restore' it thereafter . . . ."
> Christopher A. Ford, "Executive Prerogatives in Federal Indian Jurisprudence: The Constitutional
> Law of Tribal Recognition," 73 Denv. U. L. Rev. 141, 156 (1995) (citations omitted), quoted in
> Aplt. App. at 207 (district court opinion). Mr. Saenz's tribe, the Chiricahua Indians, was once a
> federally-recognized tribe with its own reservation. That status was revoked, however, when the
> federal government dissolved the Chiricahua reservation in 1886 after the outbreak of warfare
> between the Apache and the United States. Aplee. App. at 66-69 (Executive Orders creating and
> dissolving Chiricahua reservation). It has largely been the federal government's policies toward the
> Indian tribes over the years that have determined which tribes have survived and which tribes have
> not. On the one hand, historical government policy toward the Chiricahua tribe may have made it
> impossible for that tribe to obtain federal recognition today, while on the other hand, the
> government now wants to use that same lack of recognition to infringe on Mr. Saenz's religious
> freedom. We refuse to base Mr. Saenz's free exercise rights on such tenuous ground.

> Congress has explicitly declared a policy "to protect and preserve for American Indians their
> inherent right of freedom to believe, express, and exercise the traditional religions of the American
> Indian, . . . including but not limited to access to sites, use and possession of sacred objects, and
> the freedom to worship through ceremonials and traditional rites." The Indian Religious Freedom
> Act, 42 U.S.C. § 1996. Against this background, we do not believe that Mr. Saenz's free exercise

Since that time, Indian people have struggled to save their culture. Today, many of our Indian elders remember a time when we held our powwows and other religious ceremonies in secret, all the while fearing the wrath of the federal government. In 1989, Plaintiff Robert Soto and his family held the first open powwow in south Texas. In 2006, the fist of the federal government came down hard on our Indian community.

Plaintiffs and American Indians throughout Texas pray the court renders a summary judgment, keeping in mind that recent cases and law have begun to open the door for our Indian people to practice their religions beliefs without the repressive measures of the government.

*In the Matter of Joseluis Saenz v. Department of Interior*, U.S. 10th Circuit Court of Appeals, No. 00-2166, Appeal from the U.S. District Court in New Mexico, D.C. No. 99-21-M, both the Court of Appeals and the District Court held an American Indian (Joseluis Saenz) who did not meet the requirements for enrollment in a federally-

---

rights should be conditioned on his "political" status - whether or not he is a member of a federally-recognized tribe.

Finally, the government alleges that allowing Mr. Saenz and others like him to obtain eagle permits will result in a permit system that is administratively unfeasible. As explained, the government has offered no proof that the number of permit applicants would substantially increase in the absence of the challenged restriction, and we cannot ignore the fact that the government operated the permit system for eighteen years without requiring an applicant to be a member of a federally-recognized tribe. See supra, note 2. The government operates programs for Native Americans under the IRA and IHCIA that do not require participants to be members of federally-recognized tribes. Presumably, the government has found a way to allocate the limited resources in those programs (scholarship funds and grants) among the programs' applicants. The government will have to do the same here. As the district court stated, "[t]he federal government may find it difficult, time-consuming or bothersome to identify authentic Indian tribes ethnologically rather than simply politically, but the present test will never provide for the individual free exercise of religion precisely because of cases like the present one and because whether or not a particular tribe has been formally recognized for political purposes bears no relationship whatsoever to whether or not an individual practitioner is of Indian heritage by birth, sincerely holds and practices traditional Indian religious beliefs, is dependent on eagle feathers for the expression of those beliefs, and is substantially burdened when prohibited from possessing eagle parts." Aplt. App. at 218.

recognized tribe should be permitted to possess and use eagle feathers in American Indian religious ceremonies (such as powwows). Although Joseluis Saenz asserted he was an American Indian, he could not meet the requirements for enrollment in a federally recognized tribe. We wholeheartedly embrace the District Court's and Circuit Court's position in the *Saenz Case* that held that the government cannot "give religious preference to one group of Native Americans over another."[16]

Under the Religious Freedom Restoration Act (RFRA), laws have evolved in states, like Texas, where the majority of American Indians not enrolled in federally-recognized tribes have a right to practice their American Indian religion, such as the Native American Church whose members can ingest sacramental peyote because it is essential and central to the Church's religious observances and ceremonies,. Also, the U.S. Supreme Court ruled in favor of worshipers in a similar matter concerning the Uniao do Vegital religion permitting their ingesting of Hoasca tea as an essential and central element of their religion. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006).

