

# United States Department of the Interior

**OFFICE OF THE SOLICITOR**
Tulsa Field Solicitor's Office
7906 East 33rd Street, Suite 100
Tulsa, OK 74145
(918) 669-7730
TELEFAX (918) 669-7736

December 8, 2011

Milo Lone-Eagle Colton, Esq. and
Marisa Y. Salazar, Esq.
The Civil Rights Legal Defense & Educational Fund, Inc.
519 Culebra Road
San Antonio, Texas 78201

      Re:    Supplemental Petition for Remission of one bustle made of golden eagle feathers
              and 6 loose golden eagle feathers seized from Robert Soto and Michael Russell on
              or about March 11, 2006.

Dear Mr. Colton and Ms. Salazar:

The letter is in response to the above described Supplemental Petition for Remission of
Forfeiture you filed on behalf of Rev. Robert Soto on March 2, 2007. I am the attorney in the
Tulsa Field Solicitor's Office who is assigned to review the Supplemental Petition.

Relationship of three pending legal matters

This office has not previously addressed your client's Supplemental Petition because it was
related to a pending criminal case, U.S.A. v. Cleveland, M-06-4806 (S. D. of Tex., McAllen
Division). Michael Cleveland, a participant in the events which occurred at a March 11, 2006
powwow held at the Palm View Community Center in McAllen, Texas, was prosecuted for
violating the Migratory Bird Treaty Act (MBTA) provisions against selling or offering to sell
migratory birds or their parts, and possessing and transporting them without authorization to do
so from the U. S. Fish and Wildlife Service ("the Service"). Mr. Cleveland raised the defense
that the provisions of the MBTA under which he was prosecuted violated the First Amendment's
Free Exercise Clause and the Religious Freedom Restoration Act ("RFRA") because all the
activities at the powwow are part of the religious experience of the participants in the powwow.

Some of these same legal issues are raised in Rev. Soto's Supplemental Petition which seeks
remission of golden eagle feathers which were seized on or about March 11, 2006 at the same
powwow in McAllen Texas. As discussed in more detail below, Rev. Soto claims he should be
eligible to obtain a permit to possess eagle feathers for religious purposes under the Bald and
Golden Eagle Protection Act, 16 U.S.C. § 668a ("BGEPA"), because Rev. Soto is a member of
an Indian Tribe recognized by the State of Texas. He claims that the Service's requirement that a

Ex. A

person must be a member of a federally recognized Indian Tribe to obtain a permit to possess golden eagle feathers for religious purposes is a violation of RFRA.

You have also filed a civil case on behalf of Rev. Soto, Mr. Cleveland, and other participants in the powwow, claiming that the seizure of the golden eagle feathers and migratory bird feathers violated RFRA and the First, Fourth, Fifth, and Fourteenth Amendments to the U. S. Constitution, <u>McAllen Grace Brethren Church v. U. S. Attorney General</u>, No. 7:07-cv-00060 (S.D. Tex.) The United States District Court for the Southern District of Texas granted a stay in the civil RFRA case to allow the decision on the criminal case to become final.  To my knowledge, the stay is still in place.

Outcome of the related federal prosecution

The federal district court in McAllen Texas has now ruled on the RFRA issues raised as a defense to the charges in the criminal case.  Mr. Cleveland claimed that the prohibitions of the MBTA violated his right to free exercise of religion as guaranteed by the First Amendment and protected by the RFRA.  He claimed that vendors' activities are part of the religious aspect of powwows.  He also claimed that he would not be able to obtain an MBTA permit to possess MBTA feathers because he is not enrolled in a federally recognized Indian Tribe.  Mr. Cleveland also contended that all the feathers seized from participants in the powwow were relevant to the Native American religious practices, and were therefore relevant to his RFRA defense.  The district court held that Mr. Cleveland did not have standing to assert an "as applied" Free Exercise challenge and that he also failed to assert a "facial" challenge to the MBTA.   The court also held that he lacked standing to challenge the MBTA's application to him on religious grounds because the activity of selling migratory bird feathers for which he was prosecuted was a purely commercial activity. The district court did not rule on the merits of the Defendant's First Amendment Free Exercise of Religion/RFRA claim, including the Service's actions with regard to Rev. Soto and others present at the powwow, although the Defendant attempted to raise these issues.

Of relevance to the Supplemental Petition for Remission, the district court also noted that the parties had stipulated that the powwow was a religious service.

