**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION**

| | | |
|---|---|---|
| MCALLEN GRACE BRETHREN CHURCH, et al., | § | |
| | § | |
| | § | |
| Plaintiffs, | § | Case No. 7:07-cv-60 |
| | § | |
| v. | § | |
| | § | |
| KEN SALAZAR, SECRETARY, UNITED STATES DEPARTMENT OF THE INTERIOR, | § | |
| | § | |
| | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

Respectfully Submitted,

KENNETH MAGIDSON
UNITED STATES ATTORNEY

JIMMY A. RODRIGUEZ
Assistant United States Attorney
Southern District of Texas
Texas Bar No. 24037378
Federal ID No. 572175
919 Milam, Suite 1500
P.O. Box 61129
Houston, Texas 77208
Tel: (713) 567-9532
Fax: (713) 718-3303
Attorney in Charge for Defendant

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant, Ken Salazar, Secretary of the United States Department of the Interior, by and through the United States Attorney for the Southern District of Texas, hereby moves for Summary Judgment. Plaintiffs, McAllen Grace Brethren Church, *et al.*, have raised a variety of claims in their Amended Complaint and Motion for Summary Judgment concerning the Department of the Interior's regulations and actions under the Bald and Golden Eagle Protection Act (Eagle Act) and the Migratory Bird Treaty Act (MBTA). As discussed in detail below, Plaintiff's contentions are not supported by existing caselaw. To the contrary, courts have repeatedly, and recently, upheld the challenged regulations. Further, the Administrative Record and Supplement filed in this case fully support the Department of the Interior's actions. For these reasons and all the reasons discussed below, the Court should enter judgment in favor of the Defendant.

## INTRODUCTION

The Department of the Interior's longstanding policy is that only members of federally recognized tribes may be issued a permit to possess eagle feathers and eagle parts. This position is well supported by both the existing caselaw and the Administrative Record in this case. Although Plaintiffs make numerous allegations in their complaint and motion for summary judgment, the underlying premise of their claims is that the Department of the Interior's eagle-feather policy violates the Religious Freedom Restoration Act (RFRA). Plaintiffs contend that the Department should allow *all* persons of American Indian heritage to possess eagle feathers irrespective of whether they are members of federally recognized tribes. Plaintiffs' position -- that the number of persons entitled to possess eagle feathers should be increased by millions --

would undermine the compelling interests that the government is furthering via its eagle feather policy and should therefore be rejected.

The events giving rise to this lawsuit began in March of 2006, when a Special Agent from the United States Fish and Wildlife Service (FWS) investigated a powwow held in McAllen, Texas. The agent's investigation led to the seizure of feathers and eventually the criminal prosecution of a powwow attendee. In this context, Plaintiffs assert two broad categories of claims in this case: first, Plaintiffs challenge the Department of the Interior's actions as they relate to Plaintiff Reverend Robert Soto's eagle feathers, which were seized and subsequently voluntarily relinquished to the Department of Interior. Plaintiff Soto later filed a petition, then a supplemental petition, with the Department of the Interior for the return of his feathers. This supplemental petition was denied on December 8, 2011. Plaintiff Soto now challenges this decision. Defendant has filed an Administrative Record supporting its denial.[1] All of Plaintiffs' claims associated with the denial of Plaintiff Soto's petition are reviewed under the Administrative Procedure Act's (APA) standards. After the Court reviews the Administrative Record and the existing caselaw discussed below, this Court should follow the other circuits that have upheld the Eagle Act against RFRA challenges like the one presented here. *See, e.g., United States v. Wilgus*, 638 F.3d 1274 (10th Cir. 2011); *United States v. Vasquez-Ramos*, 531 F.3d 987 (9th Cir. 2008); *United States v. Antoine*, 318 F.3d 919 (9th Cir. 2003); *Gibson v. Babbitt*, 223 F.3d 1256 (11th Cir. 2000) (per curiam).

Plaintiffs' second category of claims concerns the events that led to Plaintiff Michael Cleveland's conviction under the MBTA for the illegal possession of migratory bird feathers.

---

[1] Defendant has also attached Declarations to this motion, which provides the Court with the most up-to-date information available.

Plaintiff Cleveland's conviction was recently upheld. Here, Plaintiffs make several claims that challenge Cleveland's criminal conviction. In fact, Plaintiffs' claims concerning the MBTA and Cleveland in this case were asserted as defenses to Cleveland's criminal prosecution. Consequently, Plaintiffs' claims have already been rejected by this Court and cannot be re-litigated here. Controlling caselaw makes clear that Plaintiffs cannot question the validity of Plaintiff Cleveland's criminal conviction in a civil case such as this. Finally, even assuming that Plaintiffs' MBTA claims could be re-reviewed here, they fail because the Department of the Interior's MBTA policies comply with the law. All of Plaintiffs' claims must therefore be rejected and judgment should be entered in favor of the Defendant.

## FACTUAL BACKGROUND

On March 11, 2006, a Special Agent of the United States Fish and Wildlife Service attended an American Indian powwow in McAllen, Texas. AR 100, Initial Denial of Petition for Remission. The powwow was held at the Palm View Library and Community Center in McAllen; it was advertised in a local newspaper and was open to the public. *See* Order Affirming Cleveland Conviction, Doc. No. 78, 7:06-mj-04806, at 1. Agent Rodriguez approached a vending booth operated by Plaintiff Cleveland and his mother, where he observed on display several "dream catchers" bearing bird feathers. *Id*. After making a preliminary determination that the feathers belonged to protected migratory birds, Agent Rodriguez confiscated eight feathers, six of which were later confirmed by laboratory analysis as belonging to bird species protected under the MBTA. *Id*.

