IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | |
|---|---|
| MC ALLEN GRACE BRETHREN CHURCH, et al., <br><br> Plaintiffs, <br><br> v. <br><br> KEN SALAZAR, Secretary of the Department of the Interior, <br><br> Defendant. | Case No. 7:07-cv-60 |

DECLARATION OF BRIAN MILLSAP

I, Brian Millsap, under penalty of perjury, state as follows:

1. I am the National Raptor Coordinator and National Eagle Coordinator of the U. S. Fish and Wildlife Service (hereinafter "Service"). I am the senior scientific expert and policy advisor for the Service on matters pertaining to birds of prey, and I coordinate the Service's national programs concerning the management of all bald and golden eagles found in the United States.

2. The bald eagle was removed from the Endangered Species List in 2007. However bald and golden eagles in the United States remain protected under the provisions of two long-standing federal conservation statutes, the 1940 Bald and Golden Eagle Protection Act ("Eagle Act"), 16 U.S.C. §§ 668-668d, and the 1918 Migratory Bird Treaty Act, ("MBTA"), 16 U.S.C. §§ 703-712.

Ex. 6 -- Def's MSJ

3.      Both the Eagle Act and the MBTA prohibit "take" of eagles. Both statutes provide for criminal penalties when the prohibition has been violated, and the Eagle Act provides for civil penalties as well. Both statutes authorize the Secretary of the Interior to determine when "take" could occur legally. I will focus my discussion on the Eagle Act, because authorization of take of eagles under the Eagle Act constitutes authorization of that take under the MBTA as well. 50 C.F.R. § 22.11(b).

4.      Take" is defined in the Eagle Act as "pursue, shoot, shoot at, poison, wound, kill, capture, trap, collect, molest or disturb." The Eagle Act allows the Service to authorize the "take" of bald or golden eagles for scientific purposes, for public museum and zoo exhibition purposes, or for the religious purposes of Indian tribes. The Service may also authorize the taking of eagles for the protection of wildlife or agricultural or other interests in any particular locality.

5.      The Service's ability to authorize take of eagles is restricted by BGEPA to cases where it can be determined that take is compatible with the preservation of the species. Preservation in this context means that eagle populations will remain stable or increase.

6.      The size of U.S. eagle populations and the number of eagles present in these populations varies from region to region, especially between the eastern and western parts of the U.S. other than Alaska. (There are no eagles in Hawaii.) As a result, FWS is currently limiting permits to allow take under BGEPA based upon the status of the eagle populations in specified regional management areas across the country. These regional "take" limitations are found in Appendix

C of a Final Environmental Assessment ("Final EA") prepared recently in connection with the Service's issuance of incidental "take" permits under BGEPA. The Final EA evaluated the environmental impact of various alternatives for issuing eagle take permits. It considered the existing impacts on bald eagle and golden eagle populations in different regions as a baseline. It also considered human safety, the economy, cultural values, and Native American religious and cultural practices. In evaluating a particular take permit, the Service will also consider cumulative effects from eagle take allowed under past Eagle Act and ESA permits and ESA consultations, as well as ongoing illegal take such as occurs with wildlife trafficking in eagle feathers and other eagle parts.

7.     Importantly, in conducting the analyses underlying Appendix C of the Final Environmental Assessment, the Service concluded there was not sufficient biological evidence to allow any additional take of golden eagles in the United States without potentially violating the preservation standard of BGEPA. Accordingly, the Service does not currently issue permits to take golden eagles unless that take is offset by compensatory mitigation aimed at reducing pre-existing causes of mortality by a commensurate degree. Although the Service identified take of eagles by Native Americans as its second highest priority for allowable take in the Final Environmental Assessment, it concluded additional take of golden eagles in excess of historical levels could not be allowed even for this purpose.

8.     Protecting the conservation status of bald eagles is a compelling federal government interest because the bald eagle is our national symbol. Furthermore, its conservation status is still of concern. It has been improved to the point that it is no longer at risk of extinction, but if bald eagles or their parts could be possessed to serve the religious practices of a broader group

than are currently legally eligible to receive religious use permits, it is likely to cause significant death or harm to bald eagle populations.

9.  The Service has demonstrated its willingness to authorize take of eagles from the wild for Native American religious use where such take is supported by biological data. For example, earlier in 2012 the Service issued a permit to the Northern Arapahoe Tribe of Wyoming to take two bald eagles for tribal religious use. That take was from a population of bald eagles that the Service had determined could sustain removal of up to 30 individuals per year without risking population declines, and the requested take by the Northern Arapahoe was well within those annual take limits.

10. Protecting the conservation status of golden eagles is also a compelling federal government interest. While available biological data suggest the species' populations are stable, we have no evidence the species can withstand additional unmitigated mortality. Should unauthorized take increase, golden eagle populations could begin to decline, which would be inconsistent with the mandate under the Eagle Act, and it could lead to a need to propose the species for listing as threatened under ESA. Again, broadening the number of persons who could legally use golden eagles or their parts for religious purposes could put the species itself at risk if this led to increased illegal take from the wild.

This declaration is made pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing are true and correct to the best of my current knowledge.

**Ex. 6 -- Def's MSJ**

Executed in Albuquerque, New Mexico on this 16 day of May, 2012.

*Brian Millsap*
Brian Millsap
National Raptor Coordinator and National Eagle Coordinator
U.S. Fish and Wildlife Service

**Ex. 6 -- Def's MSJ**