# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### MCALLEN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | MAGISTRATE ACTION NO. M-06-4806 |
| | § | |
| MICHAEL T. CLEVELAND | § | |

## ORDER AFFIRMING ORDERS AND JUDGMENT OF MAGISTRATE JUDGE

### I. Introduction

Now before the Court is Defendant Michael Todd Cleveland's appeal of his conviction, following a bench trial to the U.S. Magistrate Judge on November 2, 2006, for the offense of unlawfully possessing, selling, offering to sell, or transporting migratory birds, their parts, or eggs, without authorization, in violation of the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. § 703, *et seq*. The following facts are undisputed. On March 11, 2006, Agent Alejandro Rodriguez of the U.S. Fish and Wildlife Service ("FWS") attended a "powwow"—a Native American religious ceremony—at the Palm View Community Center in McAllen, Texas. Upon entering the large room where various powwow activities were being held, the agent observed several "dreamcatchers," with feathers attached, hanging from a vending booth. The dreamcatchers had been made by Defendant, who was present at the powwow with his mother, the registered vendor for the booth. After making a preliminary determination that the feathers attached to the dreamcatchers belonged to protected migratory birds, Agent Rodriguez confiscated certain of the feathers and sent them to the FWS Forensics Laboratory for identification. The Forensics Laboratory confirmed that of the eight feathers that Agent Rodriguez claimed to have taken from Defendant's dreamcatchers, six belonged to birds

protected under the MBTA. Defendant was then charged with the above-described offense. The U.S. Magistrate Judge found Defendant guilty of the offense and ordered him to pay a $200 fine.

Defendant challenges his conviction on the grounds that the Magistrate Judge erred in denying his motion to suppress evidence acquired by the government as a result of Agent Rodriguez's alleged illegal search and seizure. Defendant's challenge relies on his belief that Agent Rodriguez "raided" the powwow and seized the feathers attached to Defendant's dreamcatchers without probable cause and without a warrant.

Defendant also challenges his conviction by asserting that the prohibitions of the MBTA violate his right to free exercise of religion as guaranteed by the First Amendment and protected by the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb, *et seq*. According to Defendant, the Magistrate Judge's error was finding that Defendant engaged in "purely commercial" activities because, he sustains, vendors are a part of the religious aspect of powwows. Furthermore, Defendant contends that obtaining a permit for the religious use of bird feathers under the MBTA is impossible because he is not enrolled in a federally-recognized tribe and, thus, that being subject to the permit requirement is a violation of his right to free exercise religion. On this basis, Defendant contends that the Magistrate Judge erred in granting the Government's motion *in limine* to exclude evidence and argument regarding Defendant's race, his religious practices, and the protections of Native Americans under federal policy.

Finally, Defendant argues that the Magistrate Judge erred in excluding feathers seized from others at the powwow and testimony regarding the criminal charges of Reverend Robert Soto and Michael Russell. According to Defendant, it is important for the Court to consider the entirety of Agent Rodriguez's investigation into all vendors and religious participants at the powwow because "the feathers of *all* birds [that were seized] are relevant to Native American

practices, social ceremonies or other activities." (Doc. 72 at 27) (internal quotations and citation omitted).

Upon consideration of the record in light of relevant case law, the Court holds that the orders and judgment of the Magistrate Judge should be AFFIRMED for the reasons discussed below.

## II. Appellate Review

Pursuant to the Federal Rules of Criminal Procedure, a defendant who appeals a Magistrate Judge's order or judgment in a case involving a petty offense or other misdemeanor "is not entitled to a trial de novo by a district judge." FED. R. CRIM. P. 58(g)(2)(D). Rather, "[t]he scope of the appeal is the same as in an appeal to the court of appeals from a judgment entered by a district judge." *Id.*

## III. Defendant's Motion to Suppress

### a. Standard of Review

In an appeal from a district court's denial of a motion to suppress, the Fifth Circuit reviews questions of law *de novo* and findings of fact for clear error. *United States v. Nunez-Sanchez*, 478 F.3d 663, 665 (5th Cir. 2007) (citation omitted). In reviewing factual findings, the appellate court considers all of the evidence presented in the light most favorable to the prevailing party below. *Id.* (citation omitted); *United States v. Ibarra*, 493 F.3d 526, 530 (5th Cir. 2007). If this review leads it to the "'definite and firm conviction that a mistake has been committed,'" the district court's factual findings must be deemed clearly erroneous. *United States v. Lopez-Moreno*, 420 F.3d 420, 429-30 (5th Cir. 2005) (quoting *Payne v. United States*, 289 F.3d 377, 381 (5th Cir. 2002)). In addition, the Fifth Circuit reviews *de novo* the trial court's determination that the facts provided reasonable suspicion or probable cause. *Nunez-Sanchez*,

478 F.3d at 665 (citation omitted). However, in carrying out this *de novo* review, it must "'give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers.'" *Id.* (quoting *Lopez-Moreno*, 420 F.3d at 429).

### b. Authority

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." This right is implicated only where a person has a "'constitutionally protected reasonable expectation of privacy.'" *California v. Ciraolo*, 476 U.S. 207, 211 (1986) (quoting *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)); *see Smith v. Maryland*, 442 U.S. 735, 740 (1979) ("Consistently with *Katz*, [the Supreme Court] uniformly has held that the application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action."). In order to determine whether this requirement for Fourth Amendment protection exists, courts conduct a two-step inquiry. First, the court must ask "whether the individual, by his conduct, has exhibited an actual expectation of privacy; that is, whether he has shown that 'he [sought] to preserve [something] as private.'" *Bond v. United States*, 529 U.S. at 338 (quoting *Smith*, 442 U.S. at 740). Second, the court inquires whether the individual's expectation of privacy is "'one that society is prepared to recognize as reasonable.'" *Id.* (quoting same). In other words, the individual must demonstrate a subjective and objective expectation of privacy. *Kee v. City of Rowlett*, 247 F.3d 206, 212 (5th Cir. 2001).

"What a person knowingly exposes to the public…is not a subject of Fourth Amendment protection." *Katz*, 389 U.S. at 351. "[T]he Fourth Amendment protects people, not places." *Id.* It is well-established that "'[a]n essential element to a successful challenge of a search or seizure

on Fourth Amendment grounds is the existence of a legitimate expectation of privacy." *United States v. Fields*, 456 F.3d 519, 524 (5th Cir. 2006) (quoting *United States v. Salvucci*, 448 U.S. 83, 92-93 (1980)). There is no reasonable expectation of privacy "where the public was invited to enter and to transact business." *Maryland v. Macon*, 472 U.S. 463, 469 (1985) (citation omitted).

Furthermore, the "plain view" exception to the Fourth Amendment's prohibition of warrantless seizures allows officers to seize items where: "(1) the police lawfully entered the area where the item was located; (2) the item was in plain view; (3) the incriminating nature of the item was 'immediately apparent;' and (4) the police had a lawful right of access to the item." *United States v. Roberts*, 612 F.3d 306, 312 (5th Cir. 2010) (citation omitted). "'The incriminating nature of an item is 'immediately apparent' if the officers have 'probable cause' to believe that the item is either evidence of a crime or contraband[;] [p]robable cause does not require certainty.'" *Id.* (quoting *United States v. Waldrop*, 404 F.3d 365, 369 (5th Cir. 2005)). "Probable cause" must be examined in light of the officer's observations, knowledge, training and experience. *See United States v. Sanchez-Pena*, 336 F.3d 431, 437-38 (5th Cir. 2003) (footnotes omitted).

### c. Discussion

As an initial matter, the Court finds that the evidence Defendant sought to suppress at trial supports a finding necessary to the establishment of Defendant's guilt—that is, that the eight feathers submitted by Agent Alejandro Rodriguez to the FWS Forensic Laboratory all came from Defendant's dreamcatchers and that six of the feathers belonged to birds protected under the MBTA. The Court now considers Defendant's Fourth Amendment challenge to the evidence supporting his conviction. Defendant argues that Agent Rodriguez "raided" the religious service

held March 11, 2006 without probable cause and without a search warrant and, thus, that the feathers he seized that day should have been excluded. *See* (Doc. 72 at 3-15). The Court disagrees.

The testimony of Agent Rodriguez and Reverend Soto show that there was no reasonable expectation of privacy at the powwow and that Agent Rodriguez lawfully entered the powwow. Agent Rodriguez testified that he learned about the powwow in a local newspaper advertisement that invited the public to attend the 16th Annual South Texas Voice South Powwow held March 11, 2006. (Doc. 71 at 19). He also stated that the photograph in the advertisement showed people dressed in Native American regalia with bird feathers and that this prompted him to attend the powwow. *Id.* at 20-21. According to Agent Rodriguez, there were no restrictions on admittance. *Id.* at 22. Reverend Robert Soto testified that part of the purpose of powwows is to educate and expose Native American culture to the public. *Id.* at 88-89. Reverend Soto also stated that sales made by vendors are "open to anybody." *Id.* at 90.

