**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MC ALLEN DIVISION**

| | | |
|---|---|---|
| **Mc Allen Grace Brethren Church, Native American New Life Center, San Antonio Indian Fellowship; South Texas Indian Dancers Association; Linda Cleveland,** Individually**; Michael Russell,** Individually; **Veronica Russell,** Individually; **Edith Clark,** Individually and as council member of  Native American New Life Center**; William Clark,** Individually, and as member of Native American New Life Center**; Carrie Felps**, Individually; **Homer Hinojosa, III,** Individually and as member of Mc Allen Grace Brethren Church, San Antonio Indian Fellowship, and South Texas Indian Dancers Association**; Nancy Hollingworth,**as member of Native American New Life Center**; Lucian Oden,** as member of San Antonio Indian Fellowship**; Xavier Sanchez,** as member of San Antonio Indian Fellowship**; and Pastor Robert Soto,** Individually, and on behalf of Mc Allen Grace Brethren Church, Native American New Life Center, San Antonio Indian Fellowship, and South Texas Indian Dancers Association, | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **CIVIL NO. 7:07-CV-060 AMENDED MOTION FOR SUMMARY JUDGMENT** |
| **Plaintiffs,**<br>**V.** | §<br>§<br>§ | |
| **Secretary of the U.S. Dept. of Interior, Ken Salazar, in his official capacity,** | §<br>§<br>§ | |
| **Defendant.** | § | |

**PLAINTIFFS' AMENDED MOTION FOR SUMMARY JUDGMENT**

**COMES NOW,** Plaintiffs Mc Allen Grace Brethren, et. al., who move for summary judgment on all of the claims in their First Amended Complaint pursuant to Fed. R. Civ. P. 56. Plaintiffs' counsel discussed the grounds for this motion and the relief requested with counsel for the Defendant in March 2012. Defendant's counsel opposes the relief requested herein, but agreed to the cross-filing of motions for summary judgment. In support of a judgment in their favor, Plaintiffs state the following:

**STATEMENT OF THE ISSUES PRESENTED:**

1. **Whether Defendant's policy** excluding Plaintiffs and hundreds of thousands of other Indians, for lack of enrollment in a federally recognized tribe, from the use of eagle feathers and bird parts central and essential to practicing their religion, **violates Plaintiffs' right to freely exercise** their Indian religion as protected under the Free Exercise Clause of the First Amendment and the Religious Freedom Restoration Act (RFRA).[1]

2. **Whether Defendant's policy** excluding Plaintiffs and hundreds of thousands of other Indians, for lack of enrollment in a federally recognized tribe, from the use of eagle feathers and bird parts central and essential to practicing their religion, **substantially burdens Plaintiffs' right to freely exercise** their Indian religion as protected under the Free Exercise Clause of the First Amendment and the RFRA.

3. **Whether Defendant's policy basis of protecting eagle populations** to the extent of prohibiting Plaintiffs from using eagle feathers and bird parts central and essential to the practice of their religion, although Plaintiffs' engage a no-kill policy, **meets the strict scrutiny analysis for a "compelling governmental interest" under the Free Exercise Clause of the First Amendment and RFRA**.

---

[1] 107 Stat. 1488, 42 U.S.C. § 2000bb *et seq.*

4. **Whether Defendant's policy basis of protecting American Indian religion and culture** to the extent of prohibiting Plaintiffs and hundreds of thousands of other Indians from using eagle feathers and bird parts central and essential to the practice of their religion **meets the strict scrutiny analysis for a "compelling governmental interest" under the Free Exercise Clause of the First Amendment and RFRA**.

5. **Whether**, in the enforcement of the BGEPA and the MBTA, **Defendant's failure to employ the statutorily prescribed definition of Indian and Defendant's use instead of an American Indian as a person enrolled in a federally recognized tribe violates RFRA and the First Amendment** by criminalizing Plaintiffs and hundreds of thousands of unenrolled Indians if they use eagle feathers considered essential and central to American Indian beliefs and practices.

## PRINCIPAL CONTROLLING AUTHORITIES

**Cases**

*A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*, 611 F. 3d 248 (2010)

*In the Matter of Joseluis Saenz*, v. *Dept. of Interior*, No. 00-2166 (10th Circuit, 2000)

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006).

*Sherbert v. Verner,* 374 U.S. 398 (1963)

*Wisconsin v.Yoder,* 406 U.S. 205 (1972).

**Statutes**

107 Stat. 1488, 42 U.S.C. § 2000bb *et seq*.

16 USC 1371, 1372

16 USC 703.

## INTRODUCTION

Plaintiffs commenced this action and now bring this motion to obtain a declaration of rights that Defendant's policies and practices violate the Free Exercise Clause of the First Amendment and RFRA.  Plaintiffs therefore also seek the remedy of an order of the Court permanently enjoining Defendant from engaging in its illegal efforts to ban American Indian religious practices in the future.

Plaintiffs are American Indians as defined by federal and state law.  In 2006, they were conducting an American Indian religious event called a powwow.  Eagle feathers considered central and essential to American Indian religious rites, ceremonies, activities, and practices associated with the powwow were in the possession of and worn by powwow participants, including Plaintiffs Rev. Robert Soto and his brother-in-law Michael Russell.

As Plaintiffs' Complaint alleges and documents abundantly produced by Defendant confirm, a federal agent entered the powwow and seized eagle feathers worn by Plaintiffs Soto and Russell. Plaintiff brings this motion, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for a summary judgment on the issue of whether Defendant violated the Free Exercise Clause of the First Amendment and RFRA, as applied to Plaintiffs' right to the free exercise of their American Indian religious beliefs.

