**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**MCALLEN DIVISION**

| | | |
|---|---|---|
| MCALLEN GRACE BRETHREN CHURCH, et al., | § § § | |
| Plaintiffs, | § | Case No. 7:07-cv-60 |
| | § | |
| v. | § | |
| | § | |
| KEN SALAZAR, SECRETARY, UNITED STATES DEPARTMENT OF THE INTERIOR, | § § § | |
| | § | |
| Defendant. | | |

**DEFENDANT'S AMENDED CROSS-MOTION FOR SUMMARY JUDGMENT AND**
**OPPOSITION TO PLAINTIFFS' AMENDED MOTION FOR SUMMARY JUDGMENT**

Respectfully Submitted,

KENNETH MAGIDSON
UNITED STATES ATTORNEY

JIMMY A. RODRIGUEZ
Assistant United States Attorney
Southern District of Texas
Texas Bar No. 24037378
Federal ID No. 572175
1000 Louisiana, Suite 2300
Houston, Texas 77002
Tel: (713) 567-9532
Fax: (713) 718-3303
Attorney in Charge for Defendant

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant, Ken Salazar, Secretary of the United States Department of the Interior, by and through the United States Attorney for the Southern District of Texas, hereby renews his Motion for Summary Judgment. Defendant also opposes Plaintiffs' Motion, and Amended Motion, for Summary Judgment. In support of this renewed motion and opposition, Defendant would show the Court the following:

## INTRODUCTION

The Department of the Interior's longstanding policy is that only members of federally recognized tribes may possess eagle feathers and eagle parts. In this case, Plaintiffs challenged the Department of the Interior's denial of Plaintiff Reverend Robert Soto's petition for the return of his eagle feathers. The underlying premise of their claims is that the Department of the Interior's regulations and actions under the Bald and Golden Eagle Protection Act (Eagle Act) violate the Religious Freedom Restoration Act (RFRA). Plaintiffs contend that the Department should allow *all* persons of American Indian heritage to possess eagle feathers irrespective of whether they are members of federally recognized tribes. Plaintiffs' position -- that the number of persons entitled to possess eagle feathers should be increased by millions -- would undermine the compelling interests that the government is furthering via its eagle feather policy and should therefore be rejected. As discussed in detail below and in prior briefing, courts have repeatedly, and recently, upheld the regulations that Plaintiffs challenge in this lawsuit. Further, the Administrative Record and supplemental documents fully support the Defendant's actions. For these reasons, the Court should enter judgment in favor of the Defendant.[1]

---

[1] In their Amended Motion for Summary Judgment, Plaintiffs repeat many of the arguments that were made in their original motion. As a result, Defendant has been forced to repeat many of the

1

**BACKGROUND**

The factual and legal background in this case was set forth in Defendant's Original

Motion for Summary Judgment, which is incorporated by reference. *See* Defendant's Cross-

Motion for Summary Judgment (hereinafter "Def's Original MSJ"), Doc. No. 33 at 3-8 (Factual

and Legal Background sections). The most salient undisputed facts are as follows:

- In March of 2006, a Special Agent from the United States Fish and Wildlife Service (FWS) investigated a powwow held in McAllen, Texas. *See* Administrative Record (AR) at 100.

- The Special Agent's investigation led to the seizure of feathers and eventually the criminal prosecution of a powwow attendee. *Id.*; *see also United States v. Cleveland*, 7:06-mj-04806.

- Plaintiff Soto, with the assistance of a private attorney, voluntarily relinquished his golden eagle feathers to the Department of the Interior. AR 26 and 27.

- Plaintiff Soto availed himself of the administrative remedy of petitioning the Department of the Interior for the return of the golden eagle feathers, which was denied. AR 100.

- Plaintiff Soto then filed a supplemental petition for remission, which was also denied on December 8, 2011.  AR 286.[2]

- Plaintiff Soto's supplemental petition for remission was denied because he is not a member of a federally recognized tribe.  *Id.*

- None of the Plaintiffs in this case are members of federally recognized tribes.  *See* Exhibit 1 to Def's Original MSJ, Declaration of R. Lee Fleming, ¶¶ 3-6 (confirming that the Lipan Apache Tribe of Texas is not federally recognized); Plaintiffs'

---

responses that were set forth in his original cross-motion.  That said, Defendant has attempted to respond more directly to Plaintiffs' contentions in this brief as the Court instructed.

[2]  As explained in the Letter denying the supplemental petition for remission, the Department of the Interior waited for the final resolution of Mr. Cleveland's criminal case before it made its decision on Mr. Soto's supplemental petition. AR 286 at p. 2.

Amended Complaint at 21 ("Plaintiffs are American Indians as defined under 62 FR 58782 who are not enrolled in federally recognized tribes").[3]

In their amended motion for summary judgment under the heading "Undisputed Material Facts", Plaintiffs make a series of factual assertions with no citations to evidence. These types of bald assertions are not competent summary judgment evidence. *Hugh Symons Group, plc v. Motorola, Inc.,* 292 F.3d 466, 468 (5th Cir. 2002)(noting that unsubstantiated assertions and unsupported speculation are not competent summary judgment evidence). Similarly, Plaintiffs refer to newspaper articles throughout their brief, which is, again, not competent summary judgment evidence. *See* Fed.R.Civ.P. 56(c)(1)(A); *Roberts v. City of Shreveport*, 397 F.3d 287, 295 (5th Cir. 2005)(noting that newspaper articles are not competent summary judgment evidence). Rather than considering unsupported factual assertions, the Court should review this case based upon the previously-filed Administrative Record. *See* Doc. No. 30.[4] The fact that Plaintiff has made unsupported factual assertions does not preclude summary judgment for the Defendant in this Administrative Procedure Act (APA) record-review case because there are no genuine issues of material fact.

