United States District Court
Southern District of Texas
FILED

NOV 2 5 2014

David J. Bradley, Clerk

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

August 20, 2014

Lyle W. Cayce
Clerk

No. 13-40326

D.C. Docket No. 7:07-CV-60

MC ALLEN GRACE BRETHREN CHURCH; NATIVE AMERICAN NEW LIFE CENTER; SAN ANTONIO INDIAN FELLOWSHIP; SOUTH TEXAS INDIAN DANCERS ASSOCIATION; LINDA CLEVELAND, Individually; MICHAEL CLEVELAND, Individually; EDITH CLARK, Individually and as council member of Native American New Life Center; WILLIAM CLARK, Individually and as member of Native American New Life Center; CARRIE FELPS, Individually; HOMER HINOJOSA, Individually and as member of McAllen Grace Brethren Church, San Antonio Indian Fellowship, and South Texas Indian Dancers Association; NANCY HOLLINGWORTH, as a member of Native American New Life Center; LUCIAN ODEN, as a member of San Antonio Indian Fellowship; XAVIER SANCHEZ, as member of San Antonio Indian Fellowship; PASTOR ROBERT SOTO, Individually and on behalf of McAllen Grace Brethren Church, Native American New Life Center, San Antonio Indian Fellowship, and South Texas Indian Dancers Association; VERONICA RUSSELL; MICHAEL RUSSEL, Individually,

       Plaintiffs - Appellants

v.

KEN SALAZAR, Secretary of the United States Department of the Interior,

       Defendant - Appellee

Appeals from the United States District Court for the
Southern District of Texas, McAllen

Before JONES, ELROD, and HAYNES, Circuit Judges.

# J U D G M E N T

This cause was considered on the record on appeal and was argued by counsel.

It is ordered and adjudged that the judgment of the District Court is reversed, and the cause is remanded to the District Court for further proceedings in accordance with the opinion of this Court.

IT IS FURTHER ORDERED that each party bear its own costs on appeal.


JONES, Circuit Judge, concurring:


ISSUED AS MANDATE: 2 1 NOV 2014

A True Copy
Attest

Clerk, U.S. Court of Appeals, Fifth Circuit

By: _____
                Deputy
                          2 1 NOV 2014

New Orleans, Louisiana

United States District Court
Southern District of Texas
FILED

NOV 2 5 2014

David J. Bradley, Clerk

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit
**FILED**
August 20, 2014
Lyle W. Cayce
Clerk

No. 13-40326

MC ALLEN GRACE BRETHREN CHURCH; NATIVE AMERICAN NEW
LIFE CENTER; SAN ANTONIO INDIAN FELLOWSHIP; SOUTH TEXAS
INDIAN DANCERS ASSOCIATION; LINDA CLEVELAND, Individually;
MICHAEL CLEVELAND, Individually; EDITH CLARK, Individually and as
council member of Native American New Life Center; WILLIAM CLARK,
Individually and as member of Native American New Life Center; CARRIE
FELPS, Individually; HOMER HINOJOSA, Individually and as member of
McAllen Grace Brethren Church, San Antonio Indian Fellowship, and South
Texas Indian Dancers Association; NANCY HOLLINGWORTH, as a member
of Native American New Life Center; LUCIAN ODEN, as a member of San
Antonio Indian Fellowship; XAVIER SANCHEZ, as member of San Antonio
Indian Fellowship; PASTOR ROBERT SOTO, Individually and on behalf of
McAllen Grace Brethren Church, Native American New Life Center, San
Antonio Indian Fellowship, and South Texas Indian Dancers Association;
VERONICA RUSSELL; MICHAEL RUSSELL, Individually,

Plaintiffs - Appellants

v.

KEN SALAZAR, Secretary of the United States Department of the Interior,

Defendant - Appellee

Appeals from the United States District Court
for the Southern District of Texas

Before JONES, ELROD, and HAYNES, Circuit Judges.

No. 13-40326

HAYNES, Circuit Judge:

Appellants filed suit against the Department of the Interior (the "Department") seeking a declaration of rights that the Department's enforcement of the Migratory Bird Treaty Act (the "MBTA") and the Bald and Golden Eagle Protection Act (the "Eagle Protection Act") violates the Free Exercise Clause of the First Amendment and the Religious Freedom Restoration Act ("RFRA") because it prohibits American Indians who are not members of federally recognized tribes from possessing bald and golden eagle feathers. The district court granted the Department's motion for summary judgment, finding that the Department's implementation of the Eagle Protection Act was narrowly tailored to a compelling governmental interest. Because we find that the Department did not provide sufficient evidence that the policy of limiting permits for the possession of eagle feathers to members of federally recognized tribes survives the scrutiny required by RFRA, we REVERSE the district court's grant of summary judgment and REMAND for proceedings consistent with this opinion.

## I. Factual and Procedural Background

In 2006, Appellants Michael Cleveland, Robert Soto, and Michael Russell attended an American Indian religious ceremony, known as a powwow, where eagle feathers were in the possession of and worn by its participants. An agent of the United States Fish and Wildlife Service attended the powwow and noticed that Cleveland was selling "dream catchers" bearing bird feathers. Cleveland's feathers were confiscated, and he faced criminal charges for the unlawful possession, sale, offer to sell, or transportation of migratory birds or their parts without a permit in violation of the MBTA, 16 U.S.C. § 703. The Appellants do not challenge his criminal conviction.