## RELIEF REQUESTED

For the reasons set forth above, Plaintiffs seek the following relief:

1.     A judgment declaring the Defendants' interpretation of the MBTA and the BGEPA as barring Plaintiffs' religious use of feathers and bird parts of protected species of birds violates RFRA, 42 U.S.C. §§ 2000bb-2000bb(4), the First Amendment to the

---

[16] The *Saenz Case* is distinguished from *U.S. v. Wilgus* and *U.S. v. Hardman*, 297 F.3d 1116 (10th Cir. 2002) which involved non-Indians who had been prosecuted under the BGEPA for possession of eagle feathers without a BGEPA permit. Mr. Saenz self-identified as an American Indian, even though he could not meet the requirements for enrollment in a federally-recognized tribe. Wilgus and Hardman both identified as non-Indians practicing an American Indian religion that used eagle feathers as part of its worship and practices.

U.S. Constitution, the Equal Protection Clause of the Fifth and Fourteenth Amendments to the U.S. Constitution and international law.

2.      A judgment declaring that the MBTA and the BGEPA does not apply to American Indians as defined under 62 FR 58782, whether enrolled in federally recognized tribes or not[17], and that all American Indians as defined under 62 FR 58782 may possess, carry, use, wear, give, loan, or exchange among other American Indians, without compensation, all federally protected birds, as well as their parts or feathers.

3.      A judgment declaring that the federal agent who raided the Mc Allen Powwow and seized the feathers of Rev. Robert Soto, Michael V. Russell, and Michael Todd Cleveland on or about March 11, 2006, at the premises at the Palm View Library and Community Center, located at 1401 Jordan Street, in Mc Allen, Texas acted beyond the bounds of his legal authority because as American Indians as defined under 62 FR 58782 Rev. Robert Soto, Michael V. Russell, and Michael Todd Cleveland were entitled to the feathers seized for religious reasons and purposes.

4.      A judgment declaring that the federal agent who raided the Mc Allen Powwow and seized the feathers of Rev. Robert Soto, Michael V. Russell, and Michael Todd Cleveland on or about March 11, 2006, at the premises at the Palm View Library and Community Center, located at 1401 Jordan Street, in Mc Allen, Texas acted beyond the bounds of his legal authority in violation of RFRA and the Administrative Procedure Act as well as the constitutional rights of Plaintiffs under the First, Fifth and Fourteenth Amendments.

---

[17] The Texas Senate and House of Representatives have recognized via resolution of their formal bodies, the Lipan Apache Tribe of Texas, of which Reverend Soto and Veronica Russell are members. (See attached Exhibits B and C.)

5.      An order compelling Defendants to return to Plaintiffs Soto and Russell all feathers and items seized on or about March 11, 2006 from the premises at the Palm View Library and Community Center, located at 1401 Jordan Street, in Mc Allen, Texas or surrendered on or about March 23 at the Law Office of Attorney Art Cisneros in Mc Allen, Texas.

6.      Such other and further relief as warranted.

                                        Respectfully submitted,

                                        BY: _/s/ Milo Lone-Eagle Colton _____
                                        Dr. Milo Lone-Eagle Colton, Regional Counsel
                                        Nebraska Bar No: 19693
                                        Civil Rights Legal Defense & Edu. Fund, Inc.

                                        /s/ Marisa Y. Salazar_____
                                        Marisa Y. Salazar, Regional Counsel
                                        ATTORNEY IN CHARGE FOR PLAINTIFFS
                                        New Mexico Bar No: 25887
                                        Civil Rights Legal Defense & Edu. Fund, Inc.
                                        519 Culebra Road
                                        San Antonio, Texas 78201
                                        Telephone: 210-334-5209
                                        Fax: 210-492-1601

### CERTIFICATE OF SERVICE

This is to certify that on April 13, 2012, the attached Plaintiff's Motion for Summary Judgment was filed electronically. Notice of the filing will be sent to all parties by operation of the Court's electronic filing system, including the Counsel listed below. Parties may access this filing through the Court's system.

Jimmy Rodriguez
Assistant U.S. Attorney
Southern District of Texas
919 Milam, Suite 1500
P.O. Box 61129
Houston, TX 77208
**Attorney for Defendant**                    _/s/Marisa Y. Salazar_____
                                        Attorney for Plaintiffs