Supplemental Petition

Now that the district court has entered a final ruling in the related criminal case, I am able to proceed with review of the Supplemental Petition for Remission.  The Tulsa Field Solicitor's Office previously denied the Petition for Remission in this case as being untimely based on your letter dated July 4, 2006.  The Supplemental Petition for Remission claims that the Tulsa Field Office's decision was based on the wrong letter because your letter dated May 9, 2006 was actually the Petition for Remission, which was submitted within the 60 day deadline established in the notice of abandonment.  The Supplemental Petition also states that Kevin R. Adams, Chief of the Service's Office of Law Enforcement, treated the May 9, 2006 letter as a Petition for Remission of Forfeiture.

2

I have reviewed the May 9, 2006 letter as well as the July 4, 2006 letter. The May 9, 2006 letter makes a demand for the return of the golden eagle feathers and also cites <u>Saenz v. Dept. of Interior</u> case, No. 00-2166 (10th Circuit), in support of a request that the eagle feathers be returned to the owner pending the outcome of the case. (The <u>Saenz</u> case also involved the issue of whether a person of Indian ancestry was required to be a member of a federally recognized Indian Tribe in order to qualify to possess eagle feathers for religious purposes under BGEPA.) Otherwise the May 9, 2006 letter provides little explanation why the Solicitor's Office should exercise its discretion to return the seized feathers to Rev. Soto. The July 4, 2006 letter relays the information that Rev. Soto is a member of the Lipan Apache Band of Texas which is not currently a federally recognized Indian Tribe, although it has applied for federal recognition. It also explains that the Lipan Apache Band of Texas is recognized as an Indian tribe by the State of Texas. It explains that Rev. Soto is a leader and holy man in the American Indian community of Texas and that he has been engaging in powwows since he was eight years old and now dances nationally and internationally. Assuming for the sake of argument that your petition was timely, I will further address the issues raised in your Supplemental Petition.

As noted above, the federal government stipulated in <u>U.S.A. v. Cleveland</u> that powwow dancing is part of the religious experience of its participants. Similarly, in the <u>Saenz</u> appeal, the federal government did not dispute the sincerity of Mr. Saenz' beliefs that use of eagle feathers in powwow dancing was a religious practice. Therefore I will accept that Mr. Soto and Mr. Russell were exercising their religious beliefs in the use of the golden eagle feathers they wore during the powwow.

It is undisputed that Michael Russell, Mr. Soto's brother-in-law, wore the golden eagle bustle and possession of four single golden eagle feathers owned by Rev. Soto with Rev. Soto's permission. Michael Russell's affidavit states that he is not a member of the Lipan Apache Tribe of Texas. Therefore it is undisputed that Mr. Soto allowed a person who is not a member of a federally recognized Indian tribe to take possession of his bustle made from golden eagle feathers as well as the four loose golden eagle feathers.

Bald and Golden Eagle Protection Act

The Tenth Circuit has recently explained the BGEPA provisions in <u>United States v. Wilgus,</u> 638 F. 3d 1274 (10th Cir. 2011. It is quoted at length below:

> The Eagle Act
>
> The Bald and Golden Eagle Protection Act, in combination with the Migratory Bird Treaty Act and the Endangered Species Act, is one of the cornerstones of our nation's efforts to protect and preserve the bald eagle. The basis of that protection is a blanket ban on possession of any part of a bald or golden eagle:
>
> > Whoever . . . without being permitted to do so as provided in this subchapter, shall knowingly, or with wanton disregard for the consequences of his act take, possess, sell, purchase, barter, offer to sell, purchase or barter, transport, export or import, at any time or in any manner, any bald eagle commonly known as the American eagle, or any golden eagle, alive or dead,

3

or any part, nest, or egg thereof of the foregoing eagles, or whoever violates any permit or regulation issued pursuant to this subchapter, shall be fined not more than $5,000 or imprisoned not more than one year or both.

*16 U.S.C. § 668(a).* [1] Originally passed in 1940, see Act of June 8, 1940, ch. 278, 54 Stat. 250-51, the Eagle Act was amended in 1962, adding both protection for golden eagles (the young of which are easily confused with bald eagles) and the exception at issue in this case, for possession for the religious purposes of Indian tribes. See Pub. L. 87-884, 76 Stat. 1246; *Hardman, 297 F.3d at 1122.* The exception reads:

Whenever, after investigation, the Secretary of the Interior shall determine that it is compatible with the preservation of the bald eagle or the golden eagle to permit the taking, possession, and transportation of specimens thereof for the scientific or exhibition purposes of public museums, scientific societies, and zoological parks, or for the religious purposes of Indian tribes . . . he may authorize the taking of such eagles pursuant to regulations which he is hereby authorized to prescribe.