At the powwow, Agent Rodriguez also encountered Plaintiffs Soto and Russell, who were in possession of golden eagle feathers. AR 100.  Plaintiff Soto identified himself as being a

member of the Lipan Apache Tribe of Texas. *Id*. The Agent informed Plaintiff Soto that the

matter would be further investigated. *Id*. The two loose golden eagle feathers worn by Soto were

not seized at the time. *Id*.  Plaintiff Russell, on the other hand, readily admitted that he was not

an American Indian. *Id*. The Agent issued Russell a Notice of Violation under the Eagle Act for

the possession of eagle feathers without a permit. AR 25. The golden eagle feathers in his

possession were seized (44 feathers in a bustle). AR 100.

After the Special Agent researched the matter, he determined that the Lipan Apache Tribe

of Texas is not a federally recognized tribe. AR 101; *see also* Exhibit 1, Declaration of R. Lee

Fleming, ¶¶ 3-6 (confirming that the Lipan Apache Tribe of Texas is not federally recognized).

The Agent then set up a meeting with Soto to discuss his possession of the eagle feathers. AR

101. On March 23, 2006, the Special Agent, Plaintiff Soto, Plaintiff Russell and their attorney,

met at the attorney's office. *Id*.  Both Russell and Soto signed voluntary abandonments,

abandoning the feathers that they possessed during the powwow. AR 26 and 27. Plaintiff Russell

also agreed to pay the $500.00 fine associated with the previously issued Notice of Violation,

which he paid on March 3, 2006. AR 101. In exchange, the criminal investigation was concluded

without further charges being filed against Plaintiffs Soto and Russell. *Id*. The voluntary

abandonment form signed by Mr. Russell and Mr. Soto provided them the right to file a petition

for the remission of their property within 60 days. AR 26 and 27. Plaintiff Soto availed himself

of this process by petitioning the Department of the Interior for the remission of the feathers. AR

100. His petition for remission was denied on February 23, 2007. AR 100.  In accordance with

the regulations governing petitions for remissions, Plaintiff Soto then filed a Supplemental

Petition for Remission on March 2, 2007, which was denied on December 8, 2011.  AR 286.

Plaintiff Cleveland was eventually charged with the unlawful possession, sale, offer to sell, or transportation of migratory birds, their parts without a permit, in violation of the MBTA, 16 U.S.C. § 703. *See* Docket Sheet for *United States v. Cleveland*, 7:06-mj-04806.  After a bench trial before United States Magistrate Judge Dorina Ramos, Cleveland was convicted and ordered to pay a $200 fine. *Id*. at Doc. No. 57.  Cleveland appealed his conviction to the District Court Judge. *Id*. Doc. No. 62.  The court affirmed his conviction on June 24, 2011.  *Id*. at Doc. No. 78. There was no further appeal and the conviction is final.  *See* Docket Sheet for *United States v. Cleveland,* 7:06-mj-04806.

## LEGAL BACKGROUND

A.      The Eagle Act

Recognizing that "the bald eagle is no longer a mere bird of biological interest but a symbol of the American ideals of freedom" and that "the bald eagle is now threatened with extinction," Congress enacted the Protection of the Bald Eagle Act of 1940, 54 Stat. 250 (preamble).  That statute prohibits the taking, possession, sale, barter, purchase, transport, export, and import of bald eagles or any parts of bald eagles, except as permitted by the Secretary of the Interior. *See* 16 U.S.C. §§668(a), 668a, Stat. Add. i.  Because young golden eagles are very difficult to distinguish from young bald eagles, Congress extended the statute's prohibition to golden eagles in the Bald and Golden Eagle Protection Act of 1962, 76 Stat. 1246.  *See United States v. Dion*, 476 U.S. 734, 736, 740-743 (1986).

The Eagle Act abrogated the treaty rights of numerous Indian tribes to hunt eagles on their land.  *See id*. at 743-745.  Recognizing that "feathers of the golden eagle are important in religious ceremonies of some tribes," H.R. Rep. No. 87-1450, at 2 (1962); *see also* S. Rep. No.

87-1986, at 3-4 (1962), Congress in 1962 authorized the Secretary of the Interior to permit the taking, possession, and transportation of eagles and eagle parts for certain specified purposes, including for "the religious purposes of Indian tribes."  16 U.S.C. §668a (hereinafter "Indian tribes exception"); *see Dion*, 476 U.S. at 740-43 (describing legislative history of 1962 amendment).  The Secretary may issue such permits only if he determines that it is "compatible with the preservation of the bald eagle or the golden eagle." *Id*.

Under regulations implementing the Eagle Act's "Indian tribes" exception, only enrolled members of federally recognized Indian tribes with which the United States maintains a government-to-government relationship (hereinafter "tribal members") may apply for permits. 50 C.F.R. §22.22(a) (referencing 25 U.S.C. §479a-1), Stat. Add. iii.  In processing applications, the FWS considers "the direct or indirect effect which issuing such a permit would be likely to have upon the wild populations of bald or golden eagles." *Id.* §22.22(c).

Applications for permits to possess eagle parts are processed at the FWS's regional migratory bird permit offices and, if approved, are forwarded to the National Eagle Repository in Commerce City, Colorado. *See* AR 554-55 (National Eagle Repository brochure); AR 552 (Sample Permit Application). The Repository receives dead eagles and eagle parts and distributes them free of charge to qualified permit applicants on a first-come first-served basis. Because the demand for eagle parts exceeds the supply, applicants must wait for their requests to be filled.  *See United States v. Friday*, 525 F.3d 938, 944 (10th Cir. 2008); *Wilgus*, 638 F.3d at 1282-83.