The evidence establishes that the powwow, particularly the area set-up for vendors, was open to the public and that Agent Rodriguez did not "raid" the religious ceremony. Vendors in a powwow open to the public cannot reasonably expect that their booths and the items they offer are "private." Therefore, the Court finds that Agent Rodriguez's visit to the powwow did not violate Defendant's Fourth Amendment protection against unreasonable searches.

The Court also finds that the seizure of feathers attached to Defendant's dreamcatchers was lawful under the Fourth Amendment. As discussed above, Agent Rodriguez entered the vendor area at the powwow lawfully, and Defendant's dreamcatchers with feathers were in plain view. (Doc. 71 at 23, 104). Moreover, based on his experience and training, Agent Rodriguez believed that the feathers on the dreamcatchers belonged to migratory birds protected under

federal law and he seized them. *Id.* at 24-28. The evidence showed that Agent Rodriguez had probable cause to seize the feathers and, thus, under the "plain view" exception to the Fourth Amendment's prohibition of warrantless seizures, Agent Rodriguez lawfully seized the feathers.

Based on these findings, the Court concludes that the Magistrate Judge committed no error in denying Defendant's motion to suppress the feathers seized by Agent Rodriguez, and hereby AFFIRMS the Magistrate Judge's Order.

## IV. First Amendment Challenge

### a. Authority

The Free Exercise Clause of the First Amendment prohibits government from regulating the free exercise of religion. U.S. CONST. amend. I, cl. 1. To enforce the protection of the Free Exercise Clause, Congress passed and the President signed the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb, *et seq.*, which sets the standard of review for Free Exercise challenges. This standard requires courts to uphold a Free Exercise challenge of a law that "substantially burden[s] a person's exercise of religion" unless the Government "demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that . . . interest." 42 U.S.C. § 2000bb-1(a), (b).[1] Therefore, under the RFRA, a court must first determine whether a law "substantially burdens" the plaintiff's exercise of religion. *Diaz v. Collins*, 114 F.3d 69, 71 (5th Cir. 1997) (footnote omitted); *Henderson v. Kennedy*, 253 F.3d 12, 16 (D.C. Cir. 2001). If plaintiff meets this burden, the Government must meet the requirements of the compelling interest test of the RFRA. *Diaz*, 114 F.3d at 72.

---

[1] The Supreme Court in *City of Boerne v. Flores*, 521 U.S. 507 (1997) struck down the RFRA's application to state and local government regulations because it found Congress had exceeded its enforcement power under section 5 of the Fourteenth Amendment. The RFRA still applies to federal regulation.

However, a defendant lacks standing to assert an "as applied" Free Exercise challenge against the regulatory scheme of the Migratory Bird Treaty Act ("MBTA") when he has failed to apply for a permit to possess or sell migratory bird parts. *United States v. Tawahongva*, 456 F. Supp. 2d 1120, 1127 (D. Ariz. 2006); *see United States v. Hugs*, 109 F.3d 1375, 1378-79 (9th Cir. 1997) (per curiam). A defendant may, nonetheless, assert a "facial" Free Exercise challenge against the MBTA by establishing that "there is no set of circumstances under which the MBTA could be enforced without violating the First Amendment." *Tawahongva*, 456 F. Supp. 2d at 1129 (citations omitted).

Moreover, "to pursue an alleged violation of the Free Exercise Clause, a [defendant] must allege that his or her own 'particular religious freedoms are infringed.'" *Littlefield v. Forney Ind. Sch. Dist.*, 268 F.3d 275, 292 n.25 (5th cir 2001) (quoting *Sch. Dist. of Abington v. Schempp*, 374 U.S. 203, 224 n.9 (1963)) (citations omitted). A Free Exercise challenge must necessarily rest on the religious adherent of a defendant. *See Diaz*, 114 F.3d at 71-72. A defendant simply cannot pursue an alleged violation of the Free Exercise Clause when he is prosecuted for violation of a purely commercial, rather than religious, activity. *See United States v. Sandia*, 188 F.3d 1215, 1218 (10th Cir. 1999) ("When defendant decided to sell the birds, he no longer possessed them for a religious purpose and therefore possessed them in violation of federal law."); *Hugs*, 109 F.3d at 1377-78 ("A defendant prosecuted under the [Bald and Golden Eagle Protection Act] for purely commercial rather than religious activities may not assert a claim that the free exercise of religion has been infringed by the Act.").

### b.  Discussion

Defendant claims that the Free Exercise Clause of the First Amendment allows his use of feathers covered by the MBTA without the need to obtain a permit. *See* (Doc. 72 at 15-25).

However, the Court cannot reach the merits of his claim because he lacks standing to assert an "as applied" Free Exercise challenge. He has also failed to adequately assert a "facial" challenge to the MBTA. Moreover, the Court cannot allow Defendant to defeat conviction by claiming a religious purpose in what the evidence has shown is purely commercial activity.

Defendant admits that he did not seek a permit to use the feathers covered by the MBTA but claims he did not try to obtain a permit because the effort would have been futile. Defendant's argument is based on the testimony of Jeff Haskins, chief of FWS's migratory bird office for the region, who could not recall an instance where a permit was granted to someone not recognized as a Native American under federal law. (Doc. 71 at 15-16). Defendant contends that this is sufficient to find that seeking a permit is futile and asks the Court to find he is not required to apply for one. (Doc. 72 at 23-25). In raising the issue, Defendant tries to show he is similarly situated to the defendant in *United States v. Hardman*, 297 F.3d 1116 (10th Cir. 2002), who successfully established standing in a case involving the futility of obtaining a permit under the Bald and Golden Eagle Protection Act ("BGEPA"). However, the applications for permits under the MBTA and the BGEPA have a key difference: the BGEPA requires membership in a federally-recognized tribe and the MBTA does not. The *Hardman* Court found that the requirement made it futile for those that are not in a federally-recognized tribe to seek a permit under the BGEPA and concluded that the failure to seek such permit does not bar a Free Exercise challenge for lack of standing. The MBTA does not have such requirement; in fact, according to Mr. Haskins', "[a]ny person is allowed to apply." (Doc. 71 at 14); *see* 50 C.F.R. § 21.27. Therefore, the Court finds, in agreement with *United States v. Tawahongva*, 456 F. Supp. 2d 1120, 1127 (D. Ariz. 2006), that Defendant lacks standing to assert an "as applied" constitutional

challenge based on the Free Exercise Clause because he failed to submit himself to the permit requirement of the MBTA.

Even so, Defendant may assert a "facial" challenge to the constitutionality of the MBTA. However, he has made no attempt to establish that "there is no set of circumstances under which the MBTA could be enforced without violating the First Amendment." *Tawahongva*, 456 F. Supp. 2d at 1129 (citations omitted); *see generally* (Doc. 72, 74). Therefore, the Court finds that Defendant has not asserted a "facial" challenge to the constitutionality of the MBTA.

Finally, the Court also finds that Defendant lacks standing to assert a Free Exercise challenge because he has not shown what "particular religious freedoms are infringed" in the prosecution of a purely commercial activity. *Sch. Dist. of Abington v. Schempp*, 374 U.S. 203, 224 n.9 (1963), *quoted in Littlefield v. Forney Ind. Sch. Dist.*, 268 F.3d 275, 292 n.25 (5th cir 2001). Defendant discusses, at length, the Morton Policy[2], the importance of "living feathers" to his religious practices, and the definition of "American Indian" in support of his First Amendment challenge, (Doc. 72 at 17-23), but he makes no attempt to show that to "offer for sale, [and/or] sell" the feathers of migratory birds is a religious adherent.[3] 16 U.S.C. § 703(a). At trial, Reverend Robert Soto testified that vendors play a big part in a powwow, (Doc. 71 at 90), and Defendant's mother, Linda Cleveland, testified that vendors are a part of the ceremony, "an important part of carrying the culture, [and] trading ideas and objects," (Doc. 71 at 104). However, Defendant did not show that the sale or offer to sell dreamcatchers with feathers of migratory birds is in itself a religious, and not purely commercial, activity. *See United States v.*

---

[2] The Morton Policy is a policy promulgated by the U.S. Department of the Interior in 1975 which assures American Indians that the Government permits them to, among other things, possess, use, and exchange without compensation federally protected birds as well as their parts and feathers. *See* (Doc. 18, Ex. B).