## UNDISPUTED MATERIAL FACTS

### I.  The Plaintiffs

All Individual Plaintiffs are American Indians as defined by a federal law that also counts them as American Indians on the 2000 decennial census.  The definition set

forth is designed "to enhance the accuracy of the demographic information collected by the Federal Government" and "to monitor civil rights enforcement and program implementation" relative to American Indians.[2]

In fleshing out the law, the Executive Office of President, Office of Management and Budget (OMB), Office of Information and Regulatory Affairs makes three important points.  First, American Indian is defined as: "A person having origins in any of the original peoples of North and South America (including Central America), and who maintains tribal affiliation or community attachment."  Moreover, Central and South American Indians should be classified as American Indian and the category referred to as "American Indian or Alaska Native" should be modified to include the original peoples of Central and South America.[3]  Second, "racial and ethnic categories . . . should not be interpreted as being primarily biological or genetic in reference.  Race and ethnicity may be thought of in terms of social and cultural characteristics as well as ancestry. . . Respect for individual dignity should guide the processes and methods for collecting data on race and ethnicity; ideally, respondent self-identification should be facilitated to the greatest extent possible, recognizing that some data collection systems observer identification is more practical."[4]  And third, "(t)he term American Indian should not be changed to Native American."[5]

Plaintiffs Robert Soto, Veronica Russell, and Homer Hinojosa III also assert their American Indian identity as members of the Lipan Apache Tribe of Texas, a state-

---

[2] http://www.whitehouse.gov/omb/fedreg/ombdir1.5html. *Federal Register* Notice, October 30, 1997, "Revisions to the Standards for the Classification of Federal Data on Race and Ethnicity," Executive Office of President, Office of Management and Budget (OMB), Office of Information and Regulatory Affairs.
[3] http://www.whitehouse.gov/omb/fedreg/ombdir1.5html. *Federal Register* Notice, October 30, 1997, "Revisions to the Standards for the Classification of Federal Data on Race and Ethnicity," Executive Office of President, Office of Management and Budget (OMB), Office of Information and Regulatory Affairs.
[4] Id.
[5] Id.

recognized tribe.[6] Other named Plaintiffs are American Indian organizations wherein members of American Indian tribes, communities, churches, and dance groups can practice their sincere American Indian religious beliefs.

Plaintiff Rev. Robert Soto is a religious leader among the American Indian Plaintiffs.  He is an enrolled member of the Lipan Apache Tribe of Texas, a state-recognized tribe.  He is also Vice Chairman of the Lipan Apache Tribe of Texas.

In his role as an American Indian religious leader, he serves as Pastor of McAllen Grace Brethren Church, Native American New Life Center, and San Antonio Indian Fellowship.  He is a founder and dancer with the South Texas Indian Dancers Association, which performs at American Indian religious services, ceremonies, and events.

Plaintiff Michael Russell is a Muscogee Creek Indian and the brother-in-law of Rev. Soto. His wife Plaintiff Veronica Russell and their two sons are enrolled members of the Lipan Apache Tribe of Texas. He, his wife, and sons are all members of the South Texas Indian Dancers Association. The remaining Plaintiffs are participants in American Indian religious services, ceremonies and events organized, sponsored and led by Rev. Soto and his tribe.

On March 11, 2006, United States Fish and Wildlife Service Agent Alejandro Rodriguez entered a powwow held at the Palm View Community Center in McAllen, Texas. A powwow is an American Indian religious service and cultural event. The powwow was sponsored by members of the Lipan Apache Tribe of Texas.

---

[6] (*See* Senate Resolution 438 and House of Representative Resolution 812 attached).

Using a Department of Interior regulation that bans all American Indians not enrolled in federally-recognized tribes from possessing or using feathers or parts of birds listed on the Migratory Bird Treaty Act (MBTA)[7] and Bald and Golden Eagle Protection Act (BGEPA)[8] for their religious ceremonies, the Agent seized eagle feathers belonging to Rev. Robert Soto and Michael Russell, who were participating as dancers in the powwow.

Specifically, the Agent seized two Golden Eagle feathers that were worn in a ceremonial roach headdress by Reverend Robert Soto, who was participating at the powwow as a Feather Dancer (also known as a Fancy Dancer) and a Hoop Dancer.  Next, the Agent seized a ceremonial bustle with 42 Golden Eagle feathers belonging to Rev. Soto and worn by Michael Russell, who was participating at the powwow as a Traditional Dancer. The Agent also seized four other Golden Eagle feathers belonging to Mr. Russell.  Two of the feathers were Helushka (Warrior) feathers and two were worn in a ceremonial roach headdress.

The feathers seized are considered by American Indian Plaintiffs to be sacred objects essential and central to their American Indian religious beliefs and practices.

The Agent issued a citation to Rev. Robert Soto for possessing two Golden Eagle feathers in violation of the BGEPA, and the Migratory Bird Treaty Act.   Rev. Soto was not assessed any fine.

The Agent also issued a citation to Michael Russell for the one bustle made of Golden Eagle feathers and the four other loose Golden Eagle feathers in violation of the BGEPA and MBTA.   Mr. Russell was assessed a fine for $500, which he paid.

---

[7] 16 USC 1371, 1372
[8] 16 USC 703.

Plaintiffs Soto and Russell submitted a Petition for Remission on May 9, 2006 to the U.S. Fish and Wildlife Service; their Petition for Remission was timely and was accepted by letter on June 8, 2006 by Kevin R. Adams, Chief of the Office of Law Enforcement for Fish and Wildlife Service, U.S. Department of Interior, in the Washington, D.C. Office.  Also in 2006, Plaintiffs' Petition for Remission was supplemented by Plaintiffs' counsel without request.  Plaintiffs' Petition for Remission was denied on February 23, 2007 by Martin Steinmetz of USFWS.  Plaintiffs Soto and Russell then submitted an appeal called a Supplemental Petition for Remission on March 2, 2007.  Plaintiffs filed this civil action in March of 2007 based on violations of RFRA and their First, Fifth, and Fourteenth Amendment rights perpetrated in the raid of their March 11, 2006 powwow and the continuing violations of being denied their freedom to practice their religion with any bird parts.  Plaintiffs Soto and Russell's Supplemental Petition for Remission received a denial response four and-a-half years later in December of 2011.