## APA REVIEW

Judicial review of administrative actions is governed by section 706 of the APA, 5 U.S.C. § 706. *See U.S. v. Menendez*, 48 F.3d 1401, 1410 (5th Cir. 1995)(holding that "[e]xcept as otherwise provided by law, the APA judicial review provisions apply to all federal agency

---

[3] Plaintiffs state that "Plaintiff Michael Russell is a Muscogee Creek Indian" in their Amended Motion for Summary Judgment. *See* Pls' Amended MSJ at 6.  However, Plaintiffs' counsel has confirmed that Plaintiff Russell is not an enrolled member of any tribe.  *See* Exhibit A.

[4]  Defendant also attached Declarations to its Original Motion for Summary Judgment, which provide the Court with the most up-to-date information available.

actions unless a statute precludes judicial review or agency action is committed by law to agency discretion"). RFRA provides a private right of action for claims against federal agency actions that are allegedly in violation of the legal standards set forth in the statute. *See* 42 U.S.C. §§ 2000bb-1(c) (stating that "[a] person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government"). RFRA, however, does not establish any procedures for judicial review. Hence, RFRA's silence on the standards for judicial review of federal agency action dictates that APA principles apply. *See United States v. Carlo Bianchi*, 373 U.S. 709, 715 (1963)(noting that "in cases where Congress has simply provided for review [of federal agency actions], without setting forth the standards to be used or the procedures to be followed" review should be confined to the administrative record).[5]

Plaintiffs' challenge to Defendant's denial of Plaintiff Soto's petition is governed by the "arbitrary and capricious" standard of review set out in the APA. 5 U.S.C. § 706(2)(A); *see also Harris v. U.S.,* 19 F.3d 1090, 1096 (5th Cir. 1994).  The Court's review under this standard is narrow, and the Court cannot substitute its judgment for that of the agency, particularly when the challenged decision "implicates substantial agency expertise.'" *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 376 (1989). An agency's conclusions must be upheld if the agency has considered the relevant factors and has articulated a rational connection between its factual judgments and its policy choice.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm*

---

[5] Similarly, for example, although the Endangered Species Act provides a private right of action against federal agencies, 16 U.S.C. § 1540(g)(1), it does not contain an internal standard of judicial review. Thus, courts review agency compliance with the Endangered Species Act pursuant to the APA. *See generally In Cabinet Mountains Wilderness v. Peterson,* 685 F.2d 678 (D.C. Cir. 1982) (citing *United States v. Carlo Bianchi*).

*Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983). In essence, the Court must decide only whether the decision was "based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-16 (1971). Finally, "where the Court is reviewing an agency decision under the APA, summary judgment is the appropriate means for resolving claims because the Court is reviewing the legality of the agency action, not acting as the initial fact finder. [Thus, the Court's review] . . . cannot turn on credibility determinations or conflicting factual inferences." *Save Our Springs Alliance v. Cooke*, No. 01-855-SS, 2002 WL 31757473, at *4 (W.D. Tex. 2002).

## ARGUMENT

### I.    PLAINTIFFS' EAGLE ACT CLAIMS FAIL.

Plaintiffs' challenge to the denial of Plaintiff Soto's petition fails because the Eagle Act's prohibition against possessing eagle feathers and its limited exception for members of federally recognized tribes satisfy RFRA. Because the Lipan Apache Tribe is not federally recognized, its members are ineligible to invoke the limited exception to the prohibition on possessing eagle feathers. Plaintiffs' arguments concerning the Eagle Act fly in the face of existing caselaw. The Court need go no further than the large body of caselaw supporting the Department of the Interior's position in order to grant Defendant's Motion for Summary Judgment. If the Court nevertheless goes further and reviews the Administrative Record, it will find that the Department of the Interior's actions are fully supported and should be upheld.

#### A.    The extensive body of caselaw upholding the federally recognized tribe exception to the Eagle Act should be followed here.

As discussed in Defendant's Original Motion for Summary Judgment, virtually every court to address the validity of the Eagle Act under RFRA has upheld it. The Ninth and Eleventh

5

Circuits have upheld the Act against challenges, like the one presented here, brought by persons who are not members of federally recognized tribes alleging that the possession ban violates RFRA. *See United States v. Vasquez-Ramos*, 531 F.3d 987 (9th Cir. 2008); *United States v. Antoine*, 318 F.3d 919 (9th Cir. 2003) (rejecting claims of members of a non-federally recognized tribe); *Gibson v. Babbitt*, 223 F.3d 1256 (11th Cir. 2000) (per curiam); *see also United States v. Winddancer*, 435 F. Supp. 2d 687 (M.D. Tenn. 2006); *United States v. Lundquist*, 932 F. Supp. 1237 (D. Or. 1996); *Rupert v. Director, U.S. Fish & Wildlife Svc.*, 957 F.2d 32 (1st Cir. 1992) (holding denial of application to possess eagle feathers filed by non-member Native American did not violate Free Exercise Clause); *Garret v. Fish & Wildlife Svc.*, 4:08-3129 (March 17, 2010, S.D. Tex.) (J. Hittner), AR 245-253. Similarly, the Tenth Circuit recently upheld the Department of the Interior's implementation of the Eagle Act against a challenge similar to the one presented here. *United States v. Wilgus*, 638 F.3d 1274 (10th Cir. 2011), AR 203-244.