Soto and Russell, powwow participants, were also in possession of eagle feathers. Russell, who admitted that he was not an American Indian, was

2

No. 13-40326

issued a Notice of Violation under the Eagle Protection Act for possession of eagle feathers without a permit, and the feathers in his possession were seized. Soto identified himself as a member of the Lipan Apache Tribe. After the agent determined that the Lipan Apache Tribe is not federally recognized, he set up a meeting with Soto and Russell, during the course of which they both signed voluntary abandonments, abandoning the feathers they possessed, and Russell agreed to pay the fine associated with his Notice of Violation. In exchange, there was no further criminal investigation.

Soto filed a petition with the Department for the return of his property. It was denied, along with his supplemental petition, because Soto is not a member of a federally recognized tribe—a prerequisite for obtaining a permit for possession under the Eagle Protection Act according to regulations promulgated by the Department. *See* 50 C.F.R. § 22.22(a) (2012).

The Plaintiffs filed this action in the United States District Court for the Southern District of Texas, claiming that the confiscation of the feathers violated the Free Exercise Clause of the First Amendment. This case was stayed for several years during the pendency of a parallel criminal proceeding involving Cleveland and an administrative proceeding involving Soto. After the stay was lifted, the Plaintiffs amended the complaint, naming the Department as the sole defendant. The parties filed cross motions for summary judgment, and the district court granted the Department's motion. The Plaintiffs appealed.

## II. Statutory and Regulatory Background

The MBTA was enacted in 1916 to implement a convention between the United States and Great Britain. 16 U.S.C. § 703(a).[1] It prohibits the harming,

---

[1] The statute has been subsequently amended to reflect similar treaties with Mexico (1936), Japan (1972), and the former Soviet Union (1976).

No. 13-40326

selling, or possessing of migratory birds or their parts. *Id.* Section 704 authorizes the Department to permit takings of migratory birds when it is compatible with the terms of the various conventions.

The Eagle Protection Act was passed in 1940 in order to protect the bald eagle from extinction because it is "a symbol of the American ideals of freedom." 76 Pub. L. No. 567, 54 Stat. 250 (1940). The statute itself prohibits the taking, possession, sale, barter, purchase, transport, export, or import of bald eagles or golden eagles or any parts of bald eagles or golden eagles, except as permitted by the Secretary of the Interior.[2] 16 U.S.C. §§ 668, 668a (2012). The statute initially did not apply to golden eagles, nor did it contain exceptions for American Indian tribes. *See United States v. Dion*, 476 U.S. 734, 740–41 (1986). In 1962, the statute was amended to protect the golden eagle, and at the same time, was amended to provide an exception "for the religious purposes of Indian tribes." § 668a; *see also Dion*, 476 U.S. at 741–43. Section 668a grants the Secretary of the Interior broad authority to authorize the taking of eagles or eagle parts for the purposes of public museums, scientific societies, zoos, Indian religious uses, wildlife protection, agricultural protection, and "other interests"—provided the grant of the permit is compatible with the preservation of the eagles.[3]

Congressional hearings held over the addition of the golden eagle made clear that golden eagles are important for the religious practices of many

-----

[2] Permits are not required for bald eagle parts, nests, or eggs acquired prior to June 8, 1940, or for golden eagle parts, nests, or eggs acquired prior to October 24, 1962. 50 C.F.R. § 22.2.

[3] The regulations promulgated by the Department to enforce the statute further indicate that eagles or eagle parts possessed pursuant to a valid permit may not be transferred unless they have been "handed down from generation to generation or from one Indian to another in accordance with tribal or religious customs." 50 C.F.R. § 22.22(b)(1) (2012).

4

No. 13-40326

American Indian tribes.[4] *Dion*, 476 U.S. at 741–743.  When first enacted, the regulation stated that when "the taking and possession of bald or golden eagles for the religious purposes of Indian tribes is compatible with the preservation of such birds, [the Secretary] may issue permits for such taking and possession to those individual Indians who are *authentic, bona fide practitioners of such religion*." 50 C.F.R. § 11.5 (1966) (emphasis added).  When the Code of Federal Regulations was amended and restructured in 1974, the permitting system required applicants attach a certification from the Bureau of Indian Affairs that the applicant is an Indian, but it did not specify that the individual had to be enrolled in a federally recognized tribe.[5] 50 C.F.R. § 22.22 (1974).  The Department of Justice has interpreted the regulation as limiting the permits to members of federally recognized tribes since release of the "Morton Policy" in 1975, which "clarif[ied] the Department of the Interior's responsibilities and intentions" regarding the enforcement of the Eagle Protection Act.  Rogers C.B. Morton, Secretary of the Interior, Policy Statement on Indian Use of Bird

---

[4] By way of background, we observe that Assistant Secretary of the Interior Frank Briggs wrote a memo to Congress stating:

> The golden eagle is important in enabling many Indian tribes, particularly those in the Southwest, to continue ancient customs and ceremonies that are of deep religious or emotional significance to them.
>
> . . .
>
> There are frequent reports of continued veneration of eagles and of the use of eagle feathers in religious ceremonies of tribal rites. . . . In the circumstances, it is evident that the Indians are deeply interested in the preservation of both the golden and the bald eagle.  If enacted, the bill should therefore permit the Secretary of the Interior, by regulation, to allow the use of eagles for religious purposes by Indian tribes.