*16 U.S.C. § 668a* (emphasis added). Therefore, provided that the Secretary of the Interior is satisfied that to do so "is compatible with the preservation" of bald and golden eagles, he may by regulation allow possession of eagle parts "for the religious purposes of Indian tribes."

The Secretary, acting through the Fish and Wildlife Service ("FWS") of the Department of the Interior, has exercised this statutory authority and formulated regulations governing eagle permits. See generally 50 C.F.R. Ch. I, pt. 22. These regulations reiterate the broad prohibition on possession without a permit set out in the statute. *50 C.F.R. § 22.11.* In implementing the exception to the ban "for the religious purposes of Indian tribes," the regulations make it clear that only members of federally-recognized tribes may apply for and obtain eagle feather permits: "[w]e will issue a permit only to members of Indian entities recognized and eligible to receive services from the United States Bureau of Indian Affairs listed under *25 U.S.C. § 479a-1* engaged in religious activities who satisfy all the issuance criteria of this section." *50 C.F.R. § 22.22.* The Secretary will only grant the permit, however, if "we determine that the taking, possession, or transportation is compatible with the preservation of the bald and golden eagle." Id. *§ 22.22(c).* Finally, the permits and lawfully-possessed eagle parts "are not transferrable, except such birds or their parts may be handed down from generation to generation or from one Indian to another in accordance with tribal or religious customs." Id. *§ 22.22(b)(1).*

(Footnote 1 of the Court of Appeal's opinion provides that the Act does not apply to any eagles or eagle parts "lawfully taken prior to June 8, 1940," the effective date of the Act. *16 U.S.C. § 668(a).*)

4

This statutory and regulatory authority is the underpinning for the Service's seizure of the golden eagle feathers involved in this case and applies to review of Rev. Soto's Supplemental Petition.

Rev. Soto's Eligibility for a BGEPA permit

The July 4, 2006 letter asserts two different reasons that the federal government should consider Rev. Soto to be an American Indian eligible for a BGEPA permit.  First, Rev. Soto points to the definition of American Indian used in the 2000 U. S. Census:

> The term "American Indian and Alaska Native" refers to people having origins in any of the original peoples of North and South America (including Central America), and who maintain tribal affiliation or community attachment.

I reject this argument. The definition of American Indian used in taking the federal census is inapplicable to this issue because there is a specific legal provision developed for implementation of the BGEPA. As a matter of law, specific provisions control over general provisions or provisions designed for different statutes.

Second, Rev. Soto points to the specific legal regulation used in implementing BGEPA.  The regulation, 50 C.F.R. § 22.22, requires that a person issued a BGEPA permit for religious reasons must be enrolled in a federally recognized Indian tribe.  It provides:

> We will issue a permit only to members of Indian entities recognized and eligible to receive services from the United States Bureau of Indian Affairs listed under 25 U.S.C. § 479a-1 engaged in religious activities who satisfy all the issuance criteria of this section.

Rev. Soto contends that this definition is too narrow because not all American Indians who have sincere religious beliefs concerning eagles are members of federally recognized tribes. Rev. Soto provides examples of the different types of limitations on tribal membership which result in persons of Indian ancestry being precluded from tribal membership.  One example concerns the Santa Clara Pueblo's requirement that only the father's tribal ancestry should be used to determine whether a child is eligible for membership, even if the child's mother is a tribal member.  Another example of the fact that there are persons of Indian ancestry who are not enrolled tribal members due to many tribe's practice of limiting tribal membership to those who have at least a certain percentage of that tribe's ancestry (full blood, half blood, quarter blood, or, like the Cherokee Nation of Oklahoma--any amount of Indian ancestry traceable to a person on the 1906 tribal roll). He points out that persons of Indian ancestry who do not meet the tribal blood quantum requirements may still have sincere religious beliefs regarding eagles. He also points out the fact that some states recognize tribes which have not been federally recognized, and that some federally recognized Indian tribes were later terminated by the federal government, meaning that their federal recognition was withdrawn. Another point he raised was that applications for tribal recognition are pending before the Department of Interior, some of which will eventually be granted.