B.      RFRA

Religious Freedom Restoration Act, 42 U.S.C. §2000bb *et seq.,* allows the government to "substantially burden a person's exercise of religion" if "it demonstrates that application of the burden to the person . . . (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. §2000bb-1(a) and (b), Stat. Add. ii.  Congress enacted RFRA following *Employment Division, Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872 (1990), in which the Supreme Court held that the Free Exercise Clause did not require Oregon to exempt from its criminal drug laws the sacramental ingestion of peyote by members of the Native American Church. *Id*. at 877-882. *Smith* held that the First Amendment allows the application of generally applicable laws to religious exercises even when the laws are not supported by a compelling governmental interest. *Id*. at 884-889. RFRA codifies, as a requirement of federal statutory law, the Free Exercise Clause standard that the Supreme Court applied before *Smith* in *Sherbert v. Verner*, 374 U.S. 398 (1963), and *Wisconsin v. Yoder*, 406 U.S. 205 (1972).  *See* 42 U.S.C. §2000bb(b)(1); *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 424 (2006).

Under RFRA, the person contesting the government action must first prove that it substantially burdens a sincerely held religious belief. *Thiry v. Carlson*, 78 F.3d 1491, 1495 (10th Cir. 1996).[2] When the plaintiff has met that threshold, the government bears the burden on the compelling interest and narrow tailoring elements of RFRA. 42 U.S.C. §§2000bb-1(b), 2000bb-2(3); *O Centro*, 546 U.S.  at 428.  The government, however, is not required to "refute every conceivable option" to prove that a law is narrowly tailored.  *Hamilton v. Schriro*, 74 F.3d

---

[2]  For the purpose of this Summary Judgment Motion, Defendant does not contest this point as it relates to Plaintiff Soto's supplemental petition for remission.

1545, 1556 (8th Cir. 1996). Once the government provides evidence that an exemption would impede the government's compelling interests, the plaintiff "must demonstrate what, if any, less restrictive means remain unexplored." *Id.*; *see also Fowler v. Crawford*, 534 F.3d 931, 940 (8th Cir. 2008).

RFRA's test is not "strict in theory, but fatal in fact." *Cf. Johnson v. California*, 543 U.S. 499, 514 (2005). Rather, RFRA provides a "workable test for striking sensible balances between religious liberty and competing prior governmental interests." 42 U.S.C. §2000bb(a)(5). The test must "be applied in an appropriately balanced way, with particular sensitivity" to important governmental interests, *Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005), and "with regard to the relevant circumstances in each case," S. Rep. No. 103-111, at 9 (1993).

C.      The Migratory Bird Treaty Act

The MBTA was enacted in 1918 to implement a convention between the United States and Great Britain protecting migratory birds. The MBTA has since been amended to implement conventions which the United States has signed with Mexico, Japan, and the Soviet Union. By enacting the MBTA, Congress asserted regulatory authority over migratory birds which previously had been exercised only by the individual states. *See Missouri v. Holland*, 252 U.S. 416 (1920). The cornerstone of the protections afforded by the MBTA is found in § 703. 16 U.S.C. § 703(a) (prohibiting the harming, selling, and possession of migratory birds or their parts).

Section 704 of the MBTA authorizes the Department of the Interior to determine when, and to what extent, to permit takings of migratory birds. 16 U.S.C. § 704. The Department of the Interior has issued regulations for this purpose. 50 C.F.R. §§ 21.1 et seq.

## STANDARD OF REVIEW

The review of Plaintiff's claims concerning Plaintiff Soto's eagle feathers is governed by the "arbitrary and capricious" standard of review set out in the Administrative Procedure Act. *See Harris v. U.S.,* 19 F.3d 1090, 1096 (5th Cir. 1994).  The Court's review under this standard is narrow, and the Court cannot substitute its judgment for that of the agency, particularly when the challenged decision "implicates substantial agency expertise.'" *Marsh*, 490 U.S. at 376.  An agency's conclusions must be upheld if the agency has considered the relevant factors and has articulated a rational connection between its factual judgments and its policy choice.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).  In essence, the Court must decide only whether the decision was "based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-16 (1971). Finally, "where the Court is reviewing an agency decision under the APA, summary judgment is the appropriate means for resolving claims because the Court is reviewing the legality of the agency action, not acting as the initial fact finder. [Thus, the Court's review] . . . cannot turn on credibility determinations or conflicting factual inferences."  *Save Our Springs Alliance v. Cooke*, No. 01-855-SS, 2002 WL 31757473, at *4 (W.D.Tex. 2002).

## ARGUMENT

## I.    PLAINTIFFS' EAGLE ACT CLAIMS FAIL.

The Eagle Act's prohibition against possessing eagle feathers and its limited exception for members of federally recognized tribes satisfy RFRA. Because Plaintiffs' tribe, the Lipan Apache Tribe, is not a federally recognized tribe, they are ineligible to invoke the limited

exception to the prohibition on possessing eagle feathers. Plaintiffs' arguments concerning the

Eagle Act fly in the face of existing caselaw. The Court need go no further than the large body of

caselaw supporting the Department of the Interior's position in order to grant Defendant's

Motion for Summary Judgment. If the Court does review the administrative record however, the

Department of the Interior's actions are fully supported and should be upheld.

      A.      The extensive body of caselaw upholding the federally recognized tribe
                exception to the Eagle Act should be followed here.

Virtually every court to address the validity of the Eagle Act under RFRA has upheld it.

The Ninth and Eleventh Circuits have upheld the Act against challenges, like the one presented

here, brought by persons who are not members of federally recognized tribes alleging that the

possession ban violates RFRA. *See United States v. Vasquez-Ramos*, 531 F.3d 987 (9th Cir.

2008); *United States v. Antoine*, 318 F.3d 919 (9th Cir. 2003); *Gibson v. Babbitt*, 223 F.3d 1256

(11th Cir. 2000) (per curiam); *see also United States v. Winddancer*, 435 F. Supp. 2d 687 (M.D.

Tenn. 2006); *United States v. Lundquist*, 932 F. Supp. 1237 (D. Or. 1996); *Rupert v. Director,*

*U.S. Fish & Wildlife Svc.*, 957 F.2d 32 (1st Cir. 1992) (holding denial of application to possess

eagle feathers filed by non-member Native American did not violate Free Exercise Clause);

*Garret v. Fish & Wildlife Svc.,* 4:08-3129 (March 17, 2010, S.D. Tex) (J. Hittner), AR 245-253.