[3] Defendant contends that the Magistrate Judge erred in concluding the dreamcatchers were being sold or offered for sale because they were "decorations to provide ambience" based on Linda Cleveland's testimony. (Doc. 72 at 28). However, as the trier of fact and judge of credibility, the Magistrate Judge concluded that Defendant offered to sell the dreamcatchers with feathers of migratory birds, and, as described *infra* Part VI, Defendant has not shown clear error in the Magistrate Judge's conclusion.

*Sandia*, 188 F.3d 1215, 1218 (10th Cir. 1999) ("Allowing defendant to defeat an indictment simply by claiming he originally took the birds for religious purposes would render the [act] nugatory and permit people, under the guise of religion to stockpile protected species for commercial sale."). Reverend Soto compared vendors to the store of a local Catholic shrine, "where parishioners can purchase their candles . . . . [and] other things like rosaries and other articles that they consider sacred[,] . . . [and] postcards for the tourists, people that come by to take a little souvenir of the facility." (Doc. 71 at 91). But this comparison does not support standing to assert a Free Exercise challenge because Reverend Soto described commercial transactions, not religious activities. Defendant asks the Court to find that the offer to sell or the actual sale of dreamcatchers with feathers of protected migratory birds is religious in nature, but the fact that a commercial transaction may involve religious or sacred items does not strip the transaction of its commercial nature and does not, without more, infuse the activity with religious significance to be protected by the First Amendment.

Based on these findings, the Court concludes that Defendant lacks standing and does not reach the merits of his Free Exercise challenge to the MBTA.

## V. Government's Motion in Limine

### a. Standard of Review/Authority

The Fifth Circuit reviews a decision to exclude evidence for abuse of discretion. *Ibarra*, 493 F.3d at 532 (citation omitted). Furthermore, in reviewing matters of relevancy, the Fifth Circuit "is guided by the principle that [the lower courts] have wide discretion in determining relevancy . . . ." *United States v. Nutall*, 180 F.3d 182, 189 (5th Cir. 1999) (citations omitted). Relevant evidence must meet "two distinct requirements: (1) the evidence must tend to prove the matter sought to be proved; and (2) the matter sought to be proved must be one that is of

consequence to the determination of the action." *United States v. Waldrip*, 981 F.2d 799, 806 (5th Cir. 1993) (citation omitted).

### b. Discussion

Defendant challenges the Magistrate Judge's order granting the Government's Motion in Limine to exclude: (1) evidence concerning eagle feathers seized from other individuals at the powwow held March 11, 2006, (2) evidence concerning the religious nature of powwows, and (3) evidence regarding the Morton Policy and Defendant's status as an "American Indian." *See generally* (Doc. 72). Defendant contends that the evidence concerning eagle feathers seized from other individuals should have been admissible to tell the "whole story" regarding the search Agent Rodriguez conducted at the powwow because they were relevant to the Fourth Amendment concerns discussed above. (Doc. 72 at 25-28). Defendant also states that the Magistrate Judge erred in excluding evidence regarding the religious nature of the powwows because the evidence would have shown that he was practicing his faith and not engaging in purely commercial activity. (Doc. 72 at 28-32). Finally, Defendant alleges that the Magistrate Judge's exclusion of evidence regarding the federal government's Morton Policy and its definition of the term "American Indian" prejudiced Defendant because, in doing so, the Magistrate Judge accepted the Government's position that Defendant does not belong to a federally-recognized tribe, and, therefore, was outside the free exercise of religion protections of the Morton Policy. (Doc. 72 at 15-23).

The Court finds that the Magistrate Judge did not abuse her discretion in excluding the feathers with no connection to Defendant's case because they were irrelevant. Defendant was charged with possessing and offering to sell feathers of protected migratory birds that were part of dreamcatchers displayed at his mother's vending booth. Defendant was not charged based on

feathers seized from others at the March 11, 2006 powwow, and Defendant has not shown that they could prove or disprove any matter presented at trial.[4]

The Court also finds that the Magistrate Judge did not abuse her discretion in excluding evidence regarding the religious nature of powwows and the religious practices in powwows. The Magistrate Judge granted the motion in limine on this point after counsel for Defendant stated he would not need the evidence if the Government stipulated "that the powwow is indeed a religious service." (Doc. 69 at 10). The Government made such stipulation, *id.* at 11, and the Magistrate Judge then granted the motion in limine as to that point, *id.* Defendant cannot show that the Magistrate Judge abused her discretion after Defendant obtained the stipulation he sought from the Government and did not oppose the motion thereon.

Finally, the Court also finds that the Magistrate Judge did not abuse her discretion in excluding evidence regarding the Morton Policy and how it affects Defendant's religious rights. It was undisputed that the powwow was a religious event and the Magistrate Judge agreed with the Government that Defendant's status as an American Indian and the Morton Policy were irrelevant because counsel for Defendant intended to "discuss the need to expand the definition" of "American Indian" and argue that the Morton Policy applied to Defendant. (Doc. 69 at 12). The Court agrees with the Magistrate Judge's opinion that "this is not the place for such an argument." *Id.* at 13. A discussion of federal policy and the relationship between the federal government and Native American tribes was outside the scope of the matters tried before the Magistrate Judge and was properly excluded. Furthermore, the Court notes that Defendant was prosecuted with violating the MBTA for possessing *and* offering to sell feathers of migratory birds, so the Morton Policy—which assures American Indians that they can use feathers of

---

[4] The Court also finds that the evidence collected from other individuals is irrelevant to the Fourth Amendment challenge to the denial of his motion to suppress, discussed *supra* Part III.

protected migratory birds and exchange them *without commercial gain*—is irrelevant. *See* (Doc. 18, Ex. B).

Having considered the evidence and Defendant's arguments, the Court concludes that the Magistrate Judge did not abuse her discretion in granting the Government's Motion in Limine, and hereby AFFIRMS the Magistrate Judge's Order.

## VI. Defendant's Conviction

### a. Standard of Review/Authority

A criminal conviction must be supported by substantial evidence and reversed only if the findings were clearly erroneous. *E.g.*, *United States v. Serna-Villareal*, 352 F.3d 225, 234 (5th Cir. 2003). In the Fifth Circuit, "[t]he standard of review for sufficiency of the evidence is 'whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Bellew*, 369 F.3d 450, 452 (5th Cir. 2004) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Sufficient evidence "need not exclude every reasonable hypothesis of innocence, so long as the totality of the evidence permits a conclusion of guilt beyond a reasonable doubt." *United States v. Hicks*, 389 F.3d 514, 533 (5th Cir. 2004) (citation omitted). The Court "will affirm a magistrate judge's findings if they are supported by substantial evidence." *United States v. Lee*, 217 F.3d 284, 288 (5th Cir. 2000) (citation omitted). The reviewing court must defer to the Magistrate Judge's credibility determinations and "'all reasonable inferences drawn.'" *United States v. Mathes*, 151 F.3d 251, 252 (5th Cir. 1998) (quoting *United States v. Ybarra*, 70 F.3d 362, 364 (5th Cir. 1995)).

### b. Discussion

14 / 16

The Court finds that the Magistrate Judge's judgment is supported by substantial evidence. The record supports finding that the eight feathers submitted by Agent Alejandro Rodriguez to the FWS Forensic Laboratory all came from Defendant's dreamcatchers and that six of the feathers belonged to birds protected under the MBTA. The record also supports finding that the dreamcatchers were in a vending booth and offered for sale to the public. The evidence supports the conviction for the offense of unlawfully possessing, selling, offering to sell, or transporting migratory birds, their parts, or eggs, without authorization, in violation of the MBTA, 16 U.S.C. § 703, *et seq*.

Defendant contends that his mother, Linda Cleveland, was the actual vendor and that she placed the dreamcatchers at her booth "as decorations to provide ambience." (Doc. 72 at 28). But her testimony was directly controverted by Agent Rodriguez's testimony and Defendant's own statements to Agent Rodriguez that he was selling the dreamcatchers. *See* (Doc. 71 at 25, 35, 45). This evidence, and the test results that confirmed the feathers on the dreamcatchers were from birds protected by the MBTA, permits a trier of fact to find guilt beyond a reasonable doubt. In deference to the Magistrate Judge's credibility determinations and inferences drawn in light of the record, the Court finds no error in the judgment.

Based on the totality of the evidence, viewed in the light most favorable to the prosecution, the Court concludes that the elements of the offense were proven beyond a reasonable doubt and that the Magistrate Judge committed no error in finding Defendant guilty. Therefore, the Court hereby AFFIRMS the Magistrate Judge's Judgment.