## II. The Defendant's Stipulations

In a United States Department of Interior Letter (Attached as Exhibit A), by Janet Spaulding, Esq., dated December 8, 2011, RE: Supplemental Petition of Remission, Attorney Spaulding stated the following:

1. In a companion case,[9] "the parties had stipulated that the powwow was a religious service." (at page 2)

2. "I will accept that Mr. Soto and Mr. Russell were exercising their religious beliefs in the use of the golden eagle feathers they wore during the powwow (at page 3).

---

[9] U.S. v. Michael Cleveland, Magistrate Action No. M06-4806-1.

3. "It is undisputed that Michael Russell, Mr. Soto's brother-in-law, wore the golden eagle bustle and (had) possession of four single golden eagle feathers owned by Rev. Soto with Rev. Soto's permission." (at page 3)

4. "It is undisputed that Mr. Soto allowed a person who is not a member of a federally recognized Indian tribe to take possession of his bustle made from golden eagle feathers as well as four loose golden eagle feathers." (at page 3)

5. "I find that although Rev. Soto is a sincere religious practitioner of Native American religion, the federal government's compelling interest in limiting the right to legally possess eagle feathers for religious purposes to members of federally recognized tribes prevents any mitigation of the seizure of the golden eagle feathers involved in this matter." (at page 9)

**ARGUMENT**

**1. Defendant's action violates the Free Exercise Clause of the First Amendment and the Religious Freedom Restoration Act (RFRA).**

Plaintiffs assert that a Department of Interior (DOI) regulation banning the possession and use of eagle feathers considered essential and central to the practice of Plaintiffs' American Indian religious beliefs because they are not American Indians enrolled in federally-recognized tribes offends Plaintiffs' senses and sincere American Indian religious beliefs. Moreover, Plaintiffs assert that Defendant's action violates the Free Exercise Clause of the First Amendment and the Religious Freedom Restoration Act (RFRA).

In 2010, in the case of *A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.* ,[10] the U.S. Court of Appeals for the Fifth Circuit agreed with the U.S. District Court of the Southern District of Texas and held that a local government regulation that "offends the sincere religious belief" of a member of the Lipan Apache Tribe of Texas was invalid under Texas Law.

In this particular case, a five-year-old boy and his parents were planning to move to Needville, Texas, a small town located forty-five miles southwest of downtown Houston. The father and the boy were members of the Lipan Apache Tribe of Texas.  In keeping with the boy's and his father's American Indian religious beliefs, the boy had never cut his hair. His parents wanted assurance that the boy could continue to wear his hair long at school, and they contacted the school district in Needville concerning its dress code.

The school district had a grooming policy, which, among other things, provided that "[b]oys' hair shall not cover any part of the ear or touch the top of the standard collar in back." The policy's stated design was "to teach hygiene, instill discipline, prevent disruption, avoid safety hazards, and assert authority."  The parents challenged the school district's dress code as it applied to their son.

Although the school district agreed that the boy had a sincere religious belief in leaving his hair *uncut*, it argued that the evidence demonstrated that there was no sincere belief in wearing his hair visibly long. Thus, the school could require him to wear his uncut hair in ways that best conform his appearance to that of male students who cut their hair to meet dress code requirements.  According to the school district, even though some Americans Indians keep their hair long and in braids as a tenet of their sincere religious

---

[10] *A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.,* 611 F. 3d 248 (2010)

beliefs, "other Native Americans fasten their long hair in buns or otherwise obscure their hair so that it is not visibly long. If those Native Americans can comply with their religious beliefs in that way, the District assert(ed) that (the Lipan Apache boy) can, too," such as in a bun on top of his head or in a braid tucked inside his shirt.

In deciding the case, the Court turned to the Texas Religious Freedom Restoration Act (TRFRA), which evolved out of RFRA.  Both RFRA and TRFRA are "a response to a . . . federal kerfuffle over the level of scrutiny to apply to free exercise claims under the First Amendment of the United States Constitution."[11]  In 1990, the Supreme Court held, in *Employment Division, Department of Human Resources of Oregon v. Smith*[12] that the First Amendment's Free Exercise Clause does not inhibit enforcement of otherwise valid laws of general application that incidentally burden religious conduct.

Responding to *Smith*, Congress enacted the Religious Freedom Restoration Act of 1993 (RFRA)[13].  RFRA expressly adopted the compelling interest test as set forth in a pair of Supreme Court cases, *Sherbert v. Verner*[14] and *Wisconsin v.Yoder.*[15]  That test "prohibits '[g]overnment' from 'substantially burden[ing]' a person's exercise of religion even if the burden results from a rule of general applicability unless the government can demonstrate the burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."[16] As originally enacted, RFRA applied to both federal and state governments, "but notably

---

[11] *A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.,* 611 F. 3d 248 (2010).
[12] *Employment Division, Department of Human Resources of Oregon v. Smith,*[12] 494 U.S. 872, 874 (1990). This is a case that challenged the use of sacramental peyote in the Native American Church.
[13] 107 Stat. 1488, 42 U.S.C. § 2000bb *et seq.,*  42 U.S.C. § 2000bb(b)(1).
[14] *Sherbert v. Verner,*[14] 374 U.S. 398, 399–402 (1963)
[15] *Wisconsin v.Yoder*[15], 406 U.S. 205, 221–29 (1972).
[16] *City of Boerne v. Flores*, 521 U.S. 507, 515–16 (1997) (quoting 42 U.S.C. § 2000bb-1; brackets in original

lacked a Commerce Clause underpinning or a Spending Clause limitation to recipients of federal funds."[17]

In *City of Boerne v. Flores* in 1997,[18] the Supreme Court invalidated RFRA as applied to the states and their subdivisions, finding that Congress had exceeded its remedial power under the Fourteenth Amendment to delineate the scope of constitutional violations.  Even though the *City of Boerne v. Flores* held that RFRA no longer applied to states and their subdivisions, RFRA still applied to the federal government.