The *Wilgus* decision, as the most recent Court of Appeals decision on the issue, is particularly instructive here. AR 203. In *Wilgus*, the district court had dismissed the charges against the defendant for the possession of eagle feathers, holding that the Eagle Act's prohibition against possessing eagle feathers violates the RFRA. 638 F.3d at 1284. The court of appeals reversed the lower court, joining the Ninth and Eleventh Circuits in upholding the Eagle Act against RFRA claims. 638 F.3d at 1274. The court held that the current regulatory scheme, which allows only members of federally recognized tribes to possess eagle parts, is the least restrictive means of furthering the government's competing compelling interests in protecting eagles and fostering the culture and religion of federally-recognized tribes. 638 F.3d 1296.

In making its decision, the *Wilgus* court rejected the district court's proffered alternative of opening the Repository to sincere adherents of Native American religions. 638 F.3d at 1293-94. The court found that opening the Repository to non-members would undermine the government's interest in fulfilling its trust responsibilities to the tribes by increasing the time that members of federally recognized tribes would have to wait to receive eagle parts from the Repository, and it could increase enforcement problems. *Id.* at 1293. Finally, the court held that the current regulatory scheme, under which only members of federally recognized tribes are permitted to possess eagle parts for religious purposes, is the least restrictive means of furthering both of the government's compelling interests in that it protects eagles and "does its best to guarantee that those tribes, which share a unique and constitutionally-protected relationship with the federal government, will receive as much of a very scarce resource (eagle feathers and parts) as possible." *Id.* at 1295. The court noted the consistency of its judgment with those of the Ninth and Eleventh Circuits in similar cases. *Id.* at n.11.

Plaintiffs' contention that the *Wilgus* decision is distinguishable from this case is disingenuous. *See* Pls' Amended MSJ at 26, n. 41. In their original complaint and in virtually every pleading and correspondence regarding this case, Plaintiffs cited the district court opinion in *United States v. Wilgus. See e.g.,* Doc. Nos. 12, 14, and 22.  That is, Plaintiffs placed great weight on the district court decision that the Tenth Circuit recently reversed. Thus, Plaintiffs cannot now dispute the fact that the *Wilgus* decision is persuasive authority.

**B.    The cases cited by Plaintiffs are unpersuasive.**

In their amended motion for summary judgment, Plaintiffs mistakenly rely on two cases in support of their arguments. First, Plaintiffs direct the Court to *A.A. ex rel. Betenbaugh v.*

*Needville Indep. Sch. Dist.,* 611 F.3d 248 (2010).  *See* Pls' Amended MSJ at 10.  The

*Betenbaugh* decision involved a challenge under the Texas Religious Freedom Restoration Act

(TRFRA) to the Needville Independent School District's ("School District") grooming policy.

The policy required a Lipan Apache child to wear his long hair in a bun on top of his head or in a

braid tucked into his shirt.  *Id.* at 253. Although the *Betenbaugh* Court's application of the

TRFRA addressed many of the same legal concepts at issue in a RFRA case and it involved a

member of the Lipan Apache Tribe, the final holding of *Betenbaugh* is inapposite.

The *Betenbaugh* decision turned on the fact that the School District failed to demonstrate

that a compelling governmental interest required it to implement the grooming policy. *Id.* at 266.

The Fifth Circuit noted that the School District made "only cursory attempts" to demonstrate that

it had a compelling interest that justified its policy. *Id.* at 268.  Similarly, the School District

"failed to put forth a single case in which the school's interest . . ." had been found to be

compelling in the context of a religious exercise challenge. *Id.* at 269.  In making its decision the

Fifth Circuit repeatedly emphasized that "context matters" because the analysis in a TRFRA case

is a fact-specific inquiry.  *Id*. at 269-70.

The *Betenbaugh* decision is easily distinguishable from the case at bar. Unlike the School

District's "cursory" attempt to demonstrate the existence of a compelling interest supporting its

policy here, the Department of the Interior has extensively detailed the compelling governmental

interests supporting its Eagle Feather policy.  Further, the Administrative Record provides a

factual basis for the articulated compelling interests. In addition, contrary to the school district's

inability to present the Fifth Circuit with a "single case" supporting its position, the Defendant

here has provided the Court with numerous cases that are directly on point.  Moreover, the facts

at issue here are very different from those dealt with by the Fifth Circuit in *Betenbaugh*, which forecloses any meaningful comparison to this case in light of the fact-specific inquiry required under RFRA. For these reasons, the *Betenbaugh* decision is distinguishable from this case and the Court should not rely upon it.