*Dion*, 476 U.S. at 741–42 (citation and internal quotation marks omitted).

[5] While a Certificate of Degree of Indian Blood requires an individual to demonstrate a blood relationship to ancestors who were or are members of enrolled tribes, it does not grant membership to the tribe, nor does it require the individual actually be enrolled as a member of a federally recognized tribe to obtain the certificate.  BUREAU OF INDIAN AFFAIRS, OMB Control. No. 1076-0153, *Certificate of Degree of Indian or Alaska Native Blood Instructions*, *available at* http://www.bia.gov/idc/groups/public/documents/text/idc002653.pdf (last visited March 3, 2014).

5

No. 13-40326

Feathers (Feb. 5, 1975), *available at* http://www.justice.gov/ag/ef-policy.pdf (last visited July 25, 2014).  However, it was not until 1999, over three decades after the amendment was enacted, that the Secretary promulgated regulations requiring that individuals seeking permits must demonstrate that they are members of federally recognized Indian tribes.  50 C.F.R. § 22.22(a)(5) (2000).

Once an American Indian receives a permit from the Secretary, the permit is forwarded to the National Eagle Repository in Colorado, which receives dead eagle parts and distributes them to qualified permit applicants on a first-come, first-served basis.  According to the evidence on record, whole bird orders take approximately three and a half years to fill, and loose feather orders take approximately six months to fill.

### III. Standing

Before reaching the merits, we must first consider whether the claimants have standing to bring suit in federal court.  It is undisputed that none of the claimants applied for a permit with the Department.  However, standing has been found despite failure to apply for a benefit if doing so would have been futile.  *Ellison v. Connor*, 153 F.3d 247, 255 (5th Cir. 1998).  The Department denied Soto's request to have his feathers returned to him because he could not qualify for a permit as he is not a member of a federally recognized tribe.  It is further undisputed that the Plaintiffs would not qualify for a permit because none of them are enrolled in federally recognized tribes.  Additionally, Soto does allege a personal injury that is traceable to the Department's conduct: his feathers were confiscated by the agent at the powwow.[6]  *See Roark & Hardee*

---

[6] While Russell was in possession of some of the feathers confiscated at the powwow, the record indicates that the feathers actually belonged to Soto.  Furthermore, the Plaintiffs have not raised arguments concerning Cleveland's criminal conviction, thus waiving those claims.  *See Lockett v. EPA*, 319 F.3d 678, 684 n.16 (5th Cir. 2003).  Therefore, we do not consider whether these Plaintiffs would have individual standing.

6

No. 13-40326

*LP v. City of Austin*, 522 F.3d 533, 542 (5th Cir. 2008) (plaintiffs must allege a personal injury that is traceable to the defendant's actions to have standing).

It is well settled that once we determine that at least one plaintiff has standing, we need not consider whether the remaining plaintiffs have standing to maintain the suit. *See Nat'l Rifle Ass'n v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 192 (5th Cir. 2012). Because Soto has standing, we find sufficient standing for the Plaintiffs to challenge the regulatory scheme.[7]

## IV. Applicable Law and Standard of Review

We review the district court's grant of summary judgment *de novo*. *Terrebonne Parish Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877 (5th Cir. 2002). Summary judgment is appropriate if the moving party shows there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

When Congress enacted RFRA in 1993, it did so explicitly to create "a statutory prohibition against government action substantially burdening the exercise of religion." S. Rep. No. 103-111, 2 (1993), *reprinted in* 1993 U.S.C.C.A.N. 1892, 1893; *see also Diaz v. Collins*, 114 F.3d 69, 71 (5th Cir. 1997). RFRA was enacted to "restore the compelling interest test set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972)." 42 U.S.C. § 2000bb(b)(1). RFRA states: "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section." 42 U.S.C. § 2000bb–1(a). Subsection (b) provides that "Government

---

[7] While the Eagle Protection Act specifies that the religious exception is "for the religious purposes of Indian tribes," 16 U.S.C. § 668a, the actual permits are granted to individual members of tribes, not to the tribes themselves. 50 C.F.R. § 22.22. The Department does not argue that the statute or associated regulations create a group right rather than an individual right.

7

No. 13-40326

may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b). The compelling interest test is "a mixed question of fact and law, which is subject to de novo review." *Garner v. Kennedy*, 713 F.3d 237, 242 (5th Cir. 2013).

## V. Discussion

The Department does not contest the Plaintiffs' assertion that the Eagle Protection Act substantially burdens their religious beliefs. Soto is involved in a ministry that uses eagle feathers in its worship practice, and his sincerity in practicing his religion is not in question. Furthermore, the eagle feather is sacred to the religious practices of many American Indians.[8] Therefore, any scheme that limits the access that Soto, as a sincere adherent to an American Indian religion, has to possession of eagle feathers has a substantial effect on the exercise of his religious beliefs. *Cf. A.A. ex. rel. Betenbaugh v. Needville Indep. Sch. Distr.*, 611 F.3d 248, 264 (5th Cir. 2010) (noting that complete bans on religious conduct "substantially burden[] an adherent's free exercise of that religion" (citation and internal quotation marks omitted)). Importantly, once the regulatory scheme has been shown to substantially burden a sincerely-held religious belief, the burden is on the government to establish that the regulation (1) advances a compelling government interest; and (2) is the least restrictive means of furthering that interest. 42 U.S.C. § 2000bb-1(b); *see also Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2779 (2014). We conclude

---

[8] We recognize that not all American Indian religions hold the eagle feather to be sacred. However, for the sake of simplicity in this opinion, we refer to all American Indian religions that hold the eagle feather sacred as "American Indian religions."