In short, Rev. Soto claims that the Service's limitation of BGEPA permits to enrolled tribal members of federally recognized Tribes is arbitrary and capricious and violates RFRA because it excludes persons of Indian ancestry such as himself and other Texas Indians whose tribes have not received federal recognition, but who have sincere religious beliefs.

<u>RFRA litigation in the Tenth Circuit.</u>

The legal principles applicable to review of a RFRA claim are also thoroughly explained in the Tenth Circuit's 2011 decision in <u>United States v. Wilgus</u>, as follows.:

> In response to the government's indictment, Wilgus interposed the Religious Freedom Restoration Act of 1993. The genesis of RFRA lies in a protracted exchange between the Supreme Court and Congress over the proper standard to apply when reviewing laws that burden religion. In *Employment Division v. Smith, 494 U.S. 872, 879, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990)*, the Supreme Court held that neutral laws of general applicability that nonetheless burden the exercise of religion would be subject only to rational-basis scrutiny under the *First Amendment*, rather than the heightened scrutiny it had applied in previous cases. In response, Congress passed RFRA, which purported "to restore the compelling interest test as set forth in *Sherbert v. Verner, 374 U.S. 398, 83 S. Ct. 1790, 10 L. Ed. 2d 965 (1963)* and *Wisconsin v. Yoder, 406 U.S. 205, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972)* and to guarantee its application in all cases where free exercise of religion is substantially burdened." *42 U.S.C. § 2000bb(b)(1)*. In *City of Boerne v. Flores, 521 U.S. 507, 536, 117 S. Ct. 2157, 138 L. Ed. 2d 624 (1997)*, the Supreme Court held that RFRA could not be constitutionally applied to the states as an exercise of Congress' power to enforce the *Fourteenth Amendment*. RFRA can, however, be constitutionally applied to the federal government, as an exercise of Congress' Article I, Section 8 powers under the Necessary and Proper Clause. See *Kikumura v. Hurley, 242 F.3d 950, 959 (10th Cir. 2001)*. Therefore, RFRA provides a statutory claim to individuals whose religious exercise is burdened by the federal government.

> RFRA provides that:

>> (a) In general

>> Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

>> (b) Exception

>> Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person--

>>> (1) is in furtherance of a compelling governmental interest; and
>>> (2) is the least restrictive means of furthering that compelling governmental interest.

*42 U.S.C. § 2000bb-1* (emphasis added). Thus, in order to make out a defense against a criminal prosecution under RFRA, the defendant must prove that his religious exercise is substantially burdened by the regulation at issue. If he does so, the government may save the provision by establishing that it is the least restrictive means of forwarding a compelling governmental interest. See *Friday, 525 F.3d at 946* (upholding Eagle Act restrictions on taking eagles against RFRA challenge).

Saenz/Hardman/Wilgus decisions in the Tenth Circuit.

Rev. Soto raises the Tenth Circuit's 2002 ruling in the Saenz case on appeal as authority on the merits of these RFRA and BGEPA legal issues. He also raises the New Mexico federal district court ruling in Saenz as authority for his right to possession of eagle feathers during review of the BGEPA and RFRA issues involved in this administrative Supplemental Petition for Remission.

As noted in the Supplemental Petition for Remission, the New Mexico district court held in favor of Joseluis Saenz on similar factual and legal issues now presented in this matter. The district court in Saenz held an evidentiary hearing on the BGEPA and RFRA issues raised in that case. The district court found that Saenz was of Indian ancestry but was not eligible to join a federally recognized Indian tribe, and found that he held a sincere religious belief concerning the use of eagle feathers. The district court further held that the federal government had not met the RFRA requirements because it had not proved that limiting BGEPA permits to members of federally recognized Tribes was the least restrictive means to achieve a compelling governmental purpose.

On appeal, the Saenz case was consolidated with two other cases (U.S. v. Hardman and U.S. v. Wilgus) involving non-Indians who had been prosecuted under BGEPA for possession of eagle feathers without a BGEPA permit. U. S. v. Hardman, 297 F.3d 1116 (10th Cir. 2002). Both Hardman and Wilgus claimed that they had a sincere religious need to possess the eagle feathers, and claimed that the provisions of 50 C.F.R. § 22.22 cited above violated RFRA. The Tenth Circuit Court of Appeals addressed several common legal issues raised in the three consolidated cases. It held that any scheme which limits Native American religious practitioners' access to eagle feathers has a substantial effect on the exercise of religious beliefs. It also held that (1) the protection of eagles and (2) the preservation of Native American culture and religion and fulfillment of the federal government's trust obligations to Native American tribes were compelling government interests. It then upheld the district court's ruling in the Saenz case, finding that the opportunity to present evidence on the question of whether the government had used the least restrictive means of achieving a compelling governmental purpose had already been given in the hearing before the federal district court in New Mexico. The Court of Appeals remanded the other two consolidated cases, U. S. v. Wilgus and U.S. v. Hardman, to the federal district court in Utah because there had been no opportunity to present evidence on the RFRA issues during their criminal prosecutions. United States v. Hardman, 297 F.3d 1116 (10th Cir. 2002).