Similarly, the Tenth Circuit very recently upheld the Department of the Interior's

implementation of the Eagle Act against a challenge similar to the one presented here. *United*

*States v. Wilgus*, 638 F.3d 1274 (10th Cir. 2011), AR 203-244.

The *Wilgus* decision, as the most recent Court of Appeals decision on the issue, is

particularly instructive here. AR 203. In *Wilgus*, the district court had dismissed the charges

against the defendant for the possession of eagle feathers, holding that the Eagle Act's

prohibition against possessing eagle feathers violates the RFRA. 638 F.3d at 1284. The court of appeals reversed the lower court, joining the Ninth and Eleventh Circuits in upholding the Eagle Act against RFRA claims. 638 F.3d at 1274. The court held that the current regulatory scheme, which allows only members of federally recognized tribes to possess eagle parts, is the least restrictive means of furthering the government's competing compelling interests in protecting eagles and preserving tribal religion. 638 F.3d 1296. In so holding, the court recounted some key facts: (1) although bald eagle populations are on the rise, that population increase will not increase the supply of eagle parts at the National Eagle Repository, which distributes eagle parts to tribal members; (2) the demand for eagle parts outstrips the supply; (3) some undetermined number of non-member adherents of Native American religions would apply for possession permits if they could; (4) there is a thriving black market for eagle parts; and (5) the FWS already has difficulty enforcing the Eagle Act. 638 F.3d 1282-83.

The court then rejected the district court's proffered alternative of opening the Repository to sincere adherents of Native American religions. 638 F.3d at 1293-94. The court found that opening the Repository to non-members would undermine the government's interest in fulfilling its trust responsibilities to the tribes by increasing the time that members of federally recognized tribes would have to wait to receive eagle parts from the Repository, and it could increase enforcement problems. *Id*. at 1293. Finally, the court of appeals held that the current regulatory scheme, under which only members of federally recognized tribes are permitted to possess eagle parts for religious purposes, furthers both of the government's compelling interests in that it protects eagles and "does its best to guarantee that those tribes, which share a unique and constitutionally-protected relationship with the federal government, will receive as much of a

11

very scarce resource (eagle feathers and parts) as possible." *Id*. at 1295. The court noted the

consistency of its judgment with those of the Ninth and Eleventh Circuits in similar cases. *Id*. at

n.11.

In their original complaint and in virtually every pleading and correspondence regarding

this case, Plaintiffs cited the district court opinion in *United States v. Wilgus*. *See e.g.,* Doc. Nos.

12, 14, and 22.  That is, Plaintiffs placed great weight on the district court decision that has now

been reversed. Thus, the decision most supportive -- and perhaps the only decision supportive --

of Plaintiffs' case was rejected by the Tenth Circuit in *Wilgus*.[3]

This Court should go no further than the overwhelming weight of authority and hold, as a

matter of law, that the Eagle Act satisfies RFRA. *See Antoine*, 318 F.3d at 921-22 (concluding

the government should not be forced to re-litigate its compelling interest in protecting bald and

golden eagles in response to each challenge to the Eagle Act); *Garret*, 4:08-3129 (March 17,

2010, S.D. Tex) (relying on caselaw to reject Eagle Act challenge).

B.      The Record Fully Supports the Department's Actions

Should the Court go beyond the caselaw and review the Administrative Record in this

case, the record demonstrates that the Eagle Act furthers the government's compelling interests

in protecting eagles and fulfilling its unique relationship with federally recognized Indian tribes.

The record also shows that allowing persons who are not members of federally recognized tribes

("non-members") to possess eagle feathers would defeat both of those interests. Because

Plaintiffs' are challenging an agency action under the APA, the Department of the Interior's

---

[3]   In their summary judgment motion, Plaintiffs refer to *In the Matter of Joseluis Saenz, v. Dept. of Interior*, No.00-2166 (10th Circuit), which appears to be an unpublished Tenth Circuit decision. To the extent that *Saenz* conflicts with *Wilgus*, it is no longer good law.

factual determinations are entitled to a high degree of deference. *National Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007) (describing the deferential nature of APA review). Indeed, in order to successfully challenge the Department's determinations, Plaintiffs must show that they were arbitrary and capricious. *Id*. Plaintiffs have failed to make this showing.

      C.     The Eagle Act furthers the government's compelling interests.

The Eagle Act's prohibition against possessing eagles and eagle parts furthers the government's compelling interest in protecting eagles by minimizing the black market for those items and enhancing enforcement capabilities. In addition, the Eagle Act's ban against possessing eagle feathers and its recognized Indian tribes exception furthers the United States' compelling interest arising from its unique relationship with federally recognized Indian tribes. Rather than being arbitrary and capricious, these compelling interests are rational, long-held, and well-supported by the facts found in the Administrative Record.

      1.     The Government's Compelling Interest in Protecting Eagles

The government has a compelling interest in protecting the bald eagle as our national symbol, and the golden eagle, as its survival and the survival of the bald eagle are intimately intertwined. With regard to the Government's interest in protecting eagles, Plaintiffs correctly point out that, in 2007, the Bald Eagle was removed from the list of threatened species under the Endangered Species Act. *See* Pls' SJ at 9-10. However, "the removal of the bald eagle from the list of species protected under the Endangered Species Act does not render this interest a nullity." *U.S. v. Wilgus*, 638 F.3d at 1285. The *Hardman* court also correctly observed that "whether there

[are] 100 eagles or 100,000 eagles," the government's interest in protecting them remains compelling. 297 F.3d at 1128.