## VII. Conclusion

For the reasons stated above, the Orders and Judgment of the Magistrate Judge are AFFIRMED.

SO ORDERED this 24th day of June, 2011, at McAllen, Texas.

Randy Crane
United States District Judge

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| CHARLES W. GARRETT, | § | |
| TDCJ No. 663224, | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION H-08-3129 |
| v. | § | |
| | § | |
| FISH AND WILD LIFE, U.S. | § | |
| DEPARTMENT OF THE | § | |
| INTERIOR, *et al.*, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND OPINION

Pending before this Court is a Motion for Summary Judgment filed by the Defendants. Based on consideration of the pleadings, the motion, the records, and the applicable law, this Court **GRANTS** the summary judgment motion.

## I. BACKGROUND AND PLEADINGS

Plaintiff filed this civil rights case and is proceeding *in forma pauperis* under 28 U.S.C. § 1915. Plaintiff is a prisoner in the Texas Department of Criminal Justice-Correctional Institutions Division (TDCJ). He sues the Fish and Wildlife Service (FWS) of the U.S. Department of the Interior; Katie Wade, Legal Instruments Examiner; and the City of Albuquerque. Plaintiff sues over enforcement of FWS rules and the Bald and Golden Eagle Protection Act (BGEPA), 16 U.S.C. § 668. He sues under Title 50 of the U.S. Code and 42 U.S.C. Section 1983. Plaintiff raises a First

Amendment free-exercise claim and, construing his pleadings liberally, sues under the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), codified at 42 U.S.C. § 2000cc-1, *et seq.*

Plaintiff's claims follow.  On June 16, 2008, Plaintiff submitted a permit application and "first order" (form 3-200-15a) to the FWS to obtain eagle feathers for religious ceremonies.  The FWS denied Plaintiff relief because he was not enrolled as a tribal member of an American Indian tribe.  The FWS responded to his application citing the BGEPA and Title 50, CFR, part 22.22.  On July 18, 2008, Plaintiff again sent in the permit application and "first order" to be processed.  In August 2008, Plaintiff received his final statement from Wade again informing him that he was not a duly enrolled member of a federally recognized tribe.  Wade also told him that he could not receive a permit for an eagle feather for religious use and that only federally enrolled members of a tribe of the United States could receive eagle feathers for religious use.

Plaintiff states he practices a native faith and that he holds credentials of a ministry with a legal nature.  He also says he practices a natural faith.  In the TDCJ, Plaintiff lists his religion as Native American Faith, which is the closest religious denomination or designation to his ancestral beliefs in the TDCJ religious denomination list.  He has earned the support of his peers to act as a shaman in some sacred pipe ceremonies.  Plaintiff seeks to practice his faith in the most traditional way possible.

2

He wants to practice his faith as taught to him by his mother. He does not have access to eagle feathers by way of a tribal membership, though his ancestors were freedmen and half Native-American. Plaintiff claims his right to practice his faith should not rely on his race, or whether he is part of a tribe with a "role number."

Plaintiff is asking this Court for help because the current law keeps him from having possession of any eagle parts. He explains the significance of the eagle and its feathers as follows. The eagle feather is used to carry prayer up to the creator. The sacred eagle flies higher than any other bird and its sight is far stronger. Use of the feather transfers these abilities to the holder and believer of the feather. Plaintiff believes that with an eagle feather his path will be clear and he can help more people help themselves spiritually.

Plaintiff requests an order declaring that the Defendants have acted in violation of the Constitution and an injunction for the issuance of an eagle parts permit from the FWS for religious use.

## II. THE SUMMARY JUDGMENT STANDARD

A party seeking summary judgment must inform the district court of the basis for the motion, and identify those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

3

Once the movant carries this burden, the burden shifts to the non-movant to show that summary judgment should not be granted. *Id.*

## III. RLUPIA AND THE FIRST AMENDMENT

The RLUIPA, codified at 42 U.S.C. § 2000cc, provides in part:

§ 2000cc-1. Protection of religious exercise of institutionalized persons.

(a) General rule

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution .... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person --

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

The RLUIPA prohibits the State from imposing a "substantial burden" on the practice of religious faith. Under the RLUIPA, a plaintiff must produce prima facie evidence to support a violation. 42 U.S.C. § 2000cc-2(b). The burden of proof is on the plaintiff to demonstrate that the complained of government practice imposes a substantial burden on his religious exercise under RLUIPA. *Adkins v. Kaspar*, 393 F.3d 559, 567 (5th Cir. 1994). A "religious exercise" for purposes of the RLUIPA includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A).

4

## IV. THE SUMMARY JUDGMENT MOTION

The Defendants raise the following in their summary judgment motion and accompanying evidence. As Plaintiff recognizes, under the BGEPA individuals are not allowed to possess eagle feathers. 16 U.S.C. § 668(a). Under the BGEPA and concomitant regulations, members of federally recognized Indian tribes are excused from the prohibition against possession of eagle feathers. *Id.*, 50 C.F.R. § 22.22. The Defendants denied Plaintiff's request for an eagle feather because he is not a member of a recognized tribe. Administrative Record (AR), at 008 [Docket Entry No. 25-6, p. 1]. Defendants contend that the FWS's decision and the regulations underlying the decision serve compelling governmental interests using the least restrictive means.

### A. Compelling Governmental Interest

The enacting clause of the BGEPA states that: ".... the Continental Congress in 1782 adopted the bald eagle as the national symbol; .... the bald eagle thus became the symbolic representation of a new nation under a new government in a new world; and .... by that Act of Congress and by tradition and custom during the life of this Nation, the bald eagle is no longer a mere bird of biological interest but a symbol of the American ideals of freedom; and .... the bald eagle is now threatened with extinction...." (Act June 8, 1940, c. 278, 54 Stat. 250). Protection of the golden eagle was added to the statute in 1962. 76 Stat. 1246 (1962).

5

Several courts have held that protection of eagles is a compelling government interest. Protecting eagles is a compelling government interest "because of their religious significance to Native Americans." *U.S. v. Hugs*, 109 F.3d 1375, 1378 (9th Cir.1997) citing *United States v. Dion*, 476 U.S. 734, 740-42 (1986) (discussing legislative history). The Ninth Circuit noted that district courts in the circuit have "also found a compelling interest in protecting eagles as a threatened or endangered species." *Id.* The Eleventh Circuit has alternatively found that the U.S. government has a "compelling governmental interest in fulfilling its treaty obligations with federally recognized Indian tribes" concerning the protection of eagles. *Gibson v. Babbitt*, 223 F.3d 1256, 1258 (11th Cir. 2000).

The Tenth Circuit has said "we cannot ignore that the migratory bird in question here is the symbol of our nation, heightening the government's interest in keeping the species viable." *U.S. v. Hardman*, 297 F.3d 1116, 1127-1128 (10th Cir. 2002). The Court went on to state that "most other courts that have addressed this issue have agreed that the preservation of eagle species represents a compelling interest," citing *United States v. Oliver*, 255 F.3d 588, 589 (8th Cir.2001); *Hugs*, 109 F.3d at 1378; *Gibson v. Babbitt*, 72 F.Supp.2d 1356, 1360 (S.D.Fla.1999), *aff'd*, 223 F.3d 1256 (11th Cir.2000). The Tenth Circuit also noted that there "is dicta from the Supreme Court indicating that the protection of migratory birds might qualify as a compelling

6

interest," citing *Missouri v. Holland*, 252 U.S. 416, 435 (1920) (referring to the protection of migratory birds as a national interest of very nearly the first magnitude). *Hardman*, 297 F.3d at 1127-1128.

As set forth above, Courts have found several overlapping government interests supporting the protection of eagles by restricting the distribution of eagle parts only to officially enrolled members of recognized Indian tribes. These overlapping interests include the protection of eagles as an endangered species and separately as a national symbol of the United States. The Ninth Circuit has said that "as the Tenth Circuit has recognized, '[t]he bald eagle would remain our national symbol whether there were 100 eagles or 100,000 eagles. The government's interest in preserving the species remains compelling in either situation.'" *U.S. v. Vasquez-Ramos*, 531 F.3d 987, 991 (9th Cir. 2008), citing *Hardman*, 297 F.3d 1128. That the eagle may no longer be a threatened species does not change the compelling interest analysis. As the Ninth Circuit said: "[w]e conclude, despite the fact that the bald eagle is no longer considered endangered or threatened, the United States continues to have a compelling interest in protecting eagles by enforcing BGEPA ....." *Vasquez-Ramos*, 531 F.3d at 991.