Unhappy with the results of the *City of Boerne Case,* Texas passed TRFRA which mirrored RFRA, reinstating "the same protections to religious free exercise envisioned by the framers of its federal counterpart, RFRA," and applying the language of RFRA to the State of Texas and its subdivisions (including school districts).

2.  **Defendants regulation substantially burdens Plaintiffs' free exercise of religion.**

In *A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*, the Court wrote that to succeed on a RFRA-type[19] claim, Plaintiffs "(h)aving demonstrated a sincere belief,[20] must also demonstrate (1) that the government's regulations burden the plaintiff's free exercise of religion and (2) that the burden is substantial. If the plaintiff manages that showing, the government can still prevail if it establishes that (3) its regulations further a compelling governmental interest and (4) that the regulations are the least restrictive means of furthering that interest.[21]

---

[17] *Cutter v. Wilkinson*, 544 U.S. 709, 715 (2005).
[18] 521 U.S. at 532–36.
[19] In this case, it was the Texas Restoration Freedom of Religion Act or TRFRA.
[20] Attorney for the DOI has written: "I will accept that Mr. Soto and Mr. Russell were exercising their religious beliefs in the use of the golden eagle feathers they wore during the powwow." (at page 3).
[21] A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist., 611 F. 3d 248 (2010)

The Court went on to state that a burden is substantial if it is "real vs. merely perceived, and significant vs. trivial"—two limitations that "leave a broad range of things covered." The inquiry should focus on "the degree to which a person's religious conduct is curtailed and the resulting impact on his religious expression," as "measured . . . from the person's perspective, not from the government's.[22]

The Court also noted: "From federal precedent, we know that 'at a minimum, the government's *ban* of conduct sincerely motivated by religious belief substantially burdens an adherent's free exercise of that religion.' When conduct is subject to an outright ban, "alternative accommodations do not alter 'the fact that the rituals which [the adherent] claims are important to *him*—without apparent contradiction—are now completely forbidden.'"[23]

Plaintiffs assert that the Defendant's total ban on their possessing and using eagle feathers pursuant to their religious beliefs and practices is a substantial burden to American Indian Plaintiffs. In 1962, Congress recognized that burden, as well, and it provided a remedy with an exception in the Eagle Law so that all American Indians could practice their American Indian religions and beliefs. In 1962, Congress wrote in an exception "to permit the taking, possession and transportation of (eagle feathers and parts) . . .for the religious purposes of Indian tribes."[24] Nowhere in the statute does it limit the exception to only members of federally-recognized Indian tribes. That limitation was

---

[22] Id., at page
[23] Id., at page
[24] 1 16 U.S.C. Sec. 668(a), originally passed in 1940, see Act of June 8, 1940, ch. 278, 54 Stat. 250-251, the Eagle Act as amended in 1962, adding both protection of golden eagles and the exception at issue in this case for possession for the religious purposes of Indian tribes.

engineered by Defendant's Agency, The U.S. Department of Interior, which has a long history of discrimination against American Indian religious beliefs and practices.

According to the 10th Circuit Court of Appeals: "Not until 1981, eighteen years after the regulation was first enacted, was the requirement that an applicant be a member of a federally-recognized Indian tribe clearly articulated. In 1981, after a member of an Indian tribe that was not federally recognized requested a permit for eagle feathers, the Deputy Solicitor of the Interior issued a memorandum which stated that only federally-recognized Indian tribes constituted 'Indian tribes' under the BGEPA. Id. at 3-4; Aplt. App. at 189. It was only in 1999 that the regulatory language was changed to clearly reflect the requirement that an applicant must be a member of a federally- recognized Indian tribe. See 50 C.F.R. § 22.22 (1999)."[25]

The Defendant's regulation has evolved to the point that a small minority of American Indians (specifically, those enrolled in federally-recognized tribes) has the right to the free exercise of an American Indian religion which uses feathers and parts of birds listed on the MBTA or BGEPA as essential and central to the practice of their American Indian religion.

According to the 2000 U.S. Census, 4,119,301 American Indians were counted. In 1999, the "Indian Labor Force Report," Office of Tribal Affairs, Bureau of Indian Affairs, U.S. Department of Interior, counted 1,698,483 Indians enrolled in federally recognized tribes.  Thus, if all Indians enrolled in federally-recognized tribes were counted on the 2000 census (which was highly unlikely), nearly two-thirds of all Indians counted were not enrolled in federally-recognized tribes and thus not eligible for eagle feathers under the government's regulation.

---

[25] In the Matter of Joseluis Saenz, v. Dept. of Interior, No. 00-2166 (10th Circuit)

In yet another estimate of the American Indian population in the United States referred to in a 2000 10th Circuit Court of Appeals opinion, the Court noted that in 1995 there were 8.7 million "Americans who identify themselves as having Native American Ancestry." Under this count, more than three-fourths of all Indians were not enrolled in federally recognized tribes and thus not eligible for feathers under the government's regulation.[26]

In an effort to appear to be supportive of the Indian Tribe exception in the Eagle Act, the Defendant has made a token effort to collect eagle bodies, feathers, and bird parts for American Indian rituals through the creation of a National Eagle Repository at the Rocky Mountain Arsenal National Wildlife Refuge in Denver, Colorado.[27] It also has experimented with a repository for non-eagle species of listed on the MBTA.