In addition to citing the *Betenbaugh* decision, Plaintiffs repeatedly refer to a case that is no longer good law. In particular, Plaintiffs cite a case that they refer to as "*In the Matter of Joseluis Saenz, v. Dept. of Interior*, No. 00-2166 (10th Circuit)." Pls' Amended MSJ at 14, n. 25. Because of the citation formatting, it is not entirely clear which case Plaintiffs are referring to, but it appears that they are citing an unpublished Tenth Circuit decision from 2001.  *See Saenz v. Department of Interior*, 2001 WL 892631 (10th Cir. 2001). The Tenth Circuit vacated this unpublished decision when it granted rehearing en banc for three similar cases. *See U.S. v. Hardman*, 260 F.3d 1199 (10th Cir. 2001).  Because the *Saenz* decision was vacated, Plaintiff should not have cited it as authority in this case. Moreover, even if *Saenz* were not vacated, it is no longer good law in light of the Tenth Circuit's recent published decision in *Wilgus*.

Because *Betenbaugh* is easily distinguishable and *Saenz* is not good law, Plaintiffs have failed to identify a single decision that supports their position in this case. Indeed, the Tenth Circuit recently overruled the only decision supportive of Plaintiffs' case – the district court opinion in *Wilgus*. Consequently, the Court need go no further than the overwhelming weight of authority that is directly on point and hold, as a matter of law, that the Eagle Act satisfies RFRA. *See Antoine*, 318 F.3d at 921-22 (concluding the government should not be forced to re-litigate its compelling interest in protecting bald and golden eagles in response to each challenge to the

Eagle Act); *Garret*, 4:08-3129 (March 17, 2010, S.D. Tex.) (relying on caselaw to reject Eagle Act challenge).

### C.    The Record Fully Supports the Department's Actions.

Should the Court go beyond the caselaw and review the Administrative Record in this case, it demonstrates that the Eagle Act furthers the government's compelling interests in protecting eagles and fulfilling its unique relationship with federally recognized Indian tribes. The record also shows that allowing persons who are not members of federally recognized tribes ("non-members") to possess eagle feathers would defeat both of these interests. Because Plaintiffs are challenging an agency action under the APA -- the denial of Plaintiff Soto's petition -- the Department of the Interior's factual determinations are entitled to a high degree of deference. *National Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007) (describing the deferential nature of APA review). Indeed, in order to successfully challenge the Department's determinations, Plaintiffs must show that they were arbitrary and capricious. *Id*. Plaintiffs cannot make this showing.

### D.    The Eagle Act furthers the government's compelling interests.

The Eagle Act's prohibition against possessing eagles and eagle parts furthers the government's compelling interest in protecting eagles by minimizing the black market for those items and enhancing enforcement capabilities. In addition, the Eagle Act's ban against possessing eagle feathers and its recognized Indian tribes exception furthers the United States' compelling interest arising from its unique relationship with federally recognized Indian tribes. Rather than being arbitrary and capricious, these compelling interests are rational, long-held, and well-supported by the facts found in the Administrative Record.

10

1.    The Government's Compelling Interest in Protecting Eagles

The government has a compelling interest in protecting the bald eagle (as our national symbol), and the golden eagle, as its survival and the survival of the bald eagle are intimately intertwined. With regard to the Government's interest in protecting eagles, Plaintiffs correctly point out that, in 2007, the bald eagle was removed from the list of threatened species under the Endangered Species Act. *See* Pls' Amended MSJ at 17.  However, "the removal of the bald eagle from the list of species protected under the Endangered Species Act does not render this interest a nullity." *U.S. v. Wilgus*, 638 F.3d at 1285; *see also U.S. v. Vasquez-Ramos*, 571 F.3d 987 (post-eagle delisting decision). The *Hardman* court also correctly observed that "whether there [are] 100 eagles or 100,000 eagles," the government's interest in protecting them remains compelling. 297 F.3d at 1128.

Plaintiffs also mistakenly assert that because "millions" of feathers are available through the eagles' natural molting process, the government does not have a compelling interest in prohibiting those of American Indian ancestry from possessing eagle feathers. Pls' Amended MSJ at 17.  Similarly, Plaintiffs claim that the government should allow those of American Indian ancestry to keep live eagles. *Id.* at 19. These are not workable solutions.

The Eagle Act's prohibition against possessing eagles and eagle parts -- except by members of federally recognized tribes -- furthers the government's interest in protecting eagles by minimizing the black market for those items and enhancing the Fish & Wildlife Service's enforcement capabilities. *See Andrus v. Allard*, 444 U.S. 51, 52-53 (1979) (Eagle Act is "designed to prevent the destruction of certain species of birds"). First, a possession ban serves a forensic evidentiary function. A number of criminal statues prohibit the possession of certain

11

items where it is difficult to prove the underlying illegal act once the item is reduced to possession. That concern applies to eagles as well, since "it is ordinarily impossible for an inspection to determine whether an eagle feather or other eagle part has come from a bird that died naturally or as a result of illegal hunting." *See Hardman*, 297 F.3d at 1141 (Hartz, J., concurring); *see also* AR 357, Declaration of Lucinda D. Schroeder, ("Schroeder Decl.") at ¶ 8. (explaining that it is usually not possible to accurately and readily determine whether particular eagle parts are of legal origin); *see also* AR 382, Decl. of Prof. James Fraser at ¶ 9 (rejecting the argument that it would be acceptable for persons to obtain molted eagle feathers); Exhibit 2 to Def's Original MSJ, Declaration of Ed Espinoza, at ¶ 3.