No. 13-40326

that, on this record at this early, summary judgment stage, the government did not discharge that burden.

*A. Compelling Interests*

In *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972), the Court defined a compelling interest as "only those interests of the highest order." In *Sherbert v. Verner*, 374 U.S. 398, 406 (1963), the Court stated that "[o]nly the gravest abuses, endangering paramount interest, give occasion for permissible limitation." (citation and internal quotation marks omitted).[9] We have previously stated that, in determining whether a statute furthers a compelling interest, "RFRA requires the government to explain how applying the statutory burden to the person whose sincere exercise of religion is being seriously impaired furthers the compelling governmental interest." *Tagore v. United States*, 735 F.3d 324, 330–31 (5th Cir. 2013) (citation and internal quotation marks omitted); *see also Merced v. Kasson*, 577 F.3d 578, 592 (5th Cir. 2009) (recognizing that the government must show that the challenged law as applied to the claimant satisfies the compelling interest). Therefore, "general statements of its interests" are not sufficient to demonstrate a compelling governmental interest; rather, the interests need to be closely tailored to the law. *Merced*, 577 F.3d at 592. Where a regulation already provides an exception from the law for a particular group, the government will have a higher burden in showing that the law, as applied, furthers the compelling interest. *Hobby Lobby*, 134 S. Ct. at 2781–82; *Tagore*, 735 F.3d at 331.

---

[9] The Court has held that maintaining the tax system, *Hernandez v. Commissioner*, 490 U.S. 680, 699 (1989), enforcing participation in the social security system, *United States v. Lee*, 455 U.S. 252, 258–59 (1982), and protecting children's welfare, *Prince v. Massachusetts*, 321 U.S. 158, 166–67 (1944), all qualify as compelling interests.

9

No. 13-40326

Against this backdrop, we consider the interests that the Department argues are compelling: (1) protecting eagles and (2) fulfilling the government's "unique responsibility" to federally recognized tribes.

*1. Protecting Eagles*

We agree with the Tenth and Ninth Circuits that protecting bald eagles qualifies as a compelling interest because of its status as our national symbol, regardless of whether the eagle still qualifies as an endangered species. *See United States v. Wilgus*, 638 F.3d 1274, 1285 (10th Cir. 2011); *United States v. Vasquez-Ramos*, 531 F.3d 987, 991 (9th Cir. 2008). In passing the Eagle Protection Act, Congress specifically stated that the purpose was to preserve the bald eagle because of its special status as our national symbol, 76 Pub. L. No. 567, 54 Stat. 250 (1940), and in amending the Act, Congress stated that protecting the golden eagle would further this purpose because the bald eagle is often killed by persons mistaking it for the golden eagle, 87 Pub. L. No. 887, 76 Stat. 1246 (1962). Furthermore, the Supreme Court has suggested that protecting migratory birds in general might qualify as a compelling interest. *Missouri v. Holland*, 252 U.S. 416, 435 (1920) (referring to the protection of migratory birds as "a national interest of very nearly the first magnitude").

*2. Fulfilling Responsibilities to Federally Recognized Tribes*

The Department argues that there is a second compelling interest in "fulfilling its unique responsibilities to federally recognized tribes." The Supreme Court has long held that Congress's constitutional authority to "regulate Commerce . . . with the Indian Tribes" includes an obligation to protect the interests of federally recognized tribes. *Morton v. Mancari*, 417 U.S. 535, 552 (1974) (quoting U.S. Const. art. I, § 8, cl. 3). Our sister courts have found such an interest to be compelling in similar cases. *See Wilgus*, 638 F.3d at 1285 ("[T]he interest found compelling arises from the federal government's obligations, springing from history and from the text of the

10

No. 13-40326

Constitution, to federally-recognized Indian tribes.");[10] *Gibson v. Babbitt*, 223 F.3d 1256, 1258 (11th Cir. 2000) (same).

We agree that Congress has the ability to protect the country's relationship with federally recognized tribes. Given the fact that Congress did not define "Indian tribes" in this particular section, and the fact that the Department's approach has not been entirely uniform on this, we cannot definitively conclude that Congress intended to protect only federally recognized tribe members' religious rights in this section. The Department does not question the fact that Soto is a member of the Lipan Apache Tribe or that he is the pastor of the McAllen Grace Brethren Church and the Native American New Life Center. While the Lipan Apache Tribe is not federally recognized, the Texas Senate has recognized the Lipan people as having lived in Texas and Northern Mexico for 300 years and that they have had a "government to government" relationship with the Republic of Texas,[11] the State of Texas, and the United States government.[12] Tex. S. Con. Res. 438, 81st Leg., R.S. (2009). More importantly, the Department does not contest Soto's sincerity.