On remand, the Utah district court conducted a number of hearings and held that the application of BGEPA to both Wilgus and Hardman violated RFRA because the federal government had not proved that the BGEPA was the least restrictive means of advancing the government's

7

compelling interests. <u>United States v. Wilgus</u>, 606 F. Supp. 2d 1308 (D. Utah 2009). The United States appealed only the <u>Wilgus</u> case.

Ultimately the Tenth Circuit reversed, and ruled in favor of the federal government. <u>U.S.A. v. Wilgus</u>), supra. As part of its analysis, the Court of Appeals discussed the current methods used for providing eagle carcasses and eagle feathers to Native Americans for religious use.

> Eagle carcasses that are recovered by FWS agents or the public at large are sent to the National Eagle Repository, which is housed on the grounds of the Rocky Mountain Arsenal National Wildlife Refuge in Commerce City, Colorado. *United States v. Friday, 525 F.3d 938, 944 (10th Cir. 2008)*. The Repository receives the eagle carcasses and the requests for feathers and parts pursuant to permits, then prepares the former in order to fulfill the latter. Native American religious practitioners wishing to obtain eagle parts from the Repository are required to file a request for a permit with the Wildlife Permit Office in their state of residence. Applicants are asked to fill out a form on which they must certify that they are enrolled in a federally-recognized tribe. The FWS forwards those permit requests to the Repository, which then attempts to match the requests with the available supply of eagle parts. As noted below, however, the Repository receives significantly more requests than it has available eagle carcasses, and so applicants for eagle feathers and parts typically must wait a long period of time before those requests are fulfilled.

The Tenth Circuit considered the impact of opening the National Eagle Repository to persons who are sincere practitioners of Native American religion regardless of whether they are members of federally recognized Indian tribes. It found no likely impact on eagle conservation, but found that there would be impacts on federally recognized tribes because it would extend the wait time before requests for eagle feathers could be filled by the Repository. The Tenth Circuit also considered the impact of allowing members of federally recognized tribes to give eagle feathers to other non-tribal members for religious purposes. The Tenth Circuit noted the difficulty in identifying which eagle feathers had been "gifted" and which had not and that it increase pressure on tribal members to "gift" them out of tribal members' possession. The Tenth Circuit felt that neither alternative would allow the Service to fulfill its compelling purposes of protecting eagles and protecting federally recognized tribes' culture and religion as well as the practice of restricting permits to members of federally recognized tribes. The Tenth Circuit then held that limiting the availability of BGEPA permits for religious purposes to members of federally recognized tribes met the least restrictive means test under RCRA.

In reaching this holding, the Tenth Circuit noted that the only other federal courts of appeal to address this issue had upheld the federal government's regulations, citing <u>United States v. Antoine</u>, 318 F.3d 919 (9th Cir. 2003) and <u>Gibson v. Babbitt</u>, 223 F.3d 1256 (11th Cir. 2000). Finally, I also note that a district court opinion which originated in the same federal district court as Rev. Soto's residence also reached the same result. <u>Garrett v. Fish and Wildlife Service</u>, No. 4:08-cv-3129 (U.S.D.C. S. D. Tex.) I found no Fifth Circuit cases on point.

## Conclusion

In light of these judicial decisions, I find that although Rev. Soto is a sincere religious practitioner of Native American religion, the federal government's compelling interest in limiting the right to legally possess eagle feathers for religious purposes to members of federally recognized tribes prevents any mitigation of the seizure of the golden eagle feathers involved in this matter. The Supplemental Petition for Remission is therefore denied.

Janet Spaulding
Senior Attorney

cc:     Nicholas Chavez, SAC, Law Enforcement, Region 2, U. S. Fish and Wildlife Service

Jimmy Rodriquez, AUSA, U.S. Attorney's Office, Houston, Texas