Plaintiffs mistakenly assert that because "millions" of feathers are available through the eagles' natural molting process, the government does not have a compelling interest in prohibiting those of American Indian ancestry from possessing eagle feathers. Pls' SJ at 9.[4] The Eagle Act's prohibition against possessing eagles and eagle parts -- however those feathers come into the possession of the owner -- furthers the government's interest in protecting eagles by minimizing the black market for those items and enhancing the Fish & Wildlife Service's enforcement capabilities. *See Andrus v. Allard*, 444 U.S. 51, 52-53 (1979) (Eagle Act is "designed to prevent the destruction of certain species of birds"). First, a possession ban serves a forensic evidentiary function. A number of criminal statues prohibit the possession of certain items where it is difficult to prove the underlying illegal act once the item is reduced to possession. That concern applies to eagles as well, since "it is ordinarily impossible for an inspection to determine whether an eagle feather or other eagle part has come from a bird that died naturally or as a result of illegal hunting." *See Hardman*, 297 F.3d at 1141 (Hartz, J., concurring). *See also* AR 357, Declaration of Lucinda D. Schroeder, ("Schroeder Decl.") at ¶ 8. (explaining that it is usually not possible to accurately and readily determine whether particular eagle parts are of legal origin).

Second, a possession ban minimizes the market for the fruits of an illegal act and thus minimizes the incentive to commit the act. As one court explained, "possession of a good is

---

[4] This factual assertion, along with many others found in Plaintiffs' brief, is not supported by competent summary judgment evidence. *See* Fed.R.Civ.P. 56(c)(1)(A); *Roberts v. City of Shreveport*, 397 F.3d 287, 295 (5th Cir. 2005) (noting that newspaper articles are not competent summary judgment evidence).

related to the market for that good, and Congress may regulate possession as a necessary and proper means of controlling its supply or demand. For example, the federal government may elect to prohibit the possession of eagle feathers as a practical means of drying up the market for them, and thus protecting against the killing of eagles." *United States v. Patton*, 451 F.3d 615, 626 (10th Cir. 2006) (citing *Andrus*, 444 U.S. at 58). Hence, allowing "American Indians [to] collect and gather feathers shed by living birds without government harassment or intervention" Pls' SJ at 11, simply will not work. *See* AR 382, Decl. of Prof. James Fraser at ¶ 9 (rejecting the argument that it would be acceptable for persons to obtain molted eagle feathers); *see also* Exhibit 2, Declaration of Ed Espinoza, at ¶ 3.

The Administrative Record demonstrates that, given the difficulty of catching people in the act of killing eagles and the inability to determine the origin of eagle parts, a possession ban is critical to diminishing the market for illegally taken birds and thus reducing the number of illegal takes. Agent Schroeder explained that "without a possession prohibition, once a bird was dead and reduced to someone's possession, it would be 'home free.' This creates a market for birds and their parts that does not exist where possession itself is prohibited." AR 357 at ¶9. She further opined that, "if there was no prohibition against the possession of eagles and eagle feathers, the death rate of eagles would sky-rocket as poachers sought to supply the resulting increase in the black market." *Id.*; *see also* Exhibit 3, Declaration of Agent Preston Fant at ¶¶ 6,7. If even one additional bird is killed unlawfully, the government's compelling interest in protecting eagles is compromised. *Friday*, 525 F.3d at 956. Consequently, Plaintiffs' assertion that persons of American Indian ancestry should be allowed to possess molted eagle feathers is

simply not workable and it would in fact undermine the existing regulatory scheme to preserve eagles.

2.     The Government's Compelling Interest in Fulfilling its Unique
       Relationship with Federally Recognized Indian Tribes

The Government has a compelling interest in fostering the culture and religion of federally-recognized Indian tribes to fulfill its trust obligations to those tribes. "The United States recognizes and maintains relationships with federally recognized tribes as political entities that have inherent sovereign powers of self-governance. This recognition is the basis for the special legal and political relationship, including the government-to-government relationship, established between the United States and federally recognized tribes, pursuant to which the United States supports, protects, and promotes tribal governmental authority. . . ." Exhibit 4, Declaration of Dion K. Killsback, ¶ 9. This interest is consistent with the Supreme Court's longstanding interpretation of the federal government's relationship with Native American tribes. In *Morton v. Mancari*, 417 U.S. 535, 537–39 (1974), the Supreme Court rejected an equal protection attack on a provision of the 1934 Indian Reorganization Act that gave Native Americans preference for employment in the Bureau of Indian Affairs. The Court began by noting that Congress has "plenary power" to legislate concerning the tribes. *Morton*, 417 U.S. at 551–52. The Court found that, as a consequence of the forcible seizure of Indian lands by the United States, "the United States assumed the duty of furnishing ... protection [to the Native Americans], and with it the authority to do all that was required to perform that obligation." *Id.* at 552 (quoting *Bd. of County Comm'rs v. Seber*, 318 U.S. 705, 715 (1943)). Pursuant to this obligation to the tribes, Congress was empowered to "single out for special treatment a constituency of tribal Indians." *Id.* "The preference, as applied, is granted to Indians not as a

discrete racial group, but, rather, as members of quasi-sovereign tribal entities." *Id.* at 554, 94 S.Ct. 2474. Thus, the preference was "political rather than racial, in nature." *Id.* at 553 n. 24, 94 S.Ct. 2474.

Here, the language of the exception to the possession ban in the Eagle Act refers specifically to "the religious purposes of Indian tribes." 16 U.S.C. § 668a. The Act thus draws a distinction between federally-recognized tribes and persons of American Indian descent based on the "quasi-sovereign" status of the tribes. *Cf. Morton*, 417 U.S. at 554, 94 S.Ct. 2474. *Morton* itself characterized Congress' power over Indian affairs in terms of the tribes: "Resolution of the instant issue turns on ... the plenary power of Congress, based on a history of treaties and the assumption of a 'guardian-ward' status, to legislate on behalf of federally recognized Indian tribes." *Id.* at 551, 94 S.Ct. 2474 (emphasis added). Thus, as the *Wilgus* court explained, "by adopting the federally-recognized tribes version of the compelling governmental interest in this case, we situate ourselves in the very heartland of federal power, as recognized by the Supreme Court in its *Morton* line of cases." 638 F.3d at 1287.