Another compelling governmental interest in protecting eagles is "because of their religious significance to Native Americans." *Hugs*, 109 F.3d at 1378. Other related governmental interests include the fulfillment of the United States' trust and

7

treaty obligations toward recognized Indian tribes; and the preservation of the government-to-government relationship between the United States and the recognized tribes. *Hardman*, 297 F.3d at 1127-1128.

The court opinions cited above also address the means used to further the government's interests. Limiting possession of feathers and other eagle parts is narrowly tailored to serve the compelling interests discussed above and is the least restrictive means to do so. *See e.g. Oliver*, 255 F.3d at 589; *Hugs*, 109 F.3d at 1379; *Gibson*, 223 F.3d at 1258. In sum, the government has shown that, to the extent it has substantially burdened Plaintiff's religious exercise by not allowing him to possess eagle parts, this burden serves a compelling governmental interest and is the least restrictive means of advancing that governmental interest.

## B. The Free Exercise of Religion

As stated above, Plaintiff also raises a claim that he suffered violations of the Free Exercise of Religion Clause under the First Amendment. This claim also fails. If "a ..... regulation passes muster under RLUIPA, .... it will perforce satisfy the requirements of the First Amendment, since RLUIPA offers greater protection to religious exercise than the First Amendment offers." *Smith v. Allen*, 502 F.3d 1255, 1264 (11th Cir. 2007).

# V. CONCLUSION

The record before this Court shows the absence of a genuine issue of material fact on Plaintiff's claims under the RLUIPA and the free exercise clause of the First Amendment. Plaintiff raises no claim against the City of Albuquerque.

This Court finds that there is no genuine issue of material fact as to Plaintiff's claims and that Defendants are entitled to summary judgment as a matter of law. Defendants' Motion for Summary Judgment [Document No. 26] is **GRANTED**. Plaintiffs's claims are **DISMISSED** with prejudice under Fed.R.Civ.P. 56(c).

Plaintiff's Motion for Extension of Time [Docket Entry No. 27] is **DENIED** as moot and his Motion Argument to Defendants' Objections Prohibiting Discovery [Docket Entry No. 30] is **DENIED**. All other pending motions and requests for relief not previously ruled on are **DENIED**.

SIGNED at Houston, Texas, on _____March 17_____, 2010.


DAVID HITTNER
UNITED STATES DISTRICT JUDGE

Not Reported in F.Supp.2d, 2002 WL 31757473 (W.D.Tex.)
**(Cite as: 2002 WL 31757473 (W.D.Tex.))**

**C**

Only the Westlaw citation is currently available.

United States District Court,
W.D. Texas, Austin Division.
SAVE OUR SPRINGS ALLIANCE, Plaintiff,
v.
Gregg COOKE, in his official capacity as Regional
Administrator of Region 6 of the United States En-
vironmental Protection Agency, and Christine
Whitman, in her official capacity as Administrator
of the Environmental Protection Agency, and
United States Department of Interior, Gale Norton,
in her official capacity as Secretary of the Depart-
ment of the Interior, and Marshall P. Jones, Jr., in
his official capacity as Acting Director of the U.S.
Fish & Wildlife Service, Defendants.

No. A–01–CA–855–SS.
Nov. 12, 2002.

*ORDER*

SPARKS, J.

**\*1** BE IT REMEMBERED on the *12th* day of
November 2002 the Court reviewed the file in the
above-styled cause, specifically the Plaintiff's Mo-
tion for Partial Summary Judgment [# 30], the De-
fendants' Cross–Motion for Summary Judgment [#
34], and the Intervenor–Defendants' Cross–Motion
for Summary Judgment [# 35] and brief in support
thereof [# 36]; the Plaintiff's response to the De-
fendants' motions [# 40]; and the Defendants' [# 45]
and Intervenors' [# 43] replies thereto. The Court
called the above-styled cause for hearing on the
pending summary judgment motions on October 3,
2002, and the parties appeared through counsel of
record. Thereafter, the parties submitted letter
briefs addressing issues raised at the hearing [# 47,
48, 49, 50, 51]. Having considered the motions, re-
sponses, the case file as a whole and the applicable
law, the Court enters the following opinion and or-
ders.

Background

The Barton Springs salamander ("the Salaman-
der") is an elusive and diminutive vertebrate who
lives only under rocks and woody debris in Barton
Springs in Austin. *See* 62 Fed.Reg. 23,377 (1997);
Final Biological Opinion ("Final BO"), at 7. Since
May 30, 1997, the Salamander has inhabited the
Endangered Species list and thereby enjoyed the
full protection of the Endangered Species Act
("ESA"), 16 U.S.C. §§ 1531–1544, and the full at-
tention of the federal courts. *See* 62 Fed.Reg.
23,377 (1997). Because the Salamander is entirely
aquatic, it requires a constant supply of clean water
flowing from the aquifer, and "[t]he primary threats
to this species are degradation of the quality and
quantity of water that feeds Barton Springs due to
urban expansion over the Barton Springs water-
shed." *Id.*

In this case, the plaintiff Save Our Springs Al-
liance ("SOSA") challenges the Fish and Wildlife
Service's ("FWS") analysis of the effects on the
Salamander from the Construction General Permit
program ("the Permit") the Environmental Protec-
tion Agency ("EPA") issued on July 6, 1998, which
expires July 7, 2003. The EPA issued the Permit
pursuant to the Clean Water Act, 33 U.S.C. §§ 1251
–1387. The Permit regulates the discharge of storm
water associated with construction activity that dis-
turbs at least five acres or disturbs less than five
acres but is part of a larger common development
plan. *See* 63 Fed.Reg. 36,490 (July 6, 1998)
("Permit"). It requires applicants to develop, imple-
ment and maintain a Storm Water Pollution Preven-
tion Plan, which evaluates the project's effects on
endangered and threatened species and critical hab-
itat and includes measures to protect them. *Id.*

Addendum A to the Permit outlines the require-
ments for developers. *See* 63 Fed.Reg. 7,917. Be-
fore submitting a Notice of Intent to be covered by
the Permit to the EPA, the developer must undergo
a six-step analysis: (1) determine if the construction
site is found within designated critical habitat for
any listed (endangered or threatened) species; (2)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31757473 (W.D.Tex.)
**(Cite as: 2002 WL 31757473 (W.D.Tex.))**

determine if any listed species are located in the county where the construction will occur; (3) determine if any listed species may be present in the project area; (4) determine if any listed species or critical habitat are likely to be adversely affected by the construction activity's storm water discharges; (5) determine if measures can be implemented to avoid any adverse effects; and (6) if appropriate measures cannot be implemented, the developer must consult with the FWS under the ESA. *Id.* Developers must adopt "Best Management Practices" to minimize the amount of disturbed soil, prevent and slow down runoff, remove sediment from runoff before it leaves the construction site, stabilize completed and temporary stalled areas, meet local and state requirements for sediment and erosion control plans, reduce pollutants from materials storage areas, and prevent and respond to spills. *See* Administrative Record ("AR") at 3080–81.

**\*2** Section 7(a)(2) of the Endangered Species Act ("ESA") requires federal agencies to consult with the FWS to insure an agency action "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2). Before the EPA issued the Permit in 1998, it engaged in two informal consultations with the FWS. On June 15, 2000, SOSA filed a lawsuit in this Court challenging those informal consultations as inadequate under the ESA, and the parties entered into a settlement by which the FWS agreed to consult with the EPA and issue a Biological Opinion evaluating the Permit's effects on the Salamander. The final Biological Opinion was to be completed by September 4, 2001.

On July 19, 2001, the FWS completed its draft Biological Opinion, which concluded the continued operation of the Permit in the Barton Springs watershed is likely to jeopardize the continued existence of the Salamander. *See* AR at 974. This conclusion was based in part on the FWS's determination that 52,000 acres of the approximately 240,000 acres in

the watershed have been developed, and the "pollution generated from these developed areas on the recharge and contributing areas of the aquifer is the main component of the long-term decline in water quality at Barton Springs." *Id.* The FWS hired Dr. Michael Barrett from the University of Texas to analyze the relative increase in pollution resulting from development under the Permit. *Id.* Dr. Barrett determined an additional 2,000 to 5,000 acres of construction would occur throughout the remaining duration of the Permit, producing a load of total suspended solids between 300,000 and 3,000,000 pounds. *Id.* Based on this increase in pollutant load, the FWS determined the Permit "will appreciably reduce the likelihood of both the survival and recovery of the Barton Springs salamander, by reducing its reproduction, numbers, and distribution." AR at 975. The FWS recommended as a reasonable and prudent alternative to the Permit that the EPA modify the Permit to assure water quality in the Barton Springs watershed would not be degraded. *Id.*

On December 17, 2001, SOSA filed this lawsuit, alleging breach of the settlement by failure to comply with consultation deadlines and ESA violations. *See* Complaint. On March 25, 2002, the Court found the agencies had inexcusably missed those deadlines and ordered the EPA and FWS to complete the consultation within forty days. The FWS issued the final Biological Opinion on May 6, 2002, concluding "it is the Service's biological opinion that the continued operation of the CGP in the Barton Springs watershed, as proposed, is not likely to jeopardize the continued existence of the Barton Springs salamander." AR at 3108. The FWS determined the Permit "contains measures to minimize stormwater discharges during construction," and state and local land use controls "address the quality and quantity of storm [sic] resulting from post-construction development." *Id.* With respect to the pollution loads, the FWS found "uncertainty regarding the extent to which the fraction of total loadings attributed to this action translate into increased pollutant levels in the salamander's habit-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31757473 (W.D.Tex.)
**(Cite as: 2002 WL 31757473 (W.D.Tex.))**

at." AR at 3108–09. Additionally, the FWS found "the best available information indicates that the incremental contribution of pollutants from projects covered by the permit during the next fourteen months is expected to be small, provided the permit and applicable local ordinances are followed." AR at 3109. The Biological Opinion also includes reporting and monitoring requirements for the EPA. AR at 3110–11.