By any reasonable measure, the National Eagle Repository is an abject failure. According to the Division of Migratory Bird Management, only 1.1 percent of all the members of federally-recognized tribes have eagle permits.[28] This means that **more than ninety-eight percent** of Indians the government claims it is protecting with its regulations (i.e., members of federally-recognized tribes) have not applied for and received eagle permits from the government.

Even more revealing, in *U.S. v. Cleveland* (2006)[29], Jeff Haskins, Chief of the Migratory Bird Office for the U.S. Fish and Wildlife Service, indicated that his office had

---

[26] *In the Matter of Joseluis Saenz*, v. *Dept. of Interior*, No. 00-2166 (10th Circuit) at Footnote 9.
[27] Draper, Electa, "Eagle bodies, parts for Indian rites are collected, sent from Colo. Morgue," *The Denver Post,* Posted: 09/01/2001, p. 1. http://www.denverpost.com/ci_13242945. Accessed: 2-27-2012.
[28] Stokes DaShanne, "Eagle feathers and the imperialist conquest of state-recognized tribes," *Indian Country Today*, p. 5, 8-13-08.
[29] *U.S. v. Cleveland*, Violation No ST34 W0889336, Magistrate Action No. M-06-4806, at Footnote 33.

issued only 182 permits to Indians enrolled in federally-recognized tribes for non-eagle feathers of birds listed on the MBTA. This means that **more than ninety-nine percent** of Indians the government claims it is protecting with its regulations (i.e., members of federally-recognized tribes) have not applied for and received permits from the government for non-eagle feathers or parts of birds listed on the MBTA.

Congress has explicitly declared a policy "to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian, . . . including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites." The Indian Religious Freedom Act, 42 U.S.C. § 1996.  Clearly, this policy has not been implemented in good faith by the government when it comes to American Indian possession and use of feathers of protected species of birds.  A more reasonable conclusion is the government's regulations are designed to deny American Indians access to feathers of birds listed on the MBTA and BGEPA.

## 3.  The Defendant's interest in protecting eagle populations is not compelling under RFRA or the First Amendment.

The government asserts a compelling interest for its regulation on two grounds: (1) protecting eagles, and (2) protecting federally-recognized tribes' culture.[30]  Also, the government asserts "in furtherance of a compelling governmental interest" its policy "is the least restrictive means of furthering that compelling governmental interest."

Bald eagle populations have made significant recoveries since protections were established under the BGEPA. In 2001, it was noted that "the current nesting population

---

[30] Spaulding, Janet, U.S. Department of Interior Letter, dated March 8, 2011. Also, see *U.S. v. Wilgus* and *U.S. v. Hardman*, 297 F3d 116 (10th Cir. 2002).

of Bald Eagles has increased by more than a factor of ten since 1963."[31]  Moreover, in

2007, the government removed the Bald Eagle in the lower 48 states from the List of

Endangered and Threatened Wildlife.

More recently, on March 9, 2012, the U.S. Fish and Wildlife Service issued a

permit allowing the Northern Arapaho Tribe of Wyoming to kill bald eagles for religious

purposes.[32]

Plaintiffs consider the preservation of protected species of birds as paramount.

From the beginning, Plaintiffs have taken the position that they have no desire to harm or

kill any birds listed on either the MBTA or BGEPA, nor are they seeking permission to

do so.  It is not necessary. It is estimated that there are 80,000-110,000 Bald Eagles in the

wild[33] and another 30,000 Golden Eagles in the United States alone.[34]  Each eagle has in

excess of 7,000 feathers it sheds each year through a natural process called "molting".

This means there are literally millions of eagle feathers shed annually by live birds.

Under the current government regulation, American Indians cannot pick up a single

feather shed by eagles from off the ground without a government permit—a permit the

government denies to the vast majority of our Indian people.  Because of the regulation

and the burdensome permit requirements, millions of eagle feathers that could be used in

American Indian religious practices remain uncollected and on the ground each year

subject to destruction by humans, the elements of Nature, and other sources.

---

[31] Appellee Joseluis Saenz, En Banc Rehearing Brief, U.S. Court of Appeals for the Tenth Circuit, page 3.
[32] *San Antonio Express-News*, "Feds allow tribe to kill two eagles," March 14, 2012, P. A3.
[33] Alaska's Bald Eagles: Eagles are as common as pigeons in Southeast Alaska,
http://alaskatrekker.com/eagles.htm. Accessed 2-24-2012.

[34] McNeel, Jack, Coeur d'Alene Elders View Golden Eagle Release, October 14, 2011, p. 3.
http://indiancountrytodaymediannetwork.com/2011/10/14/coeur-dalllllene-elders-view-eagle-release-58412#ixzzinJZvbyNS. Accessed: 2-24-12.

Moreover, eagle populations in zoos and aviaries regularly shed feathers, as well. Too often, their feathers are put in the trash or burned by the establishments that house these birds.  Also, there are many eagles that die from natural causes, such as old age or illness.  Others are victims of road kill, pollution, electrocution, wind farms, illegal poaching by non-Indians, and many other causes whose feathers and body parts could be used for American Indian religious practices and ceremonies. Most of these birds are never recovered by the government or any other agency for a wide range of reasons—mostly because it is illegal, impractical, and costly.

Because of (1) the Bald and Golden Eagle population recovery, (2) the government's removal of the Bald Eagle from the List of Endangered Wildlife, (3) the vitality of today's eagle populations, (4) the government's recent permitting of the killing of bald eagles by the members of the Northern Arapaho Tribe of Wyoming, and (5) the government's ineffectual ability to provide permitted feathers and eagle body parts to any American Indian, the government has no compelling interest in denying Plaintiffs, for religious purposes, feathers and body parts of birds listed on the MBTA and BGEPA.