Second, a possession ban minimizes the market for the fruits of an illegal act and thus minimizes the incentive to commit the act.  As one court explained, "possession of a good is related to the market for that good, and Congress may regulate possession as a necessary and proper means of controlling its supply or demand. For example, the federal government may elect to prohibit the possession of eagle feathers as a practical means of drying up the market for them, and thus protecting against the killing of eagles." *United States v. Patton*, 451 F.3d 615, 626 (10th Cir. 2006) (citing *Andrus*, 444 U.S. at 58).  The Administrative Record demonstrates that, given the difficulty of catching people in the act of killing eagles and law enforcement's inability to determine the origin of eagle parts, a possession ban diminishes the market for illegally taken birds and thus reducing the number of illegal takes. Agent Schroeder explained that "without a possession prohibition, once a bird was dead and reduced to someone's possession, it would be 'home free.' This creates a market for birds and their parts that does not exist where possession itself is prohibited." AR 357 at ¶9.  She further stated that, "if there was

12

no prohibition against the possession of eagles and eagle feathers, the death rate of eagles would sky-rocket as poachers sought to supply the resulting increase in the black market." *Id*.; *see also* Exhibit 3 to Def's Original MSJ, Declaration of Agent Preston Fant at ¶¶ 6,7.  If even one additional bird is killed unlawfully, the government's compelling interest in protecting eagles is compromised. *Friday*, 525 F.3d at 956.

2.   <u>The Government's Compelling Interest in Fulfilling its Unique Relationship with Federally Recognized Indian Tribes</u>

The Government has a compelling interest in fostering the culture and religion of federally-recognized Indian tribes to fulfill its trust obligations to those tribes. "The United States recognizes and maintains relationships with federally recognized tribes as political entities that have inherent sovereign powers of self-governance. This recognition is the basis for the special legal and political relationship, including the government-to-government relationship, established between the United States and federally recognized tribes, pursuant to which the United States supports, protects, and promotes tribal governmental authority. . . ." Exhibit 4 to Def's Original MSJ, Declaration of Dion K. Killsback, ¶ 9. This interest is consistent with the Supreme Court's longstanding interpretation of the federal government's relationship with Native American tribes.

In *Morton v. Mancari*, 417 U.S. 535, 537–39 (1974), the Supreme Court rejected an equal protection attack on a provision of the 1934 Indian Reorganization Act that gave Native Americans preference for employment in the Bureau of Indian Affairs. The Court began by noting that Congress has "plenary power" to legislate concerning the tribes. *Morton*, 417 U.S. at 551–52. The Court found that, as a consequence of the forcible seizure of Indian lands by the United States, "the United States assumed the duty of furnishing ... protection [to the Native

13

Americans], and with it the authority to do all that was required to perform that obligation." *Id*. at 552 (quoting *Bd. of County Comm'rs v. Seber*, 318 U.S. 705, 715 (1943)). Pursuant to this obligation to the tribes, Congress was empowered to "single out for special treatment a constituency of tribal Indians." *Id*. "The preference, as applied, is granted to Indians not as a discrete racial group, but, rather, as members of quasi-sovereign tribal entities." *Id*. at 554. Thus, the preference was "political rather than racial, in nature." *Id*. at 553 n. 24.

      Here, Plaintiffs fail to recognize that the government's compelling interest in fostering the culture and religion of tribes is based on the *political* relationship with federally recognized tribes -- it is not based on a racial or ethnic preference. *See* Pls' Amended MSJ at 15 (arguing that "more than three-fourths of all Indians were not enrolled in federally recognized tribes and thus not eligible for feathers under the government's regulation"). The language of the exception to the possession ban in the Eagle Act refers specifically to "the religious purposes of Indian tribes." 16 U.S.C. § 668a. The Act thus draws a distinction between federally-recognized tribes and persons of American Indian descent based on the "quasi-sovereign" status of the tribes. *Cf. Morton*, 417 U.S. at 554, 94 S.Ct. 2474. *Morton* itself characterized Congress' power over Indian affairs in terms of the tribes: "Resolution of the instant issue turns on ... the plenary power of Congress, based on a history of treaties and the assumption of a 'guardian-ward' status, to legislate on behalf of federally recognized Indian tribes." *Id*. at 551. Thus, as the *Wilgus* court explained, "by adopting the federally-recognized tribes version of the compelling governmental interest in this case, we situate ourselves in the very heartland of federal power, as recognized by the Supreme Court in its *Morton* line of cases." 638 F.3d at 1287.

14

**E.     The Eagle Act is the least restrictive means of furthering the government's compelling interests.**

The government's task here is to balance its interest in protecting eagles with its interest in accommodating recognized tribes in the manner that imposes the least burden on religious exercise. An absolute prohibition on possessing eagle feathers furthers the government's interest in protecting eagles, but it undermines the government's interest in accommodating the needs of recognized tribes to possess feathers. The federally-recognized tribes exception "sets those interests in equipoise." *Rupert*, 957 F.2d at 35.

By its plain language, RFRA does not require the government to abandon its compelling interests, but only to minimize the burden on religion by ensuring that it employs the "least restrictive means of furthering" those interests.  *See* 42 U.S.C. §2000bb-1(b). Here, no means of "furthering" the government's compelling interests is available that is less restrictive of religious practices. Lifting the Eagle Act's possession ban for non-members would not further either of the government's compelling interests, but would instead vitiate them and hence is not required under RFRA.