We also note that the Supreme Court, has not embraced the concept that such a relationship alone can justify granting religious exceptions for them while denying other religious groups the same, or similar, accommodations.

---

[10] *Cf. United States v. Hardman*, 297 F.3d 1116, 1128 (10th Cir. 2002) (en banc) (finding a compelling interest in "protecting Indian cultures from extinction").

[11] The Live Oak Treaty of 1838 established a relationship between the Lipan Apache Tribe and the Republic of Texas. Tex. S. Con. Res. 338, 82nd Leg., R.S. (2011).

[12] The Lipan Apache Tribe has also received federal funding prior to 2007; however, this funding was the result of its status as a non-profit entity. While there are approximately 400 non-federally recognized tribes in the United States, fewer than 50 were recipients of federal funding. US GOV'T. ACCOUNTABILITY OFFICE, GAO-12-348, INDIAN ISSUES: FEDERAL FUNDING FOR NON-FEDERALLY RECOGNIZED TRIBES 10 (2012).

No. 13-40326

*See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430–32 (2006) ("*O Centro*").[13]  In holding that a ban on a hallucinogenic substance violated RFRA as it applied to a particular religious sect, the Court noted that there existed a regulatory exemption for the use of peyote by the Native American Church. *Id.* at 433.  The Supreme Court explicitly rejected the Government's argument that the special relationship between the United States and the Tribes justified the exemption of peyote for American Indians, but not other substances for other religious purposes.  *Id.* at 432–34 (the Government "never explains what about that 'unique' relationship justifies overriding the same congressional findings on which the Government relies in resisting any exception for the UDV's religious use of [a controlled substance]").

The *Hardman* court's analysis in regards to an American Indian who was not a member of a federally recognized tribe is illustrative of this concern:

> [T]he government offers no evidence on the threshold question of whether allowing sincere practitioners who are not members of federally recognized tribes to possess eagle feathers, in addition to those who are members, truly threatens Native American culture. Allowing a wider variety of people to participate in Native American religion could just as easily *foster* Native American culture and religion by exposing it to a wider array of persons.

297 F.3d at 1133.  The Department has failed to present evidence at the summary judgment phase that an individual like Soto—whose sincerity is not in question and is of American Indian descent—would somehow cause harm to the relationship between federal tribes and the government if he were allowed

---

[13] *O Centro* concerned the Controlled Substances Act, 84 Stat. 1232, as amended, 21 U.S.C. § 801 *et seq.* (2000 ed. and Supp. I), which "regulates the importation, manufacture, distribution, and use of psychotropic substances." *O Centro,* 546 U.S. at 425. "O Centro Espírita Beneficente Uniã do Vegetal (UDV) is a Christian Spiritist sect based in Brazil, with an American branch of approximately 130 individuals" that received communion through sacramental tea made from two plants that contain a hallucinogen listed in Schedule I of the Controlled Substances Act. *Id.* By criminalizing even the possession of the substance, the regulation substantially burdened the UDV's spiritual practices. *Id.* at 426.

12

No. 13-40326

access to eagle feathers, especially given congressional findings that the exception was born out of a *religious* concern. *See Dion*, 476 U.S. at 741–43; *see also O Centro*, 546 U.S. at 434 (congressional findings that support one exception will support similar exceptions); *Merced*, 577 F.3d at 592–93.[14] The Department also fails to account for the fact that there are a multitude of non-religious exceptions to the statute. *See* 16 U.S.C. § 668a (exceptions exist for scientific and exhibition purposes, for the protection of wildlife or agriculture, or "other interests in any particular locality"); *see also Merced*, 577 F.3d at 594.

The Department's "evidence" here was largely dependent on the rulings of other circuits. Given the fact that the government bears the burden and the relative paucity of the record, we conclude that the Department and the Plaintiffs should have the opportunity to further develop the record on whether the protection of federally recognized tribes is a compelling interest protected by this statute. *See also Hobby Lobby*, 134 S. Ct. at 2779 (the governmental interest cannot be "couched in very broad terms" but must be "focused" on the particular claimant whose interest is substantially burdened).

Assuming arguendo that either or both interests (protection of eagles and further the relationship with federally recognized tribes) are compelling governmental interests, we conclude that the Department has not sufficiently demonstrated at this stage of the proceedings that the current regulatory framework is the least restrictive means of achieving its goals. We now turn, then, to that consideration.

*B. Least Restrictive Means*

---

[14] All this said, we in no way wish to endorse some type of "blood test" for protecting religious liberty. The eagle feathers cases have addressed lineage and it is possible that a particular American Indian faith itself may focus on lineage; therefore, we address lineage against that backdrop.

No. 13-40326

In the context of these cases, "least restrictive means" is a severe form of the "narrowly tailored" test. *See Sherbert*, 374 U.S. at 407 ("[E]ven if the possibility of spurious claims did threaten to dilute the fund and to disrupt the scheduling of work, it would plainly be incumbent upon [the Government] . . . to demonstrate that *no alternative forms of regulation would combat such abuses without infringing First Amendment rights.*" (emphasis added)); *Yoder*, 406 U.S. at 215 ("The essence of all that has been said and written on the subject is that only those interests of the highest order and those *not otherwise served* can overbalance legitimate claims to the free exercise of religion." (emphasis added)). It is an "exceptionally demanding" test for the Department to meet. *Hobby Lobby*, 134 S. Ct. at 2780. We have previously held that, for purposes of analyzing a statute, "[t]he phrase 'least restrictive means' has its plain meaning." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 332 (5th Cir. 2009). Because the Appellants have shown that the regulation substantially burdens their exercise of religion, the Department has the burden of proving that its implementation of the MBTA and Eagle Protection Act is the least restrictive means of furthering those interests. *Hobby Lobby*, 134 S. Ct. at 2780; *see also Adkins v. Kaspar*, 393 F.3d 559, 567 n.32 (5th Cir. 2004).