D.    The Eagle Act is the least restrictive means of furthering the government's compelling interests.

The government's task here is to balance its interest in protecting eagles with its interest in accommodating recognized tribes in the manner that imposes the least burden on religious exercise. An absolute prohibition on possessing eagle feathers furthers the government's interest in protecting eagles, but it undermines the government's interest in accommodating the needs of recognized tribes to possess feathers. The federally-recognized tribes exception "sets those interests in equipoise." *Rupert*, 957 F.2d at 35.

17

By its plain language, RFRA does not require the government to abandon its compelling interests, but only to minimize the burden on religion by ensuring that it employs the "least restrictive means of furthering" those interests. *See* 42 U.S.C. §2000bb-1(b). Here, no means of "furthering" the government's compelling interests is available that is less restrictive of religious practices. Lifting the Eagle Act's possession ban for non-members would not further either of the government's compelling interests, but would instead vitiate them and hence is not required under RFRA. As the Supreme Court observed, "government simply could not operate if it were required to satisfy every citizen's religious needs and desires." *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 452 (1988), quoted in *Navajo Nation v. U.S. Forest Service*, 535 F.3d 1058, 1072 (9th Cir. 2008) (en banc) (upholding against RFRA challenge proposed use of recycled wastewater to make artificial snow for ski resort on mountain considered sacred by Indian tribes).

1.    Eagles are a limited resource

Eagle feathers and parts are a scarce resource and, given the biology of the species, even a small increase in eagle mortality could have a dramatic impact on eagle populations. AR 514 Affidavit of Karen Steenhof; Exhibit 5, Decl. of Jody Gustitus Millar, ¶ 11. Nevertheless, Plaintiffs argue that the removal of the bald eagle from the list of threatened species under the Endangered Species Act makes it more difficult for the government to prove that the Eagle Act's possession ban is necessary to protect the species. Pl's SJ at 9 and 11. The legal status of the bald eagle under the Endangered Species Act, however, has no bearing on the golden eagle. The golden eagle population is not as healthy as the bald eagle population, and there is a significantly greater demand for golden eagles for religious use. AR 514 Steenhof Affidavit; AR 404,

Affidavit of Kevin Ellis, ¶ 7 (noting that golden eagle feathers are more sought after); *see also* Exhibit 6, Declaration of Brian Millsap at ¶¶ 7, 10 (noting that the FWS will not allow takes of golden eagles because the population cannot withstand additional unmitigated mortality); Exhibit 7, Atencio 2012 Decl. at ¶ 10 (noting greater demand for golden eagle parts). Moreover, eagles are a limited resource and a relatively small increase in the mortality of adult eagles, from whatever cause, could quickly erase the gains achieved by recent conservation measures. AR 504 Millar Affidavit, ¶¶ 9-14; *see also* Exhibit 5, Millar Decl., ¶¶ 10-14. "Without the BGEPA and MBTA protections, the status of the bald eagle could again deteriorate significantly through death or injury of bald eagles due to hunting or other man-made threats." Exhibit 5, Millar Decl. at ¶ 9; *see also* AR 504 at ¶ 14.

Even if the potential impacts on eagle populations were not so dramatic, in *United States v. Friday* the Court held that the government has a compelling interest "as regards small as well as large impacts on the eagle population" and that, even if "the viability of eagle populations" are not threatened, "the government would still have a compelling interest in ensuring that no more eagles are taken than necessary." 525 F.3d 938, 956 (10th Cir. 2008). Furthermore, the delisting of the bald eagle under the Endangered Species Act is predicated in part on the continued protection of the species under the Eagle Act. *See* 16 U.S.C. §1533(a)(1), (c)(2) (requiring Secretary to consider "inadequacy of existing regulatory mechanisms" when determining whether to list or delist a species as threatened or endangered); 72 Fed. Reg. 37,353, 37,362-66,

37,367.  Consequently, the eagles' removal from the list of threatened species does not vitiate the government's compelling interest in protecting the eagle as Plaintiffs suggest.[5]

      2.      The limited resource is already overtaxed.

Even with the current restriction of feather availability, the demand already exceeds the supply. Tribal members have to wait substantial periods for feathers from the Repository. AR 571, 2003 Affidavit of Bernadette Atencio at ¶¶ 5 and 13 (explaining that wait times have increased to 3 to 4 years for requests for whole bird carcasses); Exhibit 7, Atencio 2012 Decl. at ¶¶ 8, 14. There are approximately 1500 applications pending for loose eagle feathers and 6,000 pending requests for whole eagle carcasses. Exhibit 7, Atencio 2012 Decl. at ¶¶ 9, 14.  The rebounding bald eagle populations have not eased the backlog at the Repository. *See generally Id*. and attachments. In fact, although the Repository receives more bald eagle carcasses than golden eagle carcasses, it receives more requests for golden eagle feathers. Exhibit 7, Atencio 2012 Decl. at ¶ 10. Thus, it is clear that the Repository system is having difficulty meeting current demand and it would be highly vulnerable to any significant increase in that demand, if the expansion that Plaintiffs advocate were to ensue.

      3.      Lifting the possession ban for non-members would defeat the government's compelling interest in accommodating the needs of recognized tribes.