**\*3** The plaintiff submitted a supplemental complaint on May 17, 2002, challenging the final Biological Opinion as arbitrary and capricious and in violation of the Endangered Species Act and Administrative Procedure Act. On June 24, 2002, the Court granted the unopposed motion to intervene as defendants of the Texas Capitol Area Builders Association ("TxCABA") and the National Association of Home Builders ("NAHB"). All parties have filed motions for summary judgment.

Analysis

I. Standard of Review

The Court reviews a plaintiff's challenge to an agency's ESA decision under the Administrative Procedure Act ("APA"). 5 U.S.C. § 706(2); *Sierra Club v. Glickman,* 156 F.3d 606, 617 (5th Cir.1998) . Under the APA, courts must uphold agency decisions unless the decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). With regard to this deferential standard of review, the Supreme Court has cautioned: "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The Court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824 (1971).

In determining whether the FWS's decision to issue a no-jeopardy opinion was arbitrary or capricious, the Court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Volpe,* 401 U.S. at 416, 91 S.Ct. at 823–24. In other words, the Court's "only task is to

determine whether the [FWS] has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council,* 462 U.S. 87, 105, 103 S.Ct. 2246, 2256 (1983). Because the APA respects agencies' expertise in their fields, the "only role for a court is to insure that the agency has taken a 'hard look' at environmental consequences; it cannot 'interject itself within the area of discretion of the executive as to the choice of the action to be taken." ' *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 (1976) (citations omitted).

The Court gives even more discretion to an agency's factual determinations when they are based on the agency's scientific or technical expertise. *Marsh v. Oregon Natural Res. Def. Council,* 490 U.S. 360, 377, 109 S.Ct. 1851, 1861 (1989) ("Because analysis of the relevant documents 'requires a high level of agency expertise,' we must defer to 'the informed discretion of the responsible federal agencies." ' (quoting *Kleppe,* 427 U.S. at 412, 96 S.Ct. at 2731)). However, a court must defer to agency expertise "only to the extent that the agency utilizes, rather than ignores, the analysis of its experts." *Defenders of Wildlife v. Babbitt,* 958 F.Supp. 670, 685 (D.D.C.1997). When a case presents conflicting expert testimony, the Court must defer to the agency's decision about which expert is more reliable. *Marsh,* 490 U.S. at 378, 109 S.Ct. at 1861 ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views persuasive."); *Sierra Club v. Froehlke,* 816 F.2d 205, 214 (5th Cir.1987) (scientific disagreements among experts "are not the type that the federal courts are in business to resolve.").

**\*4** When reviewing an agency decision under the APA, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the review-

Not Reported in F.Supp.2d, 2002 WL 31757473 (W.D.Tex.)
**(Cite as: 2002 WL 31757473 (W.D.Tex.))**

ing court." *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244 (1973). The administrative record designated by the FWS consists of " 'the full administrative record that was before the [administrative officer] ... at the time he made his decision." ' *Milena Ship Mgmt. Co. v. Newcomb,* 995 F.2d 620, 624 (5th Cir.1993), *cert. denied,* 510 U.S. 1071 (1994) (quoting *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415–16, 91 S.Ct. 814, 823–24 (1971). The Court cannot conduct its own analysis of the potential jeopardy to the Salamander based on outside evidence produced by either side. *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 744, 105 S.Ct. 1598, 1607 (1985) ("The reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry.").

## II. Summary Judgment Standard

A court may grant summary judgment if the moving party shows there is no genuine issue of material fact, and it is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c). In deciding whether to grant summary judgment, the Court construes all facts and inferences in the light most favorable to the nonmoving party. *Hart v. O'Brien,* 127 F.3d 424, 435 (5th Cir.1997), *cert. denied,* 119 S.Ct. 868 (1999). The standard for determining whether to grant summary judgment "is not merely whether there is a sufficient factual dispute to permit the case to go forward, but whether a rational trier of fact could find for the nonmoving party based upon the record evidence before the court." *James v. Sadler,* 909 F.2d 834, 837 (5th Cir.1990).

Both parties bear burdens of producing evidence in the summary judgment process. *See Celotex Corp. v. Catrett,* 106 S.Ct. 2548 (1986). The moving party must first show "if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof." *Hart,* 127 F.3d at 435. The nonmoving party must then provide "specific facts showing that there is a genu-

ine issue for trial," and "[n]either 'conclusory allegations' nor 'unsubstantiated assertions' will satisfy the non-movant's burden." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588 (1986); *Wallace v. Texas Tech Univ.,* 80 F.3d 1042, 1047 (5th Cir.1996).

In a case like this one, where the Court is reviewing an agency decision under the APA, summary judgment is the appropriate means for resolving claims because the Court is reviewing the legality of the agency action, not acting as the initial factfinder. In an APA case, the Court addresses the legal question of whether the agency action was arbitrary and capricious, so "the district court's review pursuant to a summary judgment motion cannot turn on credibility determinations or conflicting factual inferences." *Sabine River Auth. v. United States Dep't of Interior,* 951 F.2d 669, 679 (5th Cir.1992). Therefore, the Court finds summary judgment appropriate in this case.

## III. Best Scientific Data Available

**\*5** Section 7(a)(2) of the ESA requires each agency to "use the best scientific and commercial data available" in a consultation. 16 U.S .C. § 1536(a)(2). If the Court finds the FWS fulfilled its duty of relying on the best scientific evidence available, "the fact that the evidence is 'weak,' and thus not dispositive, does not render the agency's determination 'arbitrary and capricious." ' *Greenpeace Action v. Franklin,* 14 F.3d 1324, 1336 (9th Cir.1992). SOSA contends the FWS did not rely on the best scientific data available and, therefore, its no-jeopardy opinion is arbitrary and capricious.

The plaintiff contends the scientific evidence in the final Biological Opinion is not the best scientific data available. The Biological Opinion relies on data sources including the EPA's water quality study, the Texas Natural Resource Conservation Commission ("TNRCC"), the United States Geological Survey, the City of Austin, and the Lower Colorado River Authority ("LCRA"). *See* AR at 3088.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31757473 (W.D.Tex.)
**(Cite as: 2002 WL 31757473 (W.D.Tex.))**

Page 5

The Biological Opinion depends heavily on the EPA's water quality analysis submitted to the FWS on April 18, 2002. *See* AR at 2240–2347. The EPA conducted the water quality analysis as part of an agreement with the FWS. *See* AR at 2240. The EPA analysis uses existing data and models to evaluate the annual and overall load of total suspended solids (or sediment), which are "the primary pollutant of concern during the construction phase," and the increase in total suspended solids from construction under the Permit. AR at 2272. The EPA concluded the increased pollutants from construction under the Permit would account for less than one percent of the annual sediment in the Barton Springs Zone streams. AR at 2274. Additionally, the EPA determined the Permit would result in an increase of impervious cover—a "strong predictor of future water quality and ecological integrity of surface waters"—by approximately 255 acres per year in the Barton Springs Zone, or 1,275 acres throughout the life of the Permit. AR at 2274, 2276. Finally, while the EPA anticipated surface water pollutant loads would increase over the long term, it found post-construction storm water pollutant loadings in the near future are only about one to three percent of the total pollutant loads. AR at 2278.