Plaintiffs challenge the government's regulation as "the least restrictive means of furthering" the government's asserted "compelling interest." Plaintiffs propose even lesser restrictive measures than the government's regulation. These measures would mean greater supplies of feathers for our Indian people and more effective management of our bird populations. These measures include:

> _First, let American Indians collect and gather feathers shed by living birds without government harassment and intervention._  Under this proposal, eagles are not harmed, killed or threatened in any way.

*Second, let American Indians themselves serve as stewards of their sacred bird populations, along with the government, by developing their own aviaries.*

Today, the "Zuni Tribe has a federal permit to keep live eagles, most of which come from raptor rehabilitation projects."[35] This practice should be expanded, encouraged and supported by the government for other tribes and Indian communities, as well. Because of the veneration Indians have for their winged brothers and sisters, they would serve as ideal guardians of these species listed on the MBTA and BGEPA.

**4.   Defendant's asserted compelling interest in preserving American Indian culture and religion for federally-recognized Indians is contradicted by its regulation prohibiting the use of bird parts for religious purposes by a majority of American Indians.**

Plaintiffs contend that Defendant's regulation prohibiting the use of feathers and bird parts of birds listed on the MBTA and BGEPA for Plaintiffs' religious purposes contradicts the government's so-called "compelling interest" in preserving American Indian culture for those enrolled in federally-recognized tribes. How can American Indian culture and religion be preserved when the government denies that culture and religion to most American Indians?

We embrace the U.S. District Court's and 10th Circuit Court's position in the *Joseluis Saenz Case* as a more reasonable approach.  In the *Saenz* Case, the courts held

---

[35] San *Antonio Express-News*, "Tribe: Bald eagle permit a victory for tradition." March 18, 2012, P. A12.

that the government cannot "give religious preference to one group of Native Americans over another."[36]

**5.  Defendant's definition of American Indian violates RFRA and the First Amendment when it enforces the BGEPA and MBTA concerning the use of eagle feathers considered essential and central to the practice of the American Indian religion.**

The federal government has used and continues to use several different definitions for American Indian. All but one includes American Indians <u>not</u> enrolled in federally-recognized tribes. The following five definitions are submitted for review:

1.  *<u>An American Indian is defined as "A person having origins in any of the original peoples of North and South America (including Central America), and who maintains tribal affiliation or community attachment</u>.*[37]

This definition of American Indian was mandated to "be used by the Bureau of the Census in the 2000 decennial census. Other Federal programs (were directed to) adopt the (definition) as soon as possible, but not later than January 1, 2003, for use in household surveys, administrative forms and records, and other data collections."[38]

In *Federal Register* Notice, dated October 30, 1997, at Supplementary Information, Section B, Comprehensive Review Process, it states:

---

[36] *In the Matter of Joseluis Saenz vs. Department of Interior*, U.S. 10th Circuit Court of Appeals, No. 00-2166, Appeal from the U.S. District Court in New Mexico, D.C. No. 99-21-M.

[37] http://www.whitehouse.gov/omb/fedreg/ombdir1.5html. *Federal Register* Notice, October 30, 1997, "Revisions to the Standards for the Classification of Federal Data on Race and Ethnicity," Executive Office of President, Office of Management and Budget (OMB), Office of Information and Regulatory Affairs.

[38] Ibid. Effective Date.

1. The racial and ethnic categories set forth in the standards should not be interpreted as being primarily biological or genetic in reference. Race and ethnicity may be thought of in terms of social and cultural characteristics as well as ancestry.

2. Respect for individual dignity should guide the processes and methods for collecting data on race and ethnicity; ideally, respondent self-identification should be facilitated to the greatest extent possible, recognizing that some data collection systems observer identification is more practical.

In *Federal Register* Notice, dated October 30, 1997, at Supplementary Information, Section B, Comprehensive Review Process, it further states:

"The **principle objective** of the review has been to **enhance the accuracy of the demographic information** collected by the Federal Government."

"The **second element (is) to monitor civil rights enforcement and program implementation**." (Bold print supplied)

In *Federal Register* Notice, dated October 30, 1997, at Supplementary Information, Section D, OMB's Decisions, Subsection (8), OMB accepts the following recommendation concerning changing the term "American Indian" to "Native American," it states:

**"The term American Indian should not be changed to Native American."** (Bold print supplied)

In *Federal Register* Notice, dated October 30, 1997, at Supplementary Information, Section D, OMB's Decisions, Subsection (12), OMB accepts the

following recommendations concerning the classification of Central and South American Indians, it states:

**Central and South American Indians should be classified as American Indian.** (Bold print supplied)

The definition of the "American Indian or Alaska Native" category should be modified to include the original peoples of Central and South America.

In addition, OMB has decided to make the definition for the American Indian or Alaska Native category more consistent with the definitions of other categories.

2.  *An  American  Indian is defined as a member of any federally or State recognized tribe, or an individual certified as an Indian artisan by an Indian tribe*.

This definition is used in the enforcement of a truth-in-advertising law that prohibits misrepresentation in marketing of Indian arts and crafts products within the United States.  The law is enforced by the Department of Interior. *See* Indian Arts and Crafts Act of 1990 (P.L. 101-644).

3.  *An American Indian is defined as" any individual who. . .irrespective of whether he or she lives on or near a reservation, is a member of a tribe, band, or other organized group of Indians, including those tribes, bands or groups terminated since 1940 (i.e., no longer federally-recognized) and those recognized now or in the future by the State in which they reside, or who is a descendent, in the first or second degree, of any such member,. . ."*

This definition is used for American Indians eligible for scholarship and grant programs. *See* Indian Health Care Improvement Act (IHCIA), U.S.C. Sec. 1603(c).