    1.     Eagles are a limited and overtaxed resource.

Eagle feathers and parts are a scarce resource and, given the biology of the species, even a small increase in eagle mortality could have a dramatic impact on eagle populations. AR 514 Affidavit of Karen Steenhof; Exhibit 5 to Def's Original MSJ, Decl. of Jody Gustitus Millar, ¶ 11. Nevertheless, Plaintiffs argue that the removal of the bald eagle from the list of threatened species under the Endangered Species Act makes it more difficult for the government to prove that the Eagle Act's possession ban is necessary to protect the species. Pls' Amended MSJ at 17 and 18. The legal status of the bald eagle under the Endangered Species Act, however, has no

bearing on the golden eagle. The golden eagle population is not as healthy as the bald eagle

population, and there is a significantly greater demand for golden eagles for religious use. AR

514 Steenhof Affidavit; AR 404, Affidavit of Kevin Ellis, ¶ 7 (noting that golden eagle feathers

are more sought after); *see also* Exhibit 6 to Def's Original MSJ, Declaration of Brian Millsap at

¶¶ 7, 10 (noting that the FWS will not allow takes of golden eagles because the population

cannot withstand additional unmitigated mortality); Exhibit 7 to Def's Original MSJ, Atencio

2012 Decl. at ¶ 10 (noting greater demand for golden eagle parts). Moreover, bald and golden

eagles are a limited resource and a relatively small increase in the mortality of adult eagles, from

whatever cause, could quickly erase the gains achieved by recent conservation measures. AR 504

Millar Affidavit, ¶¶ 9-14; *see also* Exhibit 5 to Def's Original MSJ, Millar Decl., ¶¶ 10-14.

"Without the BGEPA and MBTA protections, the status of the bald eagle could again deteriorate

significantly through death or injury of bald eagles due to hunting or other man-made threats."

Exhibit 5 to Def's Original MSJ, Millar Decl. at ¶ 9; *see also* AR 504 at ¶ 14.

Even if the potential impacts on eagle populations were not so dramatic, in *United States*

*v. Friday* the Court held that the government has a compelling interest "as regards small as well

as large impacts on the eagle population" and that, even if "the viability of eagle populations" are

not threatened, "the government would still have a compelling interest in ensuring that no more

eagles are taken than necessary." 525 F.3d 938, 956 (10th Cir. 2008). Furthermore, the delisting

of the bald eagle under the Endangered Species Act is predicated in part on the continued

protection of the species under the Eagle Act. *See* 16 U.S.C. §1533(a)(1), (c)(2) (requiring

Secretary to consider "inadequacy of existing regulatory mechanisms" when determining

whether to list or delist a species as threatened or endangered); 72 Fed. Reg. 37,353, 37,362-66,

37,367.  Consequently, the eagles' removal from the list of threatened species does not eliminate the government's compelling interest in protecting the eagle as Plaintiffs suggest.[6]

Further, Plaintiffs incorrectly argue that the exception for members of federally-recognized tribes is not the least restrictive means of furthering the government's compelling interest in protecting eagles, and that the exception should be expanded to all persons of American Indian ancestry. But, the limited exception for members of federally recognized tribes is necessary to accommodate the competing compelling interest discussed below.  Further, the law enforcement challenges associated with the enforcement of the Eagle Act would only increase with an expansion of the exception from members of federally-recognized tribes to all persons of American Indian ancestry. *See* AR 357; *Wilgu*s, 638 at 1292 (noting that "one of the few tools FWS has at its disposal to distinguish between lawful and unlawful possession is the distinction between members and non-members of federally-recognized tribes").  In addition, creating an exception for persons of American Indian ancestry would lead to a new set of enforcement problems related to the inability of law enforcement to verify someone's American Indian ancestry. *C.f., Wilgus*, 638 at 1293 (in rejecting a proposed exception for persons practicing Native American religions, noting that FWS agents would unfairly be cast in the role of "religion cop", which would undermine enforcement). Consequently, Plaintiffs' proposal --

---

[6] In their motion, Plaintiffs also point out that the FWS has issued a permit to the Northern Arapaho Tribe of Wyoming, which allowed them to take two bald eagles. Pls' Amended MSJ at 17. This fact, however, does not support their case. The take permit was issued only after a biological study of the specific bald eagle population in question had been conducted. Exhibit 6 to Def's Original MSJ, Millsap Decl. at ¶ 9. The FWS would not issue a similar permit authorizing the taking of golden eagles because of the population's more precarious biological status. *Id.* at ¶ 10.

that persons of American Indian ancestry should be allowed to possess eagle feathers or live

eagles -- would undermine the government's compelling interest in protecting eagles.[7]

> 2. Lifting the possession ban for non-members would defeat the
> government's compelling interest in accommodating the needs of
> recognized tribes.