Recent Supreme Court cases, unavailable to the district court at the time it granted summary judgment, have reaffirmed that the burden on the government in demonstrating the least restrictive means test is a heavy burden. *See Hobby Lobby*, 134 S. Ct. at 2780–82; *see also McCullen v. Coakley*, 134 S. Ct. 2518, 2540 (2014)(addressing strict scrutiny in the context of First Amendment speech). The very existence of a government-sanctioned exception to a regulatory scheme that is purported to be the least restrictive means can, in fact, demonstrate that other, less-restrictive alternatives could exist. *See Hobby Lobby,* 134 S. Ct. at 2781–82; *see also O Centro*, 546 U.S. at 433; *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 547 (1993) ("It is

14

No. 13-40326

established in our strict scrutiny jurisprudence that a law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited." (citation and internal quotation marks omitted)).  Furthermore, the Department must provide *actual evidence*, not just conjecture, demonstrating that the regulatory framework in question is, in fact, the least restrictive means. *See Hobby Lobby*, 134 S. Ct. at 2780–81.

### 1. *Protecting Eagles*

At the outset, we note that our analysis is limited to the possession and use of eagle feathers (which can be obtained from and without harm to living eagles) and we do not have before us (and do not address) the question of eagle carcasses and other issues which require that the eagle be dead.   The Department presents two arguments for why excluding sincere adherents of American Indian religions such as Soto who are not members of federally recognized tribes from receiving permits advances the government's interest in preserving the eagle population: (1) allowing broader possession would undermine law enforcement's efforts to combat the illegal trade of eagle feathers and parts; and (2) broader permitting would create law enforcement problems because law enforcement does not have a means of verifying an individual's American Indian heritage.

The Department's argument stems from affidavits taken from agents stating that a possession prohibition is necessary because there is no viable way for agents in the field to determine whether a deceased eagle carcass or parts were taken illegally.   The agents also state that if there was no prohibition on possession, poaching would increase in order to satisfy a black market in eagles and eagle feathers.   The Department's argument lacks sufficient evidence to prove that the ban in its current form is the "least restrictive means." *See Hobby Lobby*, 134 S. Ct. at 2780–83 (requiring the

15

No. 13-40326

government to provide evidence—statistical or otherwise—to prove the harms asserted; the government cannot prevail where "no effort [is made] to substantiate the prediction" ).

First, the evidence in the record simply does not support the assertion that expanding the permitting process would cause an increase in poaching. This is mere speculation on the part of the agents who provided affidavits and testimony, and the Supreme Court has stated that mere speculation is not sufficient to satisfy a least restrictive means test. *See id.*; *see also Sherbert*, 374 U.S. at 407 (rejecting a slippery slope argument similar to the one offered in this case, dismissing it as "no more than a possibility" that the State's speculation "that the filing of fraudulent claims by unscrupulous claimants feigning religious objections to Saturday work" would drain unemployment benefits). This case involves eagle feathers, rather than carcasses. It is not necessary for an eagle to die in order to obtain its feathers. Thus, speculation about poaching for carcasses is irrelevant to Soto's request for return of feathers.

Second, the evidence in the record indicates that agents currently have to rely on anecdotal information and interviews with American Indians who possess feathers to determine the legal status of the feathers in question. This would not change if the permitting system was expanded, and therefore, the Department has failed to present specific evidence that the Plaintiffs' religious practice would jeopardize the preservation of the bald and golden eagles. *See Merced*, 577 F.3d at 592–93; *Hardman*, 297 F.3d at 1133.

Third, while it is possible to hypothesize that the current system has kept the black market smaller because there are fewer individuals who can legally possess feathers—and this is what the agents assume—it is also possible to hypothesize that the black market exists precisely because sincere adherents to American Indian religions cannot otherwise obtain eagle feathers.

No. 13-40326

*See Hardman*, 297 F.3d at 1132–33. The burden is on the Department to prove that their hypothesis would come to fruition. *See Hobby Lobby*, 134 S. Ct. at 2783.

Fourth, the fact that the statute already contains a broad, catch-all provision for granting permits for "other interests" suggests that broadly considering permits is not antithetical to the goals of the Eagle Protection Act. 16 U.S.C. § 668a; *see also Merced*, 577 F.3d at 594. The fact that exceptions exist to the possession ban calls into doubt the Department's claims that someone in Soto's position should find his religious practices hindered simply to further a goal that history demonstrates is achievable even when there are exceptions in place. *See O Centro*, 546 U.S. at 433.