Adding a significant number of applications to the Repository would lengthen wait times exponentially, thereby defeating both the government's compelling interest in protecting the

---

[5] In their motion, Plaintiffs also point out that the FWS has issued a permit to the Northern Arapahoe Tribe of Wyoming, which allowed them to take two bald eagles. Pl's SJ at 9. This fact, however, does not support their case. The take permit was issued only after a biological study of the specific bald eagle population in question had been conducted. Exhibit 6, Millsap Decl. at ¶ 9. The FWS would not issue a similar permit authorizing the taking of golden eagles because of the population's more precarious biological status. *Id*. at ¶ 10.

religious practices of federally recognized tribes by giving tribal members some access to the raw materials necessary for their traditional worship, and in protecting eagles from an insatiable demand likely to lead to poaching and a burgeoning black market. As the Eleventh Circuit concluded in *Gibson*, if the possession ban were lifted for non-members, "the limited supply of bald and golden eagle parts will be distributed to a wider population and the delays will increase in providing eagle parts to members of federally recognized Indian Tribes, thereby vitiating the government['] s efforts to fulfill its . . . obligations to federally recognized Indian tribes." 223 F.3d at 1258. Plaintiffs argue that the Department of the Interior should allow all persons who fall within the Census Bureau's definition of American Indians to possess eagle feathers. Pls' SJ at 13. This would greatly increase the number of persons who are eligible to apply for eagle feathers, which would overwhelm the Repository and exhaust the existing supply of feathers.

In Plaintiffs' view, everyone who satisfies the U.S. Census definition of an American Indian should be allowed to possess eagle feathers. Pls' SJ at 13. Using Plaintiffs' own figures, this would increase the number of eligible persons from 1.6 million to 4.1 or 8.7 million Pls' SJ at 6-7. Similarly, the government estimates that there are approximately 2 million members of federally recognized tribes and, according to the 2010 Census, 5.2 million persons of American Indian and Alaska Native heritage. *See* Exhibit 8, Declaration of Steven Payson, ¶¶ 5-6. If millions of additional people were eligible to obtain feathers from the Repository as Plaintiffs wish, the Repository would certainly receive more applications, and, given the limited supply, the delay in filling requests would necessarily increase. *See Gibson*, 223 F.3d at 1258; *Antoine*, 318 F.3d at 923 ("If the government extended eligibility, every permit issued to a nonmember would be one fewer issued to a member. This is the inescapable result of a demand that exceeds

a fixed supply."). The Repository already cannot meet the current demand; the number of tribal members waiting for feathers and the length of time they have to wait continue to increase. AR 571 Atencio 2003 Decl. and Exhibit 7 at Atencio 2012 Decl. at ¶¶ 8, 14 (describing growing wait times of up to four years); Exhibit 9, Declaration of Jerry Thompson. Thus, any additional increase in the number of eligible applicants, and certainly a multi-million person increase, would create a corresponding increase in the number of people waiting and the time they have to wait. AR 571, Exhibit 7, Exhibit 9; *see also* Exhibit 3, Fant Decl at ¶ 7.

Allowing non-members to obtain feathers from the Repository -- or to bypass the Repository altogether by collecting molted feathers -- would increase the black market and increase poaching. The black market is already flourishing and lucrative, among both tribal members and non-members. AR 398 Affidavit of Kevin Ellis, at ¶¶ 4-5. Part of the black market is driven by powwow dance contests, in which both tribal members and non-members compete for prize money. *Id*. at ¶ 5a.; *see also Wilgus*, 638 F.3d at 1283. In general, black market prices are rising because of an uptick in demand and a dwindling supply. AR 398 at ¶ 7. Whole golden eagles sell for up to $1,200 each, and immature golden eagle central tail feathers command up to $200 each. *Id*. As result, the active black market for eagle feathers undermines Plaintiffs' suggestion that the problem of an overwhelmed Repository could be solved by simply allowing non-members to bypass the Repository altogether.

For all the above-discussed reasons, the Department's eagle regulations are the least restrictive means of furthering the government's compelling interests. Any further diminution in the effectiveness of the possession ban through an expansion of the types, and thus numbers, of persons who may possess eagle parts would increase the pressure on the eagle populations

through an increased black market and takings, and undermine enforcement capabilities.  The

increased demand also would negatively impact the government's compelling interest in

protecting the cultures and religions of federally recognized tribes and its trust obligations to

those tribes in general, by, among other things, ultimately decreasing the number of eagles and

eagle parts available for federally recognized tribes to use. The additional number of persons

eligible for permits if Plaintiffs' class -- persons who fall within the Census Bureau's definition -

- were to be adopted would be overwhelming and it would clearly undermine the government's

compelling interests.

## II.   PLAINTIFFS' MBTA CLAIMS CONCERNING CLEVELAND'S CRIMINAL CONVICTION FAIL AS A MATTER OF LAW.

Although Plaintiffs' summary judgment motion is focused on Plaintiff Soto's eagle

feathers and the Defendant's policy concerning eagle feathers in general, they do raise several

arguments concerning Plaintiff Cleveland's recent criminal conviction for violating the MBTA.

In fact, because Mr. Soto's petition for remission only concerned his eagle feathers, all of

Plaintiff's claims concerning the MBTA are necessarily rooted in Mr. Cleveland's conviction.[6]

---

[6] Except for Plaintiff Soto, the remaining Plaintiffs in this suit lack the requisite standing to bring claims against Defendant. With regard to Plaintiffs Russell and Cleveland, Russell lacks standing because he did not file a supplemental petition for remission as he did not own the golden eagle feathers in question, and Cleveland lacks standing because he had not applied for a permit to possess MBTA feathers.  *See infra* fnt 7. The remaining Plaintiffs lack standing because, ordinarily, a litigant "'must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" *Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464, 474 (1982) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)).  This is generally so even when the very same allegedly illegal act that affects the litigant also affects a third party. *See United States v. Payner*, 447 U.S. 727, 731-732 (1980) (criminal defendant "lacks [third-party] standing under the Fourth Amendment to suppress ... documents illegally seized from" his banker).

These arguments fail as a matter of law because Plaintiffs cannot challenge Cleveland's criminal conviction in this civil lawsuit.