SOSA attacks the EPA study on several grounds, contesting its decision to rely on certain data and discount others. However, this Court's role in APA cases is not to evaluate alleged improper choices among data made by an agency well-practiced in making such decisions. *Marsh,* 490 U.S. at 378, 109 S.Ct. at 1861. The plaintiff also suggests the EPA muscled the FWS into issuing a no-jeopardy opinion by agreeing to provide the water quality analysis. The record does not illustrate any improper influence. On the contrary, the EPA's participation was mandated by law. Under the ESA regulations, the agency requesting the consultation (here, the EPA) must provide the FWS with the best scientific or commercial data available, including the results of studies or surveys conducted by the agency. 50 C.F.R. § 402.14. Accordingly, the Court

finds nothing arbitrary or capricious about FWS's request that the EPA do the study or reliance on the data and conclusions in the study.

**\*6** The plaintiff also criticizes the FWS's reliance on the draft LCRA Environmental Impact Statement, which it contends is an unreliable draft study on which the LCRA has received voluminous negative comments. *See* AR at 2793. The Biological Opinion explains its reasons for relying on the LCRA data: "LCRA's draft study encompasses the same geographical area as the action area affected by the [Permit]. The data sets evaluated by LCRA appear largely to be the same as is available for this consultation." AR at 3088–89. Additionally, the EPA's water quality study states, "The BIO–WEST hydrogeology model [used in the LCRA draft study] appears to reflect the most comprehensive information currently known to EPA regarding the Barton Springs Zone." AR at 2261. The EPA does not rely on the LCRA's evaluation of the data to the extent it relies on the data themselves. *See* AR at 2276 ("EPA recognizes that the LCRA study does not evaluate data precisely in the fashion that is necessary to EPA's evaluation."). The administrative record demonstrates the FWS evaluated the available data sources and determined the data collected in the LCRA study were the best, and most relevant, available for its analysis. The decision to utilize the LCRA data was born out of the agency's scientific expertise, and this Court is required to give it substantial deference. *Marsh,* 490 U.S. at 378, 109 S.Ct. at 1861. Given the FWS's explanation of its decision to use the data, combined with the fact that the FWS relied on several other data sources as well, the Court need not scrutinize the agency's decision in light of public criticism of the draft study.

The plaintiff argues the final Biological Opinion ignores the scientific evidence in the draft Biological Opinion—specifically, the methodology of Dr. Michael Barrett, the scientist from the University of Texas whom the FWS hired to model the current status of Barton Springs. AR at 812–13. However, the record shows the FWS did not ignore

Not Reported in F.Supp.2d, 2002 WL 31757473 (W.D.Tex.)
**(Cite as: 2002 WL 31757473 (W.D.Tex.))**

Dr. Barrett's analysis, because it was included as part of the EPA's water quality analysis, upon which the final Biological Opinion relies heavily. The EPA study uses Dr. Barrett's model, "with minimal changes," to estimate the increase in total suspended solids resulting from the Permit. AR at 2272. Because the agency considered the model and made an informed, expert decision about how to use it, the Court must defer to that choice.

Finally, SOSA argues the FWS's final Biological Opinion was based not on science, but on politics. SOSA emphasizes the Austin Field Office's rejection of the Biological Opinion, concluding that the national FWS officials shifted positions from the draft Biological Opinion in response to pressure from the political appointees at the EPA and the lobbying muscle of TxCABA. SOSA focuses on a secret meeting in Washington, D.C. on September 5, 2001, during which EPA and FWS officials purportedly reached an agreement on the final Biological Opinion. However, there is no evidence in the administrative record that the agencies agreed at that meeting to anything other than further scientific study of the effects of the Permit. *E.g.,* AR at 1901–02 ("On September 6, 2001, FWS indicated to EPA that it intended to perform additional review of the draft Biological Opinion. Both Agencies mutually agree such a review is in the interest of good science.... [FWS and EPA officials] have met to discuss and establish an open scientific process to examine (1) the physico-chemical condition of the Barton Springs watershed; (2) the extent of biological impacts to the Barton Springs salamander; and (3) the potential sources of those impacts and actions related to the construction storm water general permit that might be taken to ensure those impacts do not jeopardize the long term survival and recovery of the species.").

**\*7** SOSA points to the "abrupt about-face of FWS" between the draft Biological Opinion and the final no-jeopardy opinion as evidence of political influence *per se.* The FWS completed the draft on July 19, 2001; the final Biological Opinion was re-

leased May 6, 2002. This is hardly an abrupt turnaround; in fact, the delay was so unnecessarily lengthy this Court had to intervene and order the FWS to complete the final opinion within forty days. The plaintiff focuses on the draft Biological Opinions prepared by FWS personnel in the Austin Field Office on April 20 and 30, 2002. *See* AR at Docs. 250 & 278. However, the Austin Field Office of the FWS could have just as easily have been motivated by political pressure as the national FWS office. The record demonstrates the draft opinion was criticized by at least one FWS biological expert, Dr. Renne R. Lohoefener, who wrote: "The opinion is rife w/ subjective conclusions not well documented by science. I can not recommend that the BO go forward as drafted." AR at 3255. Even local officials were not unanimously supportive of the draft: the Executive Director of Texas Parks & Wildlife wrote in October 2001 that the state agency officials "cannot support the USFWS conclusions" and "strongly recommend that all of the data and assumptions be given a comprehensive and critical review by an established authority," because "[w]ithout peer review, the current Biological Opinion is truly just that, an opinion issued by a few local biologists." AR at 1823.

Moreover, this Court's task is to evaluate the final Biological Opinion issued by the Secretary of the FWS, not to compare it to draft opinions. If the final Biological Opinion is not arbitrary and capricious, this Court has nothing further to say. *E.g., Southwest Center for Biological Diversity v. U.S. Bureau of Reclamation,* 143 F.3d 515, 523 (9th Cir.1998) ("The District Court correctly held that the only relevant question before it on review was whether the Secretary acted arbitrarily and capriciously or abused his discretion in adopting the final [opinion]. In answering this question, the court had only to determine if the final [opinion] met the standards and requirements of the ESA. The court was not in a position to determine if the draft [opinion] should have been adopted or if it would have afforded the [endangered species] better protection.").

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31757473 (W.D.Tex.)
**(Cite as: 2002 WL 31757473 (W.D.Tex.))**

IV. Effects of the Action

The plaintiff contends "the fatal flaw" of the Biological Opinion is the FWS did not comply with its duty to evaluate the total effects of the Permit but limited its evaluation to the time left before the expiration of the Permit. SOSA's Letter Brief [# 51], at 1. In determining whether an agency action is likely to jeopardize an endangered species under the ESA, the FWS is required to analyze the effects of the action, including "the direct and indirect effects of an action on the species or critical habitat together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline." 50 C.F.R. § 402.02. The environmental baseline "includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area." *Id.*

**\*8** SOSA contends the agency should have analyzed the effects of the entire five years of the Permit. *See* SOSA's Letter Brief [# 48], at 1. However, as described above, the EPA water quality analysis estimates the increase in pollutants on an annual basis and throughout the life of the Permit, as well as for the remaining year of the Permit. Table 11 in the study estimates the increase in impervious cover in the Barton Springs Zone over the five-year term of the Permit, and Table 12 projects the increased surface water pollutant loads post-construction for the life of the Permit. *See* AR at 2276; 2278. Relying on these estimates, the Biological Opinion states, "the construction phase pollutant loads from construction sites that are compliant with the [Permit]'s terms and conditions will account for 0.05% of the surface water [total suspended solid] loads in the watershed for the life of the permit." AR at 3104. While the Biological Opinion does emphasize that "the incremental contribution of pollutants from projects covered by the permit during the next fourteen months is expected to be small," the plaintiff cannot reasonably argue the FWS did not consider the effects of the Permit over the entire five-year period. AR at 3109.

The Biological Opinion also takes into account the long-term impacts of the Permit. For instance, when estimating the increase in post-construction storm water pollutant loads in the watershed, the FWS found the "impacts will continue for 50 to 100 years because these developments will be relatively permanent." AR at 3105. Therefore, the record demonstrates the FWS fulfilled its duty of "considering the effects of the action as a whole." 50 C.F.R. § 402.14(c).

V. Minimizing Adverse Effects

The estimated pollution increase from the Permit and, ultimately, the no-jeopardy Biological Opinion depend on compliance with and enforcement of the Permit by the EPA. The plaintiff argues the developers have too much freedom under the Permit to self-monitor and the EPA will not adequately monitor their compliance. Specifically, the plaintiff contends the conclusion in the Biological Opinion that the FWS "believes that enhanced compliance monitoring and habitat monitoring will minimize or avoid any of the potential adverse effects attributed to the action under this consultation" is unsupported by the administrative record. AR at 3107.