4. *An American Indian "shall. . .include all other persons of one-half or more Indian blood" irrespective of their membership in a federally recognized tribe.*

This definition is used for those Indians eligible for tuition loans for vocational and trade schools. *See* Indian Reorganization Act of 1934 (IRA), 25 U.S.C. Sec. 476, 479, and 471. Also *see In the Matter of Joseluis Saenz*, v. *Dept. of Interior*, No. 00-2166 (10th Circuit).

5. *An American Indian is defined **only** as a member of a federally-recognized tribe*.
This definition is used by the Department of Interior for implementing The Eagle Act, 16. U.S.C. Sec. 668(a), originally passed in 1940 and amended in 1962 (with an exception for feathers and bird parts for "religious purposes of Indian tribes").
Plaintiffs assert that, when it comes to the free exercise of religion, the broadest definition of American Indian shall be used.  Thus, **Definition 1** whose principle objective is to "enhance the accuracy of the **demographic information** collected by the Federal Government," and the second element is **"to monitor the civil rights enforcement and program implementation"** should be used for determining plaintiffs' rights to feathers seized in this case.

## CONCLUSION

The history of discrimination against American Indian religion and culture in the United States is long and sad.

In 1883, the Department of Interior's Commissioner of Indian Affairs Hiram Price declared that "the old heathenish dances" associated with American Indian powwows and other religious practices were "a great hindrance to the civilization of the Indians."

Thereupon, he promulgated a *Code of Indian Offenses*, declaring all dances and feasts associated with Indian powwows and other religious ceremonies "Indian offenses." The *Code* specifically targeted American Indian religious leaders, ruling

> "The usual practices of so-called "medicine-men" shall be considered "Indian offenses". . ., and whenever it shall be proven. . .that the influence or practice of a so-called "medicine-man" operates as a hindrance to the civilization of a tribe. . .to prevent the Indians from abandoning their heathenish rites and customs, he shall be adjudged guilty of an Indian offense. . .(and) confined in. . .prison. . .until such time as he shall produce evidence. . .that he will forever abandon all practices styled Indian offenses. . ."

In 1887, the federal government attempted to "civilize" American Indians largely through the education of their children. In 1892, Captain Richard Pratt, the founder of the first Indian boarding school in Carlisle, Pennsylvania stated the objective of educating Indian children was to make certain "*that all the Indian there is in the race should be dead. Kill the Indian in him and save the man.*"[39]

---

[39] In the *Saenz Case*, the 10th Circuit Court wrote:

> For approximately sixty years (1871-1928), the federal government conducted an official policy of "assimilation" towards Native Americans, which resulted in a "systematic attempt to eradicate Indian heritage and tribalism." Felix S. Cohen, Handbook of Federal Indian Law 127-143 (1982 ed.). The 1950s saw an official policy of "termination," in which the federal government sought to end the "trust relationship" between the federal government and Indian tribes, and Congress voted to "terminate" numerous tribes. Id. at 152-75. An "important practical effect of termination was to remove the sovereignty of terminated tribes. Although the termination acts did not expressly extinguish the governmental authority of such tribes, most were not able to exercise their governmental powers after the loss of their land base." Id. at 175.

> Overall, "[f]ederal policy toward the recognition of Indian tribes has been by no means consistent with `real' ethnological principles: Congress has frequently consolidated previously distinct groups into a single tribe for recognition purposes, or has divided an individual tribe into two or more groups, recognizing each in turn as a `different' Indian `nation.' Congress has also occasionally `terminated' tribes' federal recognition, in some cases only to `restore' it thereafter . . . ." Christopher A. Ford, "Executive Prerogatives in Federal Indian Jurisprudence: The Constitutional Law of Tribal Recognition," 73 Denv. U. L. Rev. 141, 156 (1995) (citations omitted), quoted in Aplt. App. at 207 (district court opinion). Mr. Saenz's tribe, the Chiricahua Indians, was once a federally-recognized tribe with its own reservation. That status was revoked, however, when the federal government dissolved the Chiricahua reservation in 1886 after the outbreak of warfare between the Apache and the United States. Aplee. App. at 66-69 (Executive Orders creating and dissolving Chiricahua reservation). It has largely been the federal government's policies toward the

Since that time, Indian people have struggled to save their culture.  Today, many of our Indian elders remember a time when we held our powwows and other religious ceremonies in secret, all the while fearing the wrath of the federal government.  In 1989, Plaintiff Robert Soto and his family held the first open powwow in south Texas.  In 2006, the fist of the federal government came down hard on our Indian community.

Plaintiffs and American Indians throughout Texas pray the court renders a summary judgment, keeping in mind that recent cases and law have begun to open the door for our Indian people to practice their religions beliefs without the repressive measures of the government.

---

Indian tribes over the years that have determined which tribes have survived and which tribes have not. On the one hand, historical government policy toward the Chiricahua tribe may have made it impossible for that tribe to obtain federal recognition today, while on the other hand, the government now wants to use that same lack of recognition to infringe on Mr. Saenz's religious freedom. We refuse to base Mr. Saenz's free exercise rights on such tenuous ground.

Congress has explicitly declared a policy "to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian, . . . including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites." The Indian Religious Freedom Act, 42 U.S.C. § 1996. Against this background, we do not believe that Mr. Saenz's free exercise rights should be conditioned on his "political" status-whether or not he is a member of a federally-recognized tribe.