Plaintiffs argue that the Department of the Interior should allow all persons who fall

within the Census Bureau's definition of American Indians to possess eagle feathers. Pls'

Amended MSJ at 20-23. This would greatly increase the number of persons who are eligible to

apply for eagle feathers, which would overwhelm the Repository and exhaust the existing supply

of feathers. Adding a significant number of applications to the Repository would lengthen wait

times exponentially, thereby defeating both the government's compelling interest in protecting

the religious practices of federally recognized tribes by giving tribal members some access to the

raw materials necessary for their traditional worship, and in protecting eagles from an insatiable

demand likely to lead to poaching and a burgeoning black market. As the Eleventh Circuit

concluded in *Gibson*, if the possession ban were lifted for non-members, "the limited supply of

bald and golden eagle parts will be distributed to a wider population and the delays will increase

in providing eagle parts to members of federally recognized Indian Tribes, thereby vitiating the

---

[7] The Department of Justice recently issued a Memorandum concerning the prosecution of cases involving the possession or use of eagle feathers or parts for tribal cultural and religious purposes. *See* http://www.justice.gov/tribal/feathers-fs.htm. The new policy has no bearing on the instant case because it makes clear that it "is not intended to address or change how the Department of Justice handles cases involving those who are not members of federally recognized tribes." DOJ Eagle Feathers Policy at 4.  In addition, the new DOJ Policy is consistent with the Department of the Interior's Morton Policy, which has been in place since 1975. *Id*. at p. 3; *see also* AR 631-633, Affidavit of Kevin R. Garlick (explaining the Morton Policy).

government[']s efforts to fulfill its . . . obligations to federally recognized Indian tribes." 223 F.3d at 1258.

In Plaintiffs' view, everyone who satisfies the U.S. Census definition of an American Indian should be allowed to possess eagle feathers. Pls' Amended MSJ at 20-23. Using Plaintiffs' own figures, this would increase the number of eligible persons from 1.6 million (those people enrolled in a federally recognized tribe) to 4.1 or 8.7 million (those persons who self-identified as having Native American ancestry). Pls' Amended MSJ at 14-15. Similarly, the government estimates that there are approximately 2 million members of federally recognized tribes and, according to the 2010 Census, 5.2 million persons of American Indian and Alaska Native heritage. *See* Exhibit 8 to Def's Original MSJ, Declaration of Steven Payson, ¶¶ 5-6. If millions of additional people were eligible to obtain feathers from the Repository as Plaintiffs wish, the Repository would certainly receive more applications, and, given the limited supply, the delay in filling requests would necessarily increase. *See Gibson*, 223 F.3d at 1258; *Antoine*, 318 F.3d at 923 ("If the government extended eligibility, every permit issued to a nonmember would be one fewer issued to a member. This is the inescapable result of a demand that exceeds a fixed supply."). The Repository already cannot meet the current demand; the number of tribal members waiting for feathers and the length of time they must wait continue to increase. AR 571 Atencio 2003 Decl. and Exhibit 7 to Def's Original MSJ, Atencio 2012 Decl. at ¶¶ 8, 14 (describing growing wait times of up to four years); Exhibit 9 to Def's Original MSJ, Declaration of Jerry Thompson. There are approximately 1500 applications pending for loose eagle feathers and 6,000 pending requests for whole eagle carcasses. Exhibit 7 to Def's Original MSJ, Atencio 2012 Decl. at ¶¶ 9, 14. Thus, any additional increase in the number of eligible applicants, and

certainly a multi-million person increase, would create a corresponding increase in the number of people waiting and the time they must wait. AR 571, Exhibit 7, Exhibit 9; *see also* Exhibit 3, Fant Decl at ¶ 7.

In addition, allowing non-members to obtain feathers from the Repository -- or to bypass the Repository altogether by collecting molted feathers -- would increase the black market. The black market is already flourishing and lucrative, among both tribal members and non-members. AR 398 Affidavit of Kevin Ellis, at ¶¶ 4-5. Part of the black market is driven by powwow dance contests, in which both tribal members and non-members compete for prize money. *Id*. at ¶ 5a.; *see also Wilgus*, 638 F.3d at 1283. In general, black market prices are rising because of an uptick in demand and a dwindling supply. AR 398 at ¶ 7. Whole golden eagles sell for up to $1,200 each, and immature golden eagle central tail feathers command up to $200 each. *Id*. Without a prohibition on the possession of eagle feathers by non-members, once a bird was dead and reduced to someone's possession, it would be "home free." AR 357 at ¶9.  This enforcement problem would likely cause the black market for birds and their parts to expand. *Id*. As result, Plaintiffs' suggestion that the problem of an overwhelmed Repository could be solved by simply allowing non-members to bypass the Repository altogether is untenable.

## II.   PLAINTIFFS' MBTA CLAIMS CONCERNING CLEVELAND'S CRIMINAL CONVICTION FAIL AS A MATTER OF LAW.

Although it is not clear whether Plaintiffs continue to pursue the claims associated with Plaintiff Cleveland's criminal conviction, Defendant addresses them in this brief out of an abundance of caution because the claims are at least mentioned in their amended motion. Because Mr. Soto's petition for remission only concerned his eagle feathers, all of Plaintiffs'

claims concerning the MBTA are necessarily rooted in Mr. Cleveland's conviction.[8] Plaintiffs specifically argue that Defendant's actions leading to, and including, the prosecution of Mr. Cleveland were contrary to the law. *See* Pls' Amended MSJ at 20 (requesting a judgment declaring that "the federal agent who raided the McAllen Powwow and seized the feather of . . . Michael Todd Cleveland . . . acted beyond the bounds of his legal authority"). These arguments fail as a matter of law because Plaintiffs cannot challenge Cleveland's criminal conviction in this civil lawsuit.