Furthermore, the Department has not provided sufficient evidence at this stage to conclude that there are no other means of enforcement that would achieve the same goals. *See Hobby Lobby*, 134 S. Ct. at 2780–81; *see also Sherbert*, 374 U.S. at 407. For example, the Department could require that individuals prove they obtained the feathers legally, by producing a valid permit. The regulations already allow the possession of certain feathers without a permit demonstrating that there is a method in place for determining whether feathers are legally held. *See* 50 C.F.R. § 22.2. The Plaintiffs have also suggested that they be allowed to collect feathers that have molted both in the wild and in zoos. The Department has not shown that this is not a viable alternative, and, importantly, it is its burden to do so. *See Hobby Lobby*, 134 S. Ct. at 2780–82 (noting that the government could not prove that its policy was the least restrictive when it had failed to provide evidence proving that suggested alternatives were not viable). While the Department urges that doing so would make it impossible to determine if the feathers possessed were truly molted or taken in some other way, the Department's difficulties with enforcement do not justify the diminishing of individual rights,

17

No. 13-40326

especially if a less restrictive alternative could achieve the same goals without harming the rights of someone like Soto, a sincere adherent who is a member of a tribe that is not federally recognized. *See Sherbert*, 374 U.S. at 407.

Finally, while the Department states that the current system keeps the agents from having to be "religious police" by keeping them from having to verify the genealogy of individuals who possess feathers, there is simply no evidence in the record indicating that individuals who sincerely practice American Indian religions could not demonstrate their religious need for eagle feathers. The current permitting regulations, after all, already require applicants to demonstrate that they need the feathers for a bona fide tribal religious ceremony. 50 C.F.R. § 22.22. Sincerity is an inherent issue in a RFRA case, but it is not an issue in *this* case where the Bureau admits Soto's sincerity. Because the government has not satisfactorily proved at this stage that there are not other less restrictive alternatives that could achieve the statute's preservation goals without burdening the practice of American Indian religions by American Indians, we must remand for further development of the record on the question of whether the current regulations are the least restrictive means of achieving the interest of protecting eagles. *See* 42 U.S.C. § 2000bb-1(b). On remand, the district court should consider the authorities cited in light of the Supreme Court's recent holding in *Hobby Lobby* and its exacting standard. 134 S. Ct. at 2779–82.

*2. Fulfilling Responsibilities to Federally Recognized Tribes*

Even assuming, without deciding, that the statute is meant to fulfill a compelling interest in the government's responsibilities to federally recognized tribes, the Department has not, at this stage and on this record, carried its burden to demonstrate that the current permitting system is the least restrictive means of accomplishing that interest. *See* 42 U.S.C. § 2000bb-1(b). The Department states that opening the permitting process to individuals who

18

No. 13-40326

are not members of federally recognized tribes would frustrate this purpose because it would (1) lengthen repository wait times exponentially and (2) increase the black market. We have already explained that the Department's claims regarding an increasing black market are speculative at best; therefore, we will only consider the Department's claims regarding the inability of the repository to accommodate a larger number of permits.

The Department's argument rests on the premise that the repository simply cannot fill the current needs of individuals who have permits in a timely fashion. These wait times arguably would be exacerbated by an influx of permits. The Department estimates that there would be a multi-million person increase in potential permits because, while there are approximately 2 million members of federally recognized tribes, there are 5.2 million persons of American Indian and Alaska Native heritage according to the 2010 census data.

The evidence regarding the numbers of eligible applicants is not sufficient to prove that there would be such an overwhelming number of permits sought and granted that the repository would be so overwhelmed as to endanger the ability for the federal government to fulfill its "unique" responsibilities to federally recognized tribes. *See Hobby Lobby*, 134 S. Ct. at 2780–81; *see also Merced*, 577 F.3d at 592–93 (defendant must show "specific evidence" that the religious practice would jeopardize its stated interest). Here, there is no evidence regarding the numbers of individuals who are not members of federally recognized tribes, but who do practice the American Indian religions that hold eagle feathers to be sacred. These numbers would be necessary to demonstrate that the exclusion of a particular subset of American Indian religion adherents is necessary to achieve any compelling governmental interest. *See Merced*, 577 F.3d at 592–93; *see also Hardman*, 297 F.3d at 1133.

19

No. 13-40326

The Department's main argument is that opening the repository to individuals who are bona fide religious adherents, but not members of federally recognized tribes, will tax the repository, and that taxing the repository will make it more difficult for members of federally recognized tribes to obtain eagle feathers, which will, in turn, hinder the ability of the federal government to fulfill its responsibilities to federally recognized tribes. At this stage, the Department has not provided specific evidence of how allowing individuals, and in particular, Soto, whose sincerity is not questioned, to acquire permits would jeopardize the stated interest such that it has not, at this point, proved its case on the least restrictive means analysis. *See* 42 U.S.C. § 2000bb-1(b); *see also Hobby Lobby*, 134 S. Ct. at 2780–81; *Merced*, 577 F.3d at 592–93.

Perhaps more importantly, on the state of this record, it appears that this argued harm is one of the government's own making: the alleged harm to members of federally recognized tribes is caused by the system the government has created because the repository that it established and runs is inefficient. *See Hobby Lobby*, 134 S. Ct. at 2780–81 (noting that one "least restrictive means" may include the Government "assum[ing] the cost" of providing the contraceptives at issue there). The Department cannot infringe on Soto's rights by creating and maintaining an inefficient system and then blaming those inefficiencies for its inability to accommodate Soto. *See id.*; *see also Sherbert*, 374 U.S. at 407.