With regard to Plaintiffs' claims in this case that arise from the same facts that were at issue in *United States of America v. Cleveland*, 06-MJ-04806, those claims fail as a matter of law. The Supreme Court held in *Heck v. Humphrey*, 512 U.S. 477 (1994), that an action may not proceed where success on a claim would necessarily question the validity of a criminal prosecution involving the same conduct unless the criminal defendant has successfully terminated the criminal action (*e.g.*, a reversal on appeal). In *Heck*, a plaintiff who had been previously convicted of a crime brought a 42 U.S.C. § 1983 action against the prosecutors and investigators who were responsible for his criminal conviction. *Id*. at 478-80. The Court found that the civil suit involved the same facts underlying plaintiff's criminal conviction and that a ruling in plaintiff's favor would necessarily call into question the validity of his conviction. *Id*. On these facts, the Court held that, before such a civil suit could proceed, a plaintiff's conviction must have been reversed on appeal, expunged by executive order, declared invalid by an authoritative state tribunal, or called into question by the issuance of a writ of habeas corpus by a federal court. *Id*. at 486-87.

Shortly after the Supreme Court decided *Heck v. Humphrey*, the Fifth Circuit applied the decision to facts that are similar to the case currently before the Court. In *Boyd v. Biggers*, a civil litigant attempted to challenge the constitutionality of his criminal conviction and sentence. 31 F.3d 279, 283 (5th Cir. 1994). The Fifth Circuit initially noted that the complaint, among other things, alleged that the criminal investigator had violated the civil litigant's rights by withholding exculpatory evidence. *Id*. The *Boyd* court then found that if the civil litigant

24

successfully proved these claims, it "would call [his] conviction into question under *Brady v. Maryland* []." *Id.* Based on these facts, the Fifth Circuit held that all of the civil litigant's claims fell squarely within the holding of *Heck* and affirmed the dismissal of plaintiff's complaint with prejudice. *Id.* at 284 (discussing whether it was appropriate to dismiss with or without prejudice). Further, in determining plaintiff's claims to be frivolous, the Fifth Circuit found it important that the civil litigant in *Boyd* was not seeking monetary damages but instead sought only to challenge the validity of his conviction. *Id.*

In the instant case, the encompassing premises of Plaintiffs' claims concerning Cleveland and his MBTA conviction are that Defendant has erred in interpreting the laws prohibiting the possession of certain feathers (*e.g.*, the MBTA) as applying to American Indians who are not enrolled members of federally recognized tribes. *See* Pls' SJ at 3 (discussing Cleveland). This legal question, and the underlying facts giving rise to it, is the exact issue that was before the court in *United States of America v. Cleveland*. This is demonstrated by the fact that many, if not all, of the legal claims asserted in this civil suit concerning Cleveland's conviction were also asserted as defenses to the criminal prosecution in *United States v. Cleveland*. *See generally* Appeal Brief, Doc. No. 72 in 7:06-mj-04806. As a result, it is unquestionable that the facts underlying Cleveland's criminal conviction are also the basis for Plaintiffs' current MBTA claims; and any success on Plaintiffs' MBTA claims here would call into question the validity of his criminal conviction. Accordingly, Plaintiffs' claims concerning Cleveland and the MBTA fail as a matter of law pursuant to *Heck*.[7]

---

[7] Although the Court need not reach the issue because *Heck* controls the analysis here, Plaintiffs' claims concerning Cleveland's conviction are also barred by *res judicata* and the doctrine of collateral estoppel. *See Lewis v. Green*, 101 Fed.Appx. 446, 2004 WL 1399202, *1

Finally, even if the Court were to reach the merits of Plaintiffs' MBTA claims, they would fail as a matter of law. Plaintiffs mistakenly claim that the Department of the Interior's policy concerning the MBTA and federally recognized tribes violates RFRA. Courts, however, have consistently rejected these types of claims. *See, e.g., United States v. Vasquez-Ramos*, 531 F.3d 987 (9th Cir. 2008); *United States v. Eagleboy*, 200 F.3d 1137 (8th Cir. 1999) (reversing dismissal of charge against non-member Native American for possessing hawk parts in violation of MBTA). The courts' reasoning is substantially the same as the reasons supporting the Eagle Act. *Vasquez-Ramos*, 531 F.3d 987; *see also* Fant Decl. at ¶¶ 6,7. Thus, pursuant to this caselaw and for all the reasons discussed above, if the Court reaches the merits of Plaintiffs' MBTA claims, they should be rejected.

> Respectfully Submitted,
>
> KENNETH MAGIDSON
> UNITED STATES ATTORNEY
>
> *s/Jimmy A. Rodriguez*
> JIMMY A. RODRIGUEZ
> Assistant United States Attorney
> Southern District of Texas
> Texas Bar No. 24037378
> Federal ID No. 572175
> 919 Milam, Suite 1500
> P.O. Box 61129
> Houston, Texas 77208
> Tel: (713) 567-9532
> Fax: (713) 718-3303
> Attorney in Charge for Defendant

---

(5th Cir. 2004) (affirming a dismissal based upon *Heck* and *res judicata*). Thus, if the Court reaches the issue, the Court should find for the Defendant in this case for the reasons the Court rejected Cleveland's defenses at trial and for the reasons that the Court denied his appeal.  For example, the Court found that Cleveland lacked standing to challenge the MBTA under RFRA because he had not applied for an MBTA permit and he had been engaged in a commercial activity. *See* Order Affirming Judgment, Doc. No. 78 in 7:06-mj-04806.

## **Certificate of Service**

I hereby certify that a true and correct copy of the foregoing was served on the following via the Court's Electronic Case Filing System:

Marisa Y. Salazar
Civil Rights Legal Defense & Edu. Fund, Inc.
519 Culebra Road
San Antonio, Texas 78201
Telephone: 210-334-5209


*s/ Jimmy A. Rodriguez*
JIMMY A. RODRIGUEZ
Assistant United States Attorney