While the FWS found the Permit is not likely to jeopardize the continued existence of the Salamander, it also found the Permit "could result in a some [sic] incremental increase in the levels of certain pollutants in salamander habitat. Such pollutants, when present at elevated levels, have the potential to significantly impair the salamander's essential behavior patterns." AR 3109–10. Because of this potential, the FWS issued an incidental take statement. AR at 3109. The draft Biological Opinions did not include an incidental take statement. *See, e.g.,* AR at 2818 ("[T]he Service does not anticipate any incidental take of the salamander as a result of the proposed action.").

**\*9** As part of the incidental take statement, the FWS included "non-discretionary" measures for the EPA to implement in order to minimize the impact of the Permit on the Salamander's habitat. AR at

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31757473 (W.D.Tex.)
**(Cite as: 2002 WL 31757473 (W.D.Tex.))**

3109–10. Under these conditions, the EPA is required to identify Notices of Intent submitted for construction projects under the Permit within the Barton Springs Zone and notify the developers of their duty to comply with the Permit and applicable state and local water regulations, as well as conduct outreach activities for developers in the area. AR at 3110. Additionally, the EPA must convene monthly telephone conferences with the Austin FWS office and the TNRCC, as well as the City of Austin, to discuss compliance with the Permit and specific construction sites covered under the Permit. AR at 3110. The EPA will also conduct random and targeted inspections of construction sites in the Barton Springs area and follow up on violations of the Permit. AR at 3110. Finally, the EPA will provide technical experts to discuss water quality measures to benefit the Salamander. AR at 3111.

While the Court acknowledges much of the impetus to comply with the Permit rests on the developers, it was not arbitrary and capricious for the FWS to rely on the EPA's willingness to implement these mandatory measures in order to minimize the impacts of the Permit. The EPA is obligated to monitor compliance with the Permit and enforce its requirements. If the EPA does not live up to its word, the Court trusts SOSA and the FWS will take notice and the undersigned will hear about it. Additionally, by requiring the EPA to maintain consistent relations with local authorities, the FWS ensures the EPA does not attempt to enforce the Permit from afar. Moreover, the Biological Opinion mandates continuous monitoring of the Permit's impacts and, if the monitoring "detects any significant impact to water quality in the salamander habitat due to the [Permit]," the EPA must reinitiate consultation. AR at 3111. Upon receiving the final Biological Opinion, the EPA committed to implement the mandatory conditions and also committed to implement the discretionary conservation recommendations in the Biological Opinion "to the maximum extent possible." AR at 3397–98. It was not unreasonable for the FWS to depend partly on the EPA's word in issuing the final no-jeopardy opin-

ion.

In addition to the EPA's commitment to enforce the Permit's requirements, the FWS also pointed out state and local land use controls that already help protect the Salamander. Local ordinances in Austin, Dripping Springs, and the Village of Bee Cave regulate the location of land in relation to waterways, limit impervious cover, require water quality buffer zones and include erosion control mechanisms. *See* AR at 3085–86. Various state laws and regulations also include land use controls relevant to the Barton Springs watershed. *See* AR at 3086–87. The plaintiff contends these regulations are inadequate to protect the Salamander. *See* Plaintiff's Reply [# 40], at 10–11. However, the plaintiff misses the point: the FWS does not rely on state and local regulations alone to ensure the continued existence of the Salamander, but considers the regulations in determining the environmental baseline from which to analyze the Permit's impact. The FWS concluded the Permit's impact, given the current water quality in the Barton Springs zone, the EPA's commitment to enforce the Permit's requirements, *and* the state and local regulations already in place, would not jeopardize the continued existence of the Salamander. The state and local regulations were simply one consideration out of many.

Conclusion

**\*10** Having reviewed the final Biological Opinion and the administrative record, the Court finds the FWS's no-jeopardy Biological Opinion was not arbitrary and capricious, an abuse of discretion or otherwise not in accordance with the law. The FWS considered all relevant factors in evaluating the Permit's potential impacts. Additionally, the FWS evaluated the scientific data available and ultimately made choices about which data are more reliable—a choice that deserves deference from this federal court. While the final Biological Opinion represents a quite radical change from the draft opinion, neither the Endangered Species Act nor the Administrative Procedure Act charge this Court with comparing drafts of administrative decisions

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31757473 (W.D.Tex.)
**(Cite as: 2002 WL 31757473 (W.D.Tex.))**

and looking beyond the administrative record to discern why changes were made. In fact, no statute gives federal courts these powers, because the separation of powers doctrine creates a division of labor, delegating tasks to the branch of the federal government most equipped to resolve them. This Court is certainly not equipped to choose which scientific expert's analysis of total suspended solid loads is most accurate. The Court may only scrutinize the final Biological Opinion and ensure it follows the law and is supported by the administrative record; in this case, the Court finds it passes muster.

This opinion concludes the Court's approximately fifth lawsuit concerning the Salamander and probably the one with the least real-life impact. By the plaintiff's own estimate, this Permit will become irrelevant long before its expiration in July 2003, because the Texas Commission on Environmental Quality may replace it as early as January 2003. While this fact played no role in the Court's analysis of the Biological Opinion, it should ease the concerns of the friends of the Salamander and demonstrate just how ineffectual federal courts really are.

In accordance with the foregoing:

IT IS ORDERED that the Plaintiff's Motion for Partial Summary Judgment [# 30] is DENIED;

IT IS FURTHER ORDERED that the Defendants' Cross–Motion for Summary Judgment [# 34] is GRANTED;

IT IS FINALLY ORDERED that the Intervenor–Defendants' Cross–Motion for Summary Judgment [# 35] is GRANTED.

W.D.Tex.,2002.
Save Our Springs Alliance v. Cooke
Not Reported in F.Supp.2d, 2002 WL 31757473 (W.D.Tex.)

END OF DOCUMENT

101 Fed.Appx. 446, 2004 WL 1399202 (C.A.5 (Tex.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 101 Fed.Appx. 446, 2004 WL 1399202 (C.A.5 (Tex.)))**

H

This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007.   See also Fifth Circuit Rules 28.7, 47.5.3, 47.5.4.   (Find CTA5 Rule 28 and Find CTA5 Rule 47)

United States Court of Appeals,
Fifth Circuit.
John Brown LEWIS, IV, Plaintiff-Appellant,
v.
NFN GREEN; NFN Day; Jane Doe, Defendants-Appellees.

No. 04-10070.
Conference Calendar.
DECIDED: June 22, 2004.

John Brown Lewis, IV, Texas Department of Criminal Justice, Institutional Division, Huntsville, TX, for Plaintiff-Appellant.

Appeal from the United States District Court for the Northern District of Texas, USDC No. 5:01-CV-318-BG.

Before BARKSDALE, DeMOSS, and CLEMENT, Circuit Judges.

PER CURIAM: FN*

> FN* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

**1 John Brown Lewis, IV, Texas prisoner # 1012766, appeals from the dismissal of his 42 U.S.C. § 1983 lawsuit with prejudice as frivolous

pursuant to 28 U.S.C. §§ 1915(e)(2)(B), 1915A(b)(1), and 42 U.S.C. § 1997e(c)(1)-(2). On appeal, Lewis repeats his underlying constitutional claim. The district court correctly held that Lewis's claim is barred by *Heck v. Humphrey,* 512 U.S. 477, 486-87, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), as well as under the doctrines of collateral estoppel and *res judicata. See Allen v. McCurry,* 449 U.S. 90, 95-96, 104-05, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). Accordingly, Lewis's complaint was properly dismissed as frivolous. *See Ruiz v. United States,* 160 F.3d 273, 275 (5th Cir.1998); *Martin v. Scott,* 156 F.3d 578, 580 (5th Cir.1998).

Lewis's appeal is without arguable merit and is frivolous. *See Howard v. King,* 707 F.2d 215, 219-20 (5th Cir.1983). Because the appeal is frivolous, it is DISMISSED. *See* 5TH CIR. R. 42.2. The dismissal of this appeal as frivolous counts as a "strike" for purposes of 28 U.S.C. § 1915(g), as does the district court's dismissal. *See Adepegba v. Hammons,* 103 F.3d 383, 385-87 (5th Cir.1996). We warn Lewis that if he accumulates three "strikes" under 28 U.S.C. § 1915(g), he will not be able to proceed *in forma pauperis* in any civil action or appeal filed while he is incarcerated or detained in any facility unless he is under imminent danger of serious physical injury. *See* 28 U.S.C. § 1915(g).

APPEAL DISMISSED; STRIKE WARNING ISSUED.

C.A.5 (Tex.),2004.
Lewis v. Green
101 Fed.Appx. 446, 2004 WL 1399202 (C.A.5 (Tex.))

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.