Finally, the government alleges that allowing Mr. Saenz and others like him to obtain eagle permits will result in a permit system that is administratively unfeasible. As explained, the government has offered no proof that the number of permit applicants would substantially increase in the absence of the challenged restriction, and we cannot ignore the fact that the government operated the permit system for eighteen years without requiring an applicant to be a member of a federally-recognized tribe. See supra, note 2. The government operates programs for Native Americans under the IRA and IHCIA that do not require participants to be members of federally-recognized tribes. Presumably, the government has found a way to allocate the limited resources in those programs (scholarship funds and grants) among the programs' applicants. The government will have to do the same here. As the district court stated, "[t]he federal government may find it difficult, time-consuming or bothersome to identify authentic Indian tribes ethnologically rather than simply politically, but the present test will never provide for the individual free exercise of religion precisely because of cases like the present one and because whether or not a particular tribe has been formally recognized for political purposes bears no relationship whatsoever to whether or not an individual practitioner is of Indian heritage by birth, sincerely holds and practices traditional Indian religious beliefs, is dependent on eagle feathers for the expression of those beliefs, and is substantially burdened when prohibited from possessing eagle parts." Aplt. App. at 218.

In 2010, in the case of *A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.,* the U.S. Court of Appeals for the Fifth Circuit agreed with the U.S. District Court of the Southern District of Texas and held that a local government regulation that "offends the sincere religious belief" of an American Indian boy who wishes to wear his hear long was invalid under Texas Law.[40]

In 2000, *In the Matter of Joseluis Saenz v. Department of Interior*, U.S. 10th Circuit Court of Appeals, No. 00-2166, Appeal from the U.S. District Court in New Mexico, D.C. No. 99-21-M, both the Court of Appeals and the District Court held an American Indian (Joseluis Saenz) who did not meet the requirements for enrollment in a federally-recognized tribe should be permitted to possess and use eagle feathers in American Indian religious ceremonies (such as powwows). Although Joseluis Saenz asserted he was an American Indian, he could not meet the requirements for enrollment in a federally recognized tribe. We wholeheartedly embrace the District Court's and Circuit Court's position in the *Saenz Case* that held that the government cannot "give religious preference to one group of Native Americans over another."[41]

Under the Religious Freedom Restoration Act (RFRA), laws have evolved in states, like Texas, where the majority of American Indians not enrolled in federally-recognized tribes have the same right to practice their American Indian religion as those enrolled in federally-recognized tribes.  Today, these rights not only belong to all Indian boys wishing to wear their hair long at school, but these rights belong to members of the

---

[40] *A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.,* 611 F. 3d 248 (2010)
[41] The *Saenz Case* is distinguished from *U.S. v. Wilgus* and *U.S. v. Hardman*, 297 F.3d 1116 (10th Cir. 2002) which involved non-Indians who had been prosecuted under the BGEPA for possession of eagle feathers without a BGEPA permit. Mr. Saenz self-identified as an American Indian, even though he could not meet the requirements for enrollment in a federally-recognized tribe.  Wilgus and Hardman both identified as non-Indians practicing an American Indian religion that used eagle feathers as part of its worship and practices.

Native American Church who ingest sacramental peyote because it is essential and central to the Church's religious observances and ceremonies.

Also, in 2006, the U.S. Supreme Court ruled in favor of worshipers in a similar matter concerning the Uniao do Vegital religion permitting their ingesting of Hoasca tea as an essential and central element of their religion. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006).

**RELIEF REQUESTED**

For the reasons set forth above, Plaintiffs seek the following relief:

1.  A judgment declaring the Defendant's interpretation of the MBTA and BGEPA banning Plaintiffs' religious use of eagle feathers violates the RFRA and the First Amendment's Free Exercise Clause of the U.S. Constitution.

2. A judgment declaring that the MBTA and the BGEPA does not apply to American Indians as defined under 62 FR 58782, whether enrolled in federally recognized tribes or not, and that all American Indians as defined under 62 FR 58782 may possess, carry, use, wear, give, loan, or exchange among other American Indians, without compensation, all eagle feathers.

3. A judgment declaring that the federal agent who entered the Mc Allen Powwow and seized the feathers of Rev. Robert Soto and Michael V. Russell on or about March 11, 2006, at the premises at the Palm View Library and Community Center, located at 1401 Jordan Street, in Mc Allen, Texas acted beyond the bounds of his legal authority because, as American Indians as defined under 62 FR 58782, Rev. Robert Soto and Michael V. Russell were entitled to the feathers seized for religious reasons and purposes.

4. A judgment declaring that the federal agent who raided the Mc Allen Powwow and seized the feathers of Rev. Robert Soto and Michael V. Russell on or about March 11, 2006,

at the premises at the Palm View Library and Community Center, located at 1401 Jordan

Street, in Mc Allen, Texas acted beyond the bounds of his legal authority in violation of

RFRA and the First Amendment's Free Exercise Clause of the U.S. Constitution.

     5. Return of the eagle feathers seized from Rev. Robert Soto and Michael Russell.

Respectfully submitted:

BY:  /s/ Milo Lone-Eagle Colton _____
Dr. Milo Lone-Eagle Colton, Regional Counsel
Nebraska Bar No: 19693
Civil Rights Legal Defense & Edu. Fund, Inc.

/s/ Marisa Y. Salazar _____
Marisa Y. Salazar, Regional Counsel
ATTORNEY IN CHARGE FOR PLAINTIFFS
New Mexico Bar No: 25887
Civil Rights Legal Defense & Edu. Fund, Inc.
519 Culebra Road, San Antonio, Texas 78201
Telephone: 210-334-5209 Fax: 210-492-1601

**CERTIFICATE OF SERVICE**
This is to certify that on September 25, 2012, the attached Plaintiffs' Amended Motion
for Summary Judgment was filed electronically. Notice of the filing will be sent to all
parties by operation of the Court's electronic filing system, including the Counsel listed
below. Parties may access this filing through the Court's system.

Jimmy Rodriguez, Assistant U.S. Attorney, Southern District of Texas, 919 Milam, Suite
1500, P.O. Box 61129, Houston, TX 77208, **Attorney for Defendant**

/s/Marisa Y. Salazar_____
Attorney for Plaintiffs