The Supreme Court held in *Heck v. Humphrey*, 512 U.S. 477 (1994), that an action may not proceed where success on a claim would necessarily question the validity of a criminal prosecution involving the same conduct unless the criminal defendant has successfully terminated the criminal action (*e.g.*, a reversal on appeal). In *Heck*, a plaintiff who had been previously convicted of a crime brought a 42 U.S.C. § 1983 action against the prosecutors and investigators who were responsible for his criminal conviction. *Id.* at 478-80. The Court found that the civil suit involved the same facts underlying plaintiff's criminal conviction and that a ruling in plaintiff's favor would necessarily call into question the validity of his conviction.  *Id.* On these facts, the Court held that, before such a civil suit could proceed, a plaintiff's conviction

---

[8] Except for Plaintiff Soto, the remaining Plaintiffs in this suit lack the requisite standing to bring claims against Defendant. With regard to Plaintiffs Russell and Cleveland, Russell lacks standing because he did not file a supplemental petition for remission as he did not own the golden eagle feathers in question, and Cleveland lacks standing because he had not applied for a permit to possess MBTA feathers.  *See infra* n. 9. The remaining Plaintiffs lack standing because, ordinarily, a litigant "'must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" *Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464, 474 (1982) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). This is generally so even when the very same allegedly illegal act that affects the litigant also affects a third party. *See United States v. Payner*, 447 U.S. 727, 731-732 (1980) (criminal defendant "lacks [third-party] standing under the Fourth Amendment to suppress ... documents illegally seized from" his banker).

must have been reversed on appeal, expunged by executive order, declared invalid by an authoritative state tribunal, or called into question by the issuance of a writ of habeas corpus by a federal court. *Id*. at 486-87; *see also Boyd v. Biggers*, 31 F.3d 279, 283 (5th Cir. 1994).

In the instant case, the encompassing premise of Plaintiffs' claims concerning Cleveland and his MBTA conviction is that Defendant has erred in interpreting the laws prohibiting the possession of MBTA feathers as applying to American Indians who are not enrolled members of federally recognized tribes. *See* Pls' Amended MSJ at 20. This legal question, and the underlying facts giving rise to it, is the exact issue that was before the court in *United States of America v. Cleveland*. This is demonstrated by the fact that many, if not all, of the legal claims asserted in this civil suit concerning Cleveland's conviction were also asserted as defenses to the criminal prosecution in *United States v. Cleveland*. *See generally* Appeal Brief, Doc. No. 72 in 7:06-mj-04806. As a result, it is unquestionable that the facts underlying Cleveland's criminal conviction are also the basis for Plaintiffs' current MBTA claims; and any success on Plaintiffs' MBTA claims here would call into question the validity of his criminal conviction. Accordingly, Plaintiffs' claims concerning Cleveland and the MBTA fail as a matter of law pursuant to *Heck*.[9]

Finally, even if the Court were to reach the merits of Plaintiffs' MBTA claims, they would fail as a matter of law. Plaintiffs mistakenly claim that the Department of the Interior's

_____

[9]  Although the Court need not reach the issue because *Heck* controls the analysis here, Plaintiffs' claims concerning Cleveland's conviction are also barred by *res judicata* and the doctrine of collateral estoppel. *See Lewis v. Green*, 101 Fed.Appx. 446, 2004 WL 1399202, *1 (5th Cir. 2004) (affirming a dismissal based upon *Heck* and *res judicata*). Thus, if the Court reaches the issue, the Court should find for the Defendant in this case for the reasons the Court rejected Cleveland's defenses at trial and for the reasons that the Court denied his appeal. For example, the Court found that Cleveland lacked standing to challenge the MBTA under RFRA because he had not applied for an MBTA permit and he had been engaged in a commercial activity. *See* Order Affirming Judgment, Doc. No. 78 in 7:06-mj-04806.

policy concerning the MBTA and federally recognized tribes violates RFRA. Courts, however, have consistently rejected these types of claims. *See, e.g., United States v. Vasquez-Ramos*, 531 F.3d 987 (9th Cir. 2008); *United States v. Eagleboy*, 200 F.3d 1137 (8th Cir. 1999) (reversing dismissal of charge against non-member Native American for possessing hawk parts in violation of MBTA). The courts' reasoning is substantially the same as the reasons supporting the Eagle Act. *Vasquez-Ramos*, 531 F.3d 987; *see also* Fant Decl. at ¶¶ 6,7. Thus, pursuant to this caselaw and for all the reasons discussed above, if the Court reaches the merits of Plaintiffs' MBTA claims, they should be rejected.

## CONCLUSION

For the foregoing reasons, Defendant requests that the Court deny Plaintiffs' Amended Motion for Summary Judgment and grant Defendant's Amended Cross-Motion for Summary Judgment.

Respectfully Submitted,

KENNETH MAGIDSON
UNITED STATES ATTORNEY

*s/Jimmy A. Rodriguez*
JIMMY A. RODRIGUEZ
Assistant United States Attorney
Southern District of Texas
Texas Bar No. 24037378
Federal ID No. 572175
1000 Louisiana, Suite 2300
Houston, Texas 77002
Tel: (713) 567-9532
Fax: (713) 718-3303
Attorney in Charge for Defendant

23

**<u>Certificate of Service</u>**

I hereby certify that a true and correct copy of the foregoing was served on the following via the Court's Electronic Case Filing System:

Marisa Y. Salazar
Civil Rights Legal Defense & Edu. Fund, Inc.
519 Culebra Road
San Antonio, Texas 78201
Telephone: 210-334-5209


<u>*s/ Jimmy A. Rodriguez*</u>
JIMMY A. RODRIGUEZ
Assistant United States Attorney