Left largely unexamined are the numerous solutions provided by the Plaintiffs, including collecting molted feathers from zoos or allowing tribes to run aviaries, and in fact, there is evidence in the record that certain tribes already do maintain eagle aviaries. The Department has not provided sufficient evidence to prove that these means would not achieve the government's goals (i.e., providing feathers to federally recognized tribe members) and therefore, has failed to carry its burden at this stage under

20

No. 13-40326

RFRA. *See Hobby Lobby*, 134 S. Ct. 2751; *see also Adkins*, 393 F.3d at 567 n.32.

We thus have a different take on this matter than the observation that "RFRA does not require the government to make the practice of religion easier." *Vasquez-Ramos*, 531 F.3d at 992–93. Soto does not seek to make the practice of his religion "easier," he seeks to avoid roadblocks of the government's own making which have made the practice of his religion not just "not easier" but impossible. The other circuits that have accepted the government's "least restrictive means" arguments have done so in contexts not assessing the questions of whether the government's own inefficiencies can be considered "the least restrictive means" and whether other avenues that put the burden on plaintiffs (like collecting feathers from zoos) would be less restrictive. *See, e.g., Wilgus,* 638 F.3d at 1289–95; *Babbitt*, 223 F.3d at 1257–58. On the records before them, these circuits accepted the Department's analysis that the current difficulties in obtaining eagle feathers warranted limiting the individuals who could gain access to them. *See, e.g., Wilgus,* 638 F.3d at 1295.

Those cases involved in most instances much better-developed records. We cannot accept the argument on this record for the reasons stated above. *See O Centro*, 546 U.S. at 432–34; *cf A.A. ex. rel. Betenbaugh*, 611 F.3d at 264. Furthermore, these cases were decided before the Supreme Court's holding in *Hobby Lobby* clarified how heavy the burden is on the Department to demonstrate that the regulatory framework is the least restrictive means. *See Hobby Lobby*, 134 S. Ct. at 2780–82.[15]

_____

[15] The Supreme Court has also recently made clear that the government has the burden in strict scrutiny cases of demonstrating that the alternative measures would fail to achieve their interests, not simply that the chosen route is "easier." *See McCullen*, 134 S. Ct. at 2540 (holding that to satisfy First Amendment scrutiny, the government must demonstrate that the alternative means would fail to achieve its interests, not simply be more

No. 13-40326

We do not agree, therefore, with the district court that, on this record at this stage, the Department has met its burden in demonstrating that a possession ban on all but a select few American Indians is the least restrictive means of achieving any compelling interest in maintaining the trust relationship between the United States and federally recognized tribes. The burden on the Department is a high one: they must demonstrate that "no alternative forms of regulation" would maintain this relationship without infringing upon the rights of others. *Sherbert*, 374 U.S. at 407. At this stage, the Department has not shown that this regulation is the least restrictive means of furthering its compelling interests.

## VI. Conclusion

For the foregoing reasons, we conclude that the Department has not carried its burden in showing that the current permitting scheme does not violate RFRA; therefore, we REVERSE the district court's grant of summary judgment in favor of the Department and REMAND for proceedings consistent with this opinion.

---

difficult). Although a free-speech case, *McCullen* makes clear that Department's burden is heavier than simply showing that the current regulation "works" to effectuate its interests.

No. 13-40326

JONES, Circuit Judge, concurring.

I concur in the carefully written panel opinion with one point of clarification. Soto is without dispute an Indian and a member and regular participant in the Lipan Apache Tribe, which, although not federally recognized, has long historical roots in Texas. The panel opinion discusses—and is also limited by—Soto's RFRA claim based on his and his tribe's status. No more should be read into the RFRA protection intended by this decision.

Both the conservation of eagles and the way of life of federally recognized Indian tribes are of signal national importance, as indicated by decades of federal law and regulations. If the government sustains its position that the supply of eagle feathers is limited and that increasing access by non-recognized tribe members, or even by non-Indians, to eagle feathers for sacred purposes will endanger the eagles and the federally recognized tribes, this case becomes very close. Broadening the universe of "believers" who seek eagle feathers might then seriously endanger the religious practices of real Native Americans. Soto's status does not eliminate the potential problems, which will be explored at trial, but cabins this case to Native American co-religionists.

23

# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

November 21, 2014



Mr. David J. Bradley
Southern District of Texas, McAllen
United States District Court
1701 W. Business Highway 83
Suite 1011
McAllen, TX 78501-0000

No. 13-40326   Mc Allen Grace Brethren Church, et al v.
U.S. Attorney General
USDC No. 7:07-CV-60

Dear Mr. Bradley,

Enclosed is a copy of the judgment issued as the mandate and a copy of the court's opinion.

The electronic copy of the record has been recycled.

Sincerely,

LYLE W. CAYCE, Clerk

*Christina Gardner*

By: _____
Christina A. Gardner, Deputy Clerk
504-310-7684

cc w/encl:
    Dr. Milo L. Colton
    Honorable Ricardo H. Hinojosa
    Mr. Jimmy Anthony Rodriguez

P.S. to Judge Hinojosa:  A copy of the opinion was sent to your office via email the